## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| EVELYN SYKES, | ) | |
| Guardian and Next Friend of D.B., a Minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0255 (RCL) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| A municipal corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>NOTICE OF FILING OF THE ADMINISTRATIVE RECORD</u>

The Defendant, through counsel, respectfully submits the District of Columbia Public Schools' administrative record from the September 15, 2006, Hearing Officer's Determination at issue in this case. Consistent with LCvR 5.4(f), the Defendants have redacted personal information about the minor D.B., including his name, date of birth and Social Security Number.

The undersigned counsel has served a copy of the unredacted record on counsel for the Plaintiff, by U.S. mail, simultaneous with the filing of the redacted record with the Clerk through the e-filing system.

Respectfully submitted,

LINDA SINGER
Attorney General
for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

**/s/ Edward P. Taptich**
EDWARD P. TAPTICH
Chief, Equity Section 2
Bar Number 012914

**/s/ Eden I. Miller**
EDEN I. MILLER
Assistant Attorney General
Bar Number 483802
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
(202) 724-6614
(202) 727-3625 (fax)
E-mail: Eden.Miller@dc.gov

May 29, 2007

Evelyn Sykes v. District of Columbia
Civil Action No. 07-0255 (RCL)

## INDEX OF RECORD

| Description | | Page |
|---|---|---|
| Certification of Record | - | 1 |
| Hearing Officer's Decision and Order signed 11/3/06 | - | 2 |
| Transmittal letter dated 10/3/06 for Petitioner's Motion for Recon. | - | 4 |
| Petitioner's Motion for Reconsideration certified 9/27/06 | - | 5 |
| Hearing Officer's Determination (HOD) dated 9/15/06 | - | 15 |
| Due Process Hearing Attendance sheet dated 8/23/06 | - | 27 |
| Supp. Memorandum to Hearing of August 23, 2996 cert. 8/31/06 | - | 28 |
| DCPS Disclosure Statement dated 8/16/06 | - | 33 |
| Student's Disclosure Letter dated 8/16/06 with Exhibits | - | 35 |
| DB 2 - Letter from Wayne Rhee to Richardson dated 9/20/02 | - | 39 |
| DB 3 – Independent Psychiatric Evaluation dated 1/15/03 | - | 40 |
| DB 4 – MDT Meeting Notes dated 9/17/03 | - | 43 |
| DB 5 – IEP meeting Notes dated 9/17/03[1] | - | 54 |
| DB 6 – Prior to Action Notice dated 9/17/03[2] | - | 64 |
| DB 7 – Letter from R. Prayaga to DC Center for Mental Health | - | 66 |

---

[1] Plaintiff did not label this document with the Exhibit number DB 5 but it is identified as such in disclosure letter dated 8/16/06.

[2] Plaintiff did not label this document with the Exhibit number DB 6 but it is identified as such in disclosure letter dated 8/16/06.

DB 8 – IEP and Notes dated 5/19/04[3]                              -        67

DB 9 - Prior to Action Notice dated 5/12/04                       -        82

DB 10 – Review of Social Work Related Service dated 5/27/04       -        83

DB 11 – Occupational Therapy Evaluation dated 6/4/04             -        85

DB 12 – Letter from D. McBride to R. Rabb dated 6/11/04          -        93

DB 13 – Academic Skills Screening Report dated 8/7/04           -        95

DB 14 - Letter from L. Hodge to Ctr. for Mental Health, 9/21/04  -        100

DB 15 – MDT Meeting Notes dated 1/12/05                          -        101

DB 16 – Clinical Psychological Evaluation dated 4/25/05          -        106

DB 17 – IEP dated 5/24/05                                        -        111

DB 18 - Prior to Action Notice dated 5/24/05                     -        120

DB 19 – IEP dated 5/9/06                                         -        121

DB 20 - Prior to Action Notice dated 5/9/06                      -        131

DB 21 – Due Process Complaint Notice 6/16/06                     -        133

DB 22 – DCPS Response to Due Process Complaint Notice            -        139

DB 23 – Letter from K. Hill to E. Sykes/candidate for admissions -        140

DB 24 – Petitioner's Motion for Default dated 6/28/06            -        141

DB 25 – Hearing Notice dated 7/18/06                             -        157

DB 26 – Records request to Kimbll ES dated 7/20/06              -        158

DB 27 - Records request to Grant Grayton Urban Support 7/20/06 - 161

Fax confirmation of Hearing Notice dated 7/18/06                 -        163

Letters from C. McKenzie to S. Newsome requesting reschedule     -        164

---

[3] Plaintiff did not label this document with the Exhibit number DB 8 but it is identified as such in disclosure letter dated 8/16/06.

Hearing Notice dated 7/17/06                                                -       166

Order denying Petitioner's Motion for Default dated 6/28/06     -       168

Petitioner's Amended Motion for Default dated 6/28/06            -       169

DCPS Response to Due Process Complaint Notice dated 6/27/06   -       185

Fax confirmation from A. Price to D. Tyrka regarding Response.   -       186

Scheduling Memorandum dated 6/16/06                             -       187

Due Process Complaint Notice dated 6/16/06                      -       191

Transcript of Hearing dated 8/23/06                             -       199

# CERTIFICATION OF RECORD

INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *STUDENT HEARING OFFICE*
#### SPECIAL EDUCATION

In the Matter RE:  B██████, D███ vs. DCPS

Case Information:        Hearing Dates: **08/23/2006**
                         Held at: **District of Columbia Public Schools Headquarters**
                                  **825 N. Capitol Street, N.E.**
                                  **Washington, D.C. 20002**
                         Student Identification Number:  9083058
                         Student's Date of Birth: ████/1995
                         Attending School: **Kimball Elementary School**
                         Managing School:
                         Hearing Request Date(s): **06/16/2006**

## CERTIFICATION OF RECORD

  **I, Shawnta Maddox, Legal Assistant of the Student Hearing Office,**

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting  of all letters, pleadings, orders,

exhibits and depositions.

  I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this 26th day of April 2007.

           **LEGAL ASSISTANT**
          **STUDENT HEARING OFFICE**

1

(In the Matter of DB   DOB: 1/26/95   HOD: November 3, 2006)

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## *State Enforcement and Investigation Division*
### CONFIDENTIAL
## Coles B. Ruff, Jr., Due Process Hearing Officer

| | | |
|---|---|---|
| In the Matter of D███ B███ | ) | **IMPARTIAL DUE PROCESS** |
| Date of Birth: ███████, 1995 . | ) | |
| | ) | **HEARING OFFICER'S DECISION** |
| | ) | **On Parent's Motion for Reconsideration** |
| Petitioner, | ) | Hearing Date: August 23, 2006 |
| | ) | Record Closed: August 31, 2006 |
| v. | ) | Held at: 825 North Capitol St. NE |
| | ) | Washington, DC |
| District of Columbia Public Schools | ) | |
| ("DCPS" or "District") | ) | |
| Attending School: Kimball ES | ) | |
| Respondent. | ) | |
| ———————————————— | ) | |

Counsel for Student:

Douglas Tyrka, Esq.
1726 Connecticut Ave. NW #400
Washington, DC  20009

Counsel for DCPS:

Aaron E. Price, Esq.
Office of General Counsel
825 North Capitol St. NE
Washington, DC  20002

## ORDER:

A Due Process Hearing convened on August 23, 2006, at the headquarters of the District of Columbia Public Schools, 825 North Capitol Street, NE, Washington, DC 20002, in response to a due process complaint submitted by counsel for the student and parent filed June 16, 2006.  A Hearing Officer's Determination and Order (HOD) was issued in this matter on September 15, 2006.

On October 3, 2006, Parent's counsel filed a motion for reconsideration asserting, contrary to the Hearing Officer's conclusions, the complaint challenged the appropriateness of the student's placement at Kelly Miller.  Parent's counsel asserted because DCPS presented no evidence at the hearing of the appropriateness of Kelly Miller DCPS did not meet its burden on that issue and the student should be placed a Rock Creek Academy as remedy.

1

After careful review of the complaint and the hearing record, including the audio recording, the Hearing Officer concludes the issues to be adjudicated were clearly discussed at the start of the hearing. Although the complaint makes mention in the "facts" that the placement at Kelly Miller was inappropriate, that claim was not clearly indicated in the "violations"[1] section of the complaint and was not clearly indicated in the discussion of the issues at the outset of the hearing. Thus, the Hearing Officer concluded the complaint challenged "the appropriateness of the student's IEPs and placements going back the last three school years"[2] not a specific challenge to the appropriateness of Kelly Miller. In addition, the Hearing Officer concluded the student's placement at Rock Creek Academy was inappropriate in light of the student's questionable disability classification. Consequently, Parent's **motion for reconsideration is denied**.

Coles B. Ruff, Esq.
**Hearing Officer**
**Date: November 3, 2006**

Issued: _____

---

[1] The pertinent language in the "violation" section stated: "Failure to provide an appropriate placement since the start of the 2003-04 SY."

[2] This was the specific language used when the Hearing Officer outlined the issues to be adjudicated at the beginning of the hearing. The effect of the statute of limitations and a prior HOD were also factors that were ultimately considered in the issues that were ultimately adjudicated.

2

3

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

**October 3, 2006**

Coles B. Ruff, Esquire
Hearing Officer
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, N.E.
Washington, DC 20002
By Fax:  202-442-5556

**RE:** D███ B███ (D.O.B. ███/95)

Mr. Ruff:

Enclosed please find a copy of the Petitioner's Motion for Reconsideration in the D███ B███ case.  As verified by the attached confirmations, this motion was faxed to the Student Hearing Office and to Aaron Price, counsel for DCPS, on September 27, 2006.

Sincerely,

Keith J. Coyle, Associate
PA Bar No. 201128
Tyrka & Associates, LLC
Attorneys for the Petitioner
1726 Connecticut Avenue N.W., Suite 400
Washington, D.C. 20009
p. (202) 265-4260
f. (202) 265-4264

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

| | |
|---|---|
| *Recipient:* | Coles B. Ruff, Jr., Due Process Hearing Officer |
| *Fax Number:* | 202-442-5556 |
| *From:* | Douglas Tyrka |
| *Regarding:* | D███ B██████ |
| *# of pages:* | 5 |
| *Notes:* | Motion for Reconsideration |

## CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Associates or their client(s) that is intended solely for the recipient named above. If you are not the intended recipient named above or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Associates expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Associates. Thank you.

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

| | |
|---|---|
| *Recipient:* | Aaron Price, Sr. |
| *Fax Number:* | 202-442-5098 |
| *From:* | Douglas Tyrka |
| *Regarding:* | D████ B████ |
| *# of pages:* | 5 |
| *Notes:* | Motion for Reconsideration |

## CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Associates or their client(s) that is intended solely for the recipient named above. If you are not the intended recipient named above or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Associates expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Associates. Thank you.

```
TRANSMISSION VERIFICATION REPORT
```

```
                              TIME : 09/27/2006 06:06
                              NAME : TYRKA LAW FIRM
                              FAX  : 2023320039
                              TEL  : 2023320038
                              SER.# : BROM4J176086
```

```
DATE,TIME            09/27  06:05
FAX NO./NAME         4425556
DURATION            00:01:03
PAGE(S)             05
RESULT              OK
MODE                STANDARD
                    ECM
```

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

**Recipient:**  Coles B. Ruff, Jr., Due Process Hearing Officer

**Fax Number:**  202-442-5556

**From:**  Douglas Tyrka

**Regarding:**  D███ B███

**# of pages:**  5

**Notes:**  Motion for Reconsideration

7

```
┌─────────────────────────────────────────┐
│   TRANSMISSION VERIFICATION REPORT        │
└─────────────────────────────────────────┘

                              TIME  : 09/27/2006 06:11
                              NAME  : TYRKA LAW FIRM
                              FAX   : 2023320039
                              TEL   : 2023320038
                              SER.# : BROM4J176086
```

```
┌──────────────────────────────────────────────────────────────┐
│   DATE,TIME              09/27  06:10                           │
│   FAX NO./NAME           4425098                                │
│   DURATION               00:01:03                               │
│   PAGE(S)                05                                     │
│   RESULT                 OK                                     │
│   MODE                   STANDARD                               │
│                          ECM                                    │
└──────────────────────────────────────────────────────────────┘
```

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

*Recipient:*      Aaron Price, Sr.

*Fax Number:*     202-442-5098

*From:*           Douglas Tyrka

*Regarding:*      D███ B███

*# of pages:*     5

*Notes:*          Motion for Reconsideration

8

# TYRKA & ASSOCIATES, LLC

1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

| | |
|---|---|
| *Recipient:* | Hearing Officer Ruff |
| *Fax Number:* | |
| *From:* | Keith Coyle |
| *Regarding:* | D████ B████ (D.O.B. ████95) |
| *# of pages:* | 10 |
| *Notes:* | Motion for Reconsideration |

2006 OCT -3 PM 2:52
DC PUBLIC
SCHOOL SYSTEM

## CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Associates or their client(s) that is intended solely for the recipient named above. If you are not the intended recipient named above or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Associates expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Associates. Thank you.

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

| | |
|---|---|
| **Recipient:** | Coles B. Ruff, Jr., Due Process Hearing Officer |
| **Fax Number:** | 202-442-5556 |
| **From:** | Douglas Tyrka |
| **Regarding:** | D▉▉ B▉▉ |
| **# of pages:** | 5 |
| **Notes:** | Motion for Reconsideration |

2006 SEP 27 AM 8: 05
DC PUBLIC
SCHOOL SYSTEM

## CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Associates or their client(s) that is intended solely for the recipient named above. If you are not the intended recipient named above or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Associates expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Associates. Thank you.

10

**Before the**
**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**OFFICE OF MANAGEMENT SERVICES**

|  |  |  |
|---|---|---|
| In re D██ B████, | ) | Coles B. Ruff, Esquire |
| Special Education Student, | ) | Impartial Hearing Officer |
|  | ) |  |

### PETITIONER'S MOTION FOR RECONSIDERATION

The Petitioner respectfully requests that the Hearing Officer reconsider his HOD

of September 15, 2006, to find that DCPS failed to determine an appropriate placement

for the 2006-2007 school year and to order DCPS to place and fund Daron at Rock Creek

Academy.[1]

The Hearing Officer issued an HOD in this case on September 15, 2006. In the

HOD, the Hearing Officer declined to address the question of the appropriateness of

D█████ 2006-2007 school placement, finding as follows:

> Parent's counsel indicated in his post hearing brief that the issue of an appropriate
> placement for SY 2006-2007 was to be adjudicated. However, the original
> complaint did not allege the student's 2006-2007 placement at Kelly Miller was
> inappropriate such that DCPS was required to prove the appropriateness of Kelly
> Miller. The Hearing Officer concludes, therefore, the issues enumerated here are
> the only issues to be adjudicated.

HOD at 5, footnote 8.

To the contrary, the Petitioner's Complaint alleged generally DCPS' failure to

provide an appropriate placement and specifically the inappropriateness of Kelly Miller.

The Complaint alleged DCPS' "[f]ailure to provide an appropriate placement since the

start of the 2003-2004 SY." Complaint at 1. It further states: "At a May 9, 2006 MDT

meeting, DCPS...issued a prior notice placing D████ at Kelly Miller Middle School

---

[1] The Petitioner disagrees with other aspects of the HOD, but does not raise those issues in this Motion. The
Petitioner does not waive her right to raise those issues in another forum.

("Kelly Miller MS") for the 2006-2007 SY[.]...DCPS' proposed placement at Kelly Miller MS is not appropriate." Complaint at 3. Additionally, the Petitioner made clear her case regarding the current placement at the Hearing, when she presented testimony regarding DCPS's failure to properly propose Kelly Miller, requested immediate placement to Rock Creek Academy, and presented testimony and argument regarding Rock Creek Academy's appropriateness.

The Petitioner clearly stated her claim that the 2006-2007 placement was inappropriate. DCPS clearly failed to address that claim in any way. DCPS' Response to the Complaint is completely silent on the issue of Kelly Miller. In its disclosure letter, DCPS identified a potential witness from Kelly Miller, but at the Hearing DCPS declined to call that witness. DCPS declined to file any closing brief as directed by the Hearing Officer. In short, DCPS put on no case whatsoever that Kelly Miller is an appropriate placement.

As the Hearing Officer noted in the HOD, DCPS bore the burden of proof in this case. *See* HOD at 6. DCPS utterly failed to meet that burden. Moreover, as the Hearing Officer noted in the HOD, no one has ever described the Kelly Miller program to the Petitioner or presented to the Petitioner any reason to believe that it is appropriate for D███. *See* HOD at 4. For those reasons, the Hearing Officer should therefore rule that Kelly Miller is not an appropriate placement for D███, and that DCPS has denied D███ FAPE by failing to determine an appropriate placement for the 2006-2007 school year.

In the absence of an appropriate placement, the Hearing Officer should order DCPS to place and fund D███ at Rock Creek Academy, the Petitioner's proposed placement. As indicated in the HOD, the uncontested testimony at the Hearing

2

established that Rock Creek Academy can provide educational benefit to D███, whose records indicate that he suffers from emotional disabilities and ADHD, and that he needs a full-time, therapeutic placement with a low student/teacher ratio, and counseling, speech/language therapy, and occupational therapy. *See* testimony of Keren Plowden; HOD findings of fact 2 and 5; DB3 (psychiatric evaluation diagnosing ADHD and recommending "year-round, structured, therapeutic school program [with a] smaller classroom...[and]...a behavior modification program"); DB5 (IEP categorizing D███ as ED and prescribing counseling); DB8 (similar IEP); DB11 (occupational therapy evaluation recommending occupational therapy and "a year round, structured, therapeutic school program to include a small classroom environment"); DB13 (academic skills screening report recommending "a small class...in a year-round therapeutic setting"); DB16 (clinical evaluation diagnosing ADHD and depressive disorder).

Because the Petitioner explicitly claimed that Kelly Miller was an inappropriate placement and that DCPS had failed to make an appropriate placement for the 2006-2007 school year, DCPS failed to present any argument or evidence to meet their burden on that point, and the uncontested evidence establishes that Rock Creek Academy can provide D███ with educational benefit, the Hearing Officer should order DCPS immediately to place and fund D███ at Rock Creek Academy with transportation.

Respectfully submitted,

Douglas Tyrka, #467500
Tyrka & Associates, LLP
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(ph) (202) 265-4260
(f) (202) 265-4264

3

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2006 I sent a copy of the foregoing by

facsimile to Aaron Price, Attorney-Advisor, at (202) 442-5098.

Sincerely,

Douglas Tyrka

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *State Enforcement and Investigation Division*
#### CONFIDENTIAL
### Coles B. Ruff, Jr., Due Process Hearing Officer

| | |
|---|---|
| In the Matter of D████ B███████ )<br>Date of Birth: ███████, 1995 )<br>)<br>)<br>Petitioner,  )<br>)<br>v.  )<br>)<br>)<br>District of Columbia Public Schools )<br>("DCPS" or "District")  )<br>Attending School: Kimball ES )<br>Respondent.  )<br>)<br>_____ ) | **IMPARTIAL DUE PROCESS**<br><br>**HEARING OFFICER'S DECISION**<br><br>Hearing Date: August 23, 2006<br>Record Closed:  August 31, 2006<br>Held at: 825 North Capitol St. NE<br>　　　Washington, DC |

Counsel for Student:
　　　　　　　　　　　　　　　Douglas Tyrka, Esq.
　　　　　　　　　　　　　　　1726 Connecticut Ave. NW #400
　　　　　　　　　　　　　　　Washington, DC  20009

Counsel for DCPS:
　　　　　　　　　　　　　　　Aaron E. Price, Esq.
　　　　　　　　　　　　　　　Office of General Counsel
　　　　　　　　　　　　　　　825 North Capitol St. NE
　　　　　　　　　　　　　　　Washington, DC  20002

## JURISDICATION:

　　　A Due Process Hearing was convened on August 23, 2006, at the headquarters of the District of Columbia Public Schools, 825 North Capitol Street, NE, Washington, DC 20002, in response to a due process complaint submitted by counsel for the student and parent filed June 16, 2006.  The hearing was conducted and this decision was written pursuant to the *Individuals with Disabilities Act* (I.D.E.A.), P.L. 101-476, as amended by P.L. 105-17 and the *Individuals with Disabilities Education Improvement Act of 2004* (I.D.E.I.A.), the Rules of the Board of Education of the District of Columbia and the DC Appropriations Act, Section 145, effective October 21, 1998.

## DUE PROCESS RIGHTS:

　　　The parent's counsel waived a formal reading of the due process rights.

## SUMMARY OF THE RELEVANT EVIDENCE:

The Hearing Officer considered the representations made on the record by each counsel, the testimony of the witness(es) and the documents submitted in the parties' disclosures (DB 1-27 and DCPS 1) which were admitted into the record.[1]  The record was closed with the submission of the parent's counsel's closing brief on August 31, 2006. [2]

The Hearing Officer also considered a prior Hearing Officer's Determination and Order (HOD) issued regarding this student on November 9, 2004.[3]  That HOD adjudicated issues and claims that were raised in the parent's current due process complaint.[4]

## FINDINGS OF FACT: [5]

1.  The student is currently age eleven and has been determined to be eligible for special education and related services.  The student has attended Kimball Elementary School (Kimball) since 2003 and completed his final year there at the end of (SY) 2005-06. (DB 19)

2.  A psychiatric evaluation of the student was conducted in January 2003.  The evaluation diagnosed the student with Attention Deficit Hyperactivity Disorder (ADHD) and indicated the student would benefit from a "year-round, structured, therapeutic school program.  (DB 3)

3.  The student was first determined eligible on March 14, 2003, and his initial individualized educational program (IEP) was developed September 17, 2003.  The student attended Kimball when the IEP was developed.  His disability classification was determined to be emotional disturbance (ED).  The initial IEP prescribed the following weekly services: 20 hours of specialized instruction and 1 hour of psychological counseling.  (DB 5)

4.  DCPS convened a multi-disciplinary team (MDT) meeting on May 19, 2004, to update the student's IEP.  The MDT reduced the student's specialized instruction

---

[1] Parent's counsel included in his disclosure statement a request that the Student Hearing Officer compel the attendance of DCPS employees.  However, there was no indication Parent counsel took any other action to compel attendance or put those individuals on notice to appear at the hearing.

[2] Parent's counsel made a motion prior to hearing for a default decision against DCPS. That motion was ruled on prior to the hearing and was denied.

[3] There was also an earlier HOD issued May 28, 2003, which incorporated a settlement agreement between the parties.

[4] The Hearing Officer notes the parent was represented by a different attorney and law firm when the previous HODs were adjudicated and issued.

[5] The evidence that is the source of the finding of fact is noted within a parenthesis following the finding.

to 15 hours per week and continued the one hour of counseling.   DCPS issued a
prior notice of placement for the student to continue to attend Kimball.  (DB 8, 9)

5.  An independent occupational therapy (OT) evaluation was conducted of the
    student in June 2004.  The evaluation recommended the student receive OT
    services.[6]  (DB 11)

6.  The parent's previous counsel filed a due process complaint which was
    adjudicated September 29, 2004, and resulted in a HOD issued November 12,
    2004.  The HOD concluded, inter alia, the student's IEP was appropriate, the
    student had been provided an appropriate placement at Kimball and had been
    provided FAPE.  The HOD ordered DCPS to convene a MDT meeting to review
    the student's OT evaluation, review and revise his IEP relative to that evaluation
    and determine the student's compensatory education. (November 12, 2004,
    HOD)[7]

7.  DCPS convened a MDT meeting on January 12, 2005, to review the student's
    progress and addressed the directives from the November 2004, HOD.  The MDT
    determined the student would be awarded 64 hours of compensatory education.
    The MDT was not able to review the student's occupational therapy evaluation.
    (DB 15)

8.  At Kimball the student was in a non categorical program in a special education
    classroom with a special education teacher.  While the student attended Kimball
    his IEPs were implemented and the student made progress.  The MDT met
    annually with the parent to update the student's IEP.  (Ms. Rabb's testimony)

9.  During SY 2004-05 and SY 2005-06 there has been special education teacher[5] and
    related service providers on staff at Kimball to implement the student's IEP.  If
    there was any lapse of services to the student Kimball's special education
    coordinator should have be made aware of any lapse.  The coordinator was not
    made aware of any lapse in the student's services. (Ms. Rabb's testimony)

10. A clinical psychological evaluation was conducted in April 2005.  In addition to
    ADHD the evaluation diagnosed the student with Depressive Disorder.  The
    evaluation does not recommend the student be placed in a full time special
    education placement.  (DB 16)

---

[6] The OT evaluator also reiterated the psychiatric evaluator's recommendation for a therapeutic placement.

[7] The issues alleged and adjudicated were whether: DCPS provided the student an appropriate placement at
Kimball,
- DCPS failed to provide the student ESY services for SY 2003-04,
- DCPS failed to implement the student's compensatory education plan,
- DCPS failed to provide all the student counseling services,
- DCPS failed to perform a OT screening within 30 days,
- DCPS denied the student FAPE.

3

(In the Matter of DB  DOB:  ███/95  HOD: September 6, 2006)

11. DCPS convened a MDT meeting May 24, 2005, to update the student's IEP. The IEP was revised to include the disability classification of multiple disabilities (MD). The weekly services prescribed were 15 hours of specialized instruction, 1 hour of psychological services and 1 hour of speech language therapy. The IEP cover page did not indicate the additional disability classification that was added to justify the MD classification. (DB 17)

12. The student's IEP was updated May 9, 2006. The IEP cover page indicated the student's disability classification was learning disabled (LD). The student's speech language services were reduced to 30 minutes weekly. The other services were unchanged.

13. There was a placement notice issued for the student to attend Kelly Miller Middle School for SY 2006-07. (DB 19, 20)

14. The student was suspended at least five times during SY 2004-05. The student was not consistently provided counseling services while he attended Kimball. There was no one at the May 2006, MDT meeting to discuss Kelly Miller as the placement. The parent was told at the meeting that the student's placement for SY 2006-07 would be Kelly Miller. (Parent's testimony)

15. Parent's counsel filed the current complaint June 16, 2006. On July 20, 2006, Parent's counsel submitted a request to Kimball's special education coordinator for the student's academic and special education records. There is no indication Parent's counsel received any documents following this request although some of the student's records were contained in the Parent's counsel's disclosures. (DB 21, 26)

16. The student's records were transferred to the Kelly Miller and were not available to Ms. Rabb to provide them to Parent's counsel. However, this fact was not communicated to Parent's counsel. (Ms. Rabb's testimony)

17. The student has been interviewed and admitted to Rock Creek Academy. Rock Creek is a full time special education therapeutic program with no general education students. The student would be assigned to a six grade classroom with a provisionally certified special education teacher. The student would be the fifth student in the classroom. The other students in the classroom have ED as their primary or secondary disability classification. There are related service providers on staff to provide counseling and speech/language services. (Ms. Plowden's testimony)

(In the Matter of DB  DOB: ████/95  HOD: September 6, 2006)

## ISSUE(S): [8]

Did DCPS deny the student FAPE by:

1. Failing to provide the student an appropriate IEP from December 2004.
2. Failing to provide the student specialized instruction and related services from December 2004 through the end of SY 2005-06?
3. Failing to provide the student an appropriate placement during the same period?

## CONTENTIONS OF THE PARTIES: [9]

DCPS counsel asserted the following:

1. While there has been a change in the student's disability classification, the IEPs do not indicate the student is in need of a full time special education placement.
2. Each of the IEPs was timely developed and the parent approved the IEPs when they were developed.
3. The student's psychiatric evaluation is outdated and makes no recommendation as quantity of services.
4. A MDT needs to take a look at this student and review new evaluations to properly program for the student and determine if the student is in need of a full time placement.
5. Until then the student placement at Kelly Miller should be maintained.

The parent's counsel asserted the following:

1. DCPS did not respond to the document requests. Consequently, the parent is requesting an inference be drawn in favor of the parent that the student has not been provided services and was not educated properly.
2. The psychiatric evaluation suggests the student be placed in a full time therapeutic setting.

---

[8] Parent's counsel initially asserted the issues raised in the current complaint were not limited to the two year "statute of limitation" in the reauthorization of IDEIA. However, during the hearing it was determined that the November 2004, HOD existed. Parent's counsel acknowledged in his post hearing brief that the effect of the HOD was to eliminate some of his claims. Parent's counsel asserts, therefore, his claim of inappropriate placement at Kimball and that the student did not receive services at Kimball may only reach back to December 2004, which is the deadline for a MDT pursuant to the November 9, 2004, HOD. Parent's counsel seeks placement at Rock Creek Academy as a remedy and compensatory education for the denials of FAPE. He also seeks the compensatory education that was to be awarded as result of the November 2004 HOD and asserts that compensatory education was never provided. Parent's counsel indicated in his post hearing brief that the issue of an appropriate placement for SY 2006-07 was to be adjudicated. However, the original complaint did not allege the student's 2006-07 placement at Kelly Miller was inappropriate such that DCPS was required to prove the appropriateness of Kelly Miller. The Hearing Officer concludes, therefore, the issues enumerated here are the only issues to be adjudicated.

[9] The contentions are the arguments made by opposing counsel and do not reflect any findings or conclusions made by the Hearing Officer.

(In the Matter of DB  DOB: ███/95  HOD: September 6, 2006)

3. The student's IEPs have never reflected the services that are recommended in the student's evaluations.
4. The student's services were reduced without justification.
5. The student's disabilities classifications on the IEP were changed also without justification.
6. The student's placement at Kimball was inappropriate and the student is entitled to placement at Rock Creek and compensatory education as a remedy.

## CONCLUSIONS OF LAW:

Pursuant to IDEIA Sec. 1415 (f)(3)(E)(i) a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education (FAPE).

Pursuant to 5 DCMR 3030.3 DCPS bears the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student. [10]

1. Did DCPS deny the student FAPE by failing to provide the student an appropriate IEP after December 2004?  Conclusion: DCPS did not sustain its burden of proof.

The November 2004, HOD found and concluded the student's IEP and placement at Kimball was appropriate. Therefore, the claim the student's IEP was inappropriate must be based upon factors that occurred following that HOD and during SY 2004-05 and SY 2005-06.

The HOD directed DCPS to convene a MDT meeting and review the student's OT evaluation and review and revise the student's IEP as appropriate. The OT evaluation was not reviewed at the January 12, 2005, MDT meeting. There were no meeting notes to determine if the MDT ever considered the student's OT evaluation following the November 2004 HOD. None of the subsequent IEPs contain OT services. The Hearing Officer, therefore, concludes with regard to OT services DCPS did not meet its burden of proof that the IEP was appropriate.

Although Ms. Rabb testified the student's disability classification had been changed from ED or MD to LD and the change was based on triennial evaluations, there were no evaluations presented by DCPS to support the change and insufficient evidence from which the Hearing Officer could discern whether the change in classification and, therefore, the IEP was appropriate. In addition, there was no clear indication from the record or Ms. Rabb's testimony as to why the student's speech language services were reduced when the student's IEP was revised in May 2006. The Hearing Officer

---

[10] Although the DC Board of Education has finalized rulemaking placing the burden of proof on the individual/entity filing the complaint and seeking relief, that rulemaking was not in effect at the time this complaint was filed.

concludes based on these factors the student's IEPs were inappropriate and the student was thus denied FAPE.

2. Did DCPS deny the student FAPE by failing to provide the student specialized instruction and related services from December 2004 through the end of SY 2005-06? Conclusion:  DCPS did not sustain its burden of proof.

Although Ms. Rabb testified that she knew of no lapse in services for the student during SY 2004-05 or SY 2005-06, the encounter tracking forms were not made available to verify the services.  On the other hand, the parent testified the student had not been provided all his counseling services during that period.  The Hearing Officer concludes the testimony of each witness on this issue is neutralized and without the tracking forms to indicate what services were provided DCPS has not met its burden of proof.

The Hearing Officer takes administrative notice there are no comparable tracking forms for the provision of specialized instruction.  The parent did not testify the student did not receive specialized instruction during this period.  The Hearing Officer credits Ms. Rabb's testimony with regard to the provision of specialized instruction.  However, the Hearing Officer directs DCPS in the Order below to provide the parent with copies of the students IEP report cards and any all documents that reflects the instruction provided when the MDT is convened pursuant to the Order below.

3. Did DCPS deny the student FAPE by failing to provide the student an appropriate placement from December 2004 through the end of SY 2005-06?

The November 2004, HOD found and concluded the student's IEP and placement at Kimball was appropriate.  Therefore, the claim the student's placement was inappropriate must be based upon factors that occurred following that HOD and during SY 2004-05 and SY 2005-06.

The record only contains one evaluation that was conducted following the November 2004 HOD.  That evaluation is the April 2005 independent clinical evaluation.  The evaluation does not indicate the student's disability classification be amended and did not recommend a full time special education placement.  The other evaluations to which the Parent's counsel points to support a full time special education placement pre-date the adjudication of the appropriateness of Kimball as a placement.

Although the parent testified the student had been suspended during SY 2004-05 there was no testimony or evidence to contradict Ms. Rabb's testimony the student made progress while attending Kimball.  The Hearing Officer concludes there was insufficient evidence in the record to support a finding the student was in need of a full time special education program and no evidence presented from which the Hearing Officer could conclude that the finding and conclusions already made regarding the student's placement at Kimball were no longer valid.

(In the Matter of DB  DOB: ██/95  HOD: September 6, 2006)

The student was placed at Kelly Miller in a part time special education program for SY 2006-07. The parent has proposed the student be placed at Rock Creek Academy in a classroom with all ED classified students. This student's most recent IEP does not even contain an ED classification and does not prescribe a full time special education program. There are no current evaluations from which the Hearing Officer can discern the appropriate placement for the student. It is not clear, even with the testimony of Ms. Plowden that student's placement in a full time special education program with ED students would be of educational benefit rather than detrimental to the student. Therefore, the Hearing Officer orders in addition to the evaluations that were agreed to be the parties an immediate student evaluation plan meeting to determine the evaluations necessary to accurately determine the student's disability classification.

## ORDER:

1. DCPS shall fund and the parent shall obtain the following independent evaluations consistent with the Superintendent's cost guidelines: psycho-educational evaluation and social history.[11]
2. DCPS shall, within fifteen (15) school days of the issuance of this Order, convene a student evaluation plan (SEP) meeting to determine evaluations that are warranted to accurately determine the student's disability classification and appropriate special education and related services.[12]
3. DCPS shall provide to the parent all current evaluations and student academic and special education records at the SEP meeting.
4. DCPS shall, within forty-five (45) calendar days of the issuance of this Order, complete any evaluations the SEP concludes are to be conducted and convene a multi-disciplinary team/individualized educational program (MDT/IEP) meeting to review all the student's current evaluations including the independent evaluations cited above, review and revise the student's IEP, discuss and determine placement, and discuss compensatory education and develop a compensatory education plan for any missed services during SY 2004-05 and SY 2006-07.[13]
5. DCPS shall issue a prior notice of placement within five (5) school days of the MDT/IEP meeting if the recommended placement is public and thirty (30) calendar days if the recommended placement is private.
6. Scheduling of the evaluations and MDT/IEP meeting is to be arranged through parent's counsel.

---

[11] The parties agreed at the outset of the hearing to conduct these independent evaluations.

[12] The Hearing Officer notes that it was not clear from the record whether the student's most recent OT evaluation was ever reviewed by a MDT and a new OT evaluation may be warranted.

[13] The parties agreed to compensatory education being determined by a MDT. DCPS shall provide all available encounter tracking forms for the student's related services and provide compensatory education for any OT services if it is determined the student should have been provided these services. DCPS shall also review the prior compensatory education awards and determine what compensatory education services have already been provided.

(In the Matter of DB  DOB: ███/95  HOD: September 6, 2006)

7. DCPS will be given a day for a day extension of any of the prescribed time frames in this Order for any delay caused by the student, the parent and/or their representative(s).

**APPEAL PROCESS:**

This is the final administrative decision in this matter. Appeals on legal grounds may be made to a court of competent jurisdiction within 90 days of the rendering of this decision.

_____
**Coles B. Ruff, Esq.**
**Hearing Officer**
**Date: September 15, 2006**

Issued: _____

9

(In the Matter of DB  DOB: ▆▆/95  HOD: September 6, 2006)

## In the MATTER OF D▆▆ B▆▆ V. DCPS

## INDEX OF EXHIBITS

| EXHIBIT # | IDENTIFICATION | ADMITTED |
|-----------|----------------|----------|
| DB 1-27 | Parent's Disclosures | Yes |
| DCPS 1 | DCPS Witness List | Yes |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | * A detailed list of the documents disclosed is contained in the parties' disclosure notices | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

10

(In the Matter of DB  DOB: ███95  HOD: September 6, 2006)

## In the MATTER OF D███ B███ V. DCPS

## RECORD OF PROCEEDING

| DATE | DESCRIPTION |
|---|---|
| 6/16/06 | Request for Due Process |
| | Notice of Pre-Hearing Conference (as applicable) |
| 7/18/06 | Notice of Due Process Hearing |
| | SETS Disposition Form |
| | Transcripts or audio tapes of hearing |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

11

(In the Matter of DB  DOB: ▮▮/95  HOD: September 6, 2006)

# INDEX OF NAMES

## In the MATTER OF D▮▮▮ B▮▮▮▮ V. DCPS

| | |
|---|---|
| Assistant Superintendent, Special Education (or Director) | |
| Special Education Coordinator | Ms. Robin Rabb |
| School Psychologist | |
| Regular Education Teacher | |
| | |
| Speech/Language Therapist | |
| Occupational Therapist | |
| Physical Therapist | |
| Private Psychologist | |
| Child and Child's DCPS ID # or SSN (insert ID # or Case Number on each page of the HOD vice child's name) | |
| Child's Parent(s) (specific relationship) | Ms. Evelyn Sykes (Mother) |
| Child/Parent's Representative | Douglas Tyrka, Esq. |
| School System's Representative | Aaron E. Price, Esq. |
| Parent's Educational Advocate | |
| Rock Creek Academy | Ms. Karen Plowden |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

12

# ATTENDANCE SHEET

8115 · 1:00 PM

| STUDENT'S NAME: | ██████ ██████ | |
|---|---|---|
| HEARING DATE: | August 23, 2006 | |

| PRINTED NAME | ON BEHALF OF DCPS OR STUDENT | TITLE |
|---|---|---|
| Aaron E. Price, Sr., Esq | DCPS | Attorney-Advisor |
| Douglas Tyrka | student | Counsel for Parent |
| Evelyn Sykes | Son | Mother |
| Rabb Robin | DCPS | Spec Ed Coord. |
| Keren Plowden | Exec Dir. Student Services | Rock Creek Academy |

_Impartial Hearing Officer_

27

Before the
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### OFFICE OF MANAGEMENT SERVICES

|  |  |
|---|---|
| In re D▮▮ B▮▮, )<br>Special Education Student, ) | Coles B. Ruff, Esq.<br>Impartial Hearing Officer |

## SUPPLEMENTAL MEMORANDUM TO HEARING OF AUGUST 23, 2006

Pursuant to the this Hearing Officer's order, the Petitioner submits this Supplemental Memorandum.

### INTRODUCTION

The Hearing Officer ordered the Parties to submit memoranda addressing three questions:

1) What effect do the recently uncovered HODs of May 28, 2003 and November 9, 2004 have on the case?

2) What is the availability of claims regarding events that occurred more than two years before the Complaint filing date?

3) What freedom does the Hearing Officer have regarding compensatory education following *Reid ex re. Reid v. District of Columbia*, 401 F.3d 516 (D.C. Cir. 2005)?

### EFFECT OF PRIOR HODS

The prior HODs resolve or modify, via claim and/or issue preclusion, the Petitioner's claims as follows.

The Petitioner's claims that the September 2003 and May 2004 IEPs were inappropriate are resolved.

The Petitioner's claims that Kimball was an inappropriate placement and that D▮▮ did not receive his specialized instruction and services at Kimball, may only reach back to December

1

2, 2004, the deadline for an MDT meeting under the November 9, 2004 HOD.

None of the Petitioner's other claims -- including claims regarding education since 2004 and, most noticeably, the claim that DCPS has not offered an appropriate placement for the 2006-2007 SY are affected by the prior HODs.

Additionally, the Petitioner's requests regarding compensatory education for violations prior to those HODs are still valid, as the November 9, 2004 HOD specifically instructed the MDT to resolve compensatory education. The Parties are, of course, bound by that HOD's findings regarding the FAPE denials up to that time for which D█████ might need compensatory education.

## EFFECT OF STATUTE OF LIMITATIONS

Because the prior HODs resolve questions of FAPE older than two years, and the November 2004 HOD makes a compensatory education order, the statute of limitations is no longer an issue.

## EFFECT OF *REID*

As discussed at the hearing, the Hearing Officer's specific question is whether he is permitted, following *Reid*, to order the MDT to develop an appropriate compensatory education plan. *Reid* does allow for such action.

The Hearing Officer is familiar with the facts and holdings of *Reid*, so the Petitioner forgoes a comprehensive review. The relevant holding of *Reid* relates to the provision of the HOD in that case that empowered the MDT to reduce or terminate the HOD's specific compensatory education award. *Reid* at 520, 526-527.

The Court of Appeals posed the question as: "[M]ay IDEA hearing officers authorize IEP teams to 'reduce or discontinue' compensatory education awards?" *Reid* at 526. The Court held

2

that they cannot, because "when modifying an award set by the hearing officer the IEP team would in effect exercise the officer's powers." *Id.*

The Courts objection centered on the fact that the authorization of the MDT to alter a compensatory education upset the finality of decisions by empowering the MDT to change them.

> [B]efore any reduction in an adjudicated award of compensatory instruction may take effect, the school district - the party whose failures, after all, necessitated awarding relief in the first place - must initiate new proceedings before a hearing officer.
>
> ***
>
> By the same token, of course, any increase sought by Ms. Reid over the school district's objection must be justified to a hearing officer.

*Reid* at 527.

In short, *Reid* prohibits hearing officers from making compensatory education awards and simultaneously empowering MDTs to alter those awards, because that would contradict the finality of decisions. *Reid* does not prohibit hearing officers from ordering MDTs to determine appropriate awards, because in that case the MDT does not overrule an HOD.

The Hearing Officer's basis to issue such an HOD is further buttressed in this case, as in many, by the fact that the Petitioner has specifically requested that relief. Additionally, the Petitioner has requested, and the Hearing Officer can provide, findings of denial of FAPE in particular areas that will resolve the most contentious issue in compensatory education determinations.

At least one published case in this jurisdiction employs this interpretation of *Reid*. In *Flores v. D.C.*, 2006 U.S. Dist. LEXIS 39327 (2006), the court ruled on the defendant's motion to dismiss for mootness. Despite the fact that the bulk of the relief was no longer at issue, the court denied the motion and upheld the validity of the case solely on the basis of the plaintiff's

3

request for an injunction ordering DCPS to develop an appropriate compensatory education plan,

exactly what has been requested in this case. *Flores* at 7, 25-26.

If the Hearing Officer rejects this analysis, or otherwise declines to order DCPS to

develop an appropriate compensatory education plan, the Petitioner requests in the alternative

that the Hearing Officer order DCPS to find independent evaluations with the specific purpose

of forming compensatory education recommendations from valuators for consideration by the

Hearing Officer in making a compensatory education determination

Respectfully submitted,

Douglas Tyrka, #467500
Tyrka & Houck, LLP
1726 Connecticut Ave. NW, Suite 400
Washington, DC 20009
ph. (202) 265-4260
f.   (202) 265-4264

I hereby certify that on August 31, 2006 I sent a copy of the foregoing by
facsimile to Aaron Price at (202) 442-5098.

Douglas Tyrka

4

## Tyrka & Houck, LLP

1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

### CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Houck or their client(s) that is intended solely for the recipient named below. If you are not the intended recipient named below or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Houck expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Houck. Thank you.

Recipient:        Coles B. Ruff, Esq.

Fax number:       (202) 442-5556

From:             Douglas Tyrka

Regarding:        D██ B██████

Number of pages: 5     (including cover sheet)

Notes:        Supplemental Memorandum, as ordered

**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

*Office of the Superintendent*
**Office of the General Counsel**
825 North Capitol Street, N.E., 9th Floor
202-442-5000     Fax # 202-442-5098
*www.k12 .dc.us*

August 16, 2006

Douglas Tyrka
1726 Conn. Ave., NW, #400
Wash., DC  20009

**DISCLOSURE STATEMENT**

**VIA FACSIMILE – 202-265-4564**

**Subject: Due Process Hearing – B▮▮▮▮, D▮▮▮**
**DOB: ▮▮▮/95**

Dear Mr. Tyrka:

At the upcoming due process hearing in the above-referenced matter, and pursuant to 34 C.F.R.
300.509(a)(3), in addition to any documents and witnesses disclosed by the parent, DCPS may
rely upon any of the following witnesses/documents:

**Witnesses**[1]
Principal, or designee(s), Kimball ES, DCPS
Special Education Coordinator, or designee(s), Kimball ES, DCPS
Special Education Coordinator, or designee(s), Kelly-Miller, DCPS

At the hearing, DCPS may rely upon the following additional documents:

**Documents**
None.

DCPS reserves the right to object to the testimony of any expert witnesses if a curriculum vitae
and/or resume is not provided with the student's 5-day disclosure.

DCPS reserves the right to examine any witnesses called or identified as a potential witness by
the representative of the student as though the witness was called by DCPS.

DCPS reserves the right to rely upon and /or use any documents/witnesses presented and/or
disclosed by the parent that DCPS deems relevant in this case.  Also, DCPS reserves the right to
introduce any and all witnesses and/or documents for the purpose of impeachment and rebuttal.

If you wish to discuss any aspect of this case further, or have questions, please contact me at
(202) 442-5564.

---

[1] Witnesses may testify by telephone.

*Children First*

DCPS Office of the General Counsel
Page 2

Sincerely,

Aaron E. Price, Sr., Esq.
Attorney-Advisor

cc: Student Hearing Office

**TYRKA & HOUCK, LLP**
1726 Connecticut Ave., NW, Suite 400
Washington, DC  20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

August 16, 2006

Aaron Price
Office of the General Counsel
District of Columbia Public Schools
Washington, DC 20002-4232

> RE: D▮▮▮ B▮▮▮ (D.O.B. ▮▮/95)

Mr. Price:

A hearing has been scheduled for **1:00 p.m. on August 23, 2006**, to adjudicate a due process complaint filed on behalf of the above-captioned student, D▮▮▮ B▮▮▮. In addition to any documents and witnesses disclosed by DCPS, the parent reserves the right to rely on the following witnesses and documents, as well as any other documents previously disclosed or offered into evidence in any other matter concerning this student.

Documents:

1. 08/16/06   Disclosure Letter
2. 09/20/02   Letter, Wayne Rhee, Capitol Hill Center, to Rae Richardson, Center for Mental Health
3. 01/15/03   Independent Psychiatric Evaluation
4. 09/17/03   MDT Meeting Notes
5. 09/17/03   IEP and Notes
6. 09/17/03   Prior Notice
7. 03/24/04   Letter, Rama Prayaga, Center for Mental Health
8. 05/19/04   IEP and Notes
9. 05/19/04   Prior Notice
10. 05/27/04   Review of Social Work Related Service
11. 06/04/04   Independent Occupational Therapy Evaluation
12. 06/11/04   Letter, David McBride, Educational Consultant, to Robin Rabb, SEC, Kimball
13. 08/07/04   Academic Skills Screening Report
14. 09/21/04   Letter, Letosha Hodge, Center for Mental Health
15. 01/12/05   MDT Meeting Notes
16. 04/25/05   Independent Clinical Evaluation
17. 05/24/05   IEP
18. 05/24/05   Prior Notice
19. 05/09/06   IEP
20. 05/09/06   Prior Notice
21. 06/16/06   Due Process Complaint Notice
22. 06/24/06   DCPS Response to Due Process Complaint Notice

**DB1**
35

23. 06/26/06   Letter of Acceptance to Rock Creek Academy
24. 06/28/06   Petitioner's Motion for Default
25. 07/18/06   Hearing Notice
26. 07/20/06   Due Process Hearing Records Request to Kimball Elementary School
27. 07/24/06   Due Process Hearing Records Request to Grant Grayton Urban Support

Witnesses:[1]

1. Ms. Evelyn Sykes, Parent
2. Ms. Keren Plowden, Rock Creek Academy
3. Dr. Wayne Rhee, The Capitol Hill Center
4. Dr. Rama Prayaga, Child Psychiatrist, DC Center for Mental Health
5. Mr. David McBride, Educational Consultant
6. Ms. Letosha Hodge, DC Center for Mental Health
7. Ms. Kalila Suggs, Grant Grayton Urban Support, Inc.
8. Ms. Sharon Millis, Special Education Advocate & Expert
9. Mr. Keith Coyle, Associate
10. Ms. Camille McKenzie, Office Assistant
11. Mr. Michael Tchorni, Law Clerk

Pursuant to 34 C.F.R. § 300.509(a)(2) and D.C. Mun. Regs. tit. 5 § 3031.1(b), Petitioner respectfully requests that the Student Hearing Office compel the attendance of the following necessary and material witnesses:

1. Any DCPS employee and/or agent who has drafted notes of any meeting or telephone conversation, which DCPS intends to submit as evidence at this hearing.
2. All of this student's special & general education teachers, Kimball Elementary School.
3. Ms. Robin Rabb, Special Education Coordinator, Kimball Elementary School.
4. All attendees at the September 17, 2003, May 19, 2004, January 12, 2005, May 24, 2005, and May 9, 2006 meetings.

Sincerely,

Douglas Tyrka
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Ave., NW, Suite 400
Washington, DC  20008
(ph) (202) 265-4260
(f) (202) 265-4264

---

[1] Some witnesses may be testifying by telephone and/or use a designee.

2

```
                    ┌─────────────────────────────────────┐
                    │  TRANSMISSION VERIFICATION REPORT    │
                    └─────────────────────────────────────┘

                                    TIME  : 08/16/2006 13:53
                                    NAME  : TYRKA HOUCK LLP
                                    FAX   : 2022654264
                                    TEL   :
                                    SER.# : 000A6J693992
```

```
┌────────────────────────────────────────────────────────────────────────┐
│  DATE,TIME                         08/16   13:38                         │
│  FAX NO./NAME                      OGC2                                  │
│  DURATION                          00:14:21                             │
│  PAGE(S)                           40                                    │
│  RESULT                            OK                                    │
│  MODE                              STANDARD                             │
│                                    ECM                                   │
└────────────────────────────────────────────────────────────────────────┘
```

## TYRKA & HOUCK, LLP

1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

### CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Houck or their client(s) that is intended solely for the recipient named below. If you are not the intended recipient named below or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Houck expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Houck. Thank you.

Recipient:       OGC

Fax number:

From:            Douglas Tyrka

Regarding:       D▬▬ B▬▬

Number of pages:  128 total (including cover sheet)

Notes:           DISCLOSURES

*sending in two parts; PART 1

37

TRANSMISSION VERIFICATION REPORT

```
TIME  : 08/16/2006 14:24
NAME  : TYRKA HOUCK LLP
FAX   : 2022654264
TEL   :
SER.# : 000A6J693992
```

```
DATE,TIME            08/16  13:53
FAX NO./NAME         OGC2
DURATION             00:30:18
PAGE(S)              89
RESULT               OK
MODE                 STANDARD
                     ECM
```

## TYRKA & HOUCK, LLP
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

### CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Houck or their client(s) that is intended solely
for the recipient named below. If you are not the intended recipient named below or the agent or employee thereof, this
transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this
transmission or the contents thereof is strictly prohibited. Tyrka & Houck expressly preserves and asserts all privileges
applicable to this transmission. If you have received this transmission in error, please read no further than this
Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of
Tyrka & Houck. Thank you.

Recipient:        OGC

Fax number:

From:             Douglas Tyrka

Regarding:        D███ B█████

Number of pages:  128 total (including cover sheet)

Notes:      DISCLOSURES

*sending in two parts; PART 2

38

**THE CAPITOL HILL CENTER**
For Individual And Family Therapy
530 Seventh Street, S.E.
Washington, DC 20003

Telephone: (202) 543-4645

September 20, 2002

Ms. Rae Richardson
Center for Mental Health
Suite 330
2041 Martin Luther King Avenue, SE
Washington DC 20020

Dear Ms. Richardson:

I am currently working with D███ B███ and K█████ B███ and am writing this letter in support of their receiving special education programs due to their ADHD conditions.

Both D███ and K█████ have been diagnosed with Attention Deficit Hyperactivity Disorder. I have observed both of them during psychotherapy sessions, and they both have obvious difficulties with hyperactive, impulsive behavior and short attention. They would benefit from various educational interventions for ADHD, including smaller class size, more structured school schedule, structured classroom activities, behavior modification, etc. Any accommodations for ADHD that you could provide in their education plans would be greatly helpful.

If you have any questions or need any further information from me, please do not hesitate to contact me at (202) 607-0980.

Sincerely,

Wayne Rhee, Ph.D.

**DB**



# The Chesapeake Center, Inc.

10400 Connecticut Avenue, Suite 206
Kensington, MD 20895
Tel: (301) 942-6766
Fax: (301) 942-3098

**PATIENT:** D___ B___
**DATE OF BIRTH:** ___/95
**AGE:** 8 years old
**GENDER:** Male
**SCHOOL:** Benning Elementary School

**DATE OF EVALUATION:** 1/15/03
**EXAMINER:** Rama Prayaga, M.D.
             Child Psychiatrist

## REASONS FOR REFERRAL:

D___ is an 8-year old, African American male who was referred by DCPS for appropriate disposition services. D___ has a history of being a victim of neglect. He has significant behavioral problems at home and at school. He is currently living with Ms. Evelyn Sykes who is his guardian. He will need appropriate school placement.

## IDENTIFING DATA:

D___ is an 8-year old, African American male who currently lives with Ms. Evelyn Sykes, his foster mother in Washington, DC. The client attends Benning Elementary School.

## CHIEF COMPLAINT:

Behavior problems.

## HISORY OF THE PRESENT COMPLAINT:

D___ is an 8-year old who was evaluated January 2003. The information for this report was gathered from the client, his foster mother, reports from Benning Elementary School, interviews from the social service agencies and reports from Washington Assessment Therapy Services. D___ presents with hyper activity and impulsive behaviors. He also has trouble sleeping at night, mood swings and temper tantrums. He has a history of significant impulsive behaviors in the past like climbing out of a 3rd story window and trying to jump down and running away from home and school. The client has played dangerously with matches and purposely broke things. His guardian had to give her dog away because the client was constantly harassing the dog.

He often gets into fights with children at school and at times becomes destructive. D___ and his brother Kaseem have both been going to the Center for Mental Health for treatment. D___ takes Adderall 20 mg e.r. once daily, Risperdol 0.5 mg po once daily and Clonidine 0.1 mg po once daily. Ms. Sykes reports the medicines have stabilized the behaviors and he is responding well to therapy. However, Ms. Sykes was concerned

about D████ lack of academic progress being behind with school work and having difficulty completing homework. She repeatedly pointed out papers showing his difficulties with homework and his poor grades in school. The client was tested recently by the school. The tools used include the WISC III R and the Bender-Gestalt. The testing shows the clients VIQ at 97, PIQ at 81 and FSIQ of 88. D████ was also tested at Washington Assessment Therapy Services the scores were FSIQ 88, VIQ 97 and PIQ 81. Ms. Sykes expressed her dissatisfaction with the current school system and has requested completing of all testing and evaluations so that D████ could be considered for a structured school program. Including a smaller classroom setting, help of an educational aide in school, in-house suspension to help D████ in a school setting.

During this assessment D████ was very active, interested in playing with small toys, where he continued to show aggressive instincts in the play. D████ has had significant trauma during his childhood. According to their guardian, Ms. Sykes, the children came into foster care because the biological mother, who initially lived in DC, left the boys and relocated to Delaware approximately three years ago (due to witness protection program). D████ and his brother Kaseem were both treated at Washington Assessment Therapy Services for the past two years. D████ was prescribed Adderall, Zaprexa and Clonidine by Dr. Tomasino. Dr. Rhee also evaluated the client. D████ was hospitalized at Children's Hospital in July of 2001 because of aggressive and disruptive behaviors. Currently D████ has been stable with treatment and medication. He has been consistent in compliance to treatment.

## PAST PSYCHIATRIC HISTORY:

The client has been a victim of neglect and was treated at Children's Hospital and was tried on a combination of psychotropic medications. He was stable when he was taking his medication and participating in counseling. It is unclear if D████ was exposed to drugs in utero, but his biological mother has significant substance abuse problems.

## PAST MEDICAL HISTORY:

None.

## SUBSTANCE ABUSE HISTORY:

The client's mother is believed to still be struggling with substance abuse and there is no background on the biological father.

## DEVELOPMENTAL HISTORY:

The client currently lives with Ms. Evelyn Sykes. She reports that D████ developmental milestones were normal. However, he is behind in school with writing, reading, science and math. The client's grades are falling and Ms. Sykes was concerned

Page 3,   D███ B███

and requested appropriate school placement.  Mrs. Sykes requests a more structured school setting and expresed her frustration with not being able to get those services in the current school system.  D████ has six other siblings of which only he and his brother Kaseem goes to the Center for Mental Health.

## FAMILY HISTORY:

The family history is positive for substance abuse disorders with his mother.  We do not know any specific information regarding the biological father.

## MENTAL STATUS EXAMINATION:

D███ is an 8-year old, African American male who looks appropriate for his age.  He was normally dressed.  He related well with the therapist and was cooperative.  His speech is normal in expression, quantity, rate, rhythm, volume and tone.  His mood was euthymic and affect was appropriate to the mood.  The patient denies any suicidal thoughts or plans.  He denies any psychotic symptoms such as delusions or hallucinations.  The clients' sleep and appetite are erratic.  His attention and concentration are poor.

## DSM IV DIAGNOSIS:

| | | |
|---|---|---|
| AXIS I | 314.9 | Attention-Deficit/Hyperactivity Disorder NOS |
| | | R/O Fetal Alcohol Syndrome |
| AXIS II | | None |
| AXIS III | | None |
| AXIS IV | | Moderate, Problems with primary support groups, problems relating to social environment (housing and school programs) |
| AXIS V | | GAF – 50 |

## RECOMMENDATIONS:

D███ would benefit from a year-round, structured, therapeutic school program.  D████ needs a smaller classroom.  He needs an occupational therapy assessment.  He also needs a behavior modification program.

The client will need multi-modal interventions including behavioral therapy, family therapy and medication management.

Rama Prayaga, M.D.
Child Psychiatrist

42

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**MEETING NOTES**

MDT
MEETING DATE: 9/17/03

MDT REFERRAL DATE: _____

STUDENT: D▒▒▒ B▒▒▒▒▒         SCHOOL: Kimball ES

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Cora Van Middlesworth | Cora Van Middlesworth | Special Education Coord. |
| Sean Archie | S. Archie | Social Worker |
| Sharon M. White | Sharon M. White | Benning ES 1st grade Teacher |
| Mary A. Turner | Mary A. Turner | Benning E.S. 2nd Gr. |
| Pamela Perkins | Pamela Perkins | Speech Therapist |
| Denise O. Keeling | Denise O. Keeling for SW | Social Worker |
| Sheila Louis-Charles | Sheila Louis Charles | SES |
| Deidra Alexander | Deidra Alexander | School Psychologist |
| Maria Wooley | Maria Wooley | Spec. Ed Specialist |

See MDT Notes to Follow.

The purpose of this meeting is to determine eligibility
and to satisfy an HOD issued on 5/28/03.
Ms. Sykes was provided a Procedural manual and
explained her rights under IDEA.

This is a continuation of the September 5, 2003
meeting. (See HOD for areas of consideration).

THE PARENT ☒ IS PRESENT ☐ IS NOT PRESENT AT THE MEETING

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT ___D▒▒▒ B▒▒▒▒▒___

☒ IS ELIGIBLE FOR SPECIAL EDUCATION
☐ IS NOT ELIGIBLE FOR SPECIAL EDUCATION

**DB4**
43

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT

MDT REFERRAL DATE: _____

MEETING DATE: 9/17/03

STUDENT: D█████ B█████

SCHOOL: Kimball ES

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Dr. Laura Olesen, Psy D. | (teleconference) | Clinical Psychologist |
| Dr. Rama Prayaga MD | (teleconference) | Psychiatrist |
| Jeff Kaplan | | Compliance Specialist |

See MDT Notes to Follow.

THE PARENT [✓] IS PRESENT [ ] IS NOT PRESENT AT THE MEETING

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT _____

[ ] IS ELIGIBLE FOR SPECIAL EDUCATION

[ ] IS NOT ELIGIBLE FOR SPECIAL EDUCATION

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE _____

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
MEETING TYPE: **Eligibility**

2 of 9

STUDENT D___ B___    SCHOOL Kimball ES    DATE 9/17/03

Introduction:

The meeting convened and all discipline specialists introduced themselves to the

parent. The Procedural Safeguards Manual was issued and a summary of the parental

rights was given. A receipt for the manual was obtained. The purpose of the meeting

was stated: To review the current assessments and determine the student's

eligibility for special education and related services. If the student is found eligible,

the team will devise an I.E.P and discuss placement.

The Parent Reports or Social History: D___ has been seen by Dr. Rhee once a week for over on year and half. He is also receiving services from Dr. Prayaga of the Center for Mental Health. He has been diagnosed with ADHD and currently takes Adderal, Respirdol and Clonidine.

According to Ms Sykes D___ is in the process of being adopted. This process is pending.

Ms. Sykes added that D___ was hospitalized during the Summer of 2002- He was disruptive and could not be calmed by Ms. Sykes. He was hospitalized for one week and returned to WATTs for therapy.

The General Educator Reports:

See notes

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES (continuation)

MDT

STUDENT: D▇▇▇ B▇▇▇▇   SCHOOL: Kimball Elementary   DATE: 9/17/03

School Psychologist notes

Explained the initial testing that was conducted by DCPS (11/7/01). D▇▇▇ was not in need of special education services at that time.

D▇▇▇ was testing by DCPS school psychologist on (7/18/02). He was assessed in the area of language - listening comp was 113 - Oral expression 107. 3rd grade level. - The advocate mentioned his perceptual organization (79). School psychologist revealed that she assessed all of his scores and did not find him eligible. She recommended afterschool tutoring and school counseling. She felt that D▇▇▇ could be easily re-directed as he taunted his brother, haseem, repeatedly during the assessment interview.

He was tested again on (1/2/03). by another DCPS school psychologist. An additional tool (Kaufman) was used to assess D▇▇▇. Again, based on testing he did not meet the criteria for special education services. The advocate mentioned the ranges of the Kaufman. DCPS psychologist only found spacial numbering which was at six. DCPS psychologist recommended assistance at school and in the home. DCPS psychologist asked if any of the recommendations suggested were implemented at home. Ms. Sykes revealed that Benning never followed through with the recommendations. Ms. Sykes revealed that she can not control him in the home. She added that this is why he is in therapy.

The advocate mentioned that he functioned below basic on all levels of the STANFORD-9. She sighted that the open classroom setting may be why he tested so low CFSA social worker if strategies had been implemented in the home. Ms. Sykes response was that she reads to

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES (continuation)

STUDENT: D___ B___          SCHOOL: Kimball Elementary          DATE: 9/17/03

| MDT |
| --- |

him and helps him with homework. DCPS social worker asked who helps her with the children. She revealed that other adult family members assist her in the home. She added that she attempted to obtain tutoring through a Charter School, both without success.

CFSA social worker asked Kimball's regular education teacher how D___ is adjusting. The teacher revealed that she is establishing a bridge between the school and the parents. The teacher added that he is adjusting well. He has been giving homework since his new placement. Ms. Sykes revealed that she has not received any homework thus far. The teacher is suggesting that strategies be put in place to assure that D___ copies from the board his homework. She strongly suggest that Ms. Sykes visits her to assure that D___ brings homework home. The advocate asked about the present grouping in the class. "Coral" grouping is currently being implemented. The advocate also asked if multisensory activities have been implemented. The regular education teacher revealed that the program "Voyger" is being used and that area has not been covered. The advocate also about grouping - teacher revealed that the size of class has not had a negative impact on D___

Principal, Miller, explained her program "The Voyger". She mentioned that the program has three groupings 1) Stationary 2) On Tract 3) Emerger. Ms. Miller is also in partnership with First Baptist Church Class Act for Achievers. She suggested and recommended that both children participate in the program.

Kimball's reading teacher discussed the Voyger program. She revealed that the program has a phonetic base. The advocate asked about the hands on activities. The reading teacher demonstrated from the program on hands activities the children will be using. Comprehension is also a big part of the program. The advocate was satisfied with the content of the program.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE _____

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
MEETING TYPE: __Eligibility__

3 of 9

STUDENT D___ B___    SCHOOL __Kimball Elem__    DATE _____

**The Speech Therapist Reports:**

D___ speech production and his receptive and expressive language skills were within normal limits when assessed on 12/13/02. He was able to speak with ease in conversations, discussions and storytelling. Speech therapy and/or language therapy is not indicated at this time.

**The Psychologist Reports:**

D___ 7/18/02 psychoeducational revealed IQ scores of: (verbal = 97, performance = 81, full scale 88). The academic achievement scores revealed a math composite of 87, reading composite of 85, and language composite of 110. He was found ineligible for special education services. The most recent psychoed revealed the following KABC scores (sequential processing = 102, simultaneous processing = 100, mental processing composite = 100, nonverbal = 95). His educational achievement scores revealed a reading composite of 90, math composite of 101 and total composite of 93. He was found ineligible for services once again as a learning disabled or mentally retarded student. Didra Alexander, School Psych.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES (continuation)

MDT

STUDENT: D___ B___          SCHOOL: Kimball Elementary          DATE: 9/17/03

Regular Education teacher
Revealed that D___ was functioning below grade
level last year. She feels that due to the
open space at Benning the child did not
progress well. The teacher kept in touch with
Ms. Sykes regarding his progress and both were
aware that he had been referred for special
education testing.

The advocate asked if intervention was provided
during the interim. The teachers response was
Yes" intervention strategies were in place
while D___ was being tested.

Regular Education Teacher - Kimball - Ms. Davis
D___ has attended Bemball for the past two
weeks. His adjustment has been positive. He
has not been assessed academically. The school
will use the Voyger for all students. He is
personable and well adjusted. He is being
paired with his peers and appears to be doing well.
Regarding the pairing - The school has implemented
"oral" reading. He is working well with his
peers and adjusting well. D___ was tested
with a reading inventory - D___ tested in the
60 percentile (Dolch) basic reading words
D___ was recently transferred from another
teacher (Ms. Worthamer). According to the
teacher he is adjusting well.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
**(MDT)**
MEETING NOTES (continuation)

STUDENT: ▮▮▮▮▮ ▮▮▮▮▮     SCHOOL: Kimball Elementary     DATE: 9/16/03

▮▮▮▮▮ was initially made SLI, but discharged from services as he had met his goals.

The CFSA social worker revealed that their are issue regarding the intra-agency conflict. According to the social worker, Delaware has not satisfied/complied with the Interstate Compact, thus the agency is not sure who will be financially responsible for the children. The question was raised by the Principal, Ms Miller if Ms Sykes can sign legal documents for ▮▮▮▮▮ DCPS has proof that the child was placed legally in Ms Sykes care. It is important to add that attrition contract was never implemented.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES (continuation)

MDT

STUDENT: _____    SCHOOL: Kimball Elementary    DATE: _____

Dr. Prayaga and Dr. Olsens report.

Dr. Prayaga is currently seeing D██████ in counseling. He revealed that Ms Sykes expressed some frustration with the children emotionally and academically. D██████ is being managed by medication and therapy. Dr. Prayaga also asked about the program at Kimball. Kimball currently has classroom size of 9 students 1 aide. Dr. Prayaga asked if Kimball could meet their needs. Special education coordinator revealed that we have not been able to assess since this is the beginning of the school year.

The advocate asked if D██████ meets the criteria of LD- He stated "yes" based on his involvement with D██████. Clinical psychologist, Ms. Olesen, Atlantic Health, disagrees with Dr. Prayaga. She does not feel that Daron is LD. The CFSA social worker, asked Dr. Prayaga for a prognosis. He stated that they are at risk for Manic Depressive disorder. He is suggesting a possible change in medication and a more structured school environment. The social worker also added if the children ever complained about their educational setting. He revealed that the information was obtained from the foster parent. He added that a Center for Mental Health social worker revealed that the children have complained about the school. DCPS social worker asked if the foster parent been molded in therapy. Dr. Prayaga revealed that he would be willing to include the parent within the next two weeks.

Dr. Olesen stated that many of D██████ emotional problems stem from the home situation. Dr. Olesen asked if he has noticed improvement since D██████ started. Dr. Prayaga response was "yes" and that Ms. Sykes has been helpful with the improvement.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES (continuation)

STUDENT: D~~ B~~     SCHOOL: Kimball Elementary     DATE: 9/17/03

Dr. Prayaga gave a diagnosis of emotional disturbance. 6.
He revealed that he requires a smaller classroom
setting.

Dr. Olesen agreed with Dr. Prayaga that D~~
meets the criteria of Emotional Disturbance. Both
agreed that D~~ also has a disability of Attention-
Deficit/Hyperactivity Disorder (NOS)

The MDT discussed the ADHD disability. DCPS submitted
information to Dr. Taylor Davis regarding an OHI
disability. A letter dated 5/12/03, revealed that
Very little information was forwarded for review. Information
submitted supports classification under the category of
ED

2) Completetion of the School Health Certificate with
Vision and hearing screening data is needed.

The MDT determined that D~~ meets the criteria
of ED.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**MEETING NOTES (continuation)**

MDT

STUDENT: D_____ B_____            SCHOOL: Kimball Elementary            DATE: 9/17/03

---

DCPS OT

The report was discussed via telephone by O.T., Ms. Karen Young. She revealed that his performance in all areas were age appropriate. Self care activities - revealed that he is able to snap and fasten buttons. He is also able to tie his shoes without difficulties. There were problems however, with his attention.

Note: The guardian brought D_____ into meeting to demonstrate D_____ abilities. He was able to tie his shoes and button his shirt. His pencil grip was slightly awkward - Thus school psychologist recommended that the guardian purchase a pencil grip at a local supply store and encourage D_____ to hold his pencil correctly at home.

The O.T. is not recommending services at this time. The parent and advocate are not satisfied with this decision are requesting a reevaluation at this time. Recommendation suggested can be implemented by the classroom teacher. (See report)

D_____ will receive a OT screening by the OT provider at Kimball.

---

**EXHIBIT**

ALL-STATE LEGAL® DB-13

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## WASHINGTON, D.C.
## INDIVIDUALIZED EDUCATIONAL PROGRAM

### I. IDENTIFICATION INFORMATION

Student Name: Last B_____   First D_____ K   MI

Student ID 9083058   Soc. Sec. No. _____   Age: 8   Grade 02

Gender [X] M [ ] F   Date of Birth _____1995   Ethnic Group B

Address 3930 Blaine St.
House No.   Street Name

Washington   DC   20019
City   Quadrant Apartment # State   Zip Code

[ ] Non-attending   Kimball ES

Attending School Benning Elementary   Home School Benning ES

[X] Elem. [ ] Mid/JHS [ ] SHS [ ] CWS /

Guardian   E Sykes

Address of (if different from student):   [ ] Parent [X] Guardian [ ] Surrogate

House No.   Street Name   Quad   Apt. No.   City   State   Zip Code

Telephone: Home (202) 388-5524   Work (202) 499-7724

### II. CURRENT INFORMAT

Date of IEP Meeting: 09/1

Date of Last IEP Meeting: _____

Date of Most Recent Eligibility Decision: 03/1

Purpose of IEP Conference:
[X] Initial IEP   [ ] Revie
[ ] Requested Eval.   [ ] 3yr Re

Indicate Level of Standardized Asses
Le

ADDENDA TO BE ATTACHED AS
Check the appropriate box(

| X | BEHAVIOR | X | TRANSP |
| --- | --- | --- | --- |
| | ESY | | TRANSI |

### III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements |
| --- | --- | --- | --- | --- |
| Student | English | English | English | Native Language |
| Parent | English | English | English | Native Language |
| Home | English | English | English | Native Language |

To be completed by Office of Bilingual English and Math Proficiency Assessm
Oral
Rdg./ Written
Instrument:
Date:

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | SpEd | Total | FREQUENCY Hr./ Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURA # w |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Specialized Instruction | 0.00 | 20.00 | 20.00 | Hrs | Week | | 09/18/2003 | 10 M |
| Psychological Services | | 1.00 | 1.00 | Hrs | Week | School Social Worker | 09/18/2003 | 10 M |
| | | | 0.00 | | | | | |
| | | | 0.00 | | | | | |
| | | | 0.00 | | | | | |
| | | | 0.00 | | | | | |
| | | | 0.00 | | | | | |
| TOTAL | 0.00 | 21.00 | 21.00 | Hours Per Week | | | | |

Percent of time in Specialized Instruction and Relate

### V. Disability(ies) Emotionally Disturbed

[ ] 0-20%   [ ] 21-60%   [X] 61-100

Percent of time NOT in a General Education Setting

[ ] (Check if setting is general Ed.)

### VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

Evelyn Sykes   *Guardian*   _Evelyn Sykes_

Robin Rabb   *Special Ed Teacher*   _Robin Rabb_

Mary Turner   *General Ed Teacher*

Maria Woolery   *LEA Representative*   _Maria Woolery_

Shelia Miller   *Principal or Designee*   _Shelia Miller_

Deidra Alexander   *Student*   _Deidra Alex_

Denise Keeling   *school social worker*   _Denise Keeling_

Theresa Boolloch   *parent advocate*   _Theresa_

_Pamela Perkins_   *speech therapist*

X _I AGREE_ with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a co
IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rig
pertaining to special education.
Parent/Guardian Signature   _Evelyn Sykes_   Date _9/18/03_   IEP Pag

District of Columbia Public Schools   07-02-2001   Division of Special Education   Appendix - A   _____

54

09/17/2003

| Student Name | D_____ K____ B_____ | Managing School | Kimball Elementary | DCPS - IEP |
| Student ID Number 9083058 | | DOB ____1995 | Attending School | Benning Elementary | Page 2 of 4 |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

**Additional Comments:** ☐

Academic Areas: (Evaluator) School Psychologist

**Score(s) When Available**

Math Strengths:

D_____ is proficient in addition and subtraction.

Math Cal. SS = 91

Math Rea. SS = 90

Impact of disability on educational performance in general education curriculum:

D_____ Math achievement is within average limits.

See goal page:

Date: 1/2/03

Reading Strengths:

D_____ is able to read sight words.

Rdg. Com SS = 90

Rdg. Basic SS = 88

Written Ex. N/A

Impact of disability on educational performance in general education curriculum:

D_____ achievement in reading is within average limits.

See goal page:

Date: 1/2/03

Communication (Speech & Language) (Evaluator) Pamela Perkins

**Score(s) When Available**

Strengths:

D_____ speech production and his receptive and expressive language skills were within normal limits

Exp.Lang. TOLD-P:3 Quot.-98

Rec.Lang. TACL-R Quot.-108

Artic WNL

Voice WNL

Fluency WNL

Impact of disability on educational performance in general education curriculum:

Exp. Voc. _____

Rec. Voc. _____

See goal page:

Date: 12/13/02

Motor/Health (Evaluator) _____

**Score(s) /Results When Available**

Strengths:

_____

_____

_____

Impact of disability on educational performance in general education curriculum:

See goal page: _____

Date: _____

Social Emotional Behavioral Areas: (Evaluator) School Psychologist

**Score(s) When Available**

Strengths:

D_____ is well behaved and helpful when redirected often.

VIQ 97

PIQ 81

FSIQ 88

Impact of disability on educational performance in general education curriculum:

D_____ tends to be withdrawn and easily distracted by others.

Sensory Processing Comp = 100

See goal page:

Date: 1/2/03

Cognitive/Adaptive Behavior: (Evaluator) _____

**Score(s) When Available**

Strengths:

_____

_____

_____

Impact of disability on educational performance in general education curriculum:

See goal page: _____

Date: _____

Prevocational Skills: (Evaluator) _____

**Score(s) When Available**

Strengths:

_____

_____

Impact of disability on educational performance in general education curriculum:

See goal page: _____

Date: _____

| Student Name D████ K B████ | Managing School Kimball Elementary | DCPS - IEP |
|---|---|---|
| Student ID Number 9083058        DOB ███/1995 | Attending School Benning Elementary | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐                                    Goal Number: ☒☒

Area addressed by goal: Academic Areas: Reading

**ANNUAL GOAL:** (including mastery criteria.)

D███will increase reading skills within 10 months time by meeting the following short term objectives with 80% accuracy.

Provider(s): Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| D███ will recall facts and details in a reading selection 3 out 5 trials | | Monthly |
| D███will use multiple strategies, including phonics, sight word identification,and context cues to decode and define words at 80% accuracy. | | Monthly |
| D███ will identify the main idea, plot and setting from a reading selection in 3 out 5 trials | | Monthly |
| D███ will spell words from a weekly spelling list in 3 out 5 trials or 80% accuracy | | Monthly |
| D███ will write sentences to convey ideas | | Monthly |
| D███ will associate dipthongs and diagraphs with appropriate phonemes in 3 out 5 trials. | | Monthly |

**EVALUATION PROCEDURE(S)**

☒ Portfolio   ☐ Log   ☐ Chart   ☒ Test   ☐ Documented Observation   ☒ Report   ☐ Other _____

~~DRAFT~~

| Student Name | D____ K      B____ | Managing School | Kimball Elementary | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9083058      DOB 0__1995 | Attending School | Benning Elementary | Page 3 of 4 |

| **VIII. SPECIALIZED SERVICES** | Additional Comments: ☐ | | Goal Number: ☒ 2 |
|---|---|---|---|

Area addressed by goal: Social Emotional Behavioral

ANNUAL GOAL: (including mastery criteria.)

D____ will *improve his coping skills and on-task behavior in the classroom with 80% accuracy.*

Provider(s): School Social Worker, Psychologist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| D____ will be able to discuss the parameters of his behavior plan, identifying behaviors and their consequences when asked. | | Monthly |
| D____ will identify his feelings and the causes for them when asked. | | Monthly |
| D____ will learn and role play appropriate behavior in stressful situations (i.e. ignoring, walking away, asking for help etc.) | | Monthly |
| D____ will learn and role play coping strategies in stressful situations (i.e. counting to 10, positive thinking etc.) | | Monthly |
| D____ will raise his hand to answer questions in the classroom while repeating or writing down directions given in class. | | Monthly |
| D____ will follow classroom rules with 80% accuracy. | | Monthly |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☒ Chart  ☐ Test  ☒ Documented Observation  ☐ Report  ☐ Other

District of Columbia Public Schools     07-02-2001     Division of Special Education     Appendix - A     IEP Page 3 of 4

~~DRAFT~~

| Student Name  D�the K  B▇▇ | Managing School  Kimball Elementary | DCPS - IEP |
|---|---|---|
| Student ID Number  9083058          DOB  ▇▇1995 | Attending School  Benning Elementary | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**     Additional Comments: ☐          Goal Number: [3]

Area addressed by goal: Academic Areas: Math

ANNUAL GOAL: (including mastery criteria.)

D▇▇ will demonstrate improved math skills in 10 months time by mastering the following short term objectives with 80% accuracy.

Provider(s): Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| D▇▇ will add and subtract whole numbers with regrouping in 3 out of 5 trials | | Monthly |
| D▇▇ will identify the place value of a digit up to 1▇▇ in 3 out 5 trials  *RR* | | Monthly |
| D▇▇ will tell time to the nearest 5 minutes in 3 out 5 trials  *hours, half & quarter hour* | | Monthly |
| D▇▇ will identify fractions ~~and add like fractions~~ in 3 out 5 trials | | Monthly |
| D▇▇ will identify and count a collection of coins in 3 out 5 trials | | Monthly |
| D▇▇ will model and solve word problems | | Monthly |

EVALUATION PROCEDURE(S)

☒ Portfolio   ☐ Log   ☐ Chart   ☒ Test   ☐ Documented Observation   ☒ Report   ☐ Other

09/17/2003

| Student Name DA_____ K    B_____ | | Managing School  Kimball Elementary | DCPS - IEP |
|---|---|---|---|
| Student ID Number 9083058 | DOB _____1995 | Attending School  Benning Elementary | Page 4 of 4 |

Additional Comments: ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION SERVICE ALTERNATIVES

~~DRAFT~~

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in general education?   ☐ Yes  ☒ No

Explanation for removal out of regular education classroom.

Student requires small structured environment to accommodate disabilities

## X. Supplementary Aids and Services
### Classroom Needs
(Do not name products or companies.)

| | GenEd | SETTING SpEd | Total | FREQUENCY Hr./ Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for testing:    ☐ None needed

Timing/Scheduling: Extended time
Setting:  Reduced, minimalized distractions
Presentation:  Read directions/test to student
Response:  Specific praise for appropriate behavior, improvement in work, effort
Equipment:

## XI. STATE AND DISTRICT ASSESSMENTS:

☐ Level I  Tested with non-disabled peers under standard conditions without accommodations.

☒ Level III (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level V Portfolio:

☐ Level II (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☐ Level IV (Describe the alternative assessment)

## XII. Areas Requiring Specialized Instruction and Related Services:

| | | | Modifications: |
|---|---|---|---|
| ☒ Reading | ☐ Physical/Sensory | ☐ Transition | ☒ Language Arts/English |
| ☒ Mathematics | ☒ Social Emotional | ☐ Vocational | ☐ Social Sciences |
| ☐ Written Expression | ☐ Physical Development | ☐ Independent Living | ☐ Biological & Physical Sciences |
| ☐ Other: | | ☐ Speech/Language | ☐ Fine Arts |
| ☐ None | Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above. | | |

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| In General Education Classroom Setting | Rejected | |
| Combination General Education and Resource Classro | Accepted | Time away from non-disabled peers in academic sett |
| Out of General Education Classroom | Rejected | |

Modification(s)/accommodation(s) to address the harmful effects:

Participation in counseling to address self-esteem issues

DRAFT

## DOCUMENTED LEVEL OF SERVICE
Complete and attach to MDT/IEP meeting notes

| School | Kimball Elementary | Principal S. Miller | Special Education Coordinator R. Rabb |
|---|---|---|---|
| Date 09/17/2003 | Case Manager M. Woolery | | Assistant Director Danielle Keemer |

Student D___ K___ B___   DOB __/1995  Age 8  Grade 02  ID# 9083058  SSN# _____

Parent E Sykes   Telephone (H) (202) 388-5524   (W) (202) 499-7724

Address: 3930  Blaine St.   NE   Washington   DC  20019
Street #  Street   Quad Act. No.   City   State  Zip Code

REFERRAL SOURCE: (Check)  ☐ 120 Day  ☐ Reeval.  ☒ HOD  ☐ SA  ☐ MA  ☐ Annual

☐ Nonpublic  ☐ Residential  ☐ Citywide  ☐ Courts  ☒ Local School  ☐ Other:

Previous least restrictive environment (LRE Setting):  General education classroom setting

---

### JUSTIFICATION FOR SETTING CONSIDERATION
(Submit TAT/MDT Documentation)
SUPPORTIVE DATA/DOCUMENTATION

**2. ACCOMMODATIONS/ MODIFICATIONS**

Allowance of cooling-off period, time-out area in class, Extended time, Preferential seating, Altered worksheets/materials, Assistance with interpretations of instructions, Behavior modification reinforcement charts, Consideration of student's learning style, Frequent checks for understanding

**3. DATA REQUIREMENTS**

| | Yes | No |
|---|---|---|
| Current IEP | ☒ | ☐ |
| Signatures of required participants (MDT notes) | ☒ | |
| Intervention Behavior Plan | ☒ | |
| Copies of current class work and homework assignments: | ☒ | |
| Medical Reports: | ☐ | ☒ |
| Clinical Reports: | ☒ | ☐ |
| Psychiatric Reports | ☒ | ☐ |
| Medications: | ☒ | ☒ ← RR |
| Attendance Record | ☒ | |
| Copies of most recent evaluation(s) | ☒ | |

| **4. Results of all interventions: (TAT, MDT, etc. and attach meeting notes.)** | **5. Resources needed for program implementation** |
|---|---|
| See attached meeting notes | none |

---

### 6. CURRENT SETTING CONSIDERATIONS

| ROW | SETTING in neighborhood school (Determined through the IEP team.) | SERVICE PROVIDER (Based on documented need) | LEVEL OF SERVICE (Based on documented need) |
|---|---|---|---|
| 1 | ☐ in general education classroom setting | ☐ general educators with consultation from special education staff | ☐ between 0% and 20% of service time |
| 2 | ☒ combination general education and resource classroom | ☒ combination of general educators, special educators and related service providers | ☒ between 21 % and 60% of service time |
| 3 | ☐ *out of general education classroom | ☐ special educators and related service providers | ☒ between 61 % and 100% of service time |

*In providing or arranging for the provision of nonacademic and extracurricular service and activities, including meals, recess period, and the services and activities, each public agency shall ensure that each child with a disability participates with non-disabled children in those services and activities (300.306) to the maximum extent appropriate to the needs of that child. (300.553) Nonacademic settings.

Check the level of need as indicated:
**DIRECTIONS:**

| If two or three boxes are checked in the Row 1, check LOW. If two or three boxes are checked in the Row 2, check MODERATE. If two or three boxes are checked in the Row 3, check HIGH. | If one box is checked in each row, check either MODERATE or HIGH, depending on the need of the student. |
|---|---|

### 7. LEVEL OF NEED

| ☐ LOW | ☒ MODERATE | ☐ HIGH |
|---|---|---|

07-02-2001   Attention: Technical Support Supervisor, Compliance Team

60

**DRAFT**

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**

**INITIAL PLACEMENT**

| | | | |
|---|---|---|---|
| Student | D▮▮▮ K B▮▮▮ | DOB ▮▮1995 Age 8 | Meeting Date 09/17/2003 |
| Address | 3930 Blaine St. NE | | Telephone (W) 2024997724 |
| | Washington DC 20019 | | Telephone (H) 2023885524 |

Dear Parent:

You have been provided a copy of the "Procedural Safeguards - Parents Rights" booklet. We would like to remind you at this time that:

- granting consent is a voluntary action on your part; this consent may be revoked at any
- time although the school district is required to take all necessary action to provide appropriate service(s) and may be required t initiate due process procedures to obtain consent; and
- by granting consent in writing, you are agreeing to the process indicated below.

✔ Initial Placement

After development of an IEP, the MDT, with the parent, determined that your child will receive special education and related services at Benning Elementary                            school, for:

☐ 0%-20%,          ☐ 21% - 60%, or          ☒ 61% -100%.

**Parent Response Section:**

I give permission for District of Columbia Public Schools to proceed with the initial placement for my child.

_____          _9/17/03_____
Parent/Guardian Signature                              Date

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

DRAFT

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)
MEETING NOTES

STUDENT D___ K___ —B___          SCHOOL Kimball Elementary    —    DATE: 09/17/2003

| PARTICIPANTS: | PARTICIPANTS: (Sign Name) | DISCIPLINE |
| --- | --- | --- |
| Evelyn Sykes | _Evelyn Sykes_ | Guardian |
| Robin Rabb | _Robin Rabb_ | Special Ed Teacher |
| Mary Turner | _Mary L. Turner_ | General Ed Teacher |
| Maria Woolery | _Maria Woolery_ | LEA Representative |
| Shelia Miller | | Principal or Designee |
| Deidra Alexander | _Cydra E Alexa___ | Student |
| Denise Keeling | _Denise V. Keeling, LICSW_ | school social worker |
| Theresa ~~Bootlech~~ BOLLECH | _Dr. ___ | parent advocate |
| Sean Archie | _Archie_ | social worker CFSA |
| Pamela Perkins | _Pamela Perkins_ | Speech Therapist |
| Sheila Louis-Charles | _Sheila Louis-Charles_ | SES |

After reviewing all of the documents, The MDT determined D___ is eligible for special education as a Student with emotional Disturbance.

Specialized instruction is required in the following academic areas: Reading, Math

The total number of hours for specialized instruction is: 20 hours

Related services are required in the following areas:

The following accommodations and/ or modifications will be made: extended time, Reduced minimalized distraction read directio test to studen

Placement Discussion: The IEP can implemented at Kimball ES

The MDT discussed compensatory education per court order. It was decided by the parent and advocate that this right would be reserved until mid year or the end of school. DCPS will consider all additional programing offered by the school.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS    07-02-2001    DIVISION OF SPECIAL EDUCATION    IEP MEETING NOTES

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)
MEETING NOTES

STUDENT ~~D███ B███~~    SCHOOL Kimball ES    DATE: 9/17/03

| PARTICIPANTS: | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| Dr. Laura Clesen, Psy D. | (teleconference) | Clinical Psychologist |
| Dr. Rama Prayaga MD | (teleconference) | Psychiatrist |
| Jeff Kaplan | | Compliance Specialist |
| Tanya Davis | Tanya Davis | Classroom Teacher |

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

MULTIDISCIPLINARY TEAM (MDT)

**Prior to Action Notice**

Check Purpose:
- [ ] Initial Evaluation
- [ ] Initial Placement
- [X] Reevaluation
  - [ ] Change in Category Exit
  - [ ] Related Service Add
  - [X] Related Service
  - [X] Change in Placement
  - [ ] Annual
  - [ ] Other _____

Date _____09/17/2003_____

Student D████ K   B████    DOB ████1995

School   Kimball Elementary

Current Disability Category   ED

Setting   Combination general education and resource classro

Dear  E Sykes

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.

Therefore, you are being notified of the following proposed changes:
- [X] Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Other _____

A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check that apply)
- [ ] Your child is not eligible for special education service(s).
- [X] Your child is eligible or continues to be eligible to receive special education services as a student with ED _____
- [X] Your child will begin receiving ___Psychological Services___ as a related service(s).
- [ ] Your child will no longer receive _____ as a related service(s).
- [ ] Your child's category of disability is being changed from _____ to _____
- [ ] Your child's alternative placement on continuum (next setting) is being changed,
  from _____ to _____
- [ ] Your child is no longer eligible and will be exited from the special education program.
- [ ] Other: _____

Location of Services   Kimball Elementary

**Description and Explanation of agency action proposed or refused.**

The MDt convened and determined D████ is eligible for special education as a emotionally disturbed student who will receive 20 hours of specialized instruction and 1 hour of psychological services.

**Description of Other Options Considered and reasons for rejection of each option**

The MDT rejects placement in general education.

Other relevant factors to the decision-  need for related services

MDT Members:
- [X] Principal or Designee
- [X] Parent
- [ ] Student
- [X] Social Worker
- [X] General Education Teacher
- [X] Special Education Teacher
- [ ] Speech and Language
- [X] *LEA & Interpreter  (*may be one)
- [X] Psychologist
- [ ] Other: _____

Parents may bring individuals to participate in the MDT meeting. These participants should have knowledge or special expertise regarding the child. The following individuals invited by parent: _____

Any questions you may have concerning your child's program may be directed to the principal.

You are protected under the Procedural Safeguards for parents, which are enclosed for your information.

If I can be of assistance to you, or have questions regarding the Procedural Safeguards,
please contact R. Rabb _____ at _(202) 645-3150_ (school telephone number).

See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

MDT Prior to Action Notice
07-02-2001

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

MULTIDISCIPLINARY TEAM (MDT)

**Prior to Action Notice**

Check Purpose:
- [ ] Initial Evaluation
- [ ] Initial Placement
- [X] Reevaluation
  - [ ] Change in Cate
  - [ ] Related Servic
  - [X] Related Servic
  - [X] Change in Plac
  - [ ] Annual
  - [ ] Other

Date _____ 09/17/2003 _____

Student ___ D____ K ____ B____ ____ DOB ___ /1995

School ___ Kimball Elementary ___

Current Disability Category ___ ED ___

Setting ___ Combination general education and resource classro ___

Dear ___ E Sykes ___

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.

Therefore, you are being notified of the following proposed changes:
- [X] Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Other _____

**A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)**

- [ ] Your child is not eligible for special education service(s).
- [X] Your child is eligible or continues to be eligible to receive special education services as a student with ___ ED ___
- [X] Your child will begin receiving ___ Psychological Services ___ as a related service(s).
- [ ] Your child will no longer receive _____ as a related service(s).
- [ ] Your child's category of disability is being changed from _____ to _____
- [ ] Your child's alternative placement on continuum (next setting) is being changed,
      from _____ to _____
- [ ] Your child is no longer eligible and will be exited from the special education program.
- [ ] Other: _____

Location of Services ___ Kimball Elementary ___

**Description and Explanation of agency action proposed or refused.**

The MDt convened and determined D____ is eligible for special education as a emotionally disturbed student who will receive 20 hours of specialized instruction and 1 hour of psychological services.

**Description of Other Options Considered and reasons for rejection of each option**

The MDT rejects placement in general education.

Other relevant factors to the decision- ___ need for related services ___

MDT Members:
- [X] Principal or Designee
- [X] Parent
- [ ] Student
- [X] Social Worker
- [X] General Education Teacher
- [X] Special Education Teacher
- [ ] Speech and Language
- [X] *LEA & Interpreter (*may be one)
- [X] Psychologist
- [ ] Other: _____

Parents may bring individuals to participate in the MDT meeting. These participants should have knowledge or special expertise regar the child. The following individuals invited by parent:

Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the Procedural Safeguards for parents, which are enclosed for your information.
If I can be of assistance to you, or have questions regarding the Procedural Safeguards,
please contact R. Rabb _____ at (202) 645-3150 _____ (school telephone number).

See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

MDT Prior to Action Notice
07-02-2001

65

**District of Columbia Center for Mental Health**
**2041 Martin Luther King Jr. Ave., S.E.**
**Washington, D.C. 20020**

March 24, 2004

To Whom It May Concern:

I am a licensed psychiatrist and have been treating D██ B████ since September 2.

D██ has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) combined type; Disruptive Behavior Disorder, and Fetal Alcohol Syndrome.

It would be therapeutically beneficial for D██ to participate in a structured prog before and after school. Though D██ attends individual therapy and takes medi    n, as part of his treatment, he also needs to work on his social skills and learn how to develop relationships with his peers.

Participation in a structured program before and after school would provide D██    a a much-needed opportunity to interact with his peers without the academic pressure    l organization that exist during the school day. This would be of tremendous benef D██ treatment for the aforementioned conditions.

If you have any questions, please contact me at (202) 678-3000, ex. 243.

Very truly yours,

Rama Prayaga, M.D.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES (continuation)

MDT

STUDENT: _____ D____ K B____ _____   SCHOOL: Kimball Elementary   DATE: 05/19/2004

2

Mr. McBride inquired whether D____ would regress over the summer in his math skills. Mrs. Hepler stated that D____ may need to review subtraction with regrouping at the beginning of next year, but that he will not require more review than is age-appropriate.

Mrs. Hepler feels that D____ greatest area of need is social-emotional. He has difficulty maintaining friendships and often demonstrates the feeling that he needs to change himself to make friends. His self-esteem appears very low at times. Mrs. Hepler feels that he would benefit from additional opportunities to interact socially, outside of the school setting. She asked Ms. Sykes if D____ was involved in outside non-academic activities. Ms. Sykes stated that D____ goes to the park and interacts with other children every weekend. Ms. Sykes stated that he is not allowed to play unchaperoned in the neighborhood. She stated that he has made friends at the weekend park outings. She has never witnessed any conflicts.

Ms. Keeling reported that she has been working with D____ in small groups and in the classroom. She reported that he is making slow progress making friends. They have discussed the need to be himself around other students. She has seen evidence of a low self-esteem, as well. He is learning to understand consequences and responds to encouragement. Ms. Keeling agreed that D____ should be involved in an organized social activity such as Boy Scouts or Boys & Girls Clubs. She further stated that D____ needs structure. He has learned from consequences and is able to articulate reasons he has received consequences and what he has learned for them. She emphasizes with him that adults and children both make mistakes and need to learn from mistakes and make better choices. Ms. Keeling further reported that D____ is able to ignore other students misbehaving.

Ms. Keeling stated that D____ social-emotional goals are being met at Kimball. She feels that this is a good setting for him.

Mr. McBride stated that Dr. Prayaga recommended that D____ needs a year-round, structured, therapeutic setting to accommodate his disabilities. This is stated in a March 24, 2004 report from Dr. Prayaga. Ms. Rabb wanted it noted that in Dr. Prayga's report it is also noted that D____ needs a opportunity to to interact with his peers without academic pressure.
Ms. Sykes noted that D____ sees Dr. Wayne Rhee, a psychiatrist who sees D____ for behavior modification. She inquired about a mentor at the school whom she had been introduced to. Ms. Rabb verified that this mentor is not working with D____. Mrs. Hepler stated that, although he does not work with D____, D____ is familiar with the man and greets him when seeing him in the hallway.

Ms. Bollech inquired whether there was a 52-week school in DC. Mr. Kaplan stated that there was not, but furhter stated that he is unaware of any 52-week program in the city, private or public.

IEP Meeting
The team moved to revise D____ IEP. Mrs. Hepler reviewd her proposed goals, which were approved by the parent. Ms. Keeling reviewed proposed goals and, per request of Mr. McBride, added a goal to address interacting with peers and establishing peer relationships.

Ms. Keeling recommends 30 minutes two times per week, totaling 1 hour per week. The parent respectfully disagrees with this amount of time. Ms. Hepler recommends 15 hours of specialized instruction, per his academic progress and the legal requirement that children are serviced in the least restrictive environment. The parent and Mr. McBride feel that 20 hours of specialized instruction are needed.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS   07-02-2001   DIVISION OF SPECIAL EDUCATION   MDT MEETING NOTES   APPENDIX - A

District of Columbia Public Schools
Division of Special Education
Washington, D.C.

## IEP CONTINUATION PAGE

Student Name D____ K___ B_____   DOB ___/1995   DATE 05/19/2004

Student ID Number 9083058   Managing School Kimball Elementary

Attending School Kimball Elementary

INSTRUCTIONS: Use this addendum when additional space is needed on an IEP section or part. Enter the *section/part, page number or addendum to identify each item being continued. Attach this addendum to the form.

Page 1 of 4 or Addendum _____   3

Ms. Sykes feels that D___ should have a year-round, full-time program to meet his academic needs.

**ESY Discussion**
The team moved to discuss ESY services. Mr. McBride stated that, considering the severity of D___ continuing need for psychological therapy and structure all year round, he requires an extended school year program in order to prevent psychological regression, which impacts his emotional and educational progress. Ms. Sykes stated that she agrees with this statement, as well.

Mrs. Hepler does not feel that ESY services are warranted, as she does not feel that D___ will demonstrate severe regression.

The criteria for ESY was reviewed: Mr. Kaplan summarized that DCPS holds the position that D___ does not meet four out of the six criteria for ESY. The parent's standing is that D___ does have a need for extended school year services.

**Compensatory Education Discussion**
Ms. Sykes requested that DCPS put compensatory education terms in writing and submit to her, detailing when tutors would come and where they would work with D___.

Ms. Sykes stated that she requested an evaluation a year before D___ was identified for special education services. She feels he is owed this time.

Mr. Kaplan offered 140 hours of compensatory education. The team came to a mutual agreement of 145 hours of specialized tutoring as compensatory education. The team further agreed to 36 hours of counseling as compensatory education. Mr. McBride requested flexibility in the counseling services, such that D___ receives the additional services at times of greater need.

**Placement Discussion**
Mr. McBride stated that Ms. Sykes' position is that the appropriate placement is a year-round, structured therapeutic setting as per the recommendation of the HOD of May 28, 2003. DCPS feels that the placement at Kimball is a less restrictive placement and meets D___ needs, per the opinion of D___ teachers and other DCPS staff. Per IDEA-97, the least restrictive environment is necessary for every child.

Ms. Sykes feels that in a meeting held 5/12/04, the principal of Kimball Elementary was hostile toward the idea of D___ staying at Kimball. Ms. Sykes stated that D___ is overwhelmed with being at Kimball. He enjoys doing his homework and enjoys being at Kimball. DCPS representatives stated that Kimball is an appropriate placement for D___, and that the IEP can be implemented at Kimball.

District of Columbia Public Schools   07-02-2001   Division of Special Education   IEP Continuation Page

District of Columbia Public Schools
Division of Special Education
Washington, D.C.

**IEP Continuation Page**

## IEP CONTINUATION PAGE

Student Name D_____ K_____ B_____    DOB ____/1995 DATE 05/19/2004

Student ID Number 9083058    Managing School    Kimball Elementary

Attending School    Kimball Elementary

**INSTRUCTIONS:** Use this addendum when additional space is needed on an IEP section or part. Enter the *section/part, page number or addendum to identify each item being continued. Attach this addendum to the form.

Page __4__ of __4__ or Addendum _____    *Page 4*

**Occupational Therapy Evaluation discussion**

Per the 9/17/03 MDT and IEP meeting, the team agreed to a screening for Occupational Therapy. That screening has not yet been conducted. Mr. Kaplan stated that, the MDT agreed to an independent Occupational Therapy evaluation, persuant to the Superintendant's directive, 530.6. Mr. McBride stated that this evaluation is in response to a review of D_____ writing samples. He feels that this is warranted by D_____ writing samples.

D____ B____

IEP/MDT Meeting Addendum – PARENT CONCERNS 5/12/04

MDT must consider appropriateness of setting as per 5/23/03 HOD ordering considering of High Roads School as an possible placement.

- Parent (Mr. Sykes) raised issue of behavior warnings/letters concerning "running in the hall" and "starting fights" and "talking out loud" complaints from staff. This is directly relevant to lack of year-round structured, therapeutic school program. D____ needs a smaller classroom."

Fluency. Comprehension – when Gr.1 Independent Short hand/long hand telling time. – may need to review skills. Gr.1-2 Math.

visual motor skills in writing are below age expectation for a 9.5 yr. old child. This is related to concerns about lack of provision of O.T. services that may be be helpful for writing accommodations

- Crying incident (5/17/04) should have been responded to therapeutically "has no friends". low self-esteem, "I'm stupid" "I'm bad." more apt for social involvement. Parent takes child to community activities. Always chaperoned. Except since ____, has developed a friendship. 5-6 students (9-11 yrs. old.

Social worker: "Slow progress in making friends; self-esteem needs must be addressed therapeutically.

A discussion of placement took place at Today's meeting. It was stated by the parent that she felt that the principal does not want D____ in Kimball. She felt An incident that occurred today of fighting was reported. D____ felt that the principal did not believe or want to handle ____. That therapeutic environment that ____ requires perhaps can be provided at High Road School, as per the HOD order of 5/28/03 and the recommendation of Dr. Prepoza – D.H.Sis. & Evelyn Syph    5/19/04 70.

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**
**INDIVIDUALIZED EDUCATIONAL PROGRAM**

DCPS - IEP  Page 1 of 4
Additional Comments: ☒

## I. IDENTIFICATION INFORMATION

Student Name: Last B██████    First D█████ K    MI

Student ID 9083058    Soc. Sec. No. ████    Age: 9    Grade 02

Gender ☒ M ☐ F    Date of Birth ████1995    Ethnic Group B

Address 3930  Blaine St.
House No.    Street Name    Quadrant NE    Apartment #
Washington    DC    20019
City    State    Zip Code

☐ Non-attending

Attending School  Kimball Elementary    Home School _____

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS /

Guardian  Ms. Evelyn Sykes

Address of (if different from student):  ☐ Parent ☒ Guardian ☐ Surrogate

House No.    Street Name    Quad    Apt. No.    City    State    Zip Code
Telephone: Home (202) 388-5524    Work (202) 499-7724

### II. CURRENT INFORMATION

Date of IEP Meeting: 05/19/2004

Date of Last IEP Meeting: _____

Date of Most Recent Eligibility Decision: 09/17/2003

Purpose of IEP Conference:
☐ Initial IEP    ☒ Review of IEP
☐ Requested Eval.    ☐ 3yr ReEval.

Indicate Level of Standardized Assessment:
Level IV

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

| X | BEHAVIOR | X | TRANSPORTATION |
|---|----------|---|----------------|
|   | ESY      |   | TRANSITION     |

### III. LANGUAGE

| III. LANGUAGE | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | English | Native Language | Oral |
| Parent | English | English | English | Native Language | Rdg./ Written |
| Home | English | English | English | Native Language | Instrument: |
|  |  |  |  |  | Date: |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | SETTING SpEd | SETTING Total | FREQUENCY Hr./ Min | FREQUENCY D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # | wks./mos |
|---|---|---|---|---|---|---|---|---|---|
| Specialized Instruction | 0.00 | 15.00 | 15.00 | Hrs | Week | Special Education Teacher | 05/13/2004 | 10 | Months |
| Psychological Services | 0.00 | 1.00 | 1.00 | Hrs | Week | School Social Worker | 05/13/2004 | 10 | Months |
|  |  |  | 0.00 |  |  |  |  |  |  |
|  |  |  | 0.00 |  |  |  |  |  |  |
|  |  |  | 0.00 |  |  |  |  |  |  |
|  |  |  | 0.00 |  |  |  |  |  |  |
|  |  |  | 0.00 |  |  |  |  |  |  |
| TOTAL | 0.00 | 16.00 | 16.00 | Hours Per Week |  |  |  |  |  |

### V. Disability(ies)  Emotionally Disturbed

Percent of time in Specialized Instruction and Related Services
☐ 0-20% ☒ 21-60% ☐ 61-100%

Percent of time NOT in a General Education Setting    50%

☐ (Check if setting is general Ed.)

### VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

Evelyn Sykes
  Guardian
Shannon Hepler
  Special Ed Teacher
Tanya Davis
  General Ed Teacher
Sheila Charles
  LEA Representative
Robin Rabb
  Principal or Designee

Student
Denise Keeling
  School Social Worker
Theresa Bollech
  Parent Advocate
Jeff Kaplan
  Compliance Specialist
David McBride
  Educational Advocate

*I AGREE* with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature _____    Date _____

05/12/2004

| | |
|---|---|
| Student Name   D▓▓▓ K   B▓▓▓▓ | Managing School  Kimball Elementary |
| Student ID Number 9083058          DOB  ▓▓▓1995 | Attending School  Kimball Elementary |

DCPS - IEP
Page 2 of 4

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: ☐

**Academic Areas: (Evaluator)** Shannon Hepler

Score(s) When Available

**Math Strengths:**
D▓▓▓ is able to add two digits with regrouping.  He is able to compute basic subtraction facts.

Math Cal.   91

Math Rea.   90

**Impact of disability on educational performance in general education curriculum:**
D▓▓▓ occasionally needs reenforcement of previously learned skills.

See goal page:  1

Date:  01/02/2003

**Reading Strengths:**
D▓▓▓ is able to read basic sight words.  He uses word family associations to decode words.

Rdg. Com   90

Rdg. Basic   88

Written Ex.   n/a

**Impact of disability on educational performance in general education curriculum:**
D▓▓▓ reading achievement is within average limits.

See goal page:  2

Date:  01/02/2003

**Communication (Speech & Language) (Evaluator)**
Strengths:

Score(s) When Available
Exp. Lang. _____
Rec. Lang. _____
Artic _____
Voice _____
Fluency _____
Exp. Voc. _____
Rec. Voc. _____

**Impact of disability on educational performance in general education curriculum:**

See goal page: _____
Date: _____

**Motor/Health (Evaluator)**
Strengths:

Score(s) /Results
When Available
_____
_____
_____

**Impact of disability on educational performance in general education curriculum:**

See goal page: _____
Date: _____

**Social Emotional Behavioral Areas: (Evaluator)** Denise O. Keeling, LICSW

Score(s) When Available

**Strengths:**
▓▓▓ is A friendly And loving child.  He is cooperative And enjoys group Activities.

_____
_____

**Impact of disability on educational performance in general education curriculum:**
D▓▓▓ disability could negatively impact his social emotional developmental.

See goal page: _____
Date: _____

**Cognitive/Adaptive Behavior: (Evaluator)**
Strengths:

Score(s) When Available
_____
_____

**Impact of disability on educational performance in general education curriculum:**

See goal page: _____
Date: _____

**Prevocational Skills: (Evaluator)**
Strengths:

Score(s) When Available
_____
_____

**Impact of disability on educational performance in general education curriculum:**

See goal page: _____
Date: _____

72

| | |
|---|---|
| Student Name D___ K B___ | Managing School Kimball Elementary |
| Student ID Number 9083058    DOB ___/1995 | Attending School Kimball Elementary |

DCPS - IEP
Page 3 of 4

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐    Goal Number: ▓▓▓

Area addressed by goal: Academic Areas: Math

**ANNUAL GOAL: (including mastery criteria.)**

D___ will demonstrate increased reading skills in 10 months time by mastering the following short-term objectives with 80% accuracy

Provider(s): Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given 20 two-digit subtraction problems, D___ will solve problems using regrouping with 80% accuracy in 3 out of 5 trials, as measured by teacher-made test. | | Monthly |
| Given a set of 10 problems, D___ will add like fractions with 80% accuracy in 3 out of 5 trials, as measured by teacher-made test. | | Monthly |
| Given a teacher prompt, D___ will recite multiplication facts for factors 0-5 with 80% accuracy in 3 out of 5 trials, as measured by teacher-made test. | | Monthly |
| Given a multiplication chart, D___ will use the chart to multiply a two-digit number by a one-digit number without regrouping, with 80% accuracy in 3 out of 5 trials, as measured by teacher-made test. | | Monthly |
| Given a four-digit number, D___ will identify the place value of each digit with 90% accuracy in 3 out of 5 trials | | Monthly |
| | | |

**EVALUATION PROCEDURE(S)**

☒Portfolio ☐Log ☐Chart ☒Test ☐Documented Observation ☒Report ☐Other _____

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

73

| Student Name  D█████ K. B█████ | | Managing School **Kimball Elementary** | DCPS - IEP Page 3 of 4 |
|---|---|---|---|
| Student ID Number  9083058 | DOB ████1995 | Attending School **Kimball Elementary** | |

Goal Number: ▩▩▩

| **VIII. SPECIALIZED SERVICES** | **Additional Comments:** ☐ |
|---|---|

Area addressed by goal: ___Academic Areas: Reading___

**ANNUAL GOAL: (including mastery criteria.)**

D████ will demonstrate improved reading skills in ten months time by mastering the following short-term objectives with 80% accuracy.

Provider(s): Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given a list of sight words, D████ will correctly identify words on the third-grade level with 90% accuracy in, as measured by teacher-made test. | | Quarterly |
| Given a second-grade reading selection, D████ will read aloud with accuracy and fluency in 3 out of 5 trials, as measured by teacher observation. | | Monthly |
| Given a third-grade reading selection read aloud to D████, he will use context clues to define unknown words in 3 out of 5 trials, as measured by teacher observation. | | Monthly |
| Given a stated event (effect) from a reading selection, D████ will identify a probable cause in 3 out fo 5 trials, as measured by teacher-made test. | | Monthly |
| Given a list of words, D████ will use phonics skills to decode words with dipthongs and digraphs with 80% accuracy in 3 out of 5 trials, as measured by teacher-made test. | | Monthly |
| Given a randomized set of events from a reading selection, D████ will sequence five events with 80% accuracy in 3 out of 5 trials, as measured by teacher-made test. | | Monthly |

**EVALUATION PROCEDURE(S)**

☒ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☐ Documented Observation  ☒ Report  ☐ Other _____

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

74

| Student Name  D▓▓▓ K.  B▓▓▓ | Managing School  Kimball Elementary | DCPS - IEP |
|---|---|---|
| Student ID Number  9083058   DOB ▓▓▓/1995 | Attending School  Kimball Elementary | Page 3 of 4 |

Goal Number: ▓▓▓

| **VIII. SPECIALIZED SERVICES** | Additional Comments: ☐ |

Area addressed by goal:  Academic Areas:  Written Expression

**ANNUAL GOAL: (including mastery criteria.)**

D▓▓▓ will demonstrate improved written language skills in 10 months time by mastering the following short-term objectives with 80% accuracy.

Provider(s):  Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given a weekly spelling list, D▓▓▓ will spell words from memory with 80% accuracy in 4 out of 5 trials, as measured by teacher-made test. | | Weekly |
| Given a topic, D▓▓▓ will write four related sentences in 3 out to 5 trials, as measured by student portfolio. | | Monthly |
| Given a teacher prompt, D▓▓▓ will write slowly and carefully to demonstrate legibility of 80% of letters written while printing in 3 out of 5 trials, as measured by student portfolio. | | Monthly |
| Given a complete sentence without punctuation, D▓▓▓ will use a period, exclamation point, or question mark to punctuate appropriately with 80% accuracy in 4 out of 5 trials, as measured by teacher-made test. | | Monthly |
| Given a previously written passage, D▓▓▓ will proofread to identify word omissions with 70% accuracy in 2 out of 3 trials, as measured by student portfolio. | | Monthly |
| Given a model, D▓▓▓ will write individual words in cursive, forming 80% of letters legibly in 3 out of 5 trials, as measured by student portfolio. | | Monthly |

**EVALUATION PROCEDURE(S)**

☒ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☐ Documented Observation  ☒ Report  ☐ Other _____

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

75

| Student Name  DARON K. B██████ | Managing School  Kimball Elementary | DCPS – IEP |
|---|---|---|
| Student ID Number 9083058    DOB ██/██/1995 | Attending School  Kimball Elementary | Page 3 of 4 |

Goal Number: ▓▓

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐

Area addressed by goal: Social Emotional Behavioral

**ANNUAL GOAL: (including mastery criteria.)**

D█████ will continue to develop appropriate social emotional skills through peer and adult interaction.

Provider(s): School Social Worker

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| D█████ will continue to verbalize his feelings appropriately to peers and adults in 4 out of 5 trials. | | Monthly |
| D█████ will continue to respond appropriately to role playing situations 80% of the time. | | Monthly |
| D█████ will continue to utilize coping skills, especially when frustrated or angry in 4 out of 5 trials. | | Monthly |
| D█████ will continue to stay on task with fewer re-directions 80% of the time. | | Monthly |
| D█████ will continue to develop peer relationships through extra curricular activities and to build friendships. | | monthly |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☐ Documented Observation  ☒ Report  ☐ Other _____

08/19/2004 16:31 FAX 202 442 5098        OFF. OF GENERAL COUNSEL

05/19/2004

| Student Name | DARREN K BROWN | Managing School | Kimball Elementary | DCPS - IEP |
| Student ID Number 9083058 | DOB 1995 | Attending School | Kimball Elementary | Page 4 of 4 |

**Additional Comments:** [X]

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION
### SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in general education? [ ] Yes [X] No

Explanation for removal out of regular education classroom.

Student requires small structured environment to accommodate disabilities

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING GenEd | SpEd | Total | FREQUENCY Hr./ Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations  for testing:    [ ] None needed

Timing/Scheduling: Extended time, Extra breaks during test
Setting:          Reduced, minimalized distractions
Presentation:     Read directions/test to student. Frequent checks for understanding
Response:         Specific praise for appropriate behavior, improvement in work effort
Equipment:

## XI. STATE AND DISTRICT ASSESSMENTS:

[ ] Level I. Tested with non-disabled peers under standard conditions without accommodations.

[ ] Level III (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

[ ] Level V Portfolio

[ ] Level II (Describe accommodations for level II) Tested under standard conditions with special accommodations.

[X] Level IV (Describe the alternative assessment)
read directions/test to student

## XII. Areas Requiring Specialized Instruction and Related Services:

[X] Reading          [ ] Physical/Sensory      [ ] Transition
[X] Mathematics      [X] Social Emotional      [ ] Vocational
[X] Written Expression [ ] Physical Development [ ] Independent Living
[ ] Other:                                     [ ] Speech/Language
[ ] None      Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

**Modifications:**
[X] Language Arts/English
[ ] Social Sciences
[ ] Biological & Physical Sciences
[ ] Fine Arts

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| In General Education Classroom Setting | Rejected | |
| Out of General Education Classroom | Rejected | |
| Combination General Education and Resource Classroom | Accepted | Time away from non-disabled peers in academic sett |
| | | |

Modification(s)/Accommodation(s) to address the harmful effects:

Participation in non-academic subjects with non-disabled peers

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 4 of 4

77

## DOCUMENTED LEVEL OF SERVICE
Complete and attach to MDT/IEP meeting notes

| School | Kimball Elementary | Principal | Sheil'a Miller | Special Education Coordinator | Robin Rabb |
|---|---|---|---|---|---|

Assistant Director  Danielle Keemer

Date  05/12/2004    Case Manager  Sheila Charles

Student  D█████ K. B█████    DOB █████/1995  Age 9  Grade 02  ID# 9083058    SSN# ████████

Parent  Ms. Evelyn Sykes    Telephone (H) (202) 388-5524    (W) (202) 499-7724

Address: 3930  Blaine St.    NE  Washington    DC    20019
Street #  Street    Quad  Apt. No.  City    State    Zip Code

REFERRAL SOURCE: (Check)  ☐ 120 Day  ☐ Reeval.  ☐ HOD  ☐ SA  ☐ MA  ☒ Annual

☐ Nonpublic  ☐ Residential  ☐ Citywide  ☐ Courts  ☒ Local School  ☐ Other:

Previous least restrictive environment (LRE Setting):  Combination general education and resource classroom

## JUSTIFICATION FOR SETTING CONSIDERATION
### (Submit TAT/MDT Documentation)
### SUPPORTIVE DATA/DOCUMENTATION

| 2. ACCOMMODATIONS/ MODIFICATIONS | 3. DATA REQUIREMENTS | | |
|---|---|---|---|
| Extended time, Reduced, minimalized distractions, Read directions/test to student, Specific praise for appropriate behavior, improvement in work, effort | Current IEP | Yes ☒ | No ☐ |
| | Signatures of required participants (MDT notes) | Yes ☒ | |
| | Intervention Behavior Plan | Yes ☒ | |
| | Copies of current class work and homework assignments | Yes ☐ | No ☐ |
| | Medical Reports | Yes ☐ | No ☐ |
| | Clinical Reports | Yes ☐ | No ☐ |
| | Psychiatric Reports | Yes ☐ | No ☐ |
| | Medications | Yes ☐ | No ☒ |
| | Attendance Record | Yes ☒ | |
| | Copies of most recent evaluation(s) | Yes ☒ | |
| 4. Results of all interventions: (TAT, MDT, etc. and attach meeting notes.) | 5. Resources needed for program implementation | | |
| MDT/IEP meeting held 9/17/03 Parent-Teacher Conferences held quarterly | none | | |

## 6. CURRENT SETTING CONSIDERATIONS

| ROW | SETTING in neighborhood school (Determined through the IEP team.) | SERVICE PROVIDER (Based on documented need) | LEVEL OF SERVICE (Based on documented need) |
|---|---|---|---|
| 1 | ☐ in general education classroom setting | ☐ general educators with consultation from special education staff | ☐ between 0% and 20% of service time |
| 2 | ☒ combination general education and resource classroom | ☒ combination of general educators, special educators and related service providers | ☒ between 21 % and 60% of service time |
| 3 | ☐ *out of general education classroom | ☐ special educators and related service providers | ☐ between 61 % and 100% of service time |

*In providing or arranging for the provision of nonacademic and extracurricular service and activities, including meals, recess period, and the services and activities, each public agency shall ensure that each child with a disability participates with non-disabled children in those services and activities (300.306) to the maximum extent appropriate to the needs of that child. (300.553) Nonacademic settings)

### Check the level of need as indicated:
### DIRECTIONS:

| If two or three boxes are checked in the Row 1, check LOW. If two or three boxes are checked in the Row 2, check MODERATE. If two or three boxes are checked in the Row 3, check HIGH. | If one box is checked in each row, check either MODERATE or HIGH, depending on the need of the student. |
|---|---|

## 7. LEVEL OF NEED

| ☐ LOW | ☒ MODERATE | ☐ HIGH |
|---|---|---|

07-02-2001    Attention: Technical Support Supervisor, Compliance Team

78

EXHIBIT

DB-10

ALL-STATE LEGAL®

## COMPENSATORY EDUCATION PLAN*

**Section I:**
Student Name D____ B____ DOB ___/95 Sex M Grade 2
Age 9 Date of IEP 5/19/2004 Date of Proposal 5/19/2004 Home School Kimball ES
Attending School: Kimball ES Disability: Emotionally Disturb
Language English Address: 3930 Blaine St.
Parent Name: Evelyn Sykos Phone(H): ____ (W): ____
Instructional/Related Services Missed: Specialized instruction

Time Period for Delay/Disruption 2002 - 2003 SY
Description of Compensatory Education due to X HOD** ___ SA** ___ other: DCPS agrees to provide
145 Specialized instruction and 36 hours
of psychological counseling

**Section II: Compensatory Education Services to be Provided:**

| Skill Areas | Provider | Beginning Date | Duration |
|---|---|---|---|
| Specialized instruc. | Sp. Ed. Teacher | 7/1/2004 | until completed |
| psychological counsel. | Psychologist/Social Worker | 7/1/2004 | until completed |
| | | | |

Parent Signature: _____
Principal Signature: _____
MDT Members: SM Healer Position: Special Educator
____ _____
____ LEA, SES

**Section III: Signatures for Services Rendered:**

| Provider | Service | Total Hrs. Recd. | Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Principal Signature: _____ Date _____

**Section IV:** If the services on the plan are not completed by the end of the school year, or if the student transfers before the services are concluded, the IEP/MDT completes the bottom portion of this proposal, attaches the proposal, lesson objectives, and progress report to the new or current IEP, and files the IEP in the student's special education folder. For the transferring student, the special education records, inclusive of the IEP and compensatory education documents, are forwarded to the receiving school. Copies of documents must be forwarded to the Mediation and Compliance Unit.

| Services | Frequency | | Setting | Total Hrs. or Wks. Of Service Remaining |
|---|---|---|---|---|
| | Hr/Min | Wk/Mo | | |
| | | | | |
| | | | | |

*Complete a MDT/IEP Meeting Note Page and attach meeting page and Compensatory Education Plan to IEP. Copy of the Plan must be forwarded to the Mediation and Compliance Unit, Division of Special Education within five (5) school days. **HOD/SA must be attached.

79

District of Columbia Public Schools
Washington, D.C.

I.E.P.   Attachment A
Intervention Behavior Plan

**Meeting Date** _05/12/2004_

## INTERVENTION BEHAVIOR PLAN REVIEW

**Date Developed:** _____

Student Name D_____ K____ B_____     ID# 9083058     DOB ____/1995   Grade 02

Address _3930_   _Blaine St._ _____   _NE_ _____ _____   _Washington_   _DC_   _20019_
            Street #          Street Name,          Quadrant    Apartment #    City,            State,    Zip Code

Telephone (H) _(202) 388-5524_     (W) _(202) 499-7724_   Counselor _Frances Christian_

Attending School _Kimball Elementary_     Teacher _Shannon Hepler_     Room _005_   Section _____

Additional Comments: ☐

**OUTCOMES :**

D____ has demonstrated an increased ability to control aggressive behaviors.

**PLAN FOR** ☐ **CONTINUING,** ☐ **DISCONTINUING, OR** ☒ **MODIFYING :**

The IBP will be continued with a modification wherein D____ periodically sets a goal for himself and is rewarded for improved behavior.  Goals will be selected after discussing areas for improvement.

**FOLLOW-UP MEETING: Date** – _____

**LAST SUCCESSFUL POSITIVE REINFORCERS :**

Choice time, "grab bag"

DISTRICT OF COLUMBIA PUBLIC SCHOOLS   07-02-2001 DIVISION OF SPECIAL EDUCATION     IEP ATTACHMENT A     INTERVENTION BEHAVIOR PLAN

80

**District of Columbia Public Schools**
**Washington, D.C.**

| | I.E.P.  Attachment A |
| Intervention Behavior Plan |

**INTERVENTION BEHAVIOR PLAN**

Date Developed:  05/12/2004

Student Name  D▉▉▉ K   B▉▉▉▉       ID# 9083058       DOB ▉▉▉/1995   Grade 02

Address   3930   Blaine St.                   NE                   Washington         DC   20019
         Street #        Street Name,              Quadrant      Apartment #    City,              State,    Zip Code

Telephone (H)   (202) 388-5524        (W) (202) 499-7724    Counselor  Frances Christian

Attending School   Kimball Elementary          Teacher  Shannon Hepler        Room 005    Section _____

Additional Comments: [ ]

**TARGETED BEHAVIOR(S):**

Impulsive behavior
Anger/aggression
Hyperactive behavior

**POSITIVE INTERVENTION STRATEGIES: Student Objective –**

D▉▉▉ will decrease impulsivity and hyperactive behavior while controlling his anger and aggressive behavior in the classroom, bus, playground, and other school-related areas.  D▉▉▉ will develop a weekly goal relevant to one of the target behaviors.

**Implementation description –**

D▉▉▉ will receive psychological services for one hour per week, as well as behavior monitoring in the classroom and other school related areas.

**POSITIVE INTERVENTION STRATEGIES: Teacher Strategies**

A reward will be given for desired behavior over a period of 10 sessions or days (nonconsecutive).  D▉▉▉ will periodically receive verbal praise for appropriate, on-task behavior.

**MONITORING SYSTEM: Responsible Teacher –** Shannon Hepler

**Describe System –**

The teacher will monitor D▉▉▉ behavior and award stickers or points for achievement of his goal on a daily basis. A reward will be given after 10 sessions or days of on-task behavior.

**Data collection timeline –**

daily and weekly

**FOLLOW-UP MEETING: Date –** _____

DISTRICT OF COLUMBIA PUBLIC SCHOOLS   07-02-2001   DIVISION OF SPECIAL EDUCATION      IEP ATTACHMENT A    INTERVENTION BEHAVIOR PLAN

81

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

**MULTIDISCIPLINARY TEAM (MDT)**

**Prior to Action Notice**

**Check Purpose:**

☐ Initial Evaluation
☐ Initial Placement
☒ Reevaluation
　☐ Change in Category Exit
　☐ Related Service Add
　☐ Related Service
　☐ Change in Placement
　☒ Annual
　☐ Other

Date ____05/12/2004____
Student  D████ K  B████        DOB ████1995
School  Kimball Elementary
Current Disability Category  ED
Setting  Combination general education and resource classro

Dear  Ms. Evelyn Sykes

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.
Therefore, you are being notified of the following proposed changes:
☐ Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
☒ Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
☐ Other _____

A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)

☐ Your child is not eligible for special education service(s).
☒ Your child is eligible or continues to be eligible to receive special education services as a student with ED
☐ Your child will begin receiving _____ as a related service(s).
☐ Your child will no longer receive _____ as a related service(s).
☐ Your child's category of disability is being changed from _____ to _____
☐ Your child's alternative placement on continuum (next setting) is being changed.
　from _____ to _____
☐ Your child is no longer eligible and will be exited from the special education program.
☐ Other: _____

Location of Services  Kimball Elementary

**Description and Explanation of agency action proposed or refused.**

Continued services in combination general and special education as a student with ED.

**Description of Other Options Considered and reasons for rejection of each option**

Out of general education rejected due to negative impact on self-esteem, overly restrictive.  In general education does not meet student's needs.

Other relevant factors to the decision-  none

MDT Members: ☒ Principal or Designee    ☒ General Education Teacher    ☐ Psychologist
　　　　　　☒ Parent    ☒ Special Education Teacher    ☒ Other: Advocate
　　　　　　☐ Student    ☐ Speech and Language    _____
　　　　　　☒ Social Worker    ☒ *LEA & Interpreter *(may be one)    _____

Parents may bring individuals to participate in the MDT meeting.  These participants should have knowledge or special expertise regarding the child.  The following individuals invited by parent: _____

Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the Procedural Safeguards for parents, which are enclosed for your information.
If I can be of assistance to you, or have questions regarding the Procedural Safeguards,
please contact  Robin Rabb        at  (202) 645-3150        (school telephone number).

See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

MDT Prior to Action Notice
07-02-2001

**DB9**
82

EXHIBIT

DB-12

ALL-STATE LEGAL

David F. McBride, M. Ed.
*Educational Consultation*

920 T Street, NW, Suite 2
Washington, DC 20001
(202) 328-0484
Dmcb920t@aol.com

May 27, 2004

Review of Social Work Related Service Current Progress Notes: D██ B████ DOB: ███/95

On January 31, 2003, a clinical evaluation of D████ B████ was conducted by Laura Olesen, Psy. D., Atlantic Health Services, Inc. This report found that D██ is struggling with feelings of abandonment, sadness, depressed mood and low self-esteem. D██ was diagnosed with DSM-IV Axis I: ADHD, Adjustment Disorder, and Problems with Primary Support Group. Dr. Prayaga, psychiatrist, (DHS Mental Health Services) evaluated D██ on 1/15/2003 and recommended a "structured, therapeutic year round program" to appropriately meet D████ behavior, emotional and educational needs. Dr. Prayaga, who has been seeing D████ on a monthly basis, repeated his previous recommendation in a letter on May 24, 2004. D██ was also to receive a behavior management program, along with monitoring of his medications: Adderal, Respirdal and Clonidine. At a MDT/IEP meeting on 9/17/2003 D██ was to have been provided psychological counseling 1 hour per week to address his underlying self-esteem, depressive mood, aggressive behavior, hyperactivity and social adjustment issues.

On May 26, Ms. Sykes, Guardian, Mrs. T. Bollech, Parent Advocate and Mr. McBride reviewed weekly "Encounter Tracker" Forms (including weekly Progress Notes) for the Social Work Related Services that D██ was to have been provided from 9/17/2003 through May, 26, 2004. The following is a summary of the group therapy session records that were reviewed from D██ Special Education File at Kimball ES.

| Month, Year | Focus of Social Work Therapy Services | Hours Due | Hours Provided |
|---|---|---|---|
| September 2003 | No Group Therapy Sessions recorded | 2.00 | 0.00 |
| October 2003 | Rules, consequences, attention, join others in activities - no mention of feelings, mood | 4.50 | 1.75 |
| November 2003 | 11/18 - 45 min. Etiquette Training 11/25 - 90 min.: Thanksgiving Dinner | 3.50 | 0.00 |
| December 2003 | 12/2 - 40 min.: Friends Activity 12/11/03 - 30 min. "Class Project" | 3.50 | 1.20 |
| January 2004 | 1/6/04 - 30 mins. "discussed activities during break" | 4.00 | 0.50 |
| February 2004 | 2/3/04 - 30 min. - "stayed on task" 2/19/04 - 60 min. -"visited children's museum" 2/27/04 -45 min. "group activity - stayed on task, kept self-control" | 4.00 | 1.25 |
| March 2004 | 3/5/06 - 0 mins. "involved in fight; he was hit first and retaliated" 3/9/04 - 30 min. "stayed on task in class" 3/19/04 - 15 min. "class picture taking" | 4.50 | 1.25 |

**DB10**

83

| Month, Year | Focus of Social Work Therapy Services | Hours Due | Hours Provided |
|---|---|---|---|
| April 2004 | 4/13/04 - 30 min. - "able to stay on task" <br> 4/29/04 - 30 min. "group activity - pos/neg behaviors" | 4.00 | 1.00 |
| May 2004 | No records in Sp. Ed. File (as of 5/26/04) | 4.00 | 0.00 |
| 9/2003- 5/2004 | No individual therapy for Low Self- esteem, depressive symptoms, aggressive behaviors, adjustment concerns, problems with primary support group, per recommendations of Clinical and Psychiatric reports | 31.00 | 6.45 |

The table above relates a summary of the content of Social Work Counseling provided during the period from September 2003 through May 2004. It is significant to note the number of hours devoted to such activities as, "Etiquette" "manners", "Thanksgiving Dinner", "class picture taking", "visit to Children's museum", etc. It is also significant that no counseling hours were devoted to therapeutic intervention after D███ was involved in a fight on 3/5/04 (06). Therapeutic support for aggressive behaviors, depressive mood, and self-esteem is rarely documented in the records reviewed.

This review shows that the level of therapeutic counseling support that D███ requires has not been provided this year. D███ is due compensatory counseling of 24.75 hours of therapy not provided or documented during the current school year. Moreover, Mrs. Sykes, guardian, is extremely concerned about the hostility toward this child and his younger brother, Kaseem, on the part of the principal. The DCPS members of the MDT on May 12, 2004 denied D███ access to Extended School Year services, which would have been provided in a "year round" program. The record includes documented incidents of physical altercations, one of which occurred on May 12, 2004, minutes before the convening of the MDT/IEP meeting. The record reflects that D███ received disciplinary, rather than therapeutic, treatment subsequent to such violent incidents. Complaints about D███ "running in the hall" and "talking out of turn" are also documented. D███ lack of access to individual therapy is also reflected in the Social Work progress notes reviewed above. The 5/19/2004 MDT also revealed that D███ academic progress has been negligible. His silent reading comprehension is at Grade 1 level, over 2.5 years below age expectancy. His Math Skills are in the Grade 2 range, also significantly delayed. At age 9.5, Kaseem's writing appears akin to that of a 6-year old. He does not write in cursive, because of lack of instructional support in this area. Consequently, there is no evidence that Kimball ES is an educational program that can provide the "structured, therapeutic, year-round program and small class size that Kaseem needs in order to learn.

_David F. McBride_
David F. McBride, M. Ed.
Educational Consultant

_May 28, 2004_
Date

**KRISTIN S. CONABOY, OTR/L**
**Occupational Therapist**
**Board Certified Disability Analyst**
**705 8th St. SE**
**Suite 200**
**Washington, D.C. 20003**

## COMPREHENSIVE OCCUPATIONAL THERAPY EVALUATION

**Name:** D███ B███                    **Educational Program:** Kimball ES
**Date of Birth:** ███/95              **Therapist:** Kristin S. Conaboy, OTR/L
**Chronological Age:** 9 y. 4 m.       **Date of Evaluation:** 06/04/04

**Background Information:** D███ is a 9 year old student who is currently attending the Kimball Elementary School in Washington, D.C. He was evaluated at the request of his guardian, Ms. Evelyn Sykes and Mr. David McBride, the educational advocate working with D███ and his individual education needs.

D███ has a very complex social history. At an approximate age of five, it is reported that his mother had left both he and a brother in a store and never returned. He was later placed in the care of his paternal grandmother. D███ mother had a history significant for substance abuse. D███ is reported to have been neglected. He is described as displaying impulsive behaviors, hyperactivity, mood swings, difficulty sleeping, and various medications for both attention and mood. He is reported to be struggling within the school environment and specific concerns were raised regarding D███ handwriting. D███ most current IEP documents state that he is to receive special education services under the disability classification of being emotionally disturbed. He presents with significant language and learning concerns and currently has the diagnoses of Attention Deficit Hyperactivity Disorder (ADHD) Combined Type, Fetal Alcohol Syndrome, and Disruptive Behavior Disorder.

A comprehensive Occupational Therapy Evaluation was recommended to identify D███ current levels of functioning and to determine his need for Occupational Therapy Intervention. This evaluation should be used in part to support D███ educational needs and to enhance his classroom performance.

**Evaluations Administered:**
- Clinical Observations
- Review of records
- Consultation with classroom teacher, Ms. Hepler
- Consultation with Mr. McBride
- Bruininks-Oseretsky Test of Motor Proficiency- Fine Motor Subtests
- The Beery-Buktenica Developmental Test of Visual Motor Integration (VMI)
- The Test of Visual Perceptual Skills (non-motor) – Revised (TVPS)
- Items from the Evaluation Tool of Children's Handwriting – (ETCH)

**Clinical Observations:** This evaluation was completed in D███ school environment. D███ transitioned willingly with this unfamiliar examiner. Initially, he was very quiet but, later engaged very appropriately with the examiner. He was able to follow specific directions and made attempts at all activities. He was able to appropriately negotiate his

**DB11**

85

D███ B████
Occupational Therapy Evaluation
Page 2 of 8

environment, maintain well mannered behavior, and participated willingly in all tasks. He was able to coordinate both sides of his body together to complete tasks and was able to use his eyes and hands together in a smooth, coordinated manner. He asked for clarification when needed. His compliance and friendly nature, made him a true pleasure to work with. Therefore, this is thought to be an accurate assessment of D█████ abilities.

- **Behavior:**  In the one on one, quiet testing environment, D███ displayed well mannered behaviors demonstrating no outbursts or difficulties responding to directives or verbal prompts during testing. However, reports indicate that D███ has a history of behavioral difficulties, inattention, impulsivity, and has struggled with variable moods. He currently holds a diagnosis of Disruptive Behavior Disorder. He is reported to have responded well to medication and therapy. However, continues to display behavioral concerns both at home and at school. Subsequently, D█████ treating Child Psychiatrist, Dr. Prayaga, recommended a year round, structured, therapeutic school program to include a small classroom environment and a behavior management program. Behavioral therapy, family therapy, and medication management were also recommended. During testing, D████ made put forth his best effort, however was noted to require frequent movement breaks, praise, and encouragement to maintain involvement in tasks. Sadness revolving around his mother and family situation was apparent throughout conversation. Difficulty regulating behavior will continue to negatively impact upon D██████ performance in his school and classroom environment.

- **Sensorimotor Functioning:**  Successful sensorimotor functioning is the ability to take in, interpret, and use information from the environment appropriately. D████ is generally able to process and respond appropriately to most sensory information (tactile/touch, vestibular/movement, proprioceptive/information from muscles and joints, visual information) from his environment. However, he had some noted difficulty processing auditory information (making sense of what he hears) as evidenced by observed and reported difficulty with multiple step directions and basic dictation. D████ is additionally reported to be performing below grade level on reading and comprehension tasks. Difficulty integrating auditory information into the learning environment can significantly impact upon D██████ functional performance and ability to achieve higher level learning.

- **Motor Proficiency:**  Gross motor skills (movements of the large muscles) were informally assessed through the use of consultation and observations. D████ is able to move about his classroom and his school environment without difficulty. He reports that he enjoys movement activities. D████ demonstrates the ability to coordinate both sides of his body adequately. However, he appears to have below age expectation strength, stability and endurance as noted in his poor posture and decreased ability to maintain posture and positions. While gross motor skills are not of significant concern at this time, the quality of his movement and endurance is below that of his peers and may impact upon his ability to engage with group games or to maintain desk posture.

Fine motor skills (movements of small muscles) were assessed using the Bruininks-Oseretsky Test of Motor Proficiency.  When compared to other students his age, D████ achieved skills as follows:

D████ B██████
Occupational Therapy Evaluation
Page 3 of 8

Bruininks-Oseretsky Test of Motor Proficiency

| SUBTEST | AGE EQUIVALENT | STANDARD SCORE | DEFINTION Of TERMS | PERFORMANCE RANGE |
|---|---|---|---|---|
| Response Speed | 7 years, 11 months | 13 | Ability to respond to a quick moving stimulus. | Average |
| Visual Motor Control | 7 years, 5 months | 8 | Cutting and drawing lines within narrow boundaries. Copying geometric shapes. | Below Average |
| Upper-Limb Speed and Dexterity | 9 years, 11 months | 17 | Arm and hand speed and control with small items: pegs, coins, cards, beads, and quick pencil tasks | Average |
| | | | Overall Fine Motor Skill Performance   = | Low Average Range |

- **Interpretation:** According to the <u>Bruininks-Oseretsky Test of Motor Proficiency</u>, D████ overall fine motor skills fall in the low average performance range when compared to other children his age, however the quality of his fine motor control is below age expectation. D████ inconsistently recognized his right and left sides. He demonstrates a right hand dominance with a functional tripod pencil grasp. He was able to coordinate his eyes and hands together to complete very basic pencil and paper tasks. However, he struggled when required to use his pencil in a smooth, controlled manner for tasks such as producing specific written output, copying overlapping or angled forms, or smoothly tracing through narrow paths that change direction. He also had difficulty using scissors accurately and efficiently to cut out refined shapes. He demonstrated good skills in terms of speed and dexterity (skillfulness). He seems to benefit from extended time to complete school based tasks. D████ displayed fair to poor attention to details but made conscientious efforts to complete tasks. He did however respond fairly well to maximal cues to decrease his pace and adjust his posture when appropriate to task. Fine motor skills are found to be within the low average range, however, D████ has difficulty with refined skills such as writing and copying skills and the quality of his fine motor coordination is below that of his peers.

- **Handwriting:** D████ handwriting skills were assessed through clinical observations, informal handwriting samples, and items from <u>The Evaluation Tool of Children's Handwriting (ETCH) – Manuscript.</u> Skills observed were those similar to tasks which occur in the classroom setting. Interestingly, D████ was fully cooperative until writing tasks were demanded of him. He was significantly resistant to writing tasks and displayed avoidance behaviors (i.e. repeatedly asking to go to the bathroom) as writing instructions were given. D████ utilizes a functional pencil grasp. He displays very poor writing posture with his body slouched at the desk and his non-writing hand inconsistently stabilizing his paper. D████ posture decompensated as writing tasks continued.

It should be noted that many students D████ age have acquired cursive handwriting skills, however it is reported that D████ has not. When using manuscript (printing) writing to write the alphabet letters from memory, D████ uppercase and lowercase letters are poorly aligned, formed, and spaced. He was able to write his numbers from 1-20, however also demonstrated poor number spacing and alignment. With basic, writing tasks, D████ written output is notably slower then that of his peers. When copying from near and far point, he worked slowly and made moderate errors in terms of accuracy. He was more successful when using a near point copy to work from. He also had difficulty responding to basic dictation skills due to poor writing fluency paired with auditory processing concerns. He was unable to produce simple, age appropriate sentences. Classroom staff report that while D████ has made some writing

D██ B█████
Occupational Therapy Evaluation
Page 4 of 8

progress, he continues to have trouble with alignment, copying from the board, impulsivity, and overall writing organization.

D█████ handwriting skills are below the average range when using manuscript writing in terms of posture, sizing, spacing, alignment, general formation, and copying skills. D████ appears to labor over handwriting assignments and resists writing within the classroom. He will benefit from the use of a structured cursive handwriting program to sharpen the accuracy, maturity, and fluency (speed and ease) of his writing skills. Word processing/keyboarding and computer programs may also be beneficial to assist with editing and revising. D████ should be reminded to utilize optimal desk and writing posture (appropriate chair and desk height, forearm and elbow on table, opposite hand stabilizing paper, proper paper tilt) and to proofread his work for errors and omissions.

- **Visual Perceptual Skills/ Visual Motor Integration:** Visual Motor and Visual Perceptual skills were assessed using The Developmental Test of Visual Motor Integration (VMI) and the Test of Visual-Perceptual Skills (non-motor) – REVISED (TVPS). Good visual motor integration is well coordinated visual perception and finger-hand movements. The VMI is used to help identify significant difficulties that some students have in integrating, or coordinating, their visual perceptual and motor (finger and hand movement) abilities. The results are as follows:

The Developmental Test of Visual-Motor Integration

| Category | VMI Overall | Visual Percept. Section | Motor Section |
|---|---|---|---|
| Raw Scores | 21 | 25 | 17 |
| Standard Scores | 92 | 106 | 72 |
| Scaled Scores | 8 | 11 | 4 |
| Percentiles | 30 | 65 | 3 |
| Age Equivalents | 8 years, 4 months | 10 years, 3 months | 5 years, 11 months |
| Performance Range | Low Average | Average | Low |

- **Interpretation:** As revealed in D█████ scores, he exhibits overall visual motor integration skills within the low average range. The visual component required D████ to choose one geometric form among competing forms to match the initial stimulus. The motor component required him to trace the stimulus forms accurately, without going outside double-lined paths. The overall section required integration and use of both visual and motor information together. D████ made fairly nice efforts to copy the increasingly complex shapes on the overall VMI, however struggled with sizing, spacing, alignment, angles, and overlapping shapes. On the visual section, D████ demonstrated good skills and was able to recognize and match appropriate shapes and maintain attention to complex, specific details, achieving skills within the average range. On the motor section however, D████ had decidedly more difficulty. He struggled when required to control his pencil within the pathways, demonstrating many errors and a performance well below age expectation and in the low range. D████ required reminders to maintain an organized approach to his paper (i.e. move left to right, top to bottom, complete items). When combining D█████ performance on this measure with the Bruininks-Oseretsky Test of Motor Proficiency (Visual Motor Subtest), fine motor

D██ B██
Occupational Therapy Evaluation
Page 5 of 8

testing, and handwriting performance, it is felt that his overall visual motor integration skills are likely within the below average range and may contribute to the difficulty he has on writing and copying tasks.

The TVPS was additionally administered to further assess possible visual perceptual deficits. Visual perceptual skills are the ability to perceive, process, and respond to objects. It is the capacity to interpret or give meaning to what is seen. D██ was asked to look at several pictures, listen to specific directions, and choose the appropriate answer. The results are as follows:

Test of Visual Perceptual Skills (non-motor) – Revised

| Category | Age Equivalent Yrs-Mos | Standard Scores AVG=100 | Scaled Scores AVG=10 | Percentile Ranks AVG=50 | Definition of Terms |
|---|---|---|---|---|---|
| Visual Discrim. | >12-11 | 112 | 12 | 79 | To visually perceive differences and match forms. |
| Visual Memory | 8-11 | 99 | 10 | 47 | Remember characteristics of form for immediate recall and being able to find among other forms. |
| Visual Spatial Relations | >12-11 | 113 | 13 | 81 | To be able to differentiate among similar forms which form or part is going in a different direction. |
| Visual Form-Constancy | 8-8 | 98 | 10 | 45 | Ability to recognize basic form despite difference in size, shape, and/or orientation. |
| Vis. Seq. Memory | 11-4 | 107 | 11 | 68 | Remember series of forms for immediate recall to find among competing series. |
| Visual Fig. Ground | <4-0 | 55 | 1 | 1 | Perceive form visually and to find hidden among other forms. |
| Visual Closure | 7-9 | 86 | 7 | 18 | Determine among unfinished forms the one that is the same as a completed form. |

- **Interpretation:** According to the TVPS, D██ presents with overall visual perceptual skills within the average range. D██ made good efforts and maintained fair attention throughout this part of the testing. Relative weakness areas noted on the final two subtests but can be attributed to inattention and impulsivity as opposed to visual perceptual deficits. Visual perceptual skills are found to be similar to that of a student 8 years, 11 months and a relative strength for D██.

- **Summary:** D██ is a 9 year old student who currently attends Kimball Elementary School. According to records, D██ currently receives special education services under the classification being emotionally disturbed. He has a very complex social history including, neglect and abandonment by his mother. He presents with significant language and learning concerns and currently has the diagnoses of Attention Deficit Hyperactivity Disorder (ADHD) Combined Type, Fetal Alcohol Syndrome, and Disruptive Behavior Disorder. In the one on one testing environment, D██ was a pleasure to work with. However, he is having difficulties within the academic environment. D██ presents with moderate difficulty processing auditory information. His gross motor skills are not of significant concern at this time, however, the quality of

D▮▮▮ B▮▮▮▮
Occupational Therapy Evaluation
Page 6 of 8

his movement and endurance is below that of his peers and may impact upon his ability to engage with group games or to maintain desk posture. His fine motor skills are found to be within the low average range, with notable difficulties seen in the area of visual motor integration skills such as writing, cutting, and copying. According to the <u>VMI</u>, D▮▮▮ achieved scores within the low average range, however he displayed significantly more difficulty on the motor subtest when required to control his pencil. Paired with all related testing items, his visual motor integration skills are felt to be within the below average range. Visual perceptual skills were found to be within the average range overall. D▮▮▮▮ handwriting skills were below the average range in terms of posture, sizing, spacing, alignment, general formation, and copying skills. D▮▮▮ appeared to labor over handwriting assignments and resists writing within the classroom. D▮▮▮ responded well to support, verbal encouragement, movement breaks, and extended time. He made fair to good efforts on all tasks presented and displayed adequate behaviors. His deficits in visual motor integration, handwriting, and written language skills support a need for occupational therapy intervention. Services are recommended once per week for 30 minute sessions to enhance overall classroom performance and academic achievement.

- **Recommendations:**

**TEAM:**

1. Review of this report with classroom staff, related service providers, and caregivers.
2. The team working with D▮▮▮ should reconsider his school placement. Given his complex social history, therapeutic, and academic needs, this therapist is in agreement with D▮▮▮ treating Child Psychiatrist, Dr. Prayaga. Dr. Prayaga recommended a year round, structured, therapeutic school program to include a small classroom environment and a behavior management program. Behavioral therapy, family therapy, and medication management were also recommended and would seem to be necessary components to D▮▮▮ academic success.

**OCCUPATIONAL THERAPIST:**

1. D▮▮▮ should receive OT services once per week for 30 minute session. Services should target visual motor integration, handwriting, and written language skills to enhance classroom performance.
2. Exposure and instruction to a structured, handwriting program may assist D▮▮▮ with being more efficient with written output. The <u>Handwriting Without Tears - Cursive</u> program is one good option and can be ordered at <u>www.hwtears.com</u>, phone 301.983.8409, fax 301.983.6821.

**CLASSROOM STAFF:**

1. Due to relatively weak rate of production for written work, D▮▮▮ may benefit from the use of a computer and appropriate software (i.e. spell check, grammar check, letter writing assistance) to assist with writing, revising, and editing of written work.

90

Da▓▓ B▓▓▓▓
Occupational Therapy Evaluation
Page 7 of 8

2. Encouragement to maintain proper desk and writing posture (appropriate chair and desk height, forearm and elbow on table, opposite hand stabilizing paper, proper paper tilt), and to proofread written work for spelling, grammar, and sentence structure.
3. Positive reinforcement (i.e. small rewards, movement breaks, treats) when work is completed in an accurate and efficient way.
4. Da▓▓ may benefit from preferential seating at the front of the class and/or a near point copy to reference at his desk when materials need to be copied from the board or a distance.
5. Computer programs such as *The Children's Writing and Publishing Center* and *Storybook Weaver* (available at most software stores) help to develop writing and organizational skills.
6. Increased time to complete and proofread handwritten assignments.
7. Increased opportunities to utilize keyboarding and word processing. For students who have difficulties with handwriting and written language, word processing can be of great assistance to facilitate speed and accuracy of writing assignments, revising, and editing in the classroom environment. *Mavis Beacon Teaches Typing* is one good option available at most computer/software supply stores. Another option is *Keyboarding Skills* by Diana Hanbury King available at 1.800.225.5750.
8. Encourage opportunities to trace, copy, draw, cut and color.
9. To improve alignment of writing tasks, consider highlighting lines and margins and using graphic organizers  Try graphic organizers from www.teach-nology.com.
10. To improve alignment of math problems, try using large box graph paper or turn lined paper horizontally to create columns for problems. Try math organizers from www.do2learn .com

## AUDITORY PROCESSING:

1. To improve auditory processing Classroom Teachers should consider the following:
2. Limit oral directions.
3. Avoid oral exams when possible.
4. Simplify and reduce textual language and verbal instructions for assignments. Provide verbal information in small 'chunks' at a time to prevent overwhelming Da▓▓.
5. Once oral steps/directions are given, ask Da▓▓ to repeat directions back to ensure understanding.
6. Provide Da▓▓ with rough outlines and graphic organizers to assist with processing and writing orally presented information. Limit auditory distractions (T.V.s, fans, side conversations) to improve attention span.
7. Increase waiting time when Da▓▓ is asked to volunteer information.

D█████ B█████
Occupational Therapy Evaluation
Page 8 of 8

## CAREGIVER/FOLLOW UP:

1. A comprehensive Speech and Language assessment is recommended to further assess auditory processing deficits. A specific auditory processing evaluation should be included.
2. An Audiological should be obtained to rule out any hearing difficulties.
3. An Opthalmological Evaluation should be obtained to rule out any vision difficulties.
4. Expose D████ to various movement activities such as team sports, playground time, martial arts, balance and ball games, or swimming to encourage increased overall strength, stability, endurance, and social skills. DC Parks and Recreation and local Boys and Girls Clubs offer various summer programs that may be of interest to D████ and his family.
5. A comprehensive Speech and Language assessment is recommended to further assess auditory processing deficits. A specific auditory processing evaluation should be included.
6. An Audiological should be obtained to rule out any hearing difficulties.
7. An Opthalmological Evaluation should be obtained to rule out any vision difficulties.
8. Re-evaluate in one year to determine progress, update goals and objectives, and determine need for continued intervention.
9. Expose D████ to various movement activities such as team sports, playground time, martial arts, balance and ball games, or swimming to encourage increased overall strength, stability, endurance, and social skills. DC Parks and Recreation and local Boys and Girls Clubs offer various summer programs that may be of interest to D████ and his family.
10. To improve overall fine motor skill development provide opportunities such as:

a. Sorting and manipulating small objects, fasteners, coins/pocket change, silverware, recycling etc.
b. Lacing activities: lacing cards, beads, dry pasta, patterns, leather activities, shoe strings etc.
c. Color/paint by numbers activities
d. Drawing or tracing art activities; sharpening pencils with small hand held pencil sharpeners
e. Games (i.e. Mastermind Jr, Battleship, PickUp Sticks, Jenga, Connect Four)
f. Completing basic model cars, trains, or airplanes
g. Complex Puzzles, Legos, Knex, or other building toys
h. Arts and Craft activities (i.e. latch hook, basic sewing, painting sun catchers)
i. Modeling clay
j. Folding and putting away laundry
k. Serving plates, pouring drinks family style during meals, opening/closing small containers

It has been a pleasure working with D████ Ms. Sykes, Mr. McBride and the Kimball Elementary School personnel. If I can be of further assistance, please do not hesitate to contact me at (703) 371-7751.

*Kristin S. Conaboy, OTR/L*

Kristin S. Conaboy, OTR/L
Occupational Therapist
Board Certified Disability Analyst

**David F. McBride, M. Ed.**
*Educational Consultation*

920 T Street, NW, Suite 2
Washington, DC 20001
(202) 328-0484
Dmcb920t@aol.com

June 11, 2004

Ms. Robin Rabb, Sp. Ed. Coordinator,
Kimball ES
3375 Minnesota Avenue, SE
Washington, DC 20019
FAX: 645-3147

Subject:  Need for ESY Services for D████ B████: DOB: ██/95

Dear Ms. Rabb,
At the May 19, 2004 MDT/IEP Meeting for D████ B████ there was a discussion concerning the need for ESY services for D████ during the summer 2004.  Why were not ALL the pages of DCPS 2003-2004 ESY Guidelines pages distributed to Mrs. Sykes at the 5/19/2004 meeting?  A review of those guidelines indicates that DCPS did NOT collect or maintain data (behavior logs, IEP Objectives' Progress), by its March 3, 2004 deadline, as the 2003-2004 DCPS ESY Guidelines require.  Thus, DCPS had no basis upon which to determine that D████ did not meet eligibility for ESY.  Indeed, at the 5/19/2004 meeting, DCPS members ignored the parent's request for ESY. However, Mrs. Sykes maintains that D████ requires ESY for the following reasons:

1)  Mrs. Sykes observation that over the last two years D████ has demonstrated emotional and educational regression during periods of unstructured time ( e.g., during the Summer).

2)  Mrs. Sykes agreed that "considering the severity of D████ continuing need for psychological therapy and structure all year round, he requires an extended school year program in order to prevent psychological regression which impacts his emotional and educational progress."  This is consistent with previous clinical and psychiatric recommendations of Dr. Prayaga, psychiatrist.

3)  Critical skills related to aggression, social relations and impulsivity require ongoing therapeutic support, as per the input of Ms. Keeling, social worker, that D████ still requires help in controlling himself and in impulse self-control.  These ongoing aggression problems were clearly demonstrated the very day of the MDT/IEP meeting in which D████ was involved in an altercation with another student.

4)  D████ has achieved negligible academic progress in basic skills of Reading, Math and Writing, as per the 4/15/04 IEP Progress of Ms. Hepler which shows that he has not mastered ANY of the Reading or Written Expression Objectives on his 2003-2004 IEP; D████ has 'ACHIEVED' one Math objective: "identify the place value of a digit

D████b████ESY2004                    Page 1 of 2

**DB12**

93

up to 100" , which is a Grade 2 level skill.  D███ has not mastered the Grade 2 skills of subtracting with borrowing; nor can he add with regrouping, per his current classroom performance.

Per the DCPS 2003-2004 Guidelines, D████ ongoing severe ADHD Conduct Disorders should qualify as "interfering behaviors".  Furthermore, emotional and educational regression during non-structured extended periods had been presented and explained by the parent/guardian at the 5/19/2004 MDT/IEP meeting.  Dr. Prayaga's recommendation for a "year-round structured therapeutic" program presumes that he be provided ongoing services during the summer.

Moreover, the MDT/IEP had considered that the Compensatory Education tutoring that DCPS is to provide D████ could occur during the Summer 2004 as well.  Such Compensatory Education services had been ordered as relief for previous IDEA Violations specified in the May 23, 2003 Hearing Officer's Determination.  This in no way absolves DCPS' obligation to consider ESY services for D████ B████.  Thank you for your attention in this regard.


Yours truly,

*David F McBride*

David F. McBride, M. Ed. ,
Educational Consultant,
for D████ B████ and Evelyn Sykes, Guardian

David F. McBride, M. Ed.

920 T Street, NW, Suite 2
Washington, DC 20001
(202) 328-0484
Dmcb920t@aol.com

## Academic Skills Screening Report

Student Name: D____ B____          Legal Guardian: Mrs,. Evelyn Sykes
DOB: ____/1995                     Current Grade: NG
CA: 9 years, 7 months              DOE: 08/7/2004

### Educational Background

D____ has a history of Diagnosed Emotional (Disruptive Behavior Disorder, Fetal Alcohol
Syndrome) Disorders, Attention Deficit Hyperactivity Disorder and specific learning disabilities
in reading, written expression, spelling and arithmetic.  D____ has been receiving psychiatric
medication (Adderal) under the supervision of a psychiatrist, Dr. Prayaga.  He also continues to
receive weekly clinical psychological counseling with Dr. Wayne Rhee.  Compared to his
chronological age, D____ has achieved minimal academic progress in basic skills of Reading,
Math and Writing during 2003-2004.  At the May 19, 2004 MDT meeting, Kimball ES staff
denied D____ Extended School Year services in spite of Mrs. Sykes' insistence that D____
required year-round academic support to maintain skills and prevent regression in essential
emotional, social and academic areas.

As per the 4/15/04 IEP Progress Report of Ms. Hepler, Kimball ES, D____ had not mastered
any of the Reading or Written Expression Objectives on his 2003-2004 IEP; D____ has
achieved one Math objective: "identify the place value of a digit up to 100", a Grade 2 level
skill.  On 5/19/2004 Ms. Hepler reported D____ independent reading comprehension at
Grade 1 level.  D____ has not mastered the Grade 2 skills of subtracting with borrowing; nor
could he add with regrouping, per his recent classroom performance.  On 5/19/2004 Kimball
ES staff did not disclose the names of tests or assessments used to measure achievement
levels.  Thus, Mrs. Evelyn Sykes, D____ legal guardian requested this academic skills
screening is be conducted in order to assess D____ current levels of academic performance.

### Instruments Administered

Wide Range Achievement Test, 3rd Edition (WRAT-3)
    *Arithmetic*
Gray Oral Reading Test - 4th Edition (GORT-4)
    *Fluency*
    *Comprehension*
Brigance Test of Basic Skills (Word Recognition, Sentence Writing)
Test of Written Spelling, 3rd Edition (TWS-3)
Review of Spring 2004 classroom work samples

B____D____SCREEN08-2004                           Page 1 of 5              **DB13**
                                                                          95

## Testing Behavior

D▇▇▇ was accompanied to the test site by his guardian, Mrs. Evelyn Sykes. All tests were conducted individually in a classroom with adequate lighting, temperature and no external distractions. D▇▇▇ was friendly and very cooperative during all tasks; however, he displayed impulsive responses during some tests, especially on several arithmetic and oral reading items. He skipped a whole line of a passage of the reading comprehension test. D▇▇▇ volunteered that he did not recognize several words and asked for assistance. D▇▇▇ general attention during testing was appropriate; thus, his performance on all current instruments is considered a fair appraisal of his achievement in all given skills measured.

## Reading Achievement

D▇▇▇ Reading Word Recognition (GE 1.0) on the Brigance Test of Basic Skills reveals that he has mastered 80% of PrePrimer Words, 60% of Primer Words and 50% of Grade 1 level words. D▇▇▇ incorrectly read the words, 'said' as /sad/, 'want' as /went/, 'white' as /went/, 'many' as /male/, 'her' as /here/, 'frog' as /for/, 'worked' as /working/, and 'there' as /three/. Daron's decoding is marked by omissions and word substitutions. When reading aloud he seeks assistance in pronouncing some Grade 1 level words including 'want'; he skips words and whole lines and loses his place easily in text at Grade 1 or higher level.

This performance is commensurate with his GORT-4 Reading Comprehension performance (GE 1.0). These results indicate that D▇▇▇ word attack skills are very deficient and are hampering his comprehension of text. This impacts his performance in all academic subjects. Nevertheless, progress can be expected given individualized word recognition and comprehension instructional support and accommodations on a distraction-controlled small class setting.

## Mathematics Achievement

On the WRAT-3 Arithmetic sub-test, D▇▇▇ achieved a ss 70, PR2, GE 2.0; D▇▇▇ Math performance is over 2.5 years below age expectancy. He has mastered addition of single digits and double digits without carrying. He is unable to subtract with borrowing. He has not mastered any multiplication skills. D▇▇▇ makes mistakes with vertical placement of numerals, consistent with his visual-motor difficulties on a recent Occupational Therapy evaluation (Conaboy, June, 2004).

## Spelling

D▇▇▇ phonetic awareness and decoding deficits are magnified in his Spelling performance. D▇▇▇ overall encoding performance is very deficient at 2.5+ years below his age level. On the Test of Written Spelling his Total Words score of ss 66, GE 1.0 indicates that he has significant encoding delays, consistent with his delayed Reading Decoding and Comprehension competence. On the TWS-3 *Predictable Words*, those which follow a phonetic rule, D▇▇▇ scored at ss 79, GE 0.5; he inserted letters and omitted phonemes and endings in such words as 'spring', 'storm', 'spend' and 'when'. D▇▇▇ *Unpredictable Word* competence is equally deficient at ss 74, GE 0.5. This result suggests that D▇▇▇ needs considerable instructional support to encode sound/symbol phonetic and sight word patterns.

<u>Written Expression</u>

Review of current writing samples shows that D███ sentence coherence is immature.  On a writing sample on the theme of 'Summer Fun', his average sentence length was 7 words, equivalent to that of a student in Grade 1-2.   D███ rate of production of sentences in a paragraph is about 30 words, a performance more typical of a 7-year old child.  While thematic unity is present in some sentences, his paragraph organization is poorly developed.  His syntax, grammar (use of verb tenses) structure and mechanics are also deficient with no use of commas or other punctuation.  Improper use of upper and lower case letters is also evident.  D███ sentence writing is characterized by letter omissions in words, e.g., "cant wit So i play the game with him".  This sample displays poor syntax and impoverished (Grade 1 level) vocabulary along with misspellings of Grade 2 level words. D███ writes in manuscript form only. Most words are spaced and aligned improperly.  This is consistent with his previously diagnosed handwriting difficulties (Conaboy, June 2004). D███ expressive and receptive word recognition deficits also impair his spelling skills in writing. The combined impact of significant reading, visual-motor control, inefficient organization and spelling difficulties on D███ writing performance indicates the need for continued intensive instructional intervention, coordination and accommodations.

<u>Summary</u>

The current screening profile describes a 9.6 year-old African-American male student with significant emotional, ADHD and specific learning disabilities, particularly in the underlying visual-motor (writing), visual-perceptual (spelling) and auditory processing (reading) of letters, words, sentences and numerals.

D███ math skills are also very delayed compared to his chronological age. He has mastered addition of 2-digit numbers, but has not mastered subtraction or any skills in multiplication. D███ writing rate and efficiency are significantly delayed and his production is very limited compared to his age and grade level standards. D███ script is labored and with immaturely large letters and improper word spacing.  These inter-related deficits continue to interfere with his performance in academic content areas requiring receptive (Reading Comprehension) and expressive (Written Expression and Spelling) verbal efficiency and production.

Given D███ age, his prognosis for academic success is optimistic provided he receives appropriate support for reading, writing, spelling, and math skills.  Computer-based technology interventions should be incorporated into his school and home learning contexts. It is essential that D███ receive support services and interventions specified below.

## Recommendations

1. Consistent with the recommendations of Dr. Prayaga (May 24, 2004), D███ Emotional Disorders, ADHD and learning disabilities necessitate that he be provided a small class (1:8 teacher: student ratio) in a year-round therapeutic setting in which needed concentration, learning and testing accommodations can be individually monitored and adjusted as needed.

2. As D███ has demonstrated regression in academic skills this summer, it is clear that he should be provided Extended School Year services in a year-round therapeutic educational setting.

3. During 2004-2005 the learning and testing accommodations listed on his IEP should be implemented.  These include: small class size (1:8 teacher: student ratio), oral reading of directions, control of distractions, untimed testing conditions, use of computer assisted instruction at home and at school, etc. Peer note-taking assistance may also be useful for D███

4. D███ should receive specialized instructional support in acquiring word processing skills using programs designed for students with significant visual-motor integration difficulties. Appropriate word processing software and the instructional use of it should be integrated into his educational program all year round.

5. D███ should be encouraged to frequently read texts and materials of particular interest to him.  He should be exposed to a spectrum of materials containing highly contextualized text and vocabulary in books, magazines, newspapers, pamphlets, CD-ROM software and Internet educational sites.

6. D███ should have regular access to technological aids such as electronic dictionaries and computer software which utilizes multi-modal techniques in a variety of media.

_David F. McBride_                                    _Aug. 9, 2004_
David F. McBride, M.Ed.                               Date
Certified Special Education Teacher

B███ D███ SCREEN08-2004                                    Page 4 of 5

Educational Screening Results Table  -  D████ B█████, DOB: ██████/1995

Screening Date:      08/07/2004

| Instrument | Age Equiv. | Grade Equiv. | Standard Score | Percentile Rank | Years difference from CA 9.7 years |
|---|---|---|---|---|---|
| **Wide Range Achievement Test, 3rd Edition (WRAT-3)** | | | | | -2.7 |
| *Arithmetic* | 7.0 | 2.0 | 70 | 2 | |
| **Gray Oral Reading Test, 4th Edition (GORT-4)** | | | | | - 2 |
| *Reading Comprehension* | 6.0 | 1.0 | < 52 | <1 | |
| **Brigance Test of Basic Skills** | | | | | - 3.0 |
| *Word Recognition* | 6.0 | 1.0 | N/A | N/A | ≈ - 2.2 |
| *Analysis of writing sample* | 6.5 | 1.5 | N/A | N/A | |
| **Test of Written Spellling- 3rd Ed. (TWS-3)** | | | | | - 3.4 |
| *Predictable Words* | 6-3 | 1.3 | 79 | 8 | - 3.4 |
| *Unpredictable Words* | 6-3 | 1.3 | 68 | 2 | - 3.7 |
| *Total Words* | 6-0 | 1.0 | 66 | 1 | |

B███D████SCREEN08-2004



**THE CENTER FOR
MENTAL HEALTH, INC.**

On September 22, 2004, Damon Brown will be referred to the Children's Intensive Services Program at CMH due to several concerns in regard to his most recent behavior. Damon has shown lack of progress in individual therapy, poor frustration tolerance, and anger management problems which are felt to partly be resulting from frustrations about school due to his inability to keep up with classmates. Over the past few months, Damon's behavior has regressed to the point that most recently he walked out of a therapy session on 9/8/04, and on 9/15/04, refused to enter his session. The recommendation for Damon to receive more intensive treatment services will be presented to the disposition team at which time a decision will be about the level of services needed to effectively meet his needs.

_____  LICSW     9/21/04
Letosha Hodge, LICSW        Date

**DB14**

Non-profit community-based centers providing quality mental health and substance abuse services to children and adults

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT | (box)

MDT REFERRAL DATE: _____    MEETING DATE: 1/12/05

STUDENT: D___ B___    SCHOOL: Kimball ES

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Jacqueline W. Jones | Jacqueline W. Jones | School Social Worker |
| Joyce Venson Yates | Joyce Venson-Yates | SPED Teacher |
| Robin Rabb | Robin Rabb | Sp. Ed. Coordinator |
| Amy Caspari | Amy Caspari | Attorney for DB |
| Evelyn Sykes | Evelyn M | (ec) |

Introduction:
   The meeting convened and all discipline specialist introduced themselves to the parent. A procedural safeguard manual was issued and explaination of parents. The purpose of the meeting was stated: To review D___ progress and address the current HOD from Aug. 26 Sept. 29. The Hearing officers order will be discussed.

THE PARENT [X] IS PRESENT [ ] IS NOT PRESENT AT THE MEETING

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT_____

[ ] CONTINUES TO BE ELIGIBLE FOR SPECIAL EDUCATION

[ ] IS TO BE EXITED FROM SPECIAL EDUCATION

**DB15**

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE: _____     MULTIDISCIPLINARY TEAM (MDT)      Page: 2 of __
                                  CONTINUATION MEETING NOTES
                                  MEETING TYPE: _____

STUDENT: D___ B_____    SCHOOL: Kimball ES    DATE: 1/12/05

The Parent Report:
      The parent declined to report at that time. Ms. Sykes reports that in Sept. D___ was having difficulty with Ms. Gore's homework, but now is able to complete assignments. Parent reports she assist w/ homework

The General Ed. Teacher Reports:
      Ms. Gore reports that D___ participates in social studies and science ~~both subjects~~ ~~that~~ D___ is making progress. He has a peer that works with him to assist with independant work. D___ does not display any behavior problems. Ms. Gore reports that D___ is working on a 3rd grade level. He has made progress from Sept. to now. Ms. Gore reports that D___ participates with Human Society sessions. Ms. Gore calls to discuss progress with parent every Sunday. She assist with handwriting D___ works on computer

The Special Ed. Teachers
      Ms. Yates reports that D___ is working on subtraction w/ regrouping and multiplication. D___ is doing very well in reading. He reads fluently. For comprehension questions are rephase to make them understandable about D___. D___ is making progress

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE: _____     MULTIDISCIPLINARY TEAM (MDT)     Page: 3 of ___
CONTINUATION MEETING NOTES
MEETING TYPE: __MDT__

STUDENT: D___ B___    SCHOOL: Kimball ES    DATE: 1/12/05

in writing, spelling and language arts Ms. Yates has 10 students who are not in the class at the same time. Ms. Yates that reports that D___ writing was bunched up words, but he has improved. Ms. Yates reports that D___ does not have any behavior problems.

The social work report:

Ms. Jones reports that D___ is on task. He is appropriate with his group. He is very plesant, engaged, and interacts well with his peers. He is doing well. Ms. Jones sees D___ one hour on Thursdays. Tuesdays.

HOD Discussion:

The 1st issue discussed the award of compensatory counseling services The comp ed plan from last year was not provided therefore 36 + 28 = 56 + 8 = total of 64 hours. The team agrees that 64 hours of comp ed will be given to D___. Ms. Rabb attempted to get information from central office as to when & how these services will be provided. Ms. Rabb will contact central offices to determine how things will be

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE: _____          MULTIDISCIPLINARY TEAM (MDT)          Page: 4 of __
                                     CONTINUATION MEETING NOTES
                                     MEETING TYPE: MDT

STUDENT: D___ B___     SCHOOL: Kimball ES     DATE: 1/12/05

provided. DCPS will provide in writing &
within 30 days the implentation plan
for providing the service.
Issue 2. The Review occupational therapy
could not be completed because a
DCPS OT person was not available. Ms.
Rabb discussed that we are not
oposed to making up what ever
services are warrent due these inconvience
This team is not qualified to review
the occupational evaluation. Their
is a discrepancy between OT & DCPS
eval dated 5/30/03 and independant
eval dated 5/30/04 eval.

104

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE: _____

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
MEETING TYPE: _MDT_

Page: **5** of ___

*advocate requested additions*

STUDENT: D____ B____    SCHOOL: Kimball ES    DATE: 1/12/05

Ms. Gore con't

Ms. Gore reports that D____ work multiplication. He work with gen. ed. class a total 18 students. 15 min. a day D____ works with review with Ms. Gore class. 1:30 - 3:15. Ms. Gore reports D____ work on activities and packages from Ms. Yates on Friday afternoons. Ms. Gore did not bring samples of D____ work.

Ms. Yates reports D____ can not write a paragraph w/out assistance. D____ has difficulty with subtrsation & multiplication with regrouping. D____ appear withdrawn for a few days after his brother left. Ms. Yates spoke to the parent & he was able to resolve.

Ms. Jones did not bring logs.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS    1-01-01    DIVISION OF SPECIAL EDUCATION    MDT CONTINUATION MEETING NOTES    APPENDIX A

105

NAIJEMN/BERNARD.PHD          301 776 6365          P.82



**Atlantic Health Services Inc.°**

D████ B████Page 1

## CLINICAL PSYCHOLOGICAL EVALUATION
### Confidential Report

**Student:** D███ B████
**Date of Birth:** █████1995
**Current School:** Kimball ES
**Primary Language:** English
**Date of Evaluation:** April 4, 2005

**ID:** 9083058
**Age:** 11 years, 3 months
**Grade:** 4th

**Date of Report:** April 25, 2005

### REASON FOR REFERRAL

D████ was referred for a clinical psychological evaluation in order to rule out the presence of any emotional disorders that may impact his performance in an academic setting. He is currently classified as a student with Emotional Disturbance. Results from this evaluation will be used to assist the Multi-Disciplinary Team in determining the most appropriate educational program.

### BACKGROUND INFORMATION

D████ is an 11 year-old African American child at Kimball Elementary School. He is a slightly overweight male enrolled in the fourth grade. D████ previously attended Benning Elementary School. It was reported that he had a difficult time focusing on classroom assignments and that he had a prolonged adjustment to the school environment.

A review of D████ school records indicated that he has been diagnosed with Attention-Deficit/Hyperactivity Disorder and depression. He currently receives 23.5 hours of specialized instruction and 1 hour of psychological counseling. D████ reported to the examiner that he participated in school-based group counseling once a week and takes medications (name unknown) on a daily basis. Although D████ biological father does not reside in his home, he usually visits with him on a daily basis.

According to a social history evaluation which was conducted when D████ was eight years old, he has two half brothers, one older half sister, and three younger half sisters. D████ and his family became known to the child welfare authorities in 1999 due to his biological mother's substance abuse and sustained criminal activity. She was also previously incarcerated, upon which D████ (at age four) and his siblings were placed in foster homes through the Division of Family Services in the State of Delaware. D████

■ 600 Jefferson Plaza, Suite 305
Rockville, MD. 20852
301-838-3430
Facsimile 301-838-3063

*Commitment to Excellence*

■ 111 South Calvert St., Suite ████
Baltimore, MD. 21202
410-385-5651
Facsimile 410-385-5201

**DB16**

PAGE 05                    KES                    9645315Ø    04/28/2005  07:33

APR-27-2005 10:07 PM  NAIJEAN/BERNARD.PHD    301 776 6365    P.03

D███ B███ Page 2

currently lives with Ms. Evelyn Sykes, his paternal grandmother, and his younger brother. Several unsuccessful attempts (4/18 & 4/24/05) were made to contact Ms. Sykes in order to obtain updated background information.

D█████ familial medical history is significant for a maternal history of bipolar disorder and substance abuse. Additionally, his siblings have been diagnosed with Tourette's Syndrome, transient tic disorders, Attention-Deficit/Hyperactivity Disorder, and Adjustment disorders. There is no information available surrounding D████ birth or early childhood development. D█████ psychiatric history is significant for past hospitalizations due to suicidal gestures and impulsive behavior. Past psychotropic medications have included Risperdal, Clonidine, and Adderall. It is important to note that this information came from a social history evaluation conducted when D████ was eight years old. It remains unclear whether D████ is still receiving the same level of psychiatric care (i.e., psychotropic medication regimen) to address his Attention-Deficit/Hyperactivity Disorder and depressive symptoms.

**Psychoeducational Evaluation**
A previous Psychoeducational evaluation (March 04, 2005), conducted by Ms. Deidra Alexander (DCPS School Psychologist), was also reviewed. On an abbreviated measure of cognitive functioning (i.e., WASI), D████ obtained scores falling between the Low Average to Average range. The IQ scores are as follows: VIQ = 86, PIQ = 90, and FSIQ = 86. On the Woodcock-Johnson Tests of Achievement – Third Edition, D████ obtained a below average score in Reading (SS = 71), a low average score in Mathematics (SS = 80), and a below average score in Written Language (SS = 77). On a test of visual-motor integration, (VMI), D████ obtained a standard score of 95, which falls in the Average range.

**BEHAVIORAL OBSERVATION**
D████ willingly accompanied this evaluator to the testing room. Regarding his mental status, D█████ affect appeared to be within normal limits. His mood was congruent with his affective level. He exhibited no symptoms of depression, anxiety, suicidal or homicidal ideation. However, he did admit to having problems concentrating in school. D██████ thought process was goal oriented and logical, lucid and coherent. His thought content contained no delusions, hallucinations, or obsessions. His rate of speech, rhythm, and volume appeared to be adequate. He was oriented to time, place, and person. Both his judgment and insight were deemed to be age appropriate. Therefore, a functional rapport was established with the following results deemed a fair estimate of D████ current social emotional functioning.

**TESTS & TECHNIQUES ADMINISTERED**
Clinical Interview with student, D███ B███
Review of selected school records
- Psychoeducational evaluation (03/04/2005)
- Child Social History & Summary
Children's Sentence Completion Blank
House-Tree-Person (H-T-P)

107

APR-27-2005 10:08 PM   NAIJEAN/BERNARD.PHD         301 776 6365              P.04

Damon-Bonner Page 3

Kinetic Family Drawing (KFD)
Reynolds Children's Depression Scale (RCDS-HS)
Conners' Teacher Rating Scale – Revised, completed by Ms. Gore
The Beck Youth Inventories of Emotional & Social Impairment
- Beck Self Concept Inventory for Youth
- Beck Anxiety Inventory for Youth
- Beck Depression Inventory for Youth
- Beck Anger Inventory for Youth
- Beck Disruptive Behavior Disorder for Youth

## TEST RESULTS

On the Children's Sentence Completion Blank, Damon was asked to turn sentence stems
into complete sentences. This instrument presents a more straightforward response style
that often gives insight to issues that are in the forefront of an individual's thoughts.
Damon's sentence completions were notable due to his level of insight about his
relationship (or lack thereof) with his parents, dislike of violence, and past memories of
his former life in Delaware. Examples of his responses are included below:

"*If I were the boss around here, I'd* . . . make sure people didn't get into a lot of fights."
"*I'd be really happy if* . . . everybody would stop killing."
"*I sure wish my father would* . . . stop getting in jail."
"*My mother* . . . she don't live with me."

Perhaps the most notable sentence stem is the following, "*I would do anything to forget
the time that I* . . . left D.C." Damon explained that a policeman stopped his biological
father and allegedly threatened to shoot him if he did not take his son back to Delaware.
At that time, his paternal grandmother, Ms. Sykes, adopted him, and he has maintained a
stable familial environment ever since.

Damon also completed projective drawings of a House, Tree, and a Person, along with a
separate drawing of his family. These drawings suggest that Damon may have unmet
dependency needs, desires to be older, and, at times, displays a general air of
unhappiness. He also appears to feel emotionally closest to his uncle and paternal
grandmother. When asked by the examiner what his greatest desire was, Damon replied,
"peace on earth."

On the Reynolds Children's Depression Scale (RCDS-HS), Damon responded to 30 items
associated with depressive symptomatology. Scores exceeding 70 are considered
clinically significant. Damon endorsed items resulting in a Depression Total score of 57,
which suggests that he is acknowledging some emotional discomfort, but not at a
clinically significant level.

The Beck Youth Inventories measure a child's self-report of emotional and social
impairment in five specific areas: depression, anxiety, anger, disruptive behavior, and
self-concept. The 100 test items were read aloud to Damon by the examiner. Notably,
none of the five subscales reached clinical significance, which may mean that Damon is in

108

HRAJEAN/BERNARD,PHD          301 776 6365          P.05

Dawen Brown Page 4

denial about his current level of social-emotional functioning. The T-scores are as follows: Self-Concept = 42, Anxiety = 61, Depression = 58, Anger = 59, and Disruptive Behavior = 49.

The Conners' Teacher Rating Scale – Revised is a behavioral rating scale that measures Oppositional Behavior, Cognitive Problems/Inattention, Hyperactivity, and ADHD symptoms. Ms. Janie Gore, Dennis general education teacher (social studies and science), completed this scale. The results of the CTRS yielded no significant T-scores. The subtest T-scores are as follows: Oppositional = 48, Cognitive Problems/Inattention = 56, Hyperactivity = 47, and Conners' ADHD Index = 58.

Based on the results of the clinical interview and testing, the following diagnoses are offered:

| | |
|---|---|
| Axis I | Attention-Deficit/Hyperactivity Disorder (by history) |
| | Depressive Disorder NOS (by history) |
| Axis II | V 71.09 No Diagnosis |
| Axis III | None reported |
| Axis IV | Psychosocial stressors: history of early childhood neglect by biological mother |
| Axis V | GAF = 65 (current) |

## IMPRESSIONS/EDUCATIONAL IMPLICATIONS

Dennis is an 11-year-old African American child who is enrolled in the fourth grade at Kimball Elementary School. Dennis has an extensive social-emotional history, typified by early childhood neglect by his biological mother. He has also been hospitalized for psychiatric reasons due to impulsive behavior and suicidal gestures. The current evaluation did not yield any clinically significant evidence (i.e., see CTRS, Beck Scales, RCDS) suggesting the presence of mental health concerns. It appears that Dennis therapeutic interventions, such as school-based therapy and psychotropic medication regimen, may have subdued his depressive and ADHD symptoms within the school setting. That being said, there is a documented history of depression and Attention-Deficit/Hyperactivity Disorder in Dennis. Additionally, Dennis has a family psychiatric history of schizophrenia, Tourette's Syndrome, transient tic disorders, and Adjustment disorders, which suggests that Dennis may be at risk for future mental health concerns. As noted earlier, the examiner tried unsuccessfully to contact Ms. Sykes, Dennis legal guardian, in order to obtain updated background information. Pending the objective input of his guardian and the Multi-Disciplinary Team, Dennis may qualify for special education services as a student with an Emotional Disturbance.[a]

[a]Emotional Disturbance:
  (a) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
  (b) inappropriate types of behavior or feelings under normal circumstances;
  (c) a generally pervasive mood of unhappiness or depression; or
  (d) a tendency to develop physical symptoms or fears associated with personal or

109

D█████ B█████ Page 5

school problems.

## RECOMMENDATIONS

1) As D█████ social-emotional issues appear to be interpersonal in nature, he would continue to benefit from participation in group therapy within the school environment.

2) Continued psychiatric monitoring is recommended to address his need for psychotropic medication for ADHD and depressive symptoms.

3) D█████ should participate in a mentoring program in which he is matched with a male adult to assist him with schoolwork, motivation, and positive behavior, and with whom he can build a relationship of trust.


*Naijean Bernard, PhD*

Naijean S. Bernard, Ph.D.
Psychology Associate
April 25, 2005

Paul D. Frey, Ph.D.
Licensed Clinical Psychologist (DC #0170)
Clinical Supervisor

110

DCPS - IEP  Page 1 of 4

Additional Comments: ☐

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**
**INDIVIDUALIZED EDUCATIONAL PROGRAM**

## I. IDENTIFICATION INFORMATION

Student Name: Last B████████    First D██████ K    MI

Student ID 9083058    Soc. Sec. No. ████████    Age: 10    Grade 0

Gender ☒ M ☐ F    Date of Birth ████1995    Ethnic Group B

Address 3930 Blaine Street    SE
House No.    Street Name    Quadrant    Apartment #
Washington    DC    20019
City    State    Zip Code

☐ Non-attending

Attending School Kimball Elementary    Home School

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS /

Guardian  Ms. Evelyn Skyes

Address of (If different from student):    ☐ Parent  ☒ Guardian  ☐ Surrogate

House No.  Street Name    Quad    Apt. No.    City    State    Zip Code
Telephone: Home (202) 388-5524    Work

### II. CURRENT INFORMATION

Date of IEP Meeting:    05/24/2005
Date of Last IEP Meeting:    05/19/2004
Date of Most Recent Eligibility Decision:    09/17/2003

Purpose of IEP Conference:
☐ Initial IEP    ☒ Review of IEP
☐ Requested Eval.    ☐ 3yr ReEval.

Indicate Level of Standardized Assessment:
Level IV

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

| BEHAVIOR | TRANSPORTATION |
|---|---|
| ESY | TRANSITION |

To be completed by Office of Bilingual Education English and Math Proficiency Assessment

| Oral | |
| Rd'g/Written | |
| Instrument: | |
| Date: | |

### III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements |
|---|---|---|---|---|
| Student | English | English | English | Native Language |
| Parent | English | English | English | Native Language |
| Home | English | English | English | Native Language |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | SpEd | Total | FREQUENCY Hrs / Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # | wks./mos |
|---|---|---|---|---|---|---|---|---|---|
| Specialized Instruction | 1.00 | 15.00 | 15.00 | Hrs | Week | Special Education Teacher | 05/25/2005 | 10 | Months |
| Psychological Services | 0.00 | 1.00 | 1.00 | Hrs | Week | School Social Worker | 05/25/2005 | 10 | Months |
| Speech-Language | 0.00 | 1.00 | 1.00 | Hrs | Week | S and L Therapist | 05/25/2005 | 10 | Months |
| | | | 0.00 | | | | | | |
| | | | 0.00 | | | | | | |
| | | | 0.00 | | | | | | |
| | | | 0.00 | | | | | | |
| | | | 0.00 | | | | | | |
| TOTAL | 0.00 | 17.00 | 17.00 | Hours Per Week | | | | | |

### V. Disability(ies) Multiple Disabilities

Percent of time in Specialized Instruction and Related Services
☐ 0-20%    ☒ 21-60%    ☐ 61-100%

Percent of time NOT in a General Education Setting    53%

☐ (Check if setting is general Ed.)

### VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

Evelyn Skyes/ Sharon Millis
  Guardian

Joyce Yates
  Special Ed Teacher

Janie Gore
  General Ed Teacher

Robin Rabb
  LEA Representative

Sheila Miller
  Principal or Designee

Joyce Gaillard
  Student

Winfield White
  Occupational Therapist

Deidra Alexander
  School Psychologist

_____
  SpEd Social Worker

*I AGREE* with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature    Date

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 1 of 4

**DB17**

RECEIVED:  6/ 1/05  7:54AM; ->HP LASERJET 3150; #991; PAGE 48    PAGE 47    05/31/2005  15:48  3018705715    111

05/24/2005

| Student Name | D█████ K  B█████████ | Managing School | Kimball Elementary |
| Student ID Number | 9083058 | Attending School | Kimball Elementary |

DOB ████1995

**VII. Present Educational Performance Levels in Areas Affected by the Disability**

Additional Comments: ☐

**Score(s) When Available**

**Academic Areas: (Evaluator)** J. Yates - Special Education Teacher

Math Strengths:

D████ can perform 1 digit by 1 digit multiplication problems.

Math Cal.  84

Math Rea.  81

Impact of disability on educational performance in general education curriculum:

D████ occasionally needs reinforcement of previously learned skills.

See goal page: 2

Date: 03/04/2005

Reading Strengths:

D████ is able to read basic sight words. He uses word family associations to decode words.

Rdg. Com  82

Rdg. Basic  72

Impact of disability on educational performance in general education curriculum:

D████'s deficits impact on performance in general education.

Written Ex.  85

See goal page: 1

Date: 03/04/2005

**Communication (Speech & Language) (Evaluator)** Joyce W. Gaillard, M.S., SLP

**Score(s) When Available**

Strengths:

D████ is able to utilize sentences, ask and answer questions, and participate in conversation.

| Exp.Lang. | 96SS | CELF- |
| Rec- Lang. | 81SS | CELF- |
| Artic | WNL | |
| Voice | WNL | |
| Fluency | WNL | |

Impact of disability on educational performance in general education curriculum:

Receptive language skills negatively impact general education performance.

| Exp. Voc. | DNT | |
| Rec. Voc. | 81SS | CELF-4 |

See goal page:

Date: 04/08/2005

**Motor/Health (Evaluator)** _____

**Score(s) /Results When Available**

Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:

Date:

**Social Emotional Behavioral Areas: (Evaluator)** Jacqueline W Jones, LCSW

**Score(s) When Available**

N/A

Strengths:

D███████ is a personable boy who desires to have positive relationships

Impact of disability on educational performance in general education curriculum:

D███████'s interpersonal skills and distracting behavior may impact on his educational performance.

See goal page:

Date:

**Cognitive/Adaptive Behavior: (Evaluator)** _____

**Score(s) When Available**

Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:

Date:

**Prevocational Skills: (Evaluator)** _____

**Score(s) When Available**

Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:

Date:

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 2 of 4

05/31/2005 15:48    3018705715    112

| Student Name | D████ K  B████ | Managing School | Kimball Elementary | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9083058 | DOB 01/26/1995 | Attending School Kimball Elementary | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**   Additional Comments: ☐   Goal Number: ████

Area addressed by goal:  Academic Areas: Reading

**ANNUAL GOAL:** (including mastery criteria.)

D████ will increase his reading skills by 10 months growth by mastering the following short-term objectives.

Provider(s):  Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| (1)  Given a word list on the 3rd grade level, D████ will use strategies to identify and spell the word correctly with no more than 3 cues as measured by teacher-made assessment. | | Monthly |
| (2)  Given a model for phonetic decoding strategy, D████ will decode unfamiliar words in 3 out of 5 trials as measured by teacher assessment. | | Monthly |
| (3)  Given a third-grade reading selection, D████ will use context clues to define unknown words in 3 out of 5 trials, as measured by teacher-made test. | | Monthly |
| (4)  Given a reading selection, D████ will be able to answer questions related to the story correctly in 3 out of 5 trials as measured by teacher assessment. | | Monthly |
| (5)  Given a randomized set of events from a reading selection, D████ will sequence five events with 80 percent accuracy in 3 out of 5 trials, as measured by teacher-made test. | | Monthly |
| | | |

**EVALUATION PROCEDURE(S)**

☒ Portfolio   ☐ Log   ☐ Chart   ☒ Test   ☒ Documented Observation   ☐ Report   ☒ Other  Informal Assessment

District of Columbia Public Schools     07-02-2001     Division of Special Education     Appendix - A     IEP Page 3 of 4

113

| Student Name  D████ K  B██████ | Managing School  Kimba l Elementary | DCPS - IEP |
|---|---|---|
| Student ID Number 9083058 | DOB ████/1995  Attending School  Kimba l Elementary | Page 3 of 4 |

Goal Number: ████

## VIII. SPECIALIZED SERVICES    Additional Comments: ☐

Area addressed by goal: Academic Areas: Math

**ANNUAL GOAL: (including mastery criteria.)**

D████ will demonstrate, increased math skills in 10 months time as measured by informal and formal assessment.

Provider(s): Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| (1) Given a teacher prompt, D████ will collect and write multiplication facts for factors 0-10 with 80% accuracy in 4 out of 5 trials  as measured by teacher made test. | | Monthly |
| (2) Given a multiplication chart, D████ will use the chart to multiply a 2-digit number by 1-digit number without regrouping with 80% accuracy in 4 out of 5 trials as measured by teacher made test. | | Monthly |
| (3) Given a place value chart and problems, D████ will correctly identify the values of whole numbers up to 9,999 both written and numerical in 3 out of 5 trials as measured by teacher assessment. | | Monthly |
| (4) Given pictures, diagrams or facts, D████ will be able to identify key words in order to determine the operations and the evidence of operations to solve the word problems, 3 out of 5 trials  as measured by teacher assessment. | | Monthly |
| (5) Given five geometric shapes, D████ will name, identify in context, and reproduce shapes with no more than 2 errors as measured by teacher assessment. | | Monthly |

## EVALUATION PROCEDURE(S)

☒ Portfolio  ☐ Log  ☒ Chart  ☒ Test  ☒ Documented Observation  ☐ Report  ☒ Other  Informal Assessment

District of Columbia Public Schools       07-02-2001       Division of Special Education       Appendix - A       IEP Page 3 of 4

| Student Name | DA___ K.    B___ | Managing School | Kimball Elementary | DCPS - IEP |
| Student ID Number | 9083058 | DOB | ___1995 | Attending School | Kimball Elementary | Page 3 of 4 |

Goal Number: ___

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ |

Area addressed by goal: Language Arts

**ANNUAL GOAL:** (including mastery criteria.)

D___ will improve in language arts skills by ten months growth as measured by informal/formal assessment.

Provider(s): Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | | Date Mastered | Evaluation Schedule |
|---|---|---|---|
| (1) D___ will be able to write sentences of varying length independently using correct grammar, punctuation and spelling in 4 out of 5 trials as measured by teacher assessment. | | | Monthly |
| (2) Given a topic, D___ will write 5-7 related sentences in 3 out of 5 trials as measured by teacher assessment. | | | Monthly |
| (3) D___ will write complete sentences in cursive using correct letter formation and letter connection as measured by 90% legibility | | | Monthly |
| (4) Given a complete sentence without punctuation, D___ will use period, exclamation point, or question mark to punctuate appropriately with 80% accuracy in 4 out of 5 trials, as measured by teacher made test. | | | Monthly |
| (5) Given a previously written passage, D___ will proofread to identify word omissions with 80% accuracy in 3 out of 5 trials, as measured by teacher assessment. | | | Monthly |

**EVALUATION PROCEDURE(S)**

☒ Portfolio  ☐ Log  ☒ Chart  ☒ Test  ☒ Documented Observation  ☐ Report  ☒ Other  Informal Assessment

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

RECEIVED: 6/ 1/05 7:57AM; ->HP LASERJET 3150; #991; PAGE 52

| Student Name  D████ B████ | | Managing School  Kimball ES | DCPS - IEP |
|---|---|---|---|
| Student ID Number 9083058 | DOB ████/95 | Attending School  Kimball ES | Page 3 of 4 |

Goal Number: ☐

**VIII. SPECIALIZED SERVICES**   Additional Comments: ☐

Area addressed by goal:  Communication

**ANNUAL GOAL: (including mastery criteria.)**

D████ will increase his receptive language skills with 80% accuracy.

Provider(s): Speech Language Therapist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given a set of pictures/objects, D████ will point to the first and last items in three out of five trials as measured by therapist observations. | | Monthly |
| Given a set of pictures/objects, D████ will point to the second item in three out of five trials as measured by therapist observations. | | Monthly |
| Given a set of pictures/objects, D████ will point to the middle and last items in three out of five trials as measured by therapist observations. | | Monthly |
| Given a set of pictures/objects, D████ will execute oral directions that contain temporal (then) concepts in three out of five trials as measured by therapist observations. | | Monthly |
| Given a set of pictures/objects, D████ will execute oral directions that contain temporal (after) concepts in three out of five trials as measured by therapist observations. | | Monthly |
| Given a set of pictures/objects, D████ will execute oral directions that contain temporal (before) concepts in three out of five trials as measured by therapist observations. | | Monthly |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☒ Report  ☐ Other

District of Columbia Public Schools      07-02-2001      Division of Special Education      Appendix - A      IEP Page 3 of 4

116

| Student Name  DAMON BROWN | Managing School  Kimball ES | DCPS - IEP |
|---|---|---|
| Student ID Number 9083058 | DOB ████95  Attending School  Kimball ES | Page 3 of 4 |

Goal Number: [   ]

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐

Area addressed by goal: __Communication__

**ANNUAL GOAL: (including mastery criteria.)**

Damon will increase his receptive and expressive language skills with 80% accuracy.

Provider(s): Speech Language Therapist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given an orally presented passage, Damon will identify the main idea in three out of five trials as measured by therapist observations. | | Monthly |
| Given an orally presented passage, Damon will sequence the events in three out of five trials as measured by therapist observations. | | Monthly |
| Given an orally presented passage, Damon will recall the details in three out of five trials as measured by therapist observations. | | Monthly |
| Given an orally presented passage, Damon will make inferences in three out of five trials as measured by therapist observations. | | Monthly |
| Given an orally presented passage, Damon will make predictions in three out of five trials as measured by therapist observations. | | Monthly |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☒ Report  ☐ Other

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

301870575715    05/31/2005  15:48

PAGE 53

RECEIVED: 6/ 1/05  7:58AM; -> HP LASERJET 3150; #991; PAGE 54

Student Name _____ X. _____     Managing School Kimball E.S.     DCPS - IEP
Student ID Number 9083058     DOB ___/95     Attending School Kimball E.S.     Page 3 of 4

| VIII. SPECIALIZED SERVICES | Additional Comments: | Goal Number: |

Area addressed by goal: _Social Emotional_

**ANNUAL GOAL:** (including mastery criteria.)

_____ will improve his social-emotional skills through peer and adult interaction by 80%.

Provider(s): _Social Worker_

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| _____ will verbalize her feelings appropriately to peers and adults | | monthly |
| _____ will stay on-task with less than three re-directions. | | monthly |
| _____ will display positive verbal and physical responses to constructive criticism from peers and adults. | | monthly |
| | | |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

Portfolio     Log     Chart     Test     Documented Observation     X Report

Other: Consultation with teacher/staff regarding observations and reports

District of Columbia Public Schools     07-02-2001     Division of Special Education     Appendix - A     IEP Page 3 of 4

05/31/2005 15:48   30187085715   PAGE 54
RECEIVED: 6/ 1/05 7:59AM; ->HP LASERJET 3150; #991; PAGE 55

05/24/2005

| Student Name | D̶̶̶ K. B̶R̶O̶W̶N̶ | Managing School | Kimbal Elementary | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number 9083058 | | DOB ██████1995 | Attending School Kimbal Elementary | Page 4 of 4 |

Additional Comments: ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION
### SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in general education? ☐ Yes ☒ No

Explanation for removal out of regular education classroom.

Student requires small structured environment to accommodate disabilities

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| | GenEd | SpEd | Total | Hr./Min | D/W/M. | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for testing. ☐ None needed

Timing/Scheduling: Extended time, Extra breaks during test
Setting: Reduced, minimalized distractions
Presentation: Read directions/test to student, Frequent checks for understanding
Response: Specific praise for appropriate behavior, improvement in work effort
Equipment:

## XI. STATE AND DISTRICT ASSESSMENTS:

☐ Level I  Tested with non-disabled peers under standard conditions without accommodations.

☐ Level III (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level V Portfolio:

☐ Level II  (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☒ Level IV (Describe the alternative assessment)
Read directions/ test to student

## XII. Areas Requiring Specialized Instruction and Related Services:        Modifications:

☒ Reading
☒ Mathematics
☒ Written Expression
☐ Other.
☐ None

☐ Physical/Sensory
☒ Social Emotional
☐ Physical Development

☐ Transition
☐ Vocational
☐ Independent Living
☐ Speech/Language

☒ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| In General Education Classroom Setting | Rejected | |
| Out of General Education Classroom | Rejected | |
| Combination General Education and Resource Classroom | Accepted | Time away from non-disabled peers in academic text |
| | | |
| | | |

Modification(s)/Accommodation(s) to address the harmful effects:

Participation in non-academic subjects with non-disabled peers

District of Columbia Public Schools     07-02-2001     Division of Special Education     Appendix - A     IEP Page 4 of 4

RECEIVED:  6/ 1/05  7:58AM;  ->HP LASERJET 3150; #991; PAGE 56

DRAFT

### DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### SPECIAL EDUCATION

## MULTIDISCIPLINARY TEAM (MDT)

### Prior to Action Notice

**Check Purpose:**
- [ ] Initial Evaluation
- [ ] Initial Placement
- [X] Reevaluation
  - [ ] Change in Category Exit
  - [X] Related Service Add
  - [ ] Related Service
  - [ ] Change in Placement
  - [X] Annual
  - [ ] Other

Date __05/24/2005__

Student D_____ K_____ B_____    DOB ____'95

School __Kimball Elementary__

Current Disability Category __MD__

Setting __Combination general education and resource classro__

Dear __Ms. Evelyn Skyes__

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.

Therefore, you are being notified of the following proposed changes:
- [X] Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Other _____

A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)

- [ ] Your child is not eligible for special education service(s).
- [X] Your child is eligible or continues to be eligible to receive special education services as a student with MD
- [X] Your child will begin receiving __Social Work Services__ as a related service(s).
- [ ] Your child will no longer receive _____ as a related service(s).
- [X] Your child's category of disability is being changed from __ED__ to __MD__
- [X] Your child's alternative placement on continuum (next setting) is being changed,
  - from _____ to _____
- [ ] Your child is no longer eligible and will be exited from the special education program.
- [ ] Other: _____

Location of Services __Kimball Elementary__

**Description and Explanation of agency action proposed or refused.**

Based on the documentation and team discussion D____ disability was changed from ED to MD(LD/OHI) He requires specialized instruction and related services in a combination setting

**Description of Other Options Considered and reasons for rejection of each option**

Placement in general ed was rejected

Other relevant factors to the decision- __current assessment__

MDT Members: 
- [X] Principal or Designee
- [X] Parent
- [ ] Student
- [X] Social Worker
- [X] General Education Teacher
- [X] Special Education Teacher
- [ ] Speech and Language
- [X] *LEA & Interpreter (*may be one)
- [X] Psychologist
- [X] Other: OT
  __compliance specili__

Parents may bring individuals to participate in the MDT meeting. These participants should have knowledge or special expertise regarding the child. The following individuals invited by parent: _____

Any questions you may have concerning your child's program may be directed to the principal.

You are protected under the Procedural Safeguards for parents, which are enclosed for your information.

If I can be of assistance to you, or have questions regarding the Procedural Safeguards, at (202) 645-3150 _____ (school telephone number).

please contact Robin Rabb

**See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED**

MDT Prior to Action Notice
07-02-2001

**DB18**
120

DCPS - IEP  Page 1 of 4

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## WASHINGTON, D.C.
## INDIVIDUALIZED EDUCATIONAL PROGRAM

Additional Comments:

### I. IDENTIFICATION INFORMATION

### II. CURRENT INFORMATION

Date of IEP Meeting: 5/9/2006
Date of Last IEP Meeting: 5/24/2005
Date of Most Recent Eligibility Decision: 5/24/2005

Student Name: Last B███████  First D████ K  MI

Student ID 9083058  Soc. Sec. No. ███████  Age: 11  Grade 05

Gender [X] M [ ] F  Date of Birth ███/1995  Ethnic Group Black

Address 3930  Blaine St NE  NE
House No.  Street Name

Washington  DC  20019
Quadrant  Apartment #  City  State  Zip Code

[ ] Non-attending

Attending School Kimball Elementary  Home School

[X] Elem. [ ] Mid/JHS [ ] SHS [ ] CWS /

Parent  Ms. Evelyn Skyes

Address of (if different from student):  [X] Parent [ ] Guardian [ ] Surrogate

House No.  Street Name  Quad  Apt. No.  City  State  Zip Code
Telephone: Home 2023885524  Work

Purpose of IEP Conference:
[ ] Initial IEP  [X] Review of IEP
[ ] Requested Eval.  [ ] 3yr ReEval.

Indicate Level of Standardized Assessment:
Level IV

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

[ ] BEHAVIOR  [ ] TRANSPORTATION
[ ] ESY  [ ] TRANSITION

### III. LANGUAGE

To be completed by Office of Bilingual Education
English and Math Proficiency Assessment

Oral
Rdg./Written
Instrument:
Date:

| III. LANGUAGE | Language | Language Used for Evaluation | Language Used In Conference | Communication Requirements |
|---|---|---|---|---|
| Student | English | English | English | Native Language |
| Parent | English | English | English | Native Language |
| Home | English | English | English | Native Language |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | | | SpecEd | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # | wks/mos |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ses. | Time | Total | Ses. | Time | Total | Hr./ Min | D/W/M | | | | |
| Specialized Instruction | 0 | 0 | 0 | 1 | 15.0 | 15 | Hrs | Week | Special Education Teacher/R | 5/10/2006 | 10 | Month |
| Psychological Services | 0 | 0 | 0 | 1 | 1.00 | 1 | Hrs | Week | School Social Worker | 5/10/2006 | 10 | Month |
| Speech-Language | 0 | 0 | 0 | 1 | .50 | 0.5 | Hrs | Week | Speech and Language Thera | 5/10/2006 | 10 | Month |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| TOTAL HOURS: | | 0 | | | 16.5 | | Total Combined Hours Per Week: | | | | | |

### V. Disability(ies) Learning Disabled

Percent of time in Specialized Instruction and Related Services
[ ] 0-20% [X] 21-60% [ ] 61-100%  51 %

Percent of time NOT in a General Education Setting

[ ] (Check if setting is general Ed.)

### VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

Evelyn Skyes
  Parent
Joyce Yates
  Special Ed
Wilfred Elliott
  General Ed Teacher
Robin Rabb
  LEA Representative
Robin Rabb
  Principal or Designee

Student
Carole McNealy
  Social Worker
Joyce Gaillard
  Speech/Language Therapist

[Signatures]

[✓] I AGREE with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature  Date 5/9/06

District of Columbia Public Schools   04-02-2004   Division of Special Education   Appendix - A   IEP Page 1 of 4

DB19

| Student Name | D████ K      B████ | Managing School | Kimball Elementary | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number 9083058 | | DOB ████1995 | Attending School Kimball Elementary | Page 2 of 4 |

**VII. Present Educational Performance Levels in Areas Affected by the Disability**

Additional Comments: ☐

**Academic Areas:** (Evaluator) Joyce Yates - Special Education Teacher

Math Strengths:

D████ can multiply 2 digit by 1 digit math problems without regrouping.

Impact of disability on educational performance in general education curriculum:

D████ has trouble solving math word problems.

Reading Strengths:

D████ uses word family association to decode words.

Impact of disability on educational performance in general education curriculum:

D████ deficits impact on performance in general education.

Score(s) When Available
- Math Cal. 3.5
- Math Rea. 3.3
- See goal page: 4
- Date: 10/30/05
- Rdg. Com 3.8
- Rdg. Basic 3.8
- Written Ex. n/a
- See goal page: 3
- Date: 10/30/05

**Communication (Speech & Language)** (Evaluator) Joyce W. Gaillard, MS, DCPS Certified

Strengths:

D████ is able to utilize sentences, ask and answer questions, and participate in conversations.

Impact of disability on educational performance in general education curriculum:

Receptive language skills negatively impact general education performance.

Score(s) When Available
| | | |
|---|---|---|
| Exp. Lang. | 96SS | CELF- |
| Rec- Lang. | 81SS | CELF- |
| Artic | WFL | |
| Voice | WFL | |
| Fluency | WFL | |
| Exp. Voc. | DNT | |
| Rec. Voc. | 81SS | |
| See goal page: | 2 | |
| Date: | 4/8/2005 | |

**Motor/Health** (Evaluator)

Strengths:

Impact of disability on educational performance in general education curriculum:

Score(s) /Results When Available
- See goal page:
- Date:

**Social Emotional Behavioral Areas:** (Evaluator) Social Worker

Strengths:

D████ enjoys interacting with his peers and adults during social and group settings.

Impact of disability on educational performance in general education curriculum:

D████ should continue improve his socialization and self-esteem skills with adults and peers.

Score(s) When Available
- N/A
- See goal page: 1
- Date: 5/5/2006

**Cognitive/Adaptive Behavior:** (Evaluator)

Strengths:

Impact of disability on educational performance in general education curriculum:

Score(s) When Available
- See goal page:
- Date:

**Prevocational Skills:** (Evaluator)

Strengths:

Impact of disability on educational performance in general education curriculum:

Score(s) When Available
- See goal page:
- Date:

122

| Student Name | D██ K. B███ | Managing School | Kimball Elementary | | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | 9083058 | DOB ██1995 | Attending School | Kimball Elementary | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**   Additional Comments: ☐   Goal Number: ☐ I

Area addressed by goal: Social Emotional Behavioral

**ANNUAL GOAL: (including mastery criteria.)**

D██ will improve his social emotional skills through peer and adult interaction by 80% accuracy.

Provider(s): School Social Worker

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| D██ will communicate personal feeling and perceptions as they relate to family dynamics with an adult with 80% accuracy. | | Monthly |
| D██ will gain more independance and social skills to assist him with his maturity and growth/development with 80% accuracy. | | Monthly |
| D██ will improve his socialization and self-esteem skills with peers and adults with 80% accuracy. | | Monthly |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☒ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools        07-02-2001        Division of Special Education        Appendix - A        IEP Page 3 of 4

| Student Name  D___  K    B___ | Managing School  Kimball Elementary | DCPS - IEP |
|---|---|---|
| Student ID Number 9083058    DOB ___/1995 | Attending School  Kimball Elementary | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments: [ ]    Goal Number: [ 2 ]

Area addressed by goal:  Communication

**ANNUAL GOAL: (including mastery criteria.)**

D___ will increase receptive language skills with 80% accuracy.

Provider(s): Speech and Language Therapist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Given a set of pictures/objects, D___ to the second item in 3/5 trials as measured by therapist observations. | | Monthly |
| Given a set of pictures/objects, D___ will point to the middle and last items in a series in 3/5 trials as measured by therapist observations. | | Monthly |
| Given a set of pictures/objects, D___ will execute oral directions that contain temporal (before) concepts in 3/5 trials as measured by therapist observations. | | Monthly |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

[ ] Portfolio  [ ] Log  [ ] Chart  [ ] Test  [X] Documented Observation  [X] Report  [ ] Other ___

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

124

| Student Name | D▆▆▆ K▆ B▆▆▆▆ | Managing School | Kimball Elementary | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9083058 | DOB ▆▆/1995 | Attending School Kimball Elementary | Page 3 of 4 |

| **VIII. SPECIALIZED SERVICES** | Additional Comments: ☐ | | Goal Number: 3 |
|---|---|---|---|

Area addressed by goal: Academic Areas: Reading

**ANNUAL GOAL: (including mastery criteria.)**

D▆▆▆ will increase his reading skills by 10 months growth as measured by informal/formal assessment.

Provider(s): Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| (1) Given a word list on the 4th-5th grade level, D▆▆▆ will use strategies to identify and spell the work correctly with no more that 3 errors as measred by teacher-made assessment. | | Weekly |
| (2) Given a reading selection, D▆▆▆ will be able to answer questions related to the story correctly in 4 out of 5 trials as measured by teacher assessment. | | Monthly |
| (3) Given a randomized set of events from a reading selection, D▆▆▆ will sequence five events with 80 percent accuracy in 4 out of 5 trials as measured by teacher-made test. | | Monthly |
| (4) When given a reading selection, D▆▆▆ will use the following reading strategies: predict/infer, phonices/decoding, questions, monitor/clarify, evaluation and summarize in 4 out of 5 trials. | | Monthly |
| (5) Given books on his reading level, D▆▆▆ will read at least three books monthly as measured by teacher checklist. | | Monthly |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☒ Chart  ☒ Test  ☒ Documented Observation  ☐ Report  ☒ Other  Informal/Formal Assessment

District of Columbia Public Schools      07-02-2001      Division of Special Education      Appendix - A      IEP Page 3 of 4

| Student Name | D▮▮▮ K   B▮▮▮▮ | Managing School | Kimball Elementary | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9083058   DOB ▮▮▮▮/1995 | Attending School | Kimball Elementary | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**   Additional Comments: ☐    Goal Number: 4

Area addressed by goal: Academic Areas: Math

**ANNUAL GOAL: (including mastery criteria.)**

D▮▮▮ will demonstrate increased math skills in 10 months time as measured by informal and formal assessment.

Provider(s): Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| (1) Given a teacher prompt, D▮▮▮ will recite and write multiplication facts for factors 0-12 with 80 percent accuracy in 4 out of 5 trials, as measured by teacher-made test. | | Monthly |
| (2) Given pictures, diagrams or facts, D▮▮▮ will be able to identify key words in order to determine the operations and the sequence of operations to solve the word problems in 4 out of 5 trials as measured by teacher assessment. | | Monthly |
| (3) Given five geometric shapes, D▮▮▮ will name, identify in context, and reproduce shapes with nor more than 3 errors as measured by teacher assessment. | | Monthly |
| (4) Given a model of fractional parts, D▮▮▮ will identify the correct fraction in 4 out of 5 trials as measured by teacher made assessment. | | Monthly |
| (5) At his instructional level, D▮▮▮ will divide whole numbers in 4 out of 5 trials as measured by teacher made assessment over a consistent period of time. | | Monthly |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☒ Chart  ☒ Test  ☒ Documented Observation  ☐ Report  ☒ Other  Informal/Formal Assessment

| Student Name | D▆▆ K B▆▆ | Managing School | Kimball Elementary | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9083058 | DOB ▆▆1995 | Attending School Kimball Elementary | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐    Goal Number: 5

Area addressed by goal: Language Arts

**ANNUAL GOAL: (including mastery criteria.)**

D▆▆ will improve in language arts skills by 10 months growth as measured by informal/formal assessment.

Provider(s): Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| (1) D▆▆ will be able to write sentences of varying length independently using correct grammar, punctuation and spelling in 4 out of 5 trials as measured by teacher assessment. | | Weekly |
| (2) Given a topic, D▆▆ will write 5-7 related sentences in 4 out of 5 trials as measured by teacher assessment. | | Weekly |
| (3) D▆▆ will write complete sentences in cursive using correct letter formation and letter connection as measured by 90 percent legibility. | | Weekly |
| (4) Given a complete sentence without punctuation, D▆▆ will use a period, exclamation point, or question mark to punctuate appropriately with 80 percent accuracy in 4 out of 5 trials, as measured by teacher-made test. | | Weekly |
| (5) Given a previously written passage, D▆▆ will proofread to identify word omissions with 80 percent accuracy in 4 out of 5 trials, as measured by teacher assessment. | | Weekly |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☒ Chart  ☒ Test  ☒ Documented Observation  ☐ Report  ☒ Other  Informal/Formal Assessment

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

127

| Student Name    D___ K   B_____ | Managing School  Kimball Elementary | DCPS - IEP |
|---|---|---|
| Student ID Number 9083058          DOB ____1995 | Attending School  Kimball Elementary | Page 4 of 4 |

**Additional Comments:** ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION
### SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in <u>general education</u>?  ☐ Yes  ☒ No

Explanation for removal out of regular education classroom.

Student requires small structured environment to accommodate disabilities

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING GenEd | SETTING SpEd | Total | FREQUENCY Hr / Min | FREQUENCY D/W/M. | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for <u>testing</u>:  ☐ None needed

| | |
|---|---|
| Timing/Scheduling: | Extended time, Break tasks into parts |
| Setting: | Reduced, minimalized distractions |
| Presentation: | Read directions/test to student |
| Response: | |
| Equipment: | Number tables or math fact sheets |

## XI. STATE AND DISTRICT ASSESSMENTS:

☐ **Level I**  Tested with non-disabled peers under standard conditions without accommodations.

☐ **Level II**  (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☐ **Level III**  (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☒ **Level IV**  (Describe the alternative assessment)

Read directions/test to student

☐ **Level V** Portfolio:

## XII. Areas Requiring Specialized Instruction and Related Services:

☒ Reading
☐ Physical/Sensory
☐ Transition
☒ Mathematics
☐ Social Emotional
☐ Vocational
☒ Written Expression
☐ Physical Development
☐ Independent Living
☐ Other:
☐ Speech/Language
☐ None    Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

**Modifications:**
☒ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| In General Education Classroom Setting | Rejected | Continued school failure |
| Combination General Education and Resource Classro | Accepted | Participation in non-academic subjects with non-di |
| Out of General Education Classroom | Rejected | Impact on self-esteem |
| | | |
| | | |

Modification(s)/Accommodation(s) to address the harmful effects:

Participation in counseling to address self-esteem issues

District of Columbia Public Schools      07-02-2001      Division of Special Education      Appendix - A      IEP Page 4 of 4

128

**DOCUMENTED LEVEL OF SERVICE**
Complete and attach to MDT/IEP meeting notes

| | | |
|---|---|---|
| School **Kimball Elementary** | Principal **Sheil'a West-Miller** | Special Education Coordinator **Robin Rabb** |
| Date **5/9/2006**  Case Manager **Robin Rabb** | | Assistant Director **Jennifer Finch** |

Student **D K B**   DOB **1995**  Age **11** Grade **05** ID# **9083058**  SSN# 

Parent **Ms. Evelyn Skyes**   Telephone (H) **2023885524**   (W)

Address: **3930   Blaine St NE**   **NE**   **Washington**   **DC**   **20019**
Street #   Street   Quad  Apt. No.  City   State  Zip Code

REFERRAL SOURCE: (Check) ☐ 120 Day ☐ Reeval. ☐ HOD ☐ SA ☐ MA ☒ Annual

☐ Nonpublic ☐ Residential ☐ Citywide ☐ Courts ☒ Local School ☐ Other:

Previous least restrictive environment (LRE Setting): Combination general education and resource classroom

---

**JUSTIFICATION FOR SETTING CONSIDERATION**
(Submit TAT/MDT Documentation)
SUPPORTIVE DATA/DOCUMENTATION

**2. ACCOMMODATIONS/ MODIFICATIONS**

Extended time, break tasks into parts, minimalized distractions.

**3. DATA REQUIREMENTS**

| | Yes | No |
|---|---|---|
| Current IEP | ☒ | ☐ |
| Signatures of required participants (MDT notes) | ☒ | |
| Intervention Behavior Plan | ☐ | |
| Copies of current class work and homework assignments: | ☒ | |
| Medical Reports: | ☐ | ☐ |
| Clinical Reports: | ☐ | ☐ |
| Psychiatric Reports | ☐ | ☐ |
| Medications: | ☐ | ☒ |
| Attendance Record | ☒ | |
| Copies of most recent evaluation(s) | ☒ | |

**4. Results of all interventions:** (TAT, MDT, etc. and attach meeting notes.)

MDT met on 5/9/06.

**5. Resources needed for program implementation**

---

**6. CURRENT SETTING CONSIDERATIONS**

| ROW | SETTING in neighborhood school (Determined through the IEP team.) | SERVICE PROVIDER (Based on documented need) | LEVEL OF SERVICE (Based on documented need) |
|---|---|---|---|
| 1 | ☐ in general education classroom setting | ☐ general educators with consultation from special education setting | ☐ between 0% and 20% of service time |
| 2 | ☒ combination general education and resource classroom | ☒ combination of general educators, special educators and related service providers | ☒ between 21% and 60% of service time |
| 3 | ☐ *out of general education classroom | ☐ special educators and related service providers | ☐ between 61% and 100% of service time |

*In providing or arranging for the provision of nonacademic and extracurricular service and activities, including meals, recess period, and the services and activities, each public agency shall ensure that each child with a disability participates with non-disabled children in those services and activities (300.306) to the maximum extent appropriate to the needs of that child. (300.553) Nonacademic settings).

Check the level of need as indicated:
**DIRECTIONS:**

If two or three boxes are checked in the Row 1, check LOW.
If two or three boxes are checked in the Row 2, check MODERATE.
If two or three boxes are checked in the Row 3, check HIGH.

If one box is checked in each row, check either MODERATE or HIGH, depending on the need of the student.

**7. LEVEL OF NEED**

| ☐ LOW | ☒ MODERATE | ☐ HIGH |
|---|---|---|

07-02-2001

Attention: Technical Support Supervisor, Compliance Team

129

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
SPECIAL EDUCATION
MULTIDISCIPLINARY TEAM
(MDT)

Student D___ K    B____    DOB ▮199 Age 11   Grade 05  ID 9083058

You have the right to challenge the recommendations by requesting Mediation or a Due Process Hearing before an impartial hearing officer. To initiate a mediation or hearing, you will need to complete a REQUEST FOR MEDIATION or DUE PROCESS HEARING form and mail it to the address listed below:

Student Hearing Office
D.C. Public Schools
825 North Capitol Street, N.E. 8th floor
202-442-5432

You have the right to be represented at the hearing by legal counsel.
A copy of Parent's Procedural Safeguards handbook is provided.
A list of free or low cost legal service, for which you may qualify depending on your income, is included.
If you would like an additional copy, please contact the principal.

EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

Test/Description: Classroom Observation - assesses present functioning of the student within the classroom environment.

Date of Report: 5/9/2006

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Free or Low Cost Legal Services

Neighborhood Legal Services
701 4th Street, N.E.
Washington, D.C. 20001
202-682-2700 (NW)
202-682-2732 (NE)
Fax 202-682-0588

Neighborhood Legal Services
1213 Good Hope Road, S.E.
Washington, D.C. 20020
202-678-2000
Fax 202-889-3374

University Legal Services
300 I Street, N.E.
Washington, D.C. 20002
202-547-0198
Fax 202-547-2662

The Children's Law Center Inc.
1050 Connecticut Avenue, N.W.
Suite 1200 Washington Square
Washington, D.C. 20036-5317
202-467-4900
Fax 202-467-4949

National Coalition for Students
with Disabilities
10560 Main Street, Suite 417
Fairfax, VA 22030
703-267-6588
(fax) 703-267-6992

MDT Prior to Action Notice
03-30-2004

2

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
SPECIAL EDUCATION

MULTIDISCIPLINARY TEAM (MDT)

**Prior to Action Notice**

Check Purpose:
- [ ] Initial Evaluation
- [ ] Initial Placement
- [X] Reevaluation
  - [ ] Change in Category Exit
  - [ ] Related Service Add
  - [ ] Related Service
  - [ ] Change in Placement
  - [X] Annual
  - [ ] Other _____

Date  5/9/2006
Student  D████ K  B████  DOB  ██/1995
School  Kimball Elementary
Current Disability Category  LD
Setting  Combination general education and resource classroom

Dear  Ms. Evelyn Skyes

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.
Therefore, you are being notified of the following proposed changes:
- [X] Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Other _____

A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)
- [ ] Your child is not eligible for special education service(s).
- [X] Your child is eligible or continues to be eligible to receive special education services as a student with  LD
- [ ] Your child will begin receiving _____ as a related service(s).
- [ ] Your child will no longer receive _____ as a related service(s).
- [ ] Your child's category of disability is being changed from _____ to _____
- [ ] Your child's alternative placement on continuum (next setting) is being changed,
  from _____ to _____
- [ ] Your child is no longer eligible and will be exited from the special education program.
- [ ] Other: _____
Location of Services  Kelly Miller MS

**Description and Explanation of agency action proposed or refused.**

The MDT convened and determined D████ continues to be eligible for special education services requiring a combination setting, specialized instruction and related services.

**Description of Other Options Considered and reasons for rejection of each option**

The MDT rejects placement in general education.

Other relevant factors to the decision-  School based data

MDT Members:
- [X] Principal or Designee
- [X] Parent
- [ ] Student
- [ ] Social Worker
- [X] General Education Teacher
- [X] Special Education Teacher
- [ ] Speech and Language
- [X] *LEA & Interpreter (*may be one)
- [ ] Psychologist
- [ ] Other: _____

Parents may bring individuals to participate in the MDT meeting. These participants should have knowledge or special expertise regarding the child. The following individuals invited by parent: _____

Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the Procedural Safeguards for parents, which are enclosed for your information.
If I can be of assistance to you, or have questions regarding the Procedural Safeguards,
please contact Robin Rabb  at  (202)645-3150  (school telephone number).

See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

MDT Prior to Action Notice
07-02-2001

**DB20**
131

TRANSMISSION VERIFICATION REPORT

```
TIME  : 07/24/2006 14:38
NAME  : TYRKA HOUCK LLP
FAX   : 2022654264
TEL   :
SER.# : 000A6J693992
```

```
DATE,TIME          07/24  14:37
FAX NO./NAME       2028891226
DURATION           00:00:58
PAGE(S)            04
RESULT             OK
MODE               STANDARD
                   ECM
```

## TYRKA & HOUCK, LLP
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

### CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Houck or their client(s) that is intended solely for the recipient named below. If you are not the intended recipient named below or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Houck expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Houck. Thank you.

Recipient:        Kalila Suggs (Grant Grayton)

Fax number:       202-889-1226

From:             Mike Tchorni

Regarding:        D▆▆ B▆▆▆ (D.O.B. ▆▆/95)

Number of pages:  4      (including cover sheet)

Notes:            Due Process Hearing Records Request

132

# DUE PROCESS COMPLAINT NOTICE
### In re D█████ B█████
#### June 16, 2006

**Petitioner:** Evelyn Sykes
**Student:** D████ B████
**DOB:** ████/95
**Current School:** Kimball Elementary School ("Kimball ES")
**Residence:** 3930 Blaine Street, N.E.
Washington, DC 20019

**Petitioner's Contact Information for Special Education Purposes:**
Tyrka & Houck, LLP
1726 Connecticut Ave. N.W. Suite 400
Washington, D.C. 20009
Tel: 202-265-4260
Fax: 202-265-4264

## Violations:

1. Failure to provide an appropriate placement since the start of the 2003-2004 SY.
2. Failure to conduct and review adequate evaluations in all areas of suspected disability.
3. Failure to determine an appropriate disability classification for a qualified child with a disability since the start of the 2003-2004 SY.
4. Failure to develop appropriate IEPs since the start of the 2003-2004 SY.
5. Failure to provide necessary special education and related services since the start of the 2003-2004 SY.
6. Failure to provide ESY following the 2003-2004, 2004-2005, and 2005-2006 SYs.

## Facts:

1. DCPS placed D████ at Kimball for the 2003-2004, 2004-2005, and 2005-2006 SYs.
2. Kimball ES has never been an appropriate placement for D████.
3. A January 15, 2003 psychiatric evaluation:
   a) diagnosed D████ with Attention-Deficit/Hyperactivity Disorder, NOS and Fetal Alcohol Syndrome;
   b) recommended:
      i) placement in "year-round, structured, therapeutic school program . . . [with] a smaller classroom";
      ii) completion of an occupational therapy evaluation;
      iii) development of a behavior intervention plan.
4. At a September 17, 2003 MDT meeting, DCPS:
   a) determined that D████ was eligible to receive special education and related services as a child with an Emotional Disturbance ("ED");
   b) rejected a recommended additional disability classification of Other Health Impaired ("OHI") and Learning Disabled ("LD");

**DB21**
133

   c) determined that D▆▆ was not eligible for occupational therapy services;

   d) developed an IEP prescribing:

      i) 20 hours per week of specialized instruction and

      ii) 1 hour per week of psychological services;

   e) continued D▆▆▆ placement at Kimball ES.

5. At a May 19, 2004 MDT meeting, DCPS:

   a) continued D▆▆▆ disability classification of ED;

   b) developed an IEP:

      i) reducing D▆▆▆ specialized instruction from 20 hours to 15 hours per week and

      ii) prescribing 1 hour of psychological services;

   c) rejected:

      i) a recommended placement for D▆▆▆ in a year-round full-time therapeutic program;

      ii) the Petitioner's proposed placement at High Road Academy;

   d) continued D▆▆▆ placement at Kimball ES;

   e) determined that D▆▆▆ was not eligible for Extended School Year ("ESY") services;

6. DCPS did not:

   a) include additional disability classification of OHI and LD or

   b) prescribe all necessary special education and related services

   in D▆▆▆ September 13, 2003 and May 19, 2004 IEPs.

7. D▆▆▆ September 13, 2003 and May 19, 2004 IEPs were not appropriate.

8. D▆▆▆ did not receive all of the special education and related services prescribed in his September 13, 2003 or May 19, 2004 IEPs.

9. D▆▆▆ was eligible for ESY at the time of the May 19, 2004 MDT meeting.

10. DCPS did not provide D▆▆▆ with ESY following the 2004-2005 SY.

11. A June 4, 2004 occupational therapy evaluation determined that:

   a) "[t]he team . . . should reconsider [D▆▆▆] school placement . . .[in favor of] a year round, structured, therapeutic school program to include a small classroom environment and a behavior management program";

   b) "D▆▆▆ should receive OT services once per week for 30 minute[s]";

12. An August 7, 2004 academic skills screening report:

   a) determined that D▆▆▆ has "significant emotional, ADHD and specific learning disabilities;

   b) recommended that:

      i) "D▆▆▆ Emotional Disorders, ADHD and learning disabilities necessitate that he be provided a small class (1:8 teach: student ratio) in a year-round therapeutic setting";

      ii) D▆▆▆ "be provided with [ESY] in a year-round therapeutic educational setting."

13. At a January 12, 2005 MDT meeting, DCPS did not:

   a) review D▆▆▆ current evaluations, including his June 4, 2004 occupational therapy evaluation or his August 7, 2004 academic skills screening report;

   b) revise D▆▆▆ current IEP;

   c) discuss D▆▆▆ current educational placement;

14. An April 25, 2005 clinical psychological evaluation of D▆▆▆

   a) provided a diagnosis of ADHD and Depressive Disorder;

   b) determined that D▆▆▆ "may qualify for special education and related services as a student with an Emotional Disturbance".

15. At a May 24, 2005 MDT meeting, DCPS:

134

    a) reviewed D██████ June 4, 2004 occupational therapy evaluation;
    b) determined that D████ was:
       i) not eligible for occupational therapy services;
       ii) no longer eligible for a disability classification of ED;
       iii) not eligible for ESY.
    c) changed D██████ disability classification to Multiply Disabled (LD/OHI);
    d) developed an IEP prescribing 15 hours of specialized instruction, 1 hour of psychological services, and 1 hour of speech and language therapy;
    e) continued his placement at Kimball ES;

16. DCPS did not:
    a) include an additional disability classification of ED or
    b) prescribe all necessary special education and related services in D██████ May 24, 2005 IEP.

17. D██████ May 24, 2005 IEP was not appropriate.

18. D████ was eligible for ESY following the 2004-2005 SY.

19. DCPS did not provide D████ with ESY following the 2004-2005 SY.

20. D████ did not receive the special education and related services prescribed in his May 24, 2005 IEP.

21. At a May 9, 2006 MDT meeting, DCPS:
    a) changed D██████ current disability classification from MD to LD;
    b) developed an IEP prescribing 15 hours of specialized instruction, 1 hour of psychological services, and 0.5 hours of speech and language therapy per week;
    c) determined that D████ was not eligible for ESY;
    d) issued a prior notice placing D████ at Kelly Miller Middle School ("Kelly Miller MS") for the 2006-2007 SY;

22. DCPS did not:
    a) include an additional disability classification of OHI or
    b) prescribe all necessary special education and related services in D██████ current IEP.

23. D██████ current IEP is not appropriate.

24. DCPS' proposed placement at Kelly Miller MS is not appropriate.

25. D████ is eligible for ESY at the conclusion of the 2005-2006 SY.

26. DCPS is not providing D████ with ESY following the 2005-2006 SY.

27. DCPS has not completed current evaluations of D████ in all areas of suspected disability.

28. Current evaluations of D████ in all areas of suspected disability are warranted.

29. The Petitioner is securing D██████ admission into several appropriate private schools.

**Proposed resolution:**

1. DCPS to immediately take all steps necessary to fund and place D████ at an appropriate private school of the Petitioner's choosing, with transportation.

2. DCPS to immediately fund current evaluations of D████ in all areas of suspected disability, including social history, occupational therapy, psychoeducational, and clinical psychological evaluations, as well as any other evaluations recommended therein.

3. DCPS to convene an MDT meeting within ten (10) days of receiving current evaluations of D████ in all areas of suspected disability to:
    a) review these evaluations,

135

b) revise D▆▆▆ IEP, including his current disability classification and his prescribed hours per week of special education and related services, and

c) develop a compensatory education plan to compensate D▆▆▆ for DCPS' failure to develop and implement appropriate IEPs and to provide an appropriate placement since the start of the 2003-2004 SY.

4. DCPS to pay reasonable attorney fees and costs incurred in bringing and pursuing this case.

**Resolution Meeting:**

1. The Petitioner contends that the entire IEP Team and a representative of the LEA with authority to:

    a. immediately take all steps necessary to fund and place D▆▆▆ at an appropriate private school of the Petitioner's choosing, with transportation;

    b. immediately fund current evaluations of D▆▆▆ in all areas of suspected disability, including social history, occupational therapy, psychoeducational, and clinical psychological evaluations, as well as any other evaluations recommended therein

    c. to convene an MDT meeting within ten (10) days of receiving current evaluations of D▆▆▆ in all areas of suspected disability to:

        i. review these evaluations,

        ii. revise D▆▆▆ IEP, including his current disability classification and his prescribed hours per week of special education and related services, and

        iii. develop a compensatory education plan to compensate D▆▆▆ for DCPS' failure to develop and implement appropriate IEPs and to provide an appropriate placement since the start of the 2003-2004 SY.

    is a necessary attendee at any resolution meeting.

2. If this individual is not going to be in attendance, Petitioner requests that DCPS provide counsel with a written notice waiving its right to a resolution session 48 hours prior to any scheduled meeting.

3. The Petitioner contends that any meeting not attended by the identified individual is not a valid resolution session, but rather an informal settlement discussion.

4. The Petitioner will be accompanied by his or her attorney at any resolution session convened subsequent to the filing of this complaint and will record any resolution session by analog or digital means.

5. Any statements by the Petitioner or his or her representative during any resolution meeting or other settlement discussion incident to the filing of this complaint are for the purposes of compromise only.

Respectfully Submitted,

136

Douglas Tyrka
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20008
(ph) (202) 265-4260
(f) (202) 265-4264

137

TRANSMISSION VERIFICATION REPORT

```
                                    TIME  : 06/16/2006 14:22
                                    NAME  : TYRKA HOUCK LLP
                                    FAX   : 2022654264
                                    TEL   :
                                    SER.# : 000A6J693992
```

```
DATE,TIME            06/16  14:20
FAX NO./NAME         SHO
DURATION             00:01:47
PAGE(S)              06
RESULT               OK
MODE                 STANDARD
                     ECM
```

## TYRKA & HOUCK, LLP
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

### CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Houck or their client(s) that is intended solely for the recipient named below. If you are not the intended recipient named below or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Houck expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Houck. Thank you.

Recipient:          SHO

Fax number:         202-442-5556

From:               Douglas Tyrka

Regarding:          D█████ B██████

Number of pages: 6       (including cover sheet)

Notes:

## State Education Agency for the District of Columbia
## State Enforcement and Investigation Division (SEID)
## Special Education Programs



D███ B████ (████95)
          Petitioner

v.

District of Columbia Public Schools,
          Respondent

### District of Columbia Public School's
### Response to Due Process Complaint Notice[1]

The District of Columbia Public School (hereinafter "DCPS"), by and through the undersigned Attorney-Advisor, hereby provides its RESPONSE to the Administrative Due Process Complaint Notice (hereinafter "Complaint") filed on behalf of the above captioned student, pursuant to the Individuals with Disabilities Education Improvement Act (hereinafter "IDEIA"), 20 U.S.C. § 1415(c)(2)(B)(i)(I). DCPS responds as follows:

  a. DCPS **DENIES**, in general, all allegations contained in the complaint and intends to defend against the complaint;
  b. DCPS **DENIES** the allegation that it failed to provide an appropriate IEP. DCPS contends that the IEP was made in accordance with 5 DCMR 3007 and 3009.
  c. DCPS **DENIES** the allegation that it failed to identify this child as a child with a disability. DCPS contends that the identification was made in accordance with 5 DCMR 3005.
  d. DCPS **DENIES** the allegation that it failed to provide an appropriate placement. DCPS contends that the placement was made in accordance with 5 DCMR 3013.

---

[1] It is this attorney-advisor's position that a DCPS response is not required in all IDEIA Due Process hearings. Accordingly, DCPS objects to such an expansive reading and practice. The purpose of the prior written notice requirements of IDEIA is to inform the parents in writing of an agency's final action on a proposal or refusal to initiate or change the identification, evaluation, educational placement or the provision of FAPE (procedural safeguards and special education and related services) to a particular student. If a team (e.g., MDT or IEP team) cannot reach consensus or if the parents do not attend the team meeting, the public agency must provide the parents with prior written notice of the agency's proposals and/or refusals. If consensus between the public agency and the parent cannot be reached, prior written notice of proposed or refused actions must be provide to the parents, even if the parents participated in the meeting where the decision(s) was made. Excerpt of Memorandum from the Office of Special Education for the West Virginia Department of Education, dated, June 24, 2004, re: IDEA 2004 Interim Implementation – Prior Written Notice.

JUN-26-2006 12:24 From:



Challenging Minds. Building Character.

Rock Creek Academy, Inc.
4401 Connecticut Ave., NW
Washington, DC 20008
202.378.1400

June 26, 2006

Ms. Evelyn Sykes
3930 Blaine St., NE.
Washington, D.C. 20019

Dear Ms. Sykes,

On behalf of Rock Creek Academy, a private special education program in the District of Columbia, I would like to inform you that your child, D█████ B██████ is a candidate for admissions into our program. We have received referral information from your educational attorney and would like to schedule an appointment for both you and D████ to visit our program, take a tour, and complete the interview process. Please contact me at your earliest convenience at: 202-378-1377 to schedule this appointment. If you are interested in learning more about our program prior to our appointment please visit our website at www.rockcreekacademy.org. I look forward to meeting with you.

Sincerely,

Kendra Hill
Coordinator, Student Services

CC: Doug Tyrka, Esq.

DB23
140

**Before the**
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## OFFICE OF MANAGEMENT SERVICES

|  |  |
|---|---|
| In re D█████ B█████,<br>    Special Education Student, | )<br>)<br>)<br>) |

## PETITIONER'S AMENDED MOTION FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT

The Petitioner respectfully moves for an entry of default. The Respondent is obligated under Section 1415(c)(2)(i) to file a response within ten (10) days of receiving a due process complaint notice. 20 U.S.C. § 1415(c)(2)(i). Because the Respondent has not filed an adequate response in this case, the Petitioner's Amended Motion for Entry of Default and Default Judgment should be granted.

### BACKGROUND

On June 16, 2006, the Petitioner filed a "due process complaint" under 20 U.S.C. § 1415(b), the relevant section of the Individuals with Disabilities Act ("IDEA"). The complaint alleged that the Respondent, the District of Columbia Public Schools ("DCPS"), had violated and was violating the IDEA by failing (1) to provide the Petitioner's child with placement in a "year-round, structured, therapeutic school program . . . [with] a smaller classroom," (2) to conduct and review adequate evaluations in all areas of suspected disability, (3) to develop appropriate IEPs since the start of the 2003-2004 SY, (4) to determine an appropriate disability classification for a qualified child with a disability since the start of the 2003-2004 SY, and (5) to provide necessary special education and related services since the start of the 2003-2004 SY. At the time this

Complaint was filed, DCPS had not served the Petitioner with a "prior written notice", 20

U.S.C. § 1415(c)(1), addressing the subject matters raised therein.

On June 24, 2006, the Respondent filed a motion entitled "Response to Due

Process Complaint Notice." The relevant portions of that Response read as follows:

> (1) "DCPS DENIES, in general, all allegations contained in the complaint and intends to defend against the complaint." (2) "DCPS DENIES the allegation that it failed to provide an appropriate IEP." (3) "DCPS DENIES the allegation that it failed to identify this child as a child with a disability." (4) "DCPS DENIES the allegation that it failed to provide an appropriate placement." (5) "DCPS DENIES the allegation that it failed to complete timely and comprehensive evaluations. DCPS contends that it appropriately evaluated the child in all areas of suspected disability." (6) "DCPS DENIES the allegation that it violated the "child find" requirement. DCPS contends that it had no reason to suspect this was a child in need of special education services." (7) "DCPS DENIES the allegation that it failed to provide appropriate special education and related services. The allegation is too vague upon which a more specific answer can be given." (8) "DCPS did not issue an MDT Prior to Action Notice in this case because the allegations within the complaint fail to allege that the agency has proposed or refused to initiate or change the identification, evaluation, or educational placement of the child, pursuant to IDEIA, § 615(b)(3)." (9) "DCPS maintains that all other allegations stated within petitioner's complaint require no further prior written notice for the reasons stated above."

On its face, this Response does address any of the pertinent factors included in the

IDEA, 20 U.S.C. § 1415(c)(2)(B)(i)(I).  More specifically, this Response does not

include:

> "an explanation of why the Respondent proposed or refused to take the action raised in the complaint; a description of other options that the IEP Team considered and the reasons why those options were rejected; a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; or a description of the factors that are relevant to the agency's proposal or refusal."

20 U.S.C. § 1415(c)(2)(B)(i)(I).

As the District Court recently noted in *Massey v. District of Columbia*, "the IDEA does not allow DCPS to respond generally to the substance of the complaint in whatever form it deems appropriate." 400 F.Supp. 2d 66, (D.D.C. 2005). Because this Response is equally deficient, Petitioner respectfully requests that her Amended Motion for Entry of Default and Default Judgment be granted. *See also Diaz-Fonseca v. Commonwealth of Puerto Rico*, 2006 WL 1652490 (1st Cir. 2006) (upholding trial court's entry of default in civil action brought under 20 U.S.C. § 1415(i)(2) of the IDEA, where the defendants failed to timely forward the administrative record and violated successive discovery orders issued by the court).

## APPLICABLE LAW

The IDEA requires that:

> [i]f the local educational agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, such local educational agency shall, within 10 days of receiving the complaint, send to the parent a response that shall include –
> (aa) an explanation of why the agency proposed or refused to take the action raised in the complaint;
> (bb) a description of other options that the IEP Team considered and the reasons why those options were rejected;
> (cc) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; and
> (dd) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(2)(B)(i)(I).

The IDEA states that the timely issuance of a "prior written notice" negates the need for the written response required by 20 U.S.C. § 1415(c)(2)(B)(i)(I). In terms of substance, a prior written notice must include:

> (A) a description of the action proposed or refused by the agency;
> (B) an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;
> (C) a statement that the parents of a child with a disability have protection under the procedural safeguards of this part [20 USCS §§ 1411 et seq.] and, if this notice is not an

3

143

initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;
(D) sources for parents to contact to obtain assistance in understanding the provisions of this part [20 USCS §§ 1411 et seq.];
(E) a description of other options considered by the IEP Team and the reason why those options were rejected; and
(F) a description of the factors that are relevant to the agency's proposal or refusal. —

20 U.S.C. § 1415(c)(1)(brackets in original).

The IDEA is silent regarding the proper remedy for the failure of a local

educational agency ("LEA") to file an adequate response under 20 U.S.C. §

1415(2)(B)(i)(I).

## ARGUMENT

The Respondent has already acknowledged that a prior notice was never sent

regarding the issues raised in Petitioner's complaint, and that a response consistent with

the requirements of 20 U.S.C. § 1415(c)(1) is required.

The federal courts have held that, where the IDEA is silent regarding a procedural

rule, the most closely analogous state rule must be applied. In an administrative

proceeding under the IDEA, the most closely analogous state rules are the District of

Columbia Superior Court Rules of Civil Procedure 12(a)(5) and 55(a), which provide the

remedy for a civil defendant's failure timely to file an answer to a complaint. Because

those rules require that a court enter a default when a defendant fails timely to file an

answer, the Office of Management Services should grant the Petitioner a default for the

Respondent's failure to serve a response.

**I.    The Respondent has not served a "response" as required by the IDEA.**

The Respondent acknowledges:  (1) that a prior written notice was never sent

regarding the issues raised in the Petitioner's Complaint and (2) that the IDEA required a

written response within ten days of receiving a due process complaint notice. Because the

written Response filed by the Respondent does not include any discussion of the pertinent factors listed in 20 U.S.C. § 1415(c)(2)(B)(i)(I), the Respondent has failed to meet its statutory obligations under 20 U.S.C. § 1415(c)(2)(B)(i)(I). This outstanding violation should be remedied.

The substantive and procedural contours of the IDEA's ten-day written response were recently addressed by the District Court in *Massey*:

> "Under the statute, if DCPS had not previously issued a Prior Notice . . ., it was required to respond in writing to the request for a due process hearing. Furthermore, DCPS may not determine the form of its response: the required content of the written response is precisely detailed in the IDEA. . . . [T]he IDEA does not allow DCPS to respond generally to the substance of the complaint in whatever form it deems appropriate."

400 F.Supp. 2d 66, (D.D.C. 2005)(citations omitted).

The District Court then considered the substance of the DCPS response - a prior written notice of placement issued after the Plaintiff's had filed their due process complaint – under the IDEA's statutory requirements. First, the District Court dismissed DCPS' argument that "any failure to conform to the statute was a mere technical oversight." *Id.* To the contrary, the District Court emphasized that

> "[i]t is technical compliance with the law, . . . that gives parents faith that their concerns will be addressed in accord with Congress' intent. Many of the procedural safeguards in the IDEA are extremely technical, spelling out particular deadlines and required content. This kind of detail embodies the purpose of a statute prescribing administrative – i.e., procedural – remedies. . . Does DCPS mean to imply that it is permitted to violate the IDEA as long as the ways in which it does so are minor? This Court has not been directed to any evidence that Congress intended an exemption for "close enough."

*Id.*(citations omitted)

Second, and more importantly, the District Court specifically noted that DCPS's failure, *inter alia*, to issue a proper response called into question the adequacy of the

5

145

officers' decisions under the Education of the Handicapped Act ("EHA"), the predecessor to the IDEA. 866 F.2d at 462-470. Congress had not provided a statute of limitations in the text of the EHA, so the Court of Appeals applied the local limitations period because it was closely analogous and consistent with the policies underlying the EHA. *Id.*

The Court in *Spiegler* applied a two-part analysis: 1) identifying the most closely analogous state rule; and 2) determining whether the application of that rule was consistent with the federal policies underlying the EHA. In performing the first part of the analysis, the Court held that a substantive federal claim challenging the findings and decision of an EHA hearing officer was "sufficiently analogous to an appeal from an administrative decision to permit us to borrow the 30-day local limitations period for such appeals." 866 F.2d at 466. In the second part of the analysis, the Court concluded "that a 30-day limitations period, when combined with a duty by the District to inform hearing participants of the short [limitations] period, was not so harsh as to be inconsistent with [the EHA's underlying] policies." *Id.*

Though the *Spiegler* Plaintiffs had argued for the application of the District of Columbia's default 3-year statute of limitations, the Court of Appeals found the 30-day limitations period consistent with federal policies: "Because the Act emphasizes the prompt resolution of disputes, we find at the outset that a shorter rather than longer statute of limitations would be more consistent with the policies underlying the Act." *Id.* at 467.

According to the *Spiegler* decision, in forming a remedy for the Respondent's failure to serve a response to the complaint, the Office of Management Services should

7    146

determine the state rules most closely analogous to this situation, and should apply them if they are not inconsistent with the federal policies underlying the IDEA.

### III.    The State Rules Most Closely Analogous to this Situation are District of Columbia Superior Court Rules of Civil Procedure 12(a)(5) and 55(a).

Generally, the two best sources for analogous rules in IDEA hearings are the District of Columbia Office of Administrative Hearings Procedural Rules ("OAH rules"), D.C. Mun. Regs. tit. 1 §§ 2800 *et seq.*, and the District of Columbia Superior Court Rules of Civil Procedure ("Civil Rules").

In *Spiegler*, the Court of Appeals used the OAH Rules to determine the appropriate statute of limitations period for challenging the findings and decisions of an impartial due process hearing officer. However, because the OAH Rules do not require any response in a state administrative proceeding, these rules are not applicable to an action initiated under the IDEA, which now requires a response containing very specific information within 10 days of the filing of the complaint. *Compare* OAH Rule 2813.5 ("[u]nless otherwise ordered, no responsive pleading is required in cases commenced by a request for a hearing.") *with* 20 U.S.C. § 1415(2)(B)(i)(I)(requiring response to IDEA complaint and listing necessary elements in response); D.C. Mun. Regs. tit. 1 §§ 2813.5. In other words, because the OAH Rules do not require an agency to serve any responsive pleadings to a complaint filed by a private party, they are not analogous to the circumstances presented in this case.

The Civil Rules, on the other hand, deal extensively with every aspect of pleading practice, including the procedures for serving initial and responsive pleadings and the consequences of violations of those procedures. *See* Super. Ct. Civ. R. 3, 7, 8, 12 & 55.

147

The Civil Rules dictate the necessary contents of answers, the timelines for filing answers and the penalties for failure to file. *See* Super. Ct. Civ. R. 12 & 55.

Because the OAH rules do not require responsive pleadings and the Civil Rules do, the Civil Rules are the state rules most closely analogous to the IDEA response requirement. The Office of Management Services should therefore apply the Civil Rules by analogy as long as they are consistent with the federal policies underlying the IDEA.

## IV. By Analogy, the Civil Rules Require the Office of Management Services to Rule by Default for the Petitioner.

District of Columbia Superior Court Rule of Civil Procedure 12(a)(5) and 55(a) are the state rules most closely analogous to the Respondent's failure to serve a response, as argued *supra*. The rules require that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . the Clerk or the Court shall enter the party's default." Super. Ct. Civ. R. 55(a); *see also* Super. Ct. Civ. R.12(a)(5)("Except where the time to respond to the complaint has been extended as provided in Rule 55(a), failure to comply with the requirements of this Rule shall result in the entry of a default by the Clerk or the Court *sua sponte* unless otherwise ordered by the Court.")

The courts do not have any discretion in the entry of a default for failure to respond to a complaint; "the Clerk or the Court *shall* enter the party's default." Super. Ct. Civ. R. 55(a)(emphasis added). The comment to Rule 12 makes clear the intent that default be automatic in those circumstances. *See* Super. Ct. Civ. R. 12, cmt ("[P]aragraph (5) has been added to preserve the existing Superior Court rule of automatic entry of default against a defendant who does not timely respond to the complaint.").

9       148

The District of Columbia Court of Appeals has addressed this issue, and has enforced the clear text of the Rules in favor of automatic and non-discretionary default. *See Digital Broadcast Corp. v. Rosenman & Colin, LLP*, 847 A.2d 384, 388-89 (D.C. App. 2004)(holding that Rule 55(a) default is automatic and non-discretionary); *Restaurant Equip. and Supply Depot, Inc. v. Gutierrez*, 852 A.2d 951, 954-56 (D.C. App. 2004)(holding that default for failure to file answer was automatic even where defendant had filed motion to dismiss).

An entry of default is not a final judgment terminating a proceeding. "[T]he entry of default does not constitute a judgment, but simply precludes the defaulting party from offering any further defense on the issue of liability." *Lockhart v. Cade*, 728 A.2d 65, 68 (D.C. 1999). "[T]he defaulted party retains the right to contest and mitigate unliquidated damages." *Digital* at 389 n.7. In other words, the default resolves all liability questions against the defaulting party, but does not determine ultimate relief.

Because the serving of a "response" under the IDEA is a perfect analogue to the filing of an answer under the Civil Rules, and the Respondent has in this case failed to serve a response, by analogy to the Civil Rules the Office of Management Services must issue the equivalent to a default against the Respondent. The equivalent to a default in IDEA administrative hearings is a finding, as a matter of law, that the Respondent has committed all of the violations identified in the Complaint.

Where a violation is all that is necessary to justify relief, the Office of Management Services may simply order the relief requested in the Complaint. In the alternative, where further evidence is necessary before specific relief can be ordered, the

10          149

Office of Management Services should schedule a hearing for the sole purpose of adjudicating the issues relevant to relief.

V.     **An Order of Default After an LEA has Failed to Serve a Response is Wholly Consistent with the Policies Underlying the IDEA in that it Protects the Rights of Children, Encourages Prompt Resolution of Disputes, Promotes Administrative Efficiency and Preserves Procedural Equity.**

The application of the Civil Rules to this situation and the consequential order of default against the Respondent comports with the policies underlying the IDEA.

The primary purposes of the IDEA are, of course, "to ensure that all children with disabilities have available to them a free appropriate public education" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1).

Additionally, it is clear from the statute and the caselaw that certain policies underlie the procedural aspects of the IDEA. In *Spiegler*, the Court of Appeals noted that Congress' intent in passing the EHA was "to ensure the prompt resolution of disputes regarding the appropriate education for handicapped children." 866 F.2d 461, 467. The recent amendments to the IDEA, most notably the clauses regarding the complaint, the response and the resolution session, indicate a Congressional intent to improve administrative efficiency by narrowing issues and limiting unnecessary hearings. *See* 20 U.S.C. § 1415(b)(6), (c)(2)(B)(i)(I) & (f)(1)(B). Finally, Congress' respect for the adversarial process and intent to establish basic procedures to ensure fairness in hearings can be found in the IDEA's rights to counsel, to disclosure of evidence, to subpoenas, to cross-examination and to attorneys' fees; the Act's new clauses enabling the dismissal of

11      150

inadequately drafted complaints; and the Act's new provisions regarding the training and competence of hearing officers. *See* 20 U.S.C. § 1415(c)(2)(A), (f)(3)(A) & (h).

These four purposes – protection of the rights of children with disabilities, prompt resolution of special education disputes, administrative efficiency and procedural fairness – are all furthered by an order of default against the Respondent for failing to serve a response.

Obviously, a ruling in favor of a parent or child, particularly a ruling that prevents the LEA from violating the IDEA and sandbagging a petitioner at hearing, helps to protect the rights of children with disabilities. It is equally obvious that a default for failure to respond to a complaint furthers prompt resolution and administrative efficiency, both in the short term, in that the parties and the hearing officer are not forced to litigate issues regarding which the respondent has offered no defense, and in the long term, in that the respondent will be more likely to serve a proper response in future cases.

The impact of a default on procedural equity deserves a bit more consideration, because the recent amendments to the IDEA have changed the balance of procedural obligations. Under the old version of the law, a petitioner needed only to file a minimum hearing request, and the respondent did not need to file a response. Under the current version of the law, by the time a respondent has failed to serve a response and thereby made itself subject to default, a petitioner has had to file a substantially more comprehensive complaint, which has had to withstand a judgment of its sufficiency. *See* 20 U.S.C. § 1415(b)(7) & (c)(2)(D). If the complaint is found sufficient, the petitioner is granted a hearing, but cannot raise any issue not identified in the complaint. *See* 20

U.S.C. § 1415(f)(3)(B). While petitioners now bear that new burden, respondents bear a new burden of their own – the response to the complaint.

A default against an LEA for failure to serve a response would enforce the policy of procedural fairness evident in the IDEA's new requirements of a reciprocal information exchange prior to the resolution session and the hearing. To decline to issue a default would confound Congress' clear intent to require LEAs to provide the same level of information that petitioners must provide, and would create a fundamentally unfair system in which a petitioner is denied his/her opportunity to make a case if he/she fails to provide information according to IDEA procedure, but an LEA is allowed to make its case in the opposite situation.

## CONCLUSION

Because a default against the Respondent in this case is wholly consistent with the policies underlying the IDEA, and the denial of a default would frustrate Congress' intent, the Office of Management Services should apply the most closely analogous state rule to this situation and grant the Petitioner a default by applying Civil Rules 12(a)(5) and 55(a) by analogy.

Respectfully submitted by,

Douglas Tyrka
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Ave., NW, Suite 400
Washington, DC  20008
(ph) (202) 265-4260
(f) (202) 265-4264

13

152

14

**TYRKA & HOUCK, LLP**
1726 Connecticut Ave., NW, Suite 400
Washington, DC  20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

—       —

## Certificate of Service

Counsel for the Petitioner hereby certifies that a copy of this MOTION has been

filed with the Student Hearing Office and sent via facsimile to Counsel for the

Respondent.

Respectfully Submitted by,

Douglas Tyrka
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Ave., NW, Suite 400
Washington, DC  20008
(ph) (202) 265-4260
(f) (202) 265-4264

**DATE FILED:   Wednesday, June 28, 2006**

15

TRANSMISSION VERIFICATION REPORT

```
                                    TIME : 06/30/2006 13:16
                                    NAME : TYRKA HOUCK LLP
                                    FAX  : 2022654264
                                    TEL  :
                                    SER.# : 000A6J693992
```

```
DATE,TIME           06/30   13:11
FAX NO./NAME        OGC2
DURATION            00:04:11
PAGE(S)             16
RESULT              OK
MODE                STANDARD
                    ECM
```

**TYRKA & HOUCK, LLP**
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Houck or their client(s) that is intended solely for the recipient named below. If you are not the intended recipient named below or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Houck expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Houck. Thank you.

Recipient:        SHO & OGC

Fax number:

From:             Douglas Tyrka

Regarding:        D██ B████

Number of pages:  15    (including cover sheet)

Notes:

155

TRANSMISSION VERIFICATION REPORT

```
TIME  : 06/28/2006 09:51
NAME  : TYRKA HOUCK LLP
FAX   : 2022654264
TEL   :
SER.# : 000A6J693992
```

```
DATE,TIME              06/28  09:47
FAX NO./NAME           SHO
DURATION               00:04:09
PAGE(S)                16
RESULT                 OK
MODE                   STANDARD
                       ECM
```

## TYRKA & HOUCK, LLP
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

### CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Houck or their client(s) that is intended solely for the recipient named below. If you are not the intended recipient named below or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Houck expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Houck. Thank you.

Recipient:         SHO & OGC

Fax number:

From:              Douglas Tyrka

Regarding:         ~~Deron Brown~~

Number of pages:  15    (including cover sheet)

Notes:

156

# District of Columbia Public Schools
### *State Enforcement & Investigation Division*
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



### HEARING NOTICE

| MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:    Parent (or Representative): _D. TYRKA_    Fax No.: _265-4264_

LEA Legal Counsel: _A. PRICE_

RE:    ~~Brewer, D~~    and (LEA) DOB: ~~__/__/85__~~
       Student's Name

FROM:    **SHARON NEWSOME**
         Special Education Student Hearing Office Coordinator

DATE SENT: _7/18/06_

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on _6/16/06_. Please be advised that the hearing has been scheduled for:

DATE: _8/23/06_

TIME: _1:00 PM_

AT:    825 North Capitol Street, NE, Washington, DC
       8th Floor

ASSIGNED HEARING OFFICER: _____

[X] THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request in *writing on the attached form* to the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances are made *exclusively* by the Hearing Officer, and cannot be made by SHO administrative staff. Unless you receive notice that the Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[ ] THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates. If you are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer. If the SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you. Disclosure of evidence and witnesses to the opposing party is required at least **five business days** prior to the hearing with copies to the Special Education Student Hearing Office.

**DB25**
157

**TYRKA & HOUCK, LLP**
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

July 20, 2006

Robin Rabb
Special Education Coordinator
Kimball Elementary School
By Fax: 202-645-3147

**Re:    D____ B____ (D.O.B. ____95)**

Dear Ms. Rabb:

A due process complaint filed on behalf of this student has been scheduled to be heard at
1:00 p.m. on August 23, 2006. In order to meet their evidentiary burden under Section
3030.3 of Title V of the D.C. Municipal Regulations[1], the parent is respectfully
requesting that your school provide copies of the following to our offices:

> All form 6s
> All standardized test scores, such as CTBS or SAT-9
> All evaluation reports and DCPS reviews, including triennial review
> IEPs, BLMDT, MDT notes, placement notices, and letters of invitations
> for all years in special education
> All report cards, including progress reports and attendance records
> All disciplinary records, incident reports, and manifestation
> determinations
> All encounter tracking forms

Any other records or correspondence you believe are relevant.

As counsel for the parent we are entitled by law to receive and review these records. *See*
20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.562;[2] D.C. Mun. Regs. tit. 5 § 3021.8;[3] D.C.P.S.
S.H.O. S.O.P. §800.2 [4] (IDEA records request provisions); 20 U.S.C. § 1232g(1)(A)
(Family Educational Rights and Privacy Act of 1974).

---

[1] "The burden of proof shall be the responsibility of the party seeking relief; either the parent/or guardian of a child or the LEA. Based
solely upon the evidence presented at the hearing, an impartial hearing officer shall determine whether the party seeking relief
presented sufficient evidence to meet the burden of proof that the action and/or inaction or proposed placement is inadequate or
adequate to provide the student with a Free Appropriate Public Education (FAPE)."
[2] "The agency shall comply with a [records] request without unnecessary delay . . ., and in no case more than 45 days after the request
has been made."
[3] "A person shall have the right to examine all portions of the student's record prior to the hearing, including the right to examine and,
upon request, receive copies of any test results, reports, or other data upon which the proposed action is based."
[4] "Parents have the right to examine all records maintained by the school that are related to their child. . . Parents may authorize
counsel, advocates, investigators or other individuals to review and obtain copies of their children's records."

The parent respectfully requests that our office be provided with copies of these records immediately, **and that this request be supplemented with any newly obtained records as soon as they become available.**

Please contact our offices as soon as possible to discuss and arrange the manner by which these records will be delivered.

Sincerely,

Mike Tchorni
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Avenue, N.W., Suite 400
Washington, D.C. 20009
p. (202) 265-4260
f. (202) 265-4264

Enclosure:     Parent Authorization for Release of Documents

159

```
TRANSMISSION VERIFICATION REPORT
```

```
                              TIME  : 07/20/2006 15:24
                              NAME  : TYRKA HOUCK LLP
                              FAX   : 2022654264
                              TEL   :
                              SER.# : 000A6J693992
```

```
DATE,TIME          07/20  15:23
FAX NO./NAME       2026453147
DURATION           00:01:05
PAGE(S)            04
RESULT             OK
MODE               STANDARD
                   ECM
```

**TYRKA & HOUCK, LLP**
1726 Connecticut Ave., NW, Suite 400
Washington, DC  20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

**CONFIDENTIALITY NOTICE**

This facsimile contains confidential information belonging to Tyrka & Houck or their client(s) that is intended solely for the recipient named below. If you are not the intended recipient named below or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Houck expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Houck. Thank you.

Recipient:          Robin Rabb

Fax number:         202-645-3147

From:               Mike Tchorni

Regarding:          D████ B████ (D.O.B ██/█/95)

Number of pages:    4      (including cover sheet)

Notes:              Due Process Hearing Records Request

160

**TYRKA & HOUCK, LLP**
1726 Connecticut Ave., NW, Suite 400
Washington, DC  20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

July 24, 2006

Kalila Suggs
Grant Grayton Urban Support, Inc
2041 Martin Luther King Avenue SE, # 201
Washington, DC 20020
By Fax: 202-889-1226

Re:    D████ B█████ (D.O.B. ████/95)

Dear Ms. Suggs:

A due process complaint filed on behalf of this student has been scheduled to be heard at 1:00 p.m. on August 23, 2006.  In order to meet their evidentiary burden under Section 3030.3 of Title V of the D.C. Municipal Regulations[1], the parent is respectfully requesting that your school provide copies of the following to our offices:

> All evaluation reports
> All records of services provided

Any other records or correspondence you believe are relevant.

As counsel for the parent we are entitled by law to receive and review these records.  *See* 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.562;[2] D.C. Mun. Regs. tit. 5 § 3021.8;[3] D.C.P.S. S.H.O. S.O.P. §800.2 [4] (IDEA records request provisions); 20 U.S.C. § 1232g(1)(A) (Family Educational Rights and Privacy Act of 1974).

The parent respectfully requests that our office be provided with copies of these records immediately, **and that this request be supplemented with any newly obtained records as soon as they become available**.

Please contact our offices as soon as possible to discuss and arrange the manner by which these records will be delivered.

---

[1] "The burden of proof shall be the responsibility of the party seeking relief; either the parent/or guardian of a child or the LEA.  Based solely upon the evidence presented at the hearing, an impartial hearing officer shall determine whether the party seeking relief presented sufficient evidence to meet the burden of proof that the action and/or inaction or proposed placement is inadequate or adequate to provide the student with a Free Appropriate Public Education (FAPE)."
[2] "The agency shall comply with a [records] request without unnecessary delay . . ., and in no case more than 45 days after the request has been made."
[3] "A person shall have the right to examine all portions of the student's record prior to the hearing, including the right to examine and, upon request, receive copies of any test results, reports, or other data upon which the proposed action is based."
[4] "Parents have the right to examine all records maintained by the school that are related to their child. . . Parents may authorize counsel, advocates, investigators or other individuals to review and obtain copies of their children's records."

**DB27**
161

Sincerely,

Mike Tchorni
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Avenue, N.W., Suite 400
Washington, D.C. 20009
p. (202) 265-4260
f. (202) 265-4264

Enclosure:    Parent Authorization for Release of Documents

162

```
TRANSMISSION VERIFICATION REPORT
```

```
                              TIME : 07/18/2006 09:45
                              NAME : STUDENT HEARINGS OFF
                              FAX  : 2024425556
                              TEL  : 2024425432
                              SER.# : BROH3J608601
```

```
DATE,TIME              07/18  09:45
FAX NO./NAME           92654264
DURATION               00:00:28
PAGE(S)                01
RESULT                 OK
MODE                   STANDARD
                       ECM
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



**HEARING NOTICE**

**MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY**

TO:     Parent (or Representative): D. TYRKA          Fax No.: 265-4264

LEA Legal Counsel: A. PRICE

RE:     B_____ D_____          and (LEA) DOB: 1/26/95
              Student's Name

FROM:   SHARON NEWSOME
              Special Education Student Hearing Office Coordinator

DATE SENT:   7/18/06

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
6/16/06 . Please be advised that the hearing has been scheduled for:

DATE:   8/23/06

TIME:   1:00 PM

163

**TYRKA & HOUCK, LLP**
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

Sharon Newsome
Student Hearing Office
825 North Capitol, NE 8th floor
Washington DC 20002

Ms. Sharon Newsome,

I am writing you from the Office of Tyrka & Houck to inform you that Douglas Tyrka will be out of town August 14th thru August 21st. Can you reschedule the hearing he has during that time? We also agree to waive the timeline for the following students:

B████, D████
Green, Shanna
Smith, Timothy
Spencer, Kavon
Ward, Theresa
Williams, Imani
Williams, Jionne
Willis, Terry

If you need to speak with me, I can be reached at 202-265-4260.

Thank you in advance,


Camille McKenzie,
Office Assistant

164

**TYRKA & HOUCK, LLP**
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

Sharon Newsome
Student Hearing Office
825 North Capitol, NE 8th floor
Washington DC 200002

Ms. Sharon Newsome,

I am writing you from the Office of Tyrka & Houck to inform you that Mr. Douglas Tyrka will be out of town from August 14[h] thru August 21st. Can you reschedule the hearings he has during that time? If you need to speak with me, I can be reached at 202-265-4260.

Thank you in advance,

Camille McKenzie,
Office Assistant

165

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



### HEARING NOTICE

| MEMORANDUM VIA: [X] FACSIMILE  [ ] MAIL  [ ] HAND DELIVERY |
|---|

TO:    Parent (or Representative): _D. TYRKA_        Fax No.: _265-4264_

LEA Legal Counsel: _A. PRICE_

RE:    B_____, D_____ and (LEA)  DOB: _____/95_
       Student's Name

FROM:    **SHARON NEWSOME**
         Special Education Student Hearing Office Coordinator

DATE SENT: _7/17/06_

∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on _6/16/06_. Please be advised that the hearing has been scheduled for:

DATE: _8/16/06_

TIME: _3:00 PM_

AT:    825 North Capitol Street, NE, Washington, DC
       8th Floor

ASSIGNED HEARING OFFICER: _____

[X] THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request in *writing on the attached form* to the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances are made ***exclusively*** by the Hearing Officer, and cannot be made by **SHO** administrative staff. Unless you receive notice that the Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[ ] THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates. If you are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer. If the SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you. Disclosure of evidence and witnesses to the opposing party is required at least **five business days** prior to the hearing with copies to the Special Education Student Hearing Office.

166

```
TRANSMISSION VERIFICATION REPORT
```

```
                                TIME  : 07/18/2006 07:16
                                NAME  : STUDENT HEARINGS OFF
                                FAX   : 2024425556
                                TEL   : 2024425432
                                SER.# : BROH3J608601
```

```
DATE,TIME            07/18  07:15
FAX NO./NAME         92654264
DURATION             00:00:28
PAGE(S)              01
RESULT               OK
MODE                 STANDARD
                     ECM
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



### HEARING NOTICE

| MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:     Parent (or Representative): _D. TYRKA_     Fax No.: _265-4264_

        LEA Legal Counsel: _A. PRICE_

RE:     B_____, D_____     and (LEA) DOB: ____/95
        Student's Name

FROM:   __SHARON NEWSOME__
        Special Education Student Hearing Office Coordinator

DATE SENT: ___7/17/06___

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_6/16/06_ . Please be advised that the hearing has been scheduled for:

        DATE: ___8/16/06___

        TIME: ___3:00 PM___

167

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

In the Matter of:                                )           BEFORE A SPECIAL EDUCATION
                                                 )
                                                 )           INDEPENDENT HEARING OFFICER
                                                 )
_____ *Petitioner*                       )
                                                 )
                 Vs.                             )           STATE EDUCATION AGENCY
                                                 )
DCPS                                             )
         *Respondent*

ON THIS DAY came on to be heard _Petitioner_ _____ 's Motion

_For Default (6-28-06)_ _____ in the above styled case.

## ORDER

After reviewing the evidence, the Motion is:

_____ **DENIED.** ✓

_____ **GRANTED:**

_____ **OTHER:**

No procedural violations alleged per 20 U.S.C. 1415 (f)(3)(E)(ii) that would warrant a default

judgment.  See *Lesesne v. District of Columbia*, U.S. Court of Appeals, D.C. Circuit, No. 05-7123

SIGNED: this date_____ 6-28-06 _____.

_____

Impartial Special Education Hearing Officer

Issue Date:_____

Original to SHO – Student's File
Copy To:        Parent' - C/O:
                DCPS - C/O:
                Charter School - C/O:

168

2006 JUN 28 AM 9: 55
DC PUBLIC
SCHOOL SYSTEM

Before the
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### OFFICE OF MANAGEMENT SERVICES

|  |  |
|---|---|
| In re D████ B████ | ) |
| Special Education Student, | ) |
|  | ) |

## PETITIONER'S AMENDED MOTION FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT

The Petitioner respectfully moves for an entry of default. The Respondent is obligated under Section 1415(c)(2)(i) to file a response within ten (10) days of receiving a due process complaint notice. 20 U.S.C. § 1415(c)(2)(i). Because the Respondent has not filed an adequate response in this case, the Petitioner's Amended Motion for Entry of Default and Default Judgment should be granted.

### BACKGROUND

On June 16, 2006, the Petitioner filed a "due process complaint" under 20 U.S.C. § 1415(b), the relevant section of the Individuals with Disabilities Act ("IDEA"). The complaint alleged that the Respondent, the District of Columbia Public Schools ("DCPS"), had violated and was violating the IDEA by failing (1) to provide the Petitioner's child with placement in a "year-round, structured, therapeutic school program . . . [with] a smaller classroom," (2) to conduct and review adequate evaluations in all areas of suspected disability, (3) to develop appropriate IEPs since the start of the 2003-2004 SY, (4) to determine an appropriate disability classification for a qualified child with a disability since the start of the 2003-2004 SY, and (5) to provide necessary special education and related services since the start of the 2003-2004 SY. At the time this

169

Complaint was filed, DCPS had not served the Petitioner with a "prior written notice", 20

U.S.C. § 1415(c)(1), addressing the subject matters raised therein.

On June 24, 2006, the Respondent filed a motion entitled "Response to Due

Process Complaint Notice." The relevant portions of that Response read as follows:

> (1) "DCPS DENIES, in general, all allegations contained in the complaint and intends to defend against the complaint." (2) "DCPS DENIES the allegation that it failed to provide an appropriate IEP." (3) "DCPS DENIES the allegation that it failed to identify this child as a child with a disability." (4) "DCPS DENIES the allegation that it failed to provide an appropriate placement." (5) "DCPS DENIES the allegation that it failed to complete timely and comprehensive evaluations. DCPS contends that it appropriately evaluated the child in all areas of suspected disability." (6) "DCPS DENIES the allegation that it violated the "child find" requirement. DCPS contends that it had no reason to suspect this was a child in need of special education services." (7) "DCPS DENIES the allegation that it failed to provide appropriate special education and related services. The allegation is too vague upon which a more specific answer can be given." (8) "DCPS did not issue an MDT Prior to Action Notice in this case because the allegations within the complaint fail to allege that the agency has proposed or refused to initiate or change the identification, evaluation, or educational placement of the child, pursuant to IDEIA, § 615(b)(3)." (9) "DCPS maintains that all other allegations stated within petitioner's complaint require no further prior written notice for the reasons stated above."

On its face, this Response does address any of the pertinent factors included in the

IDEA, 20 U.S.C. § 1415(c)(2)(B)(i)(I). More specifically, this Response does not

include:

> "an explanation of why the Respondent proposed or refused to take the action raised in the complaint; a description of other options that the IEP Team considered and the reasons why those options were rejected; a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; or a description of the factors that are relevant to the agency's proposal or refusal."

20 U.S.C. § 1415(c)(2)(B)(i)(I).

2

As the District Court recently noted in *Massey v. District of Columbia*, "the IDEA does not allow DCPS to respond generally to the substance of the complaint in whatever form it deems appropriate." 400 F.Supp. 2d 66, (D.D.C. 2005). Because this Response is equally deficient, Petitioner respectfully requests that her Amended Motion for Entry of Default and Default Judgment be granted. *See also Diaz-Fonseca v. Commonwealth of Puerto Rico*, 2006 WL 1652490 (1st Cir. 2006) (upholding trial court's entry of default in civil action brought under 20 U.S.C. § 1415(i)(2) of the IDEA, where the defendants failed to timely forward the administrative record and violated successive discovery orders issued by the court).

## APPLICABLE LAW

The IDEA requires that:

[i]f the local educational agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, such local educational agency shall, within 10 days of receiving the complaint, send to the parent a response that shall include –
(aa) an explanation of why the agency proposed or refused to take the action raised in the complaint;
(bb) a description of other options that the IEP Team considered and the reasons why those options were rejected;
(cc) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; and
(dd) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(2)(B)(i)(I).

The IDEA states that the timely issuance of a "prior written notice" negates the need for the written response required by 20 U.S.C. § 1415(c)(2)(B)(i)(I). In terms of substance, a prior written notice must include:

(A) a description of the action proposed or refused by the agency;
(B) an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;
(C) a statement that the parents of a child with a disability have protection under the procedural safeguards of this part [20 USCS §§ 1411 et seq.] and, if this notice is not an

3

171

initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;

(D) sources for parents to contact to obtain assistance in understanding the provisions of this part [20 USCS §§ 1411 et seq.];

(E) a description of other options considered by the IEP Team and the reason why those options were rejected; and

(F) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(1)(brackets in original).

The IDEA is silent regarding the proper remedy for the failure of a local educational agency ("LEA") to file an adequate response under 20 U.S.C. § 1415(2)(B)(i)(I).

## ARGUMENT

The Respondent has already acknowledged that a prior notice was never sent regarding the issues raised in Petitioner's complaint, and that a response consistent with the requirements of 20 U.S.C. § 1415(c)(1) is required.

The federal courts have held that, where the IDEA is silent regarding a procedural rule, the most closely analogous state rule must be applied. In an administrative proceeding under the IDEA, the most closely analogous state rules are the District of Columbia Superior Court Rules of Civil Procedure 12(a)(5) and 55(a), which provide the remedy for a civil defendant's failure timely to file an answer to a complaint. Because those rules require that a court enter a default when a defendant fails timely to file an answer, the Office of Management Services should grant the Petitioner a default for the Respondent's failure to serve a response.

**I.**     <u>**The Respondent has not served a "response" as required by the IDEA.**</u>

The Respondent acknowledges: (1) that a prior written notice was never sent regarding the issues raised in the Petitioner's Complaint and (2) that the IDEA required a written response within ten days of receiving a due process complaint notice. Because the

4

written Response filed by the Respondent does not include any discussion of the pertinent

factors listed in 20 U.S.C. § 1415(c)(2)(B)(i)(I), the Respondent has failed to meet its

statutory obligations under 20 U.S.C. § 1415(c)(2)(B)(i)(I). This outstanding violation

should be remedied.

The substantive and procedural contours of the IDEA's ten-day written response

were recently addressed by the District Court in *Massey*:

> "Under the statute, if DCPS had not previously issued a Prior Notice . . ., it
> was required to respond in writing to the request for a due process hearing.
> Furthermore, DCPS may not determine the form of its response: the
> required content of the written response is precisely detailed in the IDEA. .
> . [T]he IDEA does not allow DCPS to respond generally to the substance
> of the complaint in whatever form it deems appropriate."

400 F.Supp. 2d 66, (D.D.C. 2005)(citations omitted).

The District Court then considered the substance of the DCPS response - a prior

written notice of placement issued after the Plaintiff's had filed their due process

complaint – under the IDEA's statutory requirements.  First, the District Court dismissed

DCPS' argument that "any failure to conform to the statute was a mere technical

oversight." *Id.* To the contrary, the District Court emphasized that

> "[i]t is technical compliance with the law, . . . that gives parents faith that
> their concerns will be addressed in accord with Congress' intent. Many of
> the procedural safeguards in the IDEA are extremely technical, spelling
> out particular deadlines and required content. This kind of detail embodies
> the purpose of a statute prescribing administrative – i.e., procedural –
> remedies. . . Does DCPS mean to imply that it is permitted to violate the
> IDEA as long as the ways in which it does so are minor? This Court has
> not been directed to any evidence that Congress intended an exemption for
> "close enough."

> *Id.*(citations omitted)

Second, and more importantly, the District Court specifically noted that DCPS's

failure, *inter alia*, to issue a proper response called into question the adequacy of the

5

173

entire administrative process and the Plaintiff's entitlement to some form of appropriate

relief:

> "Surely Congress did not intend for parents to be left with no remedy
> when the school district fails to observe the procedural safeguards in the
> IDEA. In this Court's opinion, the litany of DCPS failures reveals that it
> is apparently unable to follow statutory procedures in the first place.
> Worse yet, DCPS appears incompetent to address, in the manner required
> by the IDEA, a parent's complaints about those failures. Therefore, the
> Courts find that the plaintiffs have demonstrated that pursuing their claim
> through the administrative process would be inadequate".

*Id.* (citations omitted)

In this case, as in *Massey*, the Respondent's "response" fails to include any of this

necessary information; therefore, the Respondent has not served a response in compliance

with the requirements of IDEA. *See also Diaz-Fonseca v. Commonwealth of Puerto*

*Rico*, 2006 WL 1652490 (1st Cir. 2006) (upholding trial court's entry of default in civil

action brought under 20 U.S.C. § 1415(i)(2) of the IDEA, where the defendants failed to

timely forward the administrative record and violated successive discovery orders issued

by the court).

## II.    In the Absence of a Clear Procedure in the IDEA, the Most Closely Analogous State Rules Should be Applied.

The federal courts have ruled that where the IDEA is silent, the most closely

analogous state rule should be applied, provided that the state rule is consistent with the

policies of the IDEA. *See, e.g., Spiegler v. Dist. of Columbia*, 866 F.2d 461 (D.C. Cir.

1989)(applying local limitations period for appeals of administrative decision to federal

actions brought following adverse administrative decisions under predecessor to IDEA).

In *Spiegler*, the Court of Appeals held that the District of Columbia 30-day statute

of limitations for review of agency orders applied to federal cases challenging hearing

6

officers' decisions under the Education of the Handicapped Act ("EHA"), the predecessor to the IDEA. 866 F.2d at 462-470. Congress had not provided a statute of limitations in the text of the EHA, so the Court of Appeals applied the local limitations period because it was closely analogous and consistent with the policies underlying the EHA. *Id.*

The Court in *Spiegler* applied a two-part analysis: 1) identifying the most closely analogous state rule; and 2) determining whether the application of that rule was consistent with the federal policies underlying the EHA. In performing the first part of the analysis, the Court held that a substantive federal claim challenging the findings and decision of an EHA hearing officer was "sufficiently analogous to an appeal from an administrative decision to permit us to borrow the 30-day local limitations period for such appeals." 866 F.2d at 466. In the second part of the analysis, the Court concluded "that a 30-day limitations period, when combined with a duty by the District to inform hearing participants of the short [limitations] period, was not so harsh as to be inconsistent with [the EHA's underlying] policies." *Id.*

Though the *Spiegler* Plaintiffs had argued for the application of the District of Columbia's default 3-year statute of limitations, the Court of Appeals found the 30-day limitations period consistent with federal policies: "Because the Act emphasizes the prompt resolution of disputes, we find at the outset that a shorter rather than longer statute of limitations would be more consistent with the policies underlying the Act." *Id.* at 467.

According to the *Spiegler* decision, in forming a remedy for the Respondent's failure to serve a response to the complaint, the Office of Management Services should

determine the state rules most closely analogous to this situation, and should apply them if they are not inconsistent with the federal policies underlying the IDEA.

**III.    The State Rules Most Closely Analogous to this Situation are District of Columbia Superior Court Rules of Civil Procedure 12(a)(5) and 55(a).**

Generally, the two best sources for analogous rules in IDEA hearings are the District of Columbia Office of Administrative Hearings Procedural Rules ("OAH rules"), D.C. Mun. Regs. tit. 1 §§ 2800 *et seq.*, and the District of Columbia Superior Court Rules of Civil Procedure ("Civil Rules").

In *Spiegler*, the Court of Appeals used the OAH Rules to determine the appropriate statute of limitations period for challenging the findings and decisions of an impartial due process hearing officer. However, because the OAH Rules do not require any response in a state administrative proceeding, these rules are not applicable to an action initiated under the IDEA, which now requires a response containing very specific information within 10 days of the filing of the complaint. *Compare* OAH Rule 2813.5 ("[u]nless otherwise ordered, no responsive pleading is required in cases commenced by a request for a hearing.") *with* 20 U.S.C. § 1415(2)(B)(i)(I)(requiring response to IDEA complaint and listing necessary elements in response); D.C. Mun. Regs. tit. 1 §§ 2813.5. In other words, because the OAH Rules do not require an agency to serve any responsive pleadings to a complaint filed by a private party, they are not analogous to the circumstances presented in this case.

The Civil Rules, on the other hand, deal extensively with every aspect of pleading practice, including the procedures for serving initial and responsive pleadings and the consequences of violations of those procedures. *See* Super. Ct. Civ. R. 3, 7, 8, 12 & 55.

8

176

The Civil Rules dictate the necessary contents of answers, the timelines for filing answers and the penalties for failure to file. *See* Super. Ct. Civ. R. 12 & 55.

Because the OAH rules do not require responsive pleadings and the Civil Rules do, the Civil Rules are the state rules most closely analogous to the IDEA response requirement. The Office of Management Services should therefore apply the Civil Rules by analogy as long as they are consistent with the federal policies underlying the IDEA.

## IV.    By Analogy, the Civil Rules Require the Office of Management Services to Rule by Default for the Petitioner.

District of Columbia Superior Court Rule of Civil Procedure 12(a)(5) and 55(a) are the state rules most closely analogous to the Respondent's failure to serve a response, as argued *supra*. The rules require that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . the Clerk or the Court shall enter the party's default." Super. Ct. Civ. R. 55(a); *see also* Super. Ct. Civ. R.12(a)(5)("Except where the time to respond to the complaint has been extended as provided in Rule 55(a), failure to comply with the requirements of this Rule shall result in the entry of a default by the Clerk or the Court *sua sponte* unless otherwise ordered by the Court.")

The courts do not have any discretion in the entry of a default for failure to respond to a complaint; "the Clerk or the Court *shall* enter the party's default." Super. Ct. Civ. R. 55(a)(emphasis added). The comment to Rule 12 makes clear the intent that default be automatic in those circumstances. *See* Super. Ct. Civ. R. 12, cmt ("[P]aragraph (5) has been added to preserve the existing Superior Court rule of automatic entry of default against a defendant who does not timely respond to the complaint.").

9

The District of Columbia Court of Appeals has addressed this issue, and has enforced the clear text of the Rules in favor of automatic and non-discretionary default. *See Digital Broadcast Corp. v. Rosenman & Colin, LLP*, 847 A.2d 384, 388-89 (D.C. App. 2004)(holding that Rule 55(a) default is automatic and non-discretionary); *Restaurant Equip. and Supply Depot, Inc. v. Gutierrez*, 852 A.2d 951, 954-56 (D.C. App. 2004)(holding that default for failure to file answer was automatic even where defendant had filed motion to dismiss).

An entry of default is not a final judgment terminating a proceeding. "[T]he entry of default does not constitute a judgment, but simply precludes the defaulting party from offering any further defense on the issue of liability." *Lockhart v. Cade*, 728 A.2d 65, 68 (D.C. 1999). "[T]he defaulted party retains the right to contest and mitigate unliquidated damages." *Digital* at 389 n.7. In other words, the default resolves all liability questions against the defaulting party, but does not determine ultimate relief.

Because the serving of a "response" under the IDEA is a perfect analogue to the filing of an answer under the Civil Rules, and the Respondent has in this case failed to serve a response, by analogy to the Civil Rules the Office of Management Services must issue the equivalent to a default against the Respondent. The equivalent to a default in IDEA administrative hearings is a finding, as a matter of law, that the Respondent has committed all of the violations identified in the Complaint.

Where a violation is all that is necessary to justify relief, the Office of Management Services may simply order the relief requested in the Complaint. In the alternative, where further evidence is necessary before specific relief can be ordered, the

Office of Management Services should schedule a hearing for the sole purpose of adjudicating the issues relevant to relief.

V.   **An Order of Default After an LEA has Failed to Serve a Response is Wholly Consistent with the Policies Underlying the IDEA in that it Protects the Rights of Children, Encourages Prompt Resolution of Disputes, Promotes Administrative Efficiency and Preserves Procedural Equity.**

The application of the Civil Rules to this situation and the consequential order of default against the Respondent comports with the policies underlying the IDEA.

The primary purposes of the IDEA are, of course, "to ensure that all children with disabilities have available to them a free appropriate public education" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1).

Additionally, it is clear from the statute and the caselaw that certain policies underlie the procedural aspects of the IDEA. In *Spiegler*, the Court of Appeals noted that Congress' intent in passing the EHA was "to ensure the prompt resolution of disputes regarding the appropriate education for handicapped children." 866 F.2d 461, 467. The recent amendments to the IDEA, most notably the clauses regarding the complaint, the response and the resolution session, indicate a Congressional intent to improve administrative efficiency by narrowing issues and limiting unnecessary hearings. *See* 20 U.S.C. § 1415(b)(6), (c)(2)(B)(i)(I) & (f)(1)(B). Finally, Congress' respect for the adversarial process and intent to establish basic procedures to ensure fairness in hearings can be found in the IDEA's rights to counsel, to disclosure of evidence, to subpoenas, to cross-examination and to attorneys' fees; the Act's new clauses enabling the dismissal of

11

inadequately drafted complaints; and the Act's new provisions regarding the training and competence of hearing officers. *See* 20 U.S.C. § 1415(c)(2)(A), (f)(3)(A) & (h).

These four purposes – protection of the rights of children with disabilities, prompt resolution of special education disputes, administrative efficiency and procedural fairness – are all furthered by an order of default against the Respondent for failing to serve a response.

Obviously, a ruling in favor of a parent or child, particularly a ruling that prevents the LEA from violating the IDEA and sandbagging a petitioner at hearing, helps to protect the rights of children with disabilities. It is equally obvious that a default for failure to respond to a complaint furthers prompt resolution and administrative efficiency, both in the short term, in that the parties and the hearing officer are not forced to litigate issues regarding which the respondent has offered no defense, and in the long term, in that the respondent will be more likely to serve a proper response in future cases.

The impact of a default on procedural equity deserves a bit more consideration, because the recent amendments to the IDEA have changed the balance of procedural obligations. Under the old version of the law, a petitioner needed only to file a minimum hearing request, and the respondent did not need to file a response. Under the current version of the law, by the time a respondent has failed to serve a response and thereby made itself subject to default, a petitioner has had to file a substantially more comprehensive complaint, which has had to withstand a judgment of its sufficiency. *See* 20 U.S.C. § 1415(b)(7) & (c)(2)(D). If the complaint is found sufficient, the petitioner is granted a hearing, but cannot raise any issue not identified in the complaint. *See* 20

12

180

U.S.C. § 1415(f)(3)(B). While petitioners now bear that new burden, respondents bear a new burden of their own – the response to the complaint.

A default against an LEA for failure to serve a response would enforce the policy of procedural fairness evident in the IDEA's new requirements of a reciprocal information exchange prior to the resolution session and the hearing. To decline to issue a default would confound Congress' clear intent to require LEAs to provide the same level of information that petitioners must provide, and would create a fundamentally unfair system in which a petitioner is denied his/her opportunity to make a case if he/she fails to provide information according to IDEA procedure, but an LEA is allowed to make its case in the opposite situation.

## CONCLUSION

Because a default against the Respondent in this case is wholly consistent with the policies underlying the IDEA, and the denial of a default would frustrate Congress' intent, the Office of Management Services should apply the most closely analogous state rule to this situation and grant the Petitioner a default by applying Civil Rules 12(a)(5) and 55(a) by analogy.

Respectfully submitted by,

Douglas Tyrka
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20008
(ph) (202) 265-4260
(f) (202) 265-4264

13

181

182

**TYRKA & HOUCK, LLP**
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

## Certificate of Service

Counsel for the Petitioner hereby certifies that a copy of this MOTION has been

filed with the Student Hearing Office and sent via facsimile to Counsel for the

Respondent.

Respectfully Submitted by,

Douglas Tyrka
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20008
(ph) (202) 265-4260
(f) (202) 265-4264

**DATE FILED:  Wednesday, June 28, 2006**

# TYRKA & HOUCK, LLP

1726 Connecticut Ave., NW, Suite 400
Washington, DC 20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

## CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Houck or their client(s) that is intended solely for the recipient named below. If you are not the intended recipient named below or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Houck expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Houck. Thank you.

Recipient:      SHO & OGC

Fax number:

From:           Douglas Tyrka

Regarding:      D███ B█████

Number of pages:  15    (including cover sheet)

Notes:

DC PUBLIC
SCHOOL SYSTEM
2006 JUN 28  AM 9: 55

184

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**

D____ B____ (____/95)
    Petitioner

v.

District of Columbia Public Schools,
    Respondent

*(stamp: 2006 JUN 27 PM 2: 05 — DC PUBLIC SCHOOL SYSTEM)*

**District of Columbia Public School's**
**Response to Due Process Complaint Notice[1]**

The District of Columbia Public School (hereinafter "DCPS"), by and through the undersigned Attorney-Advisor, hereby provides its RESPONSE to the Administrative Due Process Complaint Notice (hereinafter "Complaint") filed on behalf of the above captioned student, pursuant to the Individuals with Disabilities Education Improvement Act (hereinafter "IDEIA"), 20 U.S.C. § 1415(c)(2)(B)(i)(I). DCPS responds as follows:

  a. DCPS **DENIES**, in general, all allegations contained in the complaint and intends to defend against the complaint;

  b. DCPS **DENIES** the allegation that it failed to provide an appropriate IEP. DCPS contends that the IEP was made in accordance with 5 DCMR 3007 and 3009.

  c. DCPS **DENIES** the allegation that it failed to identify this child as a child with a disability. DCPS contends that the identification was made in accordance with 5 DCMR 3005.

  d. DCPS **DENIES** the allegation that it failed to provide an appropriate placement. DCPS contends that the placement was made in accordance with 5 DCMR 3013.

---

[1] It is this attorney-advisor's position that a DCPS response is not required in all IDEIA Due Process hearings. Accordingly, DCPS objects to such an expansive reading and practice. The purpose of the prior written notice requirements of IDEIA is to inform the parents in writing of an agency's final action on a proposal or refusal to initiate or change the identification, evaluation, educational placement or the provision of FAPE (procedural safeguards and special education and related services) to a particular student. If a team (e.g., MDT or IEP team) cannot reach consensus or if the parents do not attend the team meeting, the public agency must provide the parents with prior written notice of the agency's proposals and/or refusals. If consensus between the public agency and the parent cannot be reached, prior written notice of proposed or refused actions must be provide to the parents, even if the parents participated in the meeting where the decision(s) was made. Excerpt of Memorandum from the Office of Special Education for the West Virginia Department of Education, dated, June 24, 2004, re: IDEA 2004 Interim Implementation – Prior Written Notice.

```
************ -COMM. JOURNAL- *************** DATE JUN-24-2006 ***** TIME 13:09 ********

        MODE = MEMORY TRANSMISSION              START=JUN-24 13:06    END=JUN-24 13:09
          FILE NO.=120

     STN NO.   COMM.   ABBR NO.   STATION NAME/TEL NO.   PAGES   DURATION

      001      OK       ≅          992022654264          009/009  00:02:19


                                              - NGB-JA                     -

     ***********************************  -          - ***** -         - **********
```

To: D. Tyrra

From: A. Price

Re: Response
    R. Spencer
    D. B̶̶̶̶̶
    T. Ward
    I. William

6/24/06

# STATE EDUCATION AGENCY
# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| **B██████, D.**          Petitioner | ) | |
| | ) | HEARING OFFICER |
| Vs. | ) | |
| | ) | |
| **DCPS** | ) | |
| **Kimball ES** | ) | DISTRICT OF COLUMBIA |
| | | |
| Respondent | ) | PUBLIC SCHOOLS |

## SCHEDULING MEMORANDUM

1.    A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **The Student Hearing Office does not schedule or participate in resolution meetings.**

2.    The complaint notice was filed on **June 16, 2006**

3.    The deadline for the resolution meeting is **July 1, 2006** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A.    ***Prior Written Notice Not Issued by the Local Educational Agency.***  If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

    1.    An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;

    2.    A description of other options that the IEP Team considered and the reasons why those options were rejected;

    3.    A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and

4.     A description of the factors that is relevant to the agency's proposal or refusal.

B.     Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **June 26, 2006**.

C.     ***Deficiency Notice***.   A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.     The deadline for filing a deficiency notice is **July 1, 2006**.

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence.  A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice.  The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law.  The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# ax

# Time Sensitive Materials Attached

**Prompt Attention: Attorney: Douglas Tyrka, Esq.**
**Parent: Evelyn Brown**

Telephone Number: **(202) 265-4260**
Fax Number: **(202) 265-4264**

Pages: **3**
Date: **June 16, 2006**

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: **D███ B█████**
School:  **Kimball ES**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office.  If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 724-6556.  Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

**Thank You**
**Pamela Brown**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally
privileged.  The information is intended only for use of the individual or entity named Above, if you are not the
intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in
reliance of the contents of this copied information is Strictly prohibited.  If you receive this telecopy in error, please
immediately notify us by telephone For return of the original document to us.

```
            ┌─────────────────────────────────┐
            │ TRANSMISSION VERIFICATION REPORT │
            └─────────────────────────────────┘

                              TIME  : 06/18/2006 21:44
                              NAME  : STATE ENFORCEMENT
                              FAX   : 2024425253
                              TEL   :
                              SER.# : 000D6J436181

   ┌──────────────────────────────────────────────────────┐
   │  DATE,TIME            06/18  21:43                     │
   │  FAX NO./NAME         92654264                         │
   │  DURATION             00:00:56                         │
   │  PAGE(S)              03                               │
   │  RESULT               OK                               │
   │  MODE                 STANDARD                         │
   │                       ECM                              │
   └──────────────────────────────────────────────────────┘
```

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney: Douglas Tyrka, Esq.**
**Parent: Evelyn Brown**

Telephone Number: **(202) 265-4260**
Fax Number: **(202) 265-4264**

Pages: **3**
Date: **June 16, 2006**

---

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: **D▮▮▮ B▮▮▮▮**
School: **Kimball ES**

The Complaint Intake Unit is responsible for providing parties with information notice that a Due Process Complaint has been filed with the Student Hearing Office. If you have questions about the attached Notice, please contact the Complaint Intake Unit at (202) 724-6556. Otherwise, if you have questions about the content of the compliant you should contact your legal counsel for further advice.

**Thank You**
**Pamela Brown**

190

# DUE PROCESS COMPLAINT NOTICE
## In re D████ B██
### June 16, 2006

**Petitioner**:          Evelyn Sykes
**Student**:             D████ B████
**DOB**:                 ████/95
**Current School**:      Kimball Elementary School ("Kimball ES")
**Residence**:           3930 Blaine Street, N.E.
                         Washington, DC 20019

**Petitioner's Contact Information for Special Education Purposes**:
Tyrka & Houck, LLP
1726 Connecticut Ave. N.W. Suite 400
Washington, D.C. 20009
Tel: 202-265-4260
Fax: 202-265-4264

*2006 JUN 16 PM 2: 28*
*DC PUBLIC SCHOOL SYSTEM*

## Violations:

1. Failure to provide an appropriate placement since the start of the 2003-2004 SY.
2. Failure to conduct and review adequate evaluations in all areas of suspected disability.
3. Failure to determine an appropriate disability classification for a qualified child with a disability since the start of the 2003-2004 SY.
4. Failure to develop appropriate IEPs since the start of the 2003-2004 SY.
5. Failure to provide necessary special education and related services since the start of the 2003-2004 SY.
6. Failure to provide ESY following the 2003-2004, 2004-2005, and 2005-2006 SYs.

## Facts:

1. DCPS placed D████ at Kimball for the 2003-2004, 2004-2005, and 2005-2006 SYs.
2. Kimball ES has never been an appropriate placement for D████.
3. A January 15, 2003 psychiatric evaluation:
   a) diagnosed D████ with Attention-Deficit/Hyperactivity Disorder, NOS and Fetal Alcohol Syndrome;
   b) recommended:
      i) placement in "year-round, structured, therapeutic school program . . . [with] a smaller classroom";
      ii) completion of an occupational therapy evaluation;
      iii) development of a behavior intervention plan.
4. At a September 17, 2003 MDT meeting, DCPS:
   a) determined that D████ was eligible to receive special education and related services as a child with an Emotional Disturbance ("ED");
   b) rejected a recommended additional disability classification of Other Health Impaired ("OHI") and Learning Disabled ("LD");

191

   c) determined that D▨▨ was not eligible for occupational therapy services;

   d) developed an IEP prescribing:

     i) 20 hours per week of specialized instruction and

     ii) 1 hour per week of psychological services;

   e) continued D▨▨ placement at Kimball ES.

5. At a May 19, 2004 MDT meeting, DCPS:

   a) continued D▨▨ disability classification of ED;

   b) developed an IEP:

     i) reducing D▨▨ specialized instruction from 20 hours to 15 hours per week and

     ii) prescribing 1 hour of psychological services;

   c) rejected:

     i) a recommended placement for D▨▨ in a year-round full-time therapeutic program;

     ii) the Petitioner's proposed placement at High Road Academy;

   d) continued D▨▨ placement at Kimball ES;

   e) determined that D▨▨ was not eligible for Extended School Year ("ESY") services;

6. DCPS did not:

   a) include additional disability classification of OHI and LD or

   b) prescribe all necessary special education and related services in D▨▨ September 13, 2003 and May 19, 2004 IEPs.

7. D▨▨ September 13, 2003 and May 19, 2004 IEPs were not appropriate.

8. D▨▨ did not receive all of the special education and related services prescribed in his September 13, 2003 or May 19, 2004 IEPs.

9. D▨▨ was eligible for ESY at the time of the May 19, 2004 MDT meeting.

10. DCPS did not provide D▨▨ with ESY following the 2004-2005 SY.

11. A June 4, 2004 occupational therapy evaluation determined that:

   a) "[t]he team . . . should reconsider [D▨▨] school placement . . .[in favor of] a year round, structured, therapeutic school program to include a small classroom environment and a behavior management program";

   b) "D▨▨ should receive OT services once per week for 30 minute[s]";

12. An August 7, 2004 academic skills screening report:

   a) determined that D▨▨ has "significant emotional, ADHD and specific learning disabilities;

   b) recommended that:

     i) "D▨▨ Emotional Disorders, ADHD and learning disabilities necessitate that he be provided a small class (1:8 teach: student ratio) in a year-round therapeutic setting";

     ii) D▨▨ "be provided with [ESY] in a year-round therapeutic educational setting."

13. At a January 12, 2005 MDT meeting, DCPS did not:

   a) review D▨▨ current evaluations, including his June 4, 2004 occupational therapy evaluation or his August 7, 2004 academic skills screening report;

   b) revise D▨▨ current IEP;

   c) discuss D▨▨ current educational placement;

14. An April 25, 2005 clinical psychological evaluation of D▨▨

   a) provided a diagnosis of ADHD and Depressive Disorder;

   b) determined that D▨▨ "may qualify for special education and related services as a student with an Emotional Disturbance".

15. At a May 24, 2005 MDT meeting, DCPS:

    a) reviewed D⬛⬛ June 4, 2004 occupational therapy evaluation;
    b) determined that D⬛⬛ was:
       i)   not eligible for occupational therapy services;
       ii)  no longer eligible for a disability classification of ED;
       iii) not eligible for ESY.
    c) changed D⬛⬛ disability classification to Multiply Disabled (LD/OHI);
    d) developed an IEP prescribing 15 hours of specialized instruction, 1 hour of psychological services, and 1 hour of speech and language therapy;
    e) continued his placement at Kimball ES;

16. DCPS did not:
    a) include an additional disability classification of ED or
    b) prescribe all necessary special education and related services in D⬛⬛ May 24, 2005 IEP.

17. D⬛⬛ May 24, 2005 IEP was not appropriate.

18. D⬛⬛ was eligible for ESY following the 2004-2005 SY.

19. DCPS did not provide D⬛⬛ with ESY following the 2004-2005 SY.

20. D⬛⬛ did not receive the special education and related services prescribed in his May 24, 2005 IEP.

21. At a May 9, 2006 MDT meeting, DCPS:
    a) changed D⬛⬛ current disability classification from MD to LD;
    b) developed an IEP prescribing 15 hours of specialized instruction, 1 hour of psychological services, and 0.5 hours of speech and language therapy per week;
    c) determined that D⬛⬛ was not eligible for ESY;
    d) issued a prior notice placing D⬛⬛ at Kelly Miller Middle School ("Kelly Miller MS") for the 2006-2007 SY;

22. DCPS did not:
    a) include an additional disability classification of OHI or
    b) prescribe all necessary special education and related services in D⬛⬛ current IEP.

23. D⬛⬛ current IEP is not appropriate.

24. DCPS' proposed placement at Kelly Miller MS is not appropriate.

25. D⬛⬛ is eligible for ESY at the conclusion of the 2005-2006 SY.

26. DCPS is not providing D⬛⬛ with ESY following the 2005-2006 SY.

27. DCPS has not completed current evaluations of D⬛⬛ in all areas of suspected disability.

28. Current evaluations of D⬛⬛ in all areas of suspected disability are warranted.

29. The Petitioner is securing D⬛⬛ admission into several appropriate private schools.

**Proposed resolution:**

1. DCPS to immediately take all steps necessary to fund and place D⬛⬛ at an appropriate private school of the Petitioner's choosing, with transportation.
2. DCPS to immediately fund current evaluations of D⬛⬛ in all areas of suspected disability, including social history, occupational therapy, psychoeducational, and clinical psychological evaluations, as well as any other evaluations recommended therein.
3. DCPS to convene an MDT meeting within ten (10) days of receiving current evaluations of D⬛⬛ in all areas of suspected disability to:
    a) review these evaluations,

b) revise D█████ IEP, including his current disability classification and his prescribed hours per week of special education and related services, and

c) develop a compensatory education plan to compensate D█████ for DCPS' failure to develop and implement appropriate IEPs and to provide an appropriate placement since the start of the 2003-2004 SY.

4. DCPS to pay reasonable attorney fees and costs incurred in bringing and pursuing this case.

## Resolution Meeting:

1. The Petitioner contends that the entire IEP Team and a representative of the LEA with authority to:

   a. immediately take all steps necessary to fund and place D████ at an appropriate private school of the Petitioner's choosing, with transportation;

   b. immediately fund current evaluations of D█████ in all areas of suspected disability, including social history, occupational therapy, psychoeducational, and clinical psychological evaluations, as well as any other evaluations recommended therein

   c. to convene an MDT meeting within ten (10) days of receiving current evaluations of D█████ in all areas of suspected disability to:

      i. review these evaluations,

      ii. revise D█████ IEP, including his current disability classification and his prescribed hours per week of special education and related services, and

      iii. develop a compensatory education plan to compensate D████ for DCPS' failure to develop and implement appropriate IEPs and to provide an appropriate placement since the start of the 2003-2004 SY.

   is a necessary attendee at any resolution meeting.

2. If this individual is not going to be in attendance, Petitioner requests that DCPS provide counsel with a written notice waiving its right to a resolution session 48 hours prior to any scheduled meeting.

3. The Petitioner contends that any meeting not attended by the identified individual is not a valid resolution session, but rather an informal settlement discussion.

4. The Petitioner will be accompanied by his or her attorney at any resolution session convened subsequent to the filing of this complaint and will record any resolution session by analog or digital means.

5. Any statements by the Petitioner or his or her representative during any resolution meeting or other settlement discussion incident to the filing of this complaint are for the purposes of compromise only.

Respectfully Submitted,

194

Douglas Tyrka
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20008
(ph) (202) 265-4260
(f) (202) 265-4264

**Complaint Intake Unit**
**825 North Capitol Street, NE- 8th Fl.**
**Washington, DC 20002**
**(202) 724-6556**

DISTRICT OF COLUMBIA PUCLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Principal/Administrator**
**Special Education Coordinator**

Telephone Number: **(202) 645-3150**        Pages: **8**
Fax Number: **(202) 645-3147**        Date: June 16, 2006

---

**Please find attached a copy of a Scheduling Memorandum and a copy of the Due Process Complaint Notice regarding:**

Student: D▮▮▮▮ B▮▮▮▮

School:   **Kimball ES**

**The Complaint Intake Unit is responsible for providing parties with information notice that a Due Process Complaint has been filed with the Student Hearing Office.  If you have questions about the attached Notice, please contact the Complaint Intake Unit at (202) 724-6556.  Otherwise, if you have questions about the content of the compliant you should contact your legal counsel for further advice.**

                                                **Thank You**
                                                **Pamela M. Brown**
                                                **Staff Assistant**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally privileged.  The information is intended only for use of the individual or entity named Above, if you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is Strictly prohibited.  If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

196

```
        TRANSMISSION VERIFICATION REPORT

                                    TIME : 06/18/2006 21:43
                                    NAME : STATE ENFORCEMENT
                                    FAX  : 2024425253
                                    TEL  :
                                    SER.# : 000D6J436181


        DATE,TIME              06/18  21:40
        FAX NO./NAME           96453147
        DURATION              00:02:49
        PAGE(S)               09
        RESULT               OK
        MODE                 STANDARD
                             ECM
```

**Complaint Intake Unit**
**825 North Capitol Street, NE- 8th Fl.**
**Washington, DC 20002**
**(202) 724-6556**

DISTRICT OF COLUMBIA PUBLIC SCHOOLS,
State Enforcement & Investigation Division
For Special Education Programs

# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Principal/Administrator**
                         **Special Education Coordinator**

Telephone Number: **(202) 645-3150**          Pages: **8**
        Fax Number: **(202) 645-3147**         Date: June 16, 2006

---

**Please find attached a copy of a Scheduling Memorandum and a copy of the Due Process Complaint Notice regarding:**

Student: **D██████ B███████**

School: **Kimball ES**

197

**The Complaint Intake Unit is responsible for providing parties with information notice that a Due Process Complaint has been filed with the Student Hearing**

# TYRKA & HOUCK, LLP

1726 Connecticut Ave., NW, Suite 400
Washington, DC  20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

## CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Houck or their client(s) that is intended solely for the recipient named below. If you are not the intended recipient named below or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Houck expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Houck. Thank you.

Recipient:        SHO

Fax number:       202-442-5556

From:             Douglas Tyrka

Regarding:        D█████ B███████

Number of pages: 6      (including cover sheet)

Notes:

2006 JUN 16 PM 2: 28
DC PUBLIC
SCHOOL SYSTEM

198

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
STUDENT HEARING OFFICE

IN THE MATTER OF
D█████ B███████

HEARING DATE:  8-23-06

TRANSCRIBED BY
LEGAL PERSONNEL, INC.   (301) 277-5711

## APPEARANCES

Hearing Officer:  Coles (phonetic) Ruff

Attorney for DCPS:  Aaron E. Price, Sr.

Attorney for Parent:  Douglas Tyrka

Parent of D████ B████:  Evelyn Blondell Sykes

Robin Rabb, Special Education Coordinator, Kimball Elementary School

Keren Plowden, Executive Director of Student Services, Rock Creek Elementary School

1 <u>PROCEEDINGS</u>

2    HEARING OFFICER: Good afternoon. Today's date is August 23, 2006. I'm

3 Coles Ruff, Independent Hearing Officer. This is an administrative hearing conducted

4 for the Individuals with Disabilities Education Improvement Act. This is in a matter of

5 D█████ B█████, date of birth, █████-95. The school – the home school, the school of

6 attendance?

7    MR. TYRKA: Well, he has just aged out of Kimball (phonetic).

8    HEARING OFFICER: Um-hum.

9    MR. TYRKA: That was the last school he attended.

10    HEARING OFFICER: Okay.

11    MR. TYRKA: And there's a placement notice to Kelly Miller.

12    HEARING OFFICER: Great. Could you all identify yourselves, please?

13    MR. PRICE: Good Afternoon. Aaron E. Price, Senior, Attorney Advisor

14 appearing on behalf of D.C. Public Schools.

15    MR. TYRKA: Good Afternoon, Douglas Tyrka, counsel for Ms. Sikes

16 (phonetic).

17    MS. SIKES: Good Afternoon. Evelyn Blondell Sykes.

18    HEARING OFFICER: Okay. You waive formal reading of the rights.

19    MR. TYRKA: Yes.

20    HEARING OFFICER: Okay. You said Ms. Sikes right?

21    Ms. Sikes: Sikes, yes. Uh-hum.

22    HEARING OFFICER: Sikes, okay. I'm going to rely upon Mr. Tyrka to have

23 informed you of all the procedures and I won't through formal explanation. I'll just

3

1    indicate that I'm not an employee of D.C. Public Schools and as an independent hearing

2    officer; I'll listen to whatever is presented and render an impartial decision.

3        MS. SIKES:  Sir, I'm sorry.  I didn't get your last name.  I was writing.

4        HEARING OFFICER: Ruff.  R-U-F-F.

5        MS. SIKES:  Thank you.

6        HEARING OFFICER:  Okay.  Mr. Tyrka has submitted the disclosure which

7    contains twenty seven (27) documents and a witness list.  Any objection, Mr. Price?

8        MR. PRICE:  No objections.

9        HEARING OFFICER: Are there submissions from DCPS?

10       MR. PRICE:  There is.

11       HEARING OFFICER:  Of course it did not make its way to my –

12       MR. PRICE:  It's a witness list.

13       HEARING OFFICER:  -- to my jacket.

14       MR. PRICE:  And I only have one copy so I will share it with you.

15       HEARING OFFICER:  All right.  No objection to the list, I presume.

16       MR. TYRKA:  No objection.

17       HEARING OFFICER:  Mr. Tyrka, do you have any preliminary matters?

18       MR. TYRKA:  No.

19       MR. PRICE:  I think we resolved it.

20       HEARING OFFICER:  He resolved –

21       MR. PRICE:  Do you want to –

22       HEARING OFFICER:  - some of the issues.                    MR.

23       MR. TYRKA:  Presumably resolved, or do you want to –

4

1          MR. PRICE:  Oh, yes.  There's a partial agreement with –

2          HEARING OFFICER:  Uh-hum.

3          MR. PRICE:  - DCPS agrees to find it consistent with the superintendent's

4          guidelines, independent psycho-ed and social history eval.

5          HEARING OFFICER:  Independent psycho-ed?

6          MR.  PRICE: Uh-hum.

7          HEARING OFFICER:  Is this student eligible?

8          MR. PRICE:  Yes.  He set the notice in place, yesterday.

9          HEARING OFFICER:  So it's a new psycho-ed?

10         MR. TYRKA:  New psycho-ed.

11         HEARING OFFICER:  And –

12         MR. TYRKA:  Social history.  Meeting in fifteen (15) days after?

13         MR. PRICE:  I think that's going to be contingent upon his determination.

14         HEARING OFFICER: Okay.

15         MR. TYRKA:  Well, then there will be a meeting, in effect.

16         MR. PRICE:  Right, and so, if so, I don't think we need it.

17         HEARING OFFICER:  Okay.  Let me look at the Complaint.  So, I mean, what

18    issue is still in dispute?

19         MR. TYRKA:  It was a pre-born history.

20         HEARING OFFICER:  Or is it just an issue of remedy.  Which one is it?

21         MR. TYRKA:  I think it's primarily remedy but I guess we'll have to hear DCPS.

22    We're alleging inappropriate IEP's and placements going back the last three school years.

23         HEARING OFFICER: Inappropriate IEP's and placements.

1          MR. TYRKA:  Going back the last three school years.

2          HEARING OFFICER: Is that beyond the statute?

3          MR. TYRKA:  Well, that presents legal question that we've been researching.

4   I'm not sure if you've had it brought out before you yet.

5          HEARING OFFICER: Not yet.

6          MR. TYRKA:  Because the statute is – well, our positions is because the statute

7   of limitations is substantive law, not procedural law – that it can't back-date.  So in other

8   words, the statute in effect at the time of the violation is the one that is used, not the

9   statute in effect now.

10         HEARING OFFICER:  Whew.  Okay.

11         MR. TYRKA:  Well, to give an example to make it easier to see what we're

12   saying, if you picture somebody who had a two and a half year old claim on June 30, '05.

13         HEARING OFFICER:  Oh yes, if there was a claim that was existing.  That

14   would make sense to me.

15         MR. TYRKA:  Sure.  Okay.

16         HEARING OFFICER:  There was?

17         MR. TYRKA:  Well, because we're going back to the '03, '04 school year, right,

18   the claims existed at the time the law changed.

19         HEARING OFFICER: The Complaint had not been filed.

20         MR. TYRKA:  Correct.

21         HEARING OFFICER:  But –

22         MR. TYRKA:  Correct.

23         HEARING OFFICER:  -- The cause of action --

1          MR. TYRKA:  But the alleged harm had been done.

2          HEARING OFFICER: -- Existed.  Okay.

3          MR. TYRKA:  So, I'm saying that's – you know, because somebody couldn't –

4    the statue changes on July 1st, you can't lose your claim from June 30 to July 1st just

5    because the statute changed.

6          HEARING OFFICER:  Well let's not belabor that now because –

7          MR. TYRKA:  Yes, exactly.

8          HEARING OFFICER: -- we're not clear that that's going to be an issue.

9          MR. TYRKA:  And we're also alleging no service even under the inappropriate

10   IEP's that have provided services for the past three years.  As relief – and that's in

11   addition to the eval issue which is now resolved.  As relief, we are asking for placement

12   at Rock Creek Academy.

13         HEARING OFFICER:  H: uh-hum.

14         MR. TYRKA:  A meeting following the evals, of course, to review and revise the

15   IEP and to determine compensatory education for those years.

16         HEARING OFFICER:  Where's your Complaint?

17         MR. TYRKA:  It is our No. 21.

18         HEARING OFFICER: Thanks for the tapping knees (inaudible).

19         MR. TYRKA:  Mother Truesdale has whipped us all into shape.

20         HEARING OFFICER:  Say it, I'm sorry?

21         MR. TYRKA:  Thanks – his mother Truesdale.  She is –

22         HEARING OFFICER:  Oh, she insists upon it.

23         MR. TYRKA:  Oh, yeah.  When she came in –

1        HEARING OFFICER:  You began doing it.

2        MR. TYRKA:  Both sides.  She started hammering.

3        HEARING OFFICER:  Laughter.

4        MR. TYRKA:  I used to carry tabs with her into the hearings.  Then, I became in

5   charge of this end of things.

6        [LONG SILENCE]

7        HEARING OFFICER:  Okay.

8        MR. TYRKA:  And I'll just be very brief as to the argument.  Well first off, we

9   have – I don't know if Mr. Smith ever issued an Order, but we have a motion for default.

10        HEARING OFFICER:  Yes.  I see the motion, I don't know.  For what reasons?

11        MR. TYKRA:  Failure to issue –

12        HEARING OFFICER:  A response?

13   MR. TYRKA:  An adequate response.  I believer there was a response.  Yes.  Item No.

14   twenty-two (22) but it's just a blanket denial of all claims.  It does not meet the

15   requirements of 14-15, and all of my reasoning is outlined in a written motion which is –

16   HEARING OFFICER:  Uh-hum.

17   MR. TYKRA:  -- our No. 24...

18        HEARING OFFICER: Okay.

19        MR. TYKRA:  And I know you've heard them before, so, I will just refer you to

20   that document.  Additionally, we sent document request to DCPS on July 20th.  That's our

21   No. 26.

22        HEARING OFFICER:  Uh-hum.

8

1    MR. TYRKA:  Requesting specific documents including evaluations and

2    academic records, report cards, test results, and we never got response to that request.  So

3    for that reason, I am asking for an inference that the documents show that D██ has not

4    been receiving services, that he has not been educated adequately during these past three

5    years.

6        Now, on things that are in the Record, we have evaluations going back to 2003,

7    recommending that D██ be placed in a year- round full-time therapeutic setting.  We

8    have a DCPS psychiatric, which is our No. 3.  We have a occupational therapy

9    evaluation, which is our No. 11 and we have an academic skills report which is our No.

10   13.  Some those have not be adequately reviewed but in any case, the IEP's have never –

11   reflected the recommendations of those evaluations.  Instead, DCPS has given D██ a

12   series of IEP'S ranging from around 50 percent to around 65 percent Special Ed.  They

13   have also changed his classification more than once.  In appropriate classifications,

14   classifications which did not meet the evaluations, and they have actually reduced his

15   services recently without any justification in the evaluations.

16       HEARING OFFICER: Is number seventeen (17) his most recent IEP?

17       MR. TYRKA:  No. 19 is.

18       HEARING OFFICER:  Number 19 is.

19       HEARING OFFICER:  Okay.

20       MR. TYRKA:  They are fairly similar.  There's a change in classification, again.

21   The '05 one had him as – Well, the evaluations indicate that he is ED and ADHD and

22   likely LB as well.  They have bounced around among those classifications and what he

23   has right now is LD only.

9

1        HEARING OFFICER: There have been previous IEP's with an ED classification?

2        MR TYRKA:  Yes.  The '03 IEP has him as ED only.

3        HEARING OFFICER:  Uh-hum.

4        MR. TYRKA:  Despite the fact that ADHD was clear at that time.

5        HEARING OFFICER:  The '05 has MD.

6        MR. TYKRA:  The '04 has him again, as only ED.

7        HEARING OFFICER:  Uh-hum.

8        MR. TYRKA:  The '05 has MD but its LBOHI.  The ED is not part of the MD in

9    the '05 IEP.

10        HEARING OFFICER: But the '04 –

11        MR. TYRKA:  And the '06.

12        HEARING OFFICER:  -- had him ED.

13        MR. TYRKA:  '03 and '04 are ED only.

14        HEARING OFFICER:  Okay.

15        MR. TYRKA:  '05 is LDOHI.

16        HEARING OFFICER:  Yes.

17        MR. TYRKA:  And '06 is LDL.

18        HEARING OFFICER:  Uh-hum.

19        MR. TYRKA:  So that is the short story of our basis.

20        HEARING OFFICER:  Okay.  Mr. Price?

21        MR. PRICE:  Well, DCPS will first begin with the psychiatric evaluation that was

22    conducted back in 2003.

23        HEARING OFFICER:  Which number?

1          MR. PRICE: That's Parent's No. 3. It is not DCPS evaluation as indicated.

2     None the less, in reading the psychiatric evaluation, it makes no mention and I guess

3     we'd – DCPS would caveat this entire discussion that we're speaking of and expire very

4     timely, very untimely rather, evaluation. It makes no mention of any educational impact.

5     It is purely a psychiatric evaluation with regards to the psychiatric and psychological

6     issues mental health status of the child. But at any rate, it makes no mention of an

7     educational setting other than therapeutic. It makes no indication in terms of the quantity

8     of that service. Additionally, well, in some, its DCPS's position that we recognize that

9     there may be some issues that need to be resolved with this student; however, issues

10    cannot be fully adjudicated at this point. Well they can be adjudicated, that's not correct.

11    The issue cannot fully be resolved with this student in a due process hearing. A team of –

12    a multi-disciplinary team needs take a look this student and his current performance and

13    that's why we've agreed that those was evaluations definitely needed to be done in order

14    to determine any different changes other than what's currently in place. DCPS notes that

15    all of the evaluations, not evaluations, I'm sorry; all of the IEP's for the student indicate

16    that this student is not a full-time special education student. While DCPS acknowledges

17    there has been change in the student's disability classification, that changing of the

18    classification alone, does not warrant a full-time placement. There's no document before

19    you that would indicate a full-time placement and I'm speaking without having read the

20    psychological. And I'm reading that as we speak. None the less, DCPS would note this

21    is not even close for a hearing officer to make the determination of a full-time placement.

22    The FY03-04 IEP only recommended 65% out of general education. That's 35%

23    remaining with his non-disabled peers. And, 04-05, the IEP called for 50% out general

1    education with the other 50% being with the non- disabled peers.  '05-06, 53% of the

2    time outside of the general education population with 47% mixed with the general

3    education population and most currently, and DCPS points most notably, the most recent

4    IEP that we have in effect which was just done several months ago which only requires

5    the student to be out of the general education population 51% of the time with the

6    remaining 49% in general ed with his general education peers.  Notably about the most

7    recent IEP, the parent signed the IEP in agreement, in agreement with the placement

8    51%. This alone does not warrant the team to go back and review this student on the

9    mean evaluations to determine an appropriate placement for the student in the event that

10   the Kelly Miller placement is not found appropriate.  Nevertheless, I feel I just lost my

11   thought, the law requires that students be educated in their least restricted environment.

12   There's no document before us that indicates that this child should be totally excluded

13   from the general education population.  The evaluations that we do have before us we

14   acknowledge with the exception of the clinical – would be aided and as I read this clinical

15   psychological evaluation which is done independently does not present this child as a

16   child that would warrant a full-time educational program.

17          So, what we have, we have a team that has met annually.  Each one these IEP's

18   has been timely done for the year and none of them indicate a need for full-time

19   placement.  The evaluations that were reviewed to formulate these IEP'S make no

20   indication because there's no evaluation here and that's again why we were preparing to

21   provide those evaluations.  But DCPS will stand on the law.  The children must be

22   educated in their least restricted environment.  There is nothing in this document, in this

23   record that will indicate an immediate placement – with immediate full-time placement

1    warranted.  DCPS is prepared and DCPS suggests that the hearing officer return this

2    matter to a multi-disciplinary team to take into account the parents' concern for a full-

3    time placement because apparently, it was not found warranted at the MDT meeting, IEP

4    meeting just recently held in May of '06 as they were preparing for the '06'07 school

5    year.  Accordingly, DCPS believes this is a matter of law that can be returned to the team.

6          HEARING OFFICER:  Okay, do you have any witnesses?

7          MR. PRICE:  I can call the Special Education Coordinator at Kelly Miller where

8    the student is being proposed placed for the '06-'07 school year, but even without

9    conceding, Kelly Miller is inappropriate.  A placement cannot be rendered.  It is DCPS's

10   position that a placement – what placement option if DCPS cannot present Kelly Miller

11   being appropriate based upon this IEP, could the hearing officer award other than

12   returning to a MDT meeting.

13         HEARING OFFICER:  Okay, so nobody from Kimball to refute his claims of in

14   appropriate IEP and placement for at least two school years, and that the services in the

15   existing IEP were not rendered.

16         MR. PRICE:  I can call contact and call for a witness on inappropriateness of the

17         HEARING OFFICER:  You can?

18         MR. PRICE:  But, DCPS presents, if it's still found inappropriate, there are still

19   no evaluations –

20         HEARING OFFICER:  Yes, but, I mean if he –

21         MR. PRICE:  Without conceding that –

22         HEARING OFFICER:  If there is a denial of faith, then, I mean, the remedy he

23   wants is the placement.  I understand that you're saying there's no IEP that supports a

1    full-time placement which is the remedy he's seeking. I understand that argument. But

2    I'm not precluded from granting that remedy even though –

3            MR. PRICE: No, no.

4            HEARING OFFICER: -- he doesn't have a full-time IEP right at the moment.

5            MR. PRICE: Not even a full-time IEP. There are no evaluations.

6            HEARING OFFICER: Right, there's no evaluations, right.

7            MR. PRICE: So, at best the only thing that can happen is evaluations need to be

8    developed to determine –

9            HEARING OFFICER: So, what I'm asking you is are you going to put forth the

10    case on these alleged denials of faith and/or are you simply making an argument about

11    the remedy? And if you just tell me what you're doing, I mean, I'm okay either way.

12            MR. PRICE: I am -- what I'm suggesting –. No, well, DCPS will rest on the

13    documents that at best the remedy can be a meeting, after evaluations.

14            HEARING OFFICER: I understand, okay –

15            MR. PRICE: DCPS will rest on the documents.

16            HEARING OFFICER: Then, Mr. Tyrka, I'm turning to you, are you, are you,

17    well since you in your opening went through the documents, what I'd prefer we do at this

18    point is go through the documents more thoroughly.

19            MR. TYRKA: Sure.

20            HEARING OFFICER: So that I can see that there is a case for these alleged

21    denials.

22            MR. TYRKA: Sure. Well, we're going to have to deal with the psychiatric.

1          HEARING OFFICER:  Well let me not deal with that first.  Let me just deal with

2     – you can submit after the hearing, anything that you want to submit to support your

3     argument that it should go beyond two school years.

4          MR. TYRKA:  The statute on –

5          HEARING OFFICER:  Okay.  So, I'm really just looking for '04-05 and '05-06.

6     And I want to start with those and that eval, that psychiatric was done in '03.  So, and he

7     had an ED classification at that point, it's my understanding so –

8          MR. TYRKA:  Sure, but we're relying in part on the psychiatric for the

9     inappropriateness of the other IEP's.  I mean – that time in the year '04, IEP was only a

10    year old and even if it's expired now, two months expired now, that's on DCPS for not

11    updating.

12         HEARING OFFICER:  Okay.  Well, then, was his initial IEP an '03 IEP?

13         MR.TYRKA: Yes.

14         HEARING OFFICER:  Okay, is that in here?

15         MR. TYRKA:  Yes.

16         HEARING OFFICER:  Let's look at that.

17         MR. TYRKA:  No. 4 -- excuse me, 4 and 5.

18         HEARING OFFICER: I'm reading the notes.

19         MR. TYRKA:  I'd like to point out some points.

20         HEARING OFFICER:  Yes, go ahead.  Sure.

21         MR TYRKA:  On the last page, well we can see starting the second from the last

22    page if there is a discussion of the reports of Dr. Prayaga.

23         HEARING OFFICER:  I see nine of nine.

15

1        MR. TYRKA:  It's cut off of mine, it's eight of nine.  Yes.  Eight of nine.

2        HEARING OFFICER:  Eight of nine.

3        MR. TYRKA:  This is by Dr. Prayaga and Dr. Olson.  I don't know who Dr.

4    Olson was, we didn't get those –

5        HEARING OFFICER: Prayaga is the psychiatrist?

6        MR. TYRKA:  Prayaga's one of the psychiatric.  I'm guessing Olson did the

7    psycho ed, but we never got that (inaudible).  The mother had Prayaga's.  It talks about

8    some dispute between them regarding LD.  That starts in that second paragraph,

9    The advocate asked that D▬▬ meets the criteria of LD.

10        HEARING OFFICER:  Wait a minute, let me ask this.

11        MR. TYRKA:  Sure.

12        HEARING OFFICER:  Somewhere in reading something, I saw that there had

13    been an HOD form.

14        MR. TYRKA:  Yes.  We don't have it.

15        HEARING OFFICER:  You don't have the HOD?

16        MR TYRKA:  We don't have the HOD.

17        HEARING OFFICER:  Okay, because now I'm wondering whether or not those

18    HOD's have litigated this issue.  Because they took the HOD's in between the claims that

19    you're making.

20        MR. TYRKA:  I understand.  We have the records we had.

21        HEARING OFFICER:  Okay.  But do you know the dates of them?  I mean -

22        MR. TYRKA:  No.

23        HEARING OFFICER:  Well they were somewhere referenced.

16

1        MR. TYRKA: Yes, I know.  I've seen a couple of –

2        HEARING OFFICER:  It was actually in one of the notes there was a reference.

3        MR. TYRKA:  I've seen a couple of hints of things --

4         HEARING OFFICER:  Did you make a –

5        MR. TYRKA:  I think we even sent a letter asking for that.

6        HEARING OFFICER:  Did you request the student hearing office for HOD?

7        MR. TYRKA:   I think we did actually, but it may have been used for a different

8    case.  I can check on that.

9        HEARING OFFICER:  Okay.  Well, I need to stop now, but since that would be a

10    matter of, not public record but –

11        MR. PRICE:  Right.  Sure, sure.

12        MR. TYRKA:  It's in the Record of the case, and it may have whatever effect.

13        HEARING OFFICER:  Right.  Okay.  All right.

14        MR. TYRKA:  In any case, so the two doctors had a disagreement regarding LD.

15        HEARING OFFICER:  Uh-hum.

16        MR. TYRKA:  However, they both agreed on ED.  And then it goes on, on the

17    last page nine of nine, that's where they agreed, right.  Dr. Olson agreed with Dr. Prayaga

18    on ED and then it says both agreed that D███ has a disability with ADHD.

19        HEARING OFFICER:  Now that was, Prayaga was not a DCPS psychiatrist.

20        MR. TYRKA:   Well, I want to respond to that.  If we look at the evaluation -

21        HEARING OFFICER:  It is, again, what number?

22        MR. TYRKA:  That's No. 3.  The first line is D████is an eight year-old African

23    American male who was referred by DCPS for appropriate disposition services.  It's not

17

1      unusual for DCPS to refer after psychiatrics – and the Hearing Officer has probably seen

2      Dr. Prayaga's name before.

3              HEARING OFFICER:  Yes.

4              MR. TYRKA:  So, in this case doctor's was a DCPS evaluation.

5              HEARING OFFICER:  Okay.

6              MR. TYRKA:  I also want to point out that on evaluation itself,

7      recommendations:   D███ would benefit from a year- round structured therapeutic

8      school program.  So, it was a very explicit recommendation there.  Do you want to keep

9      on looking at evals or what do you want to do?

10             HEARING OFFICER:  Was there something on down you were pointing out?

11             MR. TYRKA:  Oh, they both agreed that he was ED and the MDT.  Both the

12     doctors on the MDT agree that he's ADHD.  And the ADHD was never put on his IEP.

13             HEARING OFFICER:  The OHI, is that what you're saying?

14             MR. TYRKA:  Correct.  The OHI.

15             HEARING OFFICER:  Okay, but what they agreed to here is ED.

16             MR. TYRKA:  And OHI.

17             HEARING OFFICER: OHI did not make it to the –

18             MR. TYRKA:  The MDT discussed the ADHT disability.  DCPS submitted

19     information Dr. Prayaga gave us.

20             HEARING OFFICER: Is there anything in his notes that Dr. Prayaga asserted that

21     he should be in a full-time therapeutic place?

22             MR. TYRKA:  Anything in the MDT notes?

23             HEARING OFFICER:  Notes.  Yes.

1    MR. TYRKA:  I don't think so – I know that --

2    MR. PRICE:  So they did not agree on LD.

3    MR. TYRKA: Correct.

4    HEARING OFFICER:  Manic depressant, disoriented (inaudible).

5    MR. TYRKA:  Now, this is what we have on placement.

6    HEARING OFFICER:  Uh-hum.

7    MR. TYRKA:  I noticed this before, but I haven't found anything more on this.

8    MR. PRICE:  In this same meeting?

9    MR. TYRKA:  Yes.  On eight of eight, the end of the first paragraph.

10    MR. PRICE:  Uh-hum.

11    HEARING OFFICER:  What is the first line on that note?

12    MR. PRICE:  Dr. Prayaga and Dr. –

13    MR. TYRKA:  I should give you something else.  I must be pointing you in the

14  wrong place anyway.

15    MR. PRICE:  Oh.

16    MR. TYRKA:  Oh, yeah.  I'm sorry the second to last sentence of the first full

17  paragraph.

18    HEARING OFFICER: Dr. Prayaga –

19    MR. TYRKA:  - is currently –

20    HEARING OFFICER:  And Dr. Olson's report?  Okay.

21    MR. TYRKA: Right, and in the paragraph is Dr. Prayaga is currently.  And we go

22  to the second class sentence, we have Dr. Prayaga asked if Kimball can meet their needs.

23  Special Education Coordinator revealed that we have not been able to assess that.  This is

1    the beginning of the school year.  Excuse me.  Not been able to assess since the

2    beginning of the school year.

3           HEARING OFFICER:  Uh-hum.

4           MR. TYRKA:  So, I think that's an omission there, that the team cannot – you

5    know, there's no discussion over Kimball other than to say, well, it's at the beginning of

6    the school year, so we can't say.

7           HEARING OFFICER:  Okay.

8           MR. TYRKA:  As far as other indications in the evaluations –

9           HEARING OFFICER:  But she was a member of the team.  Do you – have you

10    spoken with her?

11           MR. TYRKA:  Dr. Prayaga?

12           HEARING OFFICER:  It would be nice to know why.  I don't know that she

13    would even remember.

14           MR. PRICE:  She was a member of the team.  She signed in as a teleconference

15    member –

16           Mr. TYRKA:  Yes.

17           HEARING OFFICER:  She was a teleconference member?

18           MR. PRICE:  Yes.

19           MR. TYRKA:  No.  I haven't spoken to her about this case.

20           HEARING OFFICER:  Okay.  So from that, you want me to draw an inference

21    that she – I know her evaluations say therapeutic, structure, small placement.

22           MR. PRICE:  Excuse me.

1       HEARING OFFICER:  But – but, I don't see anything in the notes.  So you ask

2   me to draw an inference from her eval even though the notes don't mention that.

3       MR. TYRKA:  I'm not asking you for an inference from the eval, I'm saying the

4   eval stands as evidence that the child needs a full-time therapeutic placement.  If there

5   were something contrary in the notes, if Dr. Prayaga said, you know, I know I said it's in

6   my evaluation but I'm taking that back.

7       HEARING OFFICER:  But she didn't – I don't see anything in the note that

8   support her position.  In other words, we've got her eval.  She had participated in the

9   meeting.  I don't see anything in the meeting that supports her discussion.  In other

10  words, there are times when there's a recommendation by an evaluator prior to the

11  meeting.  Participates in the meeting –

12      MR. TYRKA:  Right.

13      HEARING OFFICER:  -- as part of the team, and something different than the

14  recommendations comes out of the team.

15      MR. TYRKA:  Sure.  And I think if there were something contrary to what she

16  had said in her report, then we might go with the notes.  We still have a different issue

17  which is "these notes are created by DCPS."

18      HEARING OFFICER:  Yes.

19      MR. TYRKA:  All right.  So we have Dr. Prayaga writing her report – you know,

20  this is her statement of what she wants to say about this child.  We then have a DCPS –

21  meeting, and we have DCPS creating notes.  Now.  Did DCPS get that in there?  Did they

22  leave it out?  I mean even if it had said something contrary –

23      HEARING OFFICER:  Uh-hum.

21

1      MR. TYRKA:  - I would want to talk to the person who made the notes and verify

2   that they were accurate.  But the fact that the notes don't contain everything that was in

3   the evaluation, it doesn't evaluate – invalidate the evaluation.

4      HEARING OFFICER:  Well, no, it doesn't..

5      MR. TYRKA:  The first start is like I said.  We don't even know if the notes are

6   accurate.

7      HEARING OFFICER:  It doesn't invalidate it, but I mean just as I said, there are

8   instances when a recommendation proceeds a team meeting and a team determination is

9   other than the recommendations, particularly when you've got the evaluator participating.

10     MR. TYRKA:  Well, sure.

11     HEARING OFFICER:  I mean I don't see an objection to that.

12     MR. TYRKA:  But again, these are DCPS notes.  I mean, I think these notes can

13   only be used against them.  I don't think they can be used for them.  To put it another

14   way, we specifically compelled any people, any DCPS personnel who had created notes

15   for use in this hearing.

16     HEARING OFFICER:  Uh-hum.

17     MR. TYRKA:  I don't see that person coming forward.  The reason they are

18   compelled, is so that I can confront and cross examine them –

19     HEARING OFFICER:  Okay.

20     MR. TYRKA:  - regarding notes.

21     HEARING OFFICER:  All right.  Well this is the first IEP and this is until I

22   decide otherwise, this is a year prior to.

23     MR. TYRKA:  Understood?  Okay.  So that's – well actually –

1          HEARING OFFICER:  It's a really (inaudible) .  But this was the threshold issue

2    in terms of why you're saying a full-time therapeutic placement was warranted even then.

3          MR. TYRKA:  Correct.

4          HEARING OFFICER:  Okay.

5          MR. TYRKA:  But, now, I do want to, based on what you just said.  So you're

6    status quo is, you're not going back more than two years.  So my brief is to turn that

7    around.  Is that -

8          HEARING OFFICER:  Yes.

9          MR. TYRKA:  Okay.  I didn't understand that was the – okay.   Going through

10   more of the evals we have a June '04 OT.

11         HEARING OFFICER:  June '04.  No, wait a minute.

12         MR. TYRKA:  Well, let me ask you this.  Are you interested in the evaluation in

13   establishing a case or are you interested in just walking through the facts.  The history.

14         HEARING OFFICER:  Yes.  Well let's go through the facts.  As outlined in your

15   complaint?

16         MR. TYRKA:  Yes.  In the next IEP we have –

17         HEARING OFFICER:  Yes.  Because that's where I was going to go.  Logically,

18   to the next IEP.  Because you don't have any – you don't have any educational records.

19         MR. TYRKA:  Right.

20         HEARING OFFICER:  Of that first year.

21         MR. TYRKA:  Oh, but as you know, we have a –

22         HEARING OFFICER:  And he is eligible.  You've requested it.

1        MR. TYRKA:  And we have a, you know, I've moved that there be an inference

2    in MDCPS and a finding on that basis.

3        HEARING OFFICER:  Okay.

4        MR. TYRKA:  The next IEP is May '04.

5        HEARING OFFICER:  Uh-hum.

6        MR. TYRKA:  The notes are our No. 8.

7        HEARING OFFICER:  Notes.

8        MR. TYRKA:  Notes and IEP.  I'm on disclosure No. 8.

9        HEARING OFFICER:  And the IEP is what?

10        MR. TYRKA:  The IEP starts in approximately the 6th page.

11        HEARING OFFICER:  Is what number?

12        MR. TYRKA:  It's part of one exhibit.  It all numeric.

13        HEARING OFFICER:  Oh, it follows the notes.

14        MR. TYRKA:  Yes.

15        HEARING OFFICER:  Okay.  General education teacher.

16        HEARING OFFICER:  What is the first in A?  Okay.  I have it.

17        HEARING OFFICER:  Per HOD of May 23, '03.  Maybe that's where it starts.

18        MR. PRICE:  But that preceded his eligibility.  Because his eligibility was

19    September '03.

20        MR. TYRKA:  Well, that's assuming that the September IEP was the first one.

21        MR. PRICE:  I thought that was.  I mean, is there an initial marked?

22        HEARING OFFICER:  Initial, yes.

23        Mr. TYRKA:  Okay.

24

1          HEARING OFFICER:  Okay.  So that was the reference to the HOD I had seen.

2     Ms. Sikes, I hope you're following – even if you're not following all of this, Mr. Tyrka

3     will explain it to you.  Okay?

4          MS. SIKES:  Yes.

5          HEARING OFFICER:  Alrighty.

6          MS. SIKES:  I'm following.

7          HEARING OFFICER:  I see you looking a little confused over there.

8          MS. SIKES:  Is it possible – I don't want to hold you all, but is it possible I can

9     step out for – under a second, outside.

10         MR. TYRKA:  You'd like to speak with me outside, for a second?  Is that what

11    you're asking?

12         MS. SIKES:  Yes.  It is possible?

13         MR. TYRKA:  I don't think anyone else would mind here.

14         HEARING OFFICER:  Why do you want to speak to him?

15         MS. SIKES:  I want to ask him if it's possible.

16         HEARING OFFICER:  Okay, yes.

17         MS. SIKES:  Okay.  It just a --.

18                              [OFF THE RECORD]

19                              [ON THE RECORD]

20         HEARING OFFICER:  Okay, we're back on the record.  What grade was D████

21    in '03-'04 school year?

22         MR. TYRKA:  He had just finished 5th.

23         MS. SIKES:  Second.

25

1          HEARING OFFICER:  He was in second?

2          MS. SIKES:  He –

3          MR. TYRKA:  Third, probably.  Third?

4          MS. SIKES:  He –

5          MR. TYRKA:  Last year was 5th grade, correct?

6          MS. SIKES:  He came –

7          HEARING OFFICER:  He just finished the 5th grade?

8          MR. TYRKA:  Yes.

9          MS. SIKES:  He came from Benning in the second.  They held him back in the

10    second for two – he was in the second for two years in the second, so –

11          MR. TYRKA:  Well, why don't we go backwards.  Last year was 5th grade, right?

12          MS. SIKES:  Uh-hum.

13          MR. TYRKA:  The year before he was in fourth grade.

14          MS. SIKES:  Uh-hum.

15          MR. TYRKA:  The year before in third grade?

16          MS. SIKES:  Uh-hum.

17          MR. TYRKA:  So he went third, fourth, fifth.  He didn't get left back in that

18    period?

19          MS. SIKES:  He didn't get left back in that period.

20          MR. TYRKA:  Okay.  So then –

21          HEARING OFFICER:  Third.  So his first IEP was in third grade.

22          MS. SIKES:  If I can say, the superintendent came to the school and asked me –

23    to Kimball School and asked me –

1      MR. TYRKA: We're just trying to get the – we're just trying to find out what

2   grade he's in.

3      MS. SIKES: They asked me if they could put him in the third grade so he could

4   be with his peers. His age level. Not academically.

5      HEARING OFFICER: Okay.

6      MS. SIKES: That's why he went to the third grade.

7      HEARING OFFICER: No problem. I just want to know where he was.

8      MS. SIKES: Okay.

9      [LONG SILENCE]

10      HEARING OFFICER: Okay. I'm reading the meeting notes from that first IEP

11   update.

12      MR. TYRKA: Huh-hum.

13      MR. PRICE: Okay, because there's – they're tracking his academic progress in

14   that last paragraph on the first page. It's noted on the second page where Dr. Prada,

15   Prayaga, excuse me.

16      HEARING OFFICER: She was in this meeting, too?

17      MR. PRICE: Yes.

18      HEARING OFFICER: Vince McBride, Mr. McBride. Who is he?

19      FEMALE SPEAKER: Ms. McBride is an advocate for D███ B███.

20      HEARING OFFICER: Okay.

21      FEMALE SPEAKER: Was an advocate for D███ B███.

22      HEARING OFFICER: Okay.

23      MR. PRICE: And –

1          MR. TYRKA:  Wait, wait, wait.  I don't -- we don't have Dr. Prayaga at this

2    meeting.

3          HEARING OFFICER:  No, but Mr. McBride is evidently – this is what I infer.

4    He's re-stating what –

5          MR. TYRKA:  Oh, yes.

6          HEARING OFFICER:  - the psychiatrist said in the evaluation.

7          MR. PRICE:  And it was Prayaga's input that the child still needed to be with his

8    non-disabled peers and that's noted where –

9          MR. TYRKA:  This is getting into a –

10         HEARING OFFICER:  What?

11         MR. TYRKA:  I'm concerned about this approach.  Because we have disclosed –

12    we started with DCPS notes in these IEPs.  Now, those notes are hearsay to begin with.

13    They're – some of these statements and that person isn't here.  I've compelled those

14    people to be here.  And they're still not here.  So I can't cross-examine them.  I can't ask

15    any of the people who were at that meeting what actually happened at the meeting.

16         Now because DCPS – this is DCPS statements, I can certainly use them against

17    them.  That's a general exception of hearsay.  But I think to go through here and to take

18    statements of fact, as DCPS has suggested we do, DCPS statements and their notes.  I

19    think it's very unfair to the parent.

20         MR. PRICE:  Well, I'm presenting –

21         MR. TYRKA:  I don't think DCPS can make their case just off the IEP notes.

22         MR. PRICE:  Well, I'm not attempting to make a case.  I'm presenting on the

23    documents that at best the team has to develop another – maybe advance another IEP

1    based upon current evaluations.  But what I was presenting was the Parent's

2    representative comment.  McBride stated, Dr. Priot (phonetic).

3             HEARING OFFICER:  Well, I mean –

4             MR. PRICE:  And –

5             MR. TYRKA:  Yeah, but that's – so that's what McBride – okay.  But –

6             MR. PRICE:  That's not a DCPS.  And to go with –

7             MR. TYRKA:  This is DCPS.  The report of what Mr. McBride said is DCPS.

8             MR. PRICE:  This is the MDT team of which the parent most likely was a

9    member, as well as –

10            MR. TYRKA:  Those are notes created by them.

11            HEARING OFFICER:  Well, I'll-I'll listen to your argument that these can only

12   be used against DCPS and not to support DCPS's statements.  I mean, I, I've heard that -

13            MR. TYRKA:  Okay.

14            HEARING OFFICER:  - argument.  But I mean I'll accept it.  But –

15            MR. TYRKA:  Okay.  But I mean –

16            HEARING OFFICER:  You've already stated that.

17            MR. TYRKA:  Okay.

18            MR. TYRKA:  Okay.  Well, in any case I guess in response to DCPS, aside from

19   the abduction, in fact, that's not quoting Mr. McBride, PHONETIC, that's quoting Ms.

20   Rabb PHONETIC, who is talking about Dr. Prayaga's report, I mean there were several

21   of them, I mean we have D. Prargo's report, we can just look at it.

22            HEARING OFFICER: The Principal?

23            MR.TYRKA: Principal, so –

1        MS. SIKES: Special Coordinator.

2        MR. PRICE:  Special Education Coordinator.

3        MS. SIKES:  Special Ed Coordinator.

4        MR.PRICE:  Or designee –

5        MR. TYRKA:  I mean, here is something as far as the placement discussion goes,

6   you know everyone at this meeting knew that the psychiatric recommended a full year

7   program and ESY was specifically requested at this meeting, we have on that same page

8   of notes that you were just reading from, Ms. Bullock inquired whether there was a 52

9   week program in D.C., Mr. Caplan, that's Jeff Caplan, DCPS attorney –

10      HEARING OFFICER:  that's Parent advocate

11      MR. TYRKA:  Parent advocate, okay, she asked that Jeff Caplan stated there was

12   not but further stated he is unaware of any 52 week program in the city, private or public;

13   I mean there are full year programs in the city, there might not be 52 weeks.

14      HEARING OFFICER:  They aren't 52 weeks, but what's your point, I'm not

15   clear.

16      MR. PRICE:  The time – 52 weeks on that --

17      HEARING OFFICER:  Wait a minute, let me – what's your point about that –

18      MR. TYRKA:  I think the only placement discussion is a suggestion that well you

19   can't get a year round program no matter what, there's no attempt by DCPS anywhere

20   evidenced here to give there own full year program as recommended by the evaluations.

21      The following page there's a DSY discussion

22      HEARING OFFICER:  Can I view that?   Caplan.

23      MR. TYRKA:  Jeff Caplan.

1          HEARING OFFICER:  He was complying –

2          MR. TYRKA: That type of compliance, yea.

3          MS. SIKES:  But he was at Olive D████ IEP meetings for a couple years, he

4   came to every one.

5          HEARING OFFICER: Good – yea that's what, there a statement and here it is, in

6   the placement discussion on page 3, it says that the HOD recommended, that what I

7   wanted to see that HOD.

8          MR. TYRKA:  That was Mr. McBride talking about the HOD.

9          HEARING OFFICER:  Yea I know but, I don't know whether that's an accurate

10   statement, but that drew my attention before.

11          MR. TYRKA:  I don't know if it's in here but there's another one that refers to –

12   yea, actually it's earlier in these notes on the first page, the second paragraph, it says as

13   per HOD of May 03 the MIT was ordered to consider a possible placement at Highroad

14          So probably Mr. McBride was talking about the same thing, consider Highroad

15   was the indication.

16          HEARING OFFICER:  Consider, okay.  Killen – who

17          MR. PRICE:  Social worker.

18          HEARING OFFICER:  Alright, now that was the IEP, there's your IEP, it had 15

19   hours.

20          MR TYRKA:  So notice they cut the services, they cut the services in this item –

21          HEARING OFFICER:  What was it before –

22          MR. TYRKA:  20 specialized instructions.

1          HEARING OFFICER: 20, yea. Now you alleged, now what services starting the

2     first year, which I think your claim is good under the statue of limitations but what

3     services are you claiming he can get.

4          MR. TYRKA: All of them.

5          HEARING OFFICER: No specialized instruction and no counseling.

6          MR. TYRKA: I'm claiming that because we have requested the records and

7     we've got nothing from them, I mean that's we do, the records request to see what we're

8     talking about, since they haven't produced them, now do I believe as a matter of absolute

9     fact they received nothing, well, probably not, but that the – I'm asking for because they

10    produced nothing. Now as far as related services, I think it's entirely possible he

11    received one of those because that's a regular mailing of DCPS. We don't have any idea

12    of report cards, we don't have any encounter tracking forms, we don't have report cards

13    of any kind, test results, etc., all of which were requested.

14         MR. PRICE: Well, with regards to specialized instructions there is no encounter

15    tracking, specialized instructions is provided in the classroom setting or in a resource

16    room, the Special Education Teacher, there being one is an indication that specialized

17    instruction was rendered.

18         MR. TYRKA: Well it's an indication but it's by no means real evidence, we

19    asked for IEP report cards, they haven't been presented; we also compelled all the

20    students special and general education teachers from Kimball.

21         HEARING OFFICER: And we don't need to debate with each other, I'm the one

22    who's making the decisions.

32

1    MR. TYRKA:  Oh, I sorry, I'm talking to you Mr. Ruff.  I'm saying asked

2    specifically for documents that would establish specialized instruction but we also would

3    know the appearances of those witnesses since there not here.

4    HEARING OFFICER: Where's the 05 IEP?

5    MR. TYRKA:  05 is number 17.

6    MR. PRICE:  DCPS is not aware of any notice to prepare outside of a paragraph

7    in the disclosure letter which is not the practice as described in the SOP.

8    MR. TYRKA:  The SOP's aren't – the SOP are to the need when you're

9    subpoenaing an outside witness, there's no such limitation on compelling the appearance

10   of a member of DCPS.

11   HEARING OFFICER:  Well it goes beyond, well what did you do to compel

12   them.

13   MR. TYRKA:  We announced it as DCPS has been doing for years, incidentally.

14   HEARING OFFICER:  You disclosed it –

15   MR. TYRKA:  Announced in our disclosure letter.

16   HEARING OFFICER:  But did you not know about the procedure of actually

17   sending it out.

18   MR. TYRKA:  The SOP's, we tried to get this from the student hearing officer a

19   number of times to get clarification on this but the SOP's refer, I think, to how to

20   subpoena an outside witness as hearing officer is aware, you know 14 – 15 allows each

21   party to compel the other side and also to subpoena third 3rd parties by procedure

22   everywhere, subpoenas are not required when compelling the attendance of an opposing

1    party, only when it's a third 3rd party, but the compelling simply by putting them  on

2    notice – putting the attorney on notice.

3         MR. TYRKA:  Yes.

4         HEARING OFFICER:  Which the SOP makes no distinction between inside

5    versus outside witnesses.  Further, the party in this matter is DCPS, the organization and

6    individuals are not the party, so notice to a witness would be required.

7         MR. TYRKA:  Okay.

8         HEARING OFFICER:  How were you provided the IEP's.

9         MR. TYRKA:  This came from, Ms. Sikes.

10        HEARING OFFICER:  Karen.

11        MR. TYRKA:  Yes.

12        HEARING OFFICER:  I don't see any notes in the 06 IEP, were there no notes

13   for that IEP either?

14        MR TYRKA:  The 06, I thought there were notes, after words.

15        HEARING OFFICER:  He's not been in psychiatric since the 03 psychiatric.

16        MR. TYRKA:  Not as far as I know

17        HEARING OFFICER:  Has there been, now you don't have an original Psycho Ed

18   in here do you?

19        MR.TYRKA:  No.

20        HEARING OFFICER:  Didn't you make reference to it?

21        MR. TYRKA:  No.

22        HEARING OFFICER:  You didn't.

23        MR. TYRKA:  Not to an original Psycho Ed.

1          HEARING OFFICER:  I thought – so the only eval in here – you weren't

2    mentioning another eval, was it an  OT, what eval –

3          MR TYRKA:  There's an OT from 04, that says consider year round therapeutic

4    placement and then in August 04.

5          HEARING OFFICER:  And that's your eleven (11)?

6          MR. PRICE: Yea.

7          HEARING OFFICER:  Okay. There's a page at default, August –

8          MR. PRICE:  August what, 03

9          HEARING OFFICER:  It would be 04.

10         MR PRICE:  Where do you see that reference?

11         HEARING OFFICER:  In the Parents number 15, in the meeting notes.

12         MR. PRICE:  From what year?

13         HEARING OFFICER:  They omit the year, however, it would have to be 04

14             From August 26th and 29th, well in terms of the services, he got compensatory

15    education in that 04 plan.

16         MR. TYRKA:  That plan talks about what it was for, that's one of the reasons

17    why I think there needs to be more discussion because they may be able to – present

18    those other plans.

19         HEARING OFFICER: So you are prepared – no I'll do it then.

20         MR. TYRKA: Yea, that plan addresses 02 to 03 school year.

21         HEARING OFFICER:  Was that done at the initial IEP?

22         MR. TYRKA:  This was the 04 IEP, the end of the 04 IEP was a plan for the 02 -

23    03 school year.

1           HEARING OFFICER:  That was done in May 04.

2           MR. TYRKA:  May, 04.

3           HEARING OFFICER:  Okay, anything else in the 05 meeting notes, now you

4    were taking me, before we went to the meeting notes you were pointing out something in

5    OT evaluations

6           MR. TYRKA:  Yes, the OT evaluation – recommendations, see the sixth (6) page,

7    number two (2) refers to Dr. Prayaga but indicates he OT's agreement with the

8    recommendation of the year round structured therapeutic school program.

9           HEARING OFFICER:  Okay, and there was another eval you mentioned?

10          MR. TYRKA:  Eval which is item number 12, excuse me no, number 13

11   academic skills screening report which in the -- evaluation I guess had some elements of

12   of a Psycho Ed.

13          HEARING OFFICER:  This was done –

14          MR. TYRKA:  That would be August 04 it's got the WRET in the court and the

15   BRIGANDS, I haven't seen those first two before, I've seem BRIGANDS before.

16   so these are performance test plus IQ test.

17          HEARING OFFICER:  BREGAMES (phonetic).

18          MR TYRKA:  Is that how it's pronounced.

19          HEARING OFFICER:  UM HUM.  Laughter, that's the way I've heard it

20   pronounced it.

21          MR. TYRKA:  And, the last page, recommendations, year round therapeutic

22   setting.

23          HEARING OFFICER:  Oh, but this is McBride, the advocate

1        MR. TYRKA: A according to these orders, well no, he's certified to perform

2    these evaluations.

3        HEARING OFFICER:  Mr. Price, any explanation as to why you have no witness

4    and none of these documents have been presented?

5        MR. PRICE:  No witness for –

6        HEARING OFFICER:  For Kimball.  To attest to the services being provided.  A

7    member of MDT team that concluded that this was an appropriate placement for him.

8        MR. PRICE:  I alerted Ms. Rabb (phonetic) to this hearing.

9        HEARING OFFICER:  Huh-hum.

10        MR. PRICE:  And she should still be available to testify with regard to the

11    meetings and input that occurred.  However, Ms. Rabb as the special ed coordinator will

12    pretty much present the overview or logistics.  She is not the psychologist.  So I have

13    spoken with her and she's prepared to testify as to what his performance has been in these

14    meetings, yes.  But it was just DCPS's position that this could – I could contact Ms.

15    Rabb.

16        MR. TYRKA:  Well, I do have a question as to relevance.  I mean I think our

17    question here – re-evaluations that indicate that the IEPs are not – don't have the proper

18    classification, don't have the proper number of hours.  Even in the case of the evaluations

19    that he was not given appropriate placements, either.  I don't see anything in the

20    documents that supports an argument by DCPS that is false.  And, in fact, I haven't even

21    heard a representation from DCPS that that's false.  I don't think – if DCPS doesn't have

22    a witness to argue that the IEPs or placements were appropriate, the witness is irrelevant.

23        MR. PRICE:  Well, Ms. Rabb – well, first –

1    HEARING OFFICER:  She was a team member in some of these –

2    MR. PRICE:  Yes.  She was a team member in all the meetings.  First and

3    foremost DCPS has never conceded that any of these evaluations make reference to a

4    full-time program.  What DCPS is prepared to concede, based upon reading these

5    evaluations is that there's a strong parental input or request for year-round services which

6    would include ESY.  But there is a significant difference and distinction between ESY

7    and a full-time placement.  DCPS has always maintained throughout all the documents to

8    include the parent at the latest IEP meeting that this was not a full-time student.  That

9    wasn't – the placement was not an issue.  Ms. Rabb can and is available to testify that the

10   team – well, I can present Ms. Rabb and she will testify to the appropriateness of --

11   HEARING OFFICER:  Well, I mean it's up to you whether you're going to

12   present your witness or not.  I'm not –

13   MR. TYRKA:  My concern is how is Ms. Rabb qualified to say whether the

14   placement or the IEP is appropriate?

15   HEARING OFFICER:  Well, I mean was he on your witness list?

16   MR. PRICE:  Yes.

17   HEARING OFFICER:  I mean the coordinator is on your witness list.  Now you

18   can argue after she's given testimony that I even – either the testimony is not credible,

19   it's not relevant.

20   MR. TYRKA:  I'd rather you before if she's not qualified if you're going to –

21   HEARING OFFICER:  She's a member of the team so how could that not be

22   relevant?

38

1        MR. TYRKA:  Because we're not addressing what the team decided to do.  We

2  know that the DCPS members of the team decide to take certain action.

3        HEARING OFFICER:  Uh-hum.

4        MR. TYRKA:  What we're questioning is whether or not that action is

5  appropriate.  If she's an SEC, I mean she has to be qualified to say something about the

6  evaluations versus the outcome.

7        HEARING OFFICER:  Yes and she might be – she could be a factual witness.

8        MR. TYRKA:  To have them match up.

9        HEARING OFFICER:  About what decisions were made by the team and what

10  discussions were there.  I don't if she'll remember that or not.

11        MR. PRICE:  Yes, this is Aaron?  Can-can, I need ---

12        HEARING OFFICER:  To me, that's relevant.

13        MR. TYRKA:  Well, also –

14        HEARING OFFICER:  If he wants to present it.

15        MR. TYRKA:  Okay.  Let me just take, for a heads up also, I mean I'll object to

16  statements by her about other DCPS team member's statements.

17        HEARING OFFICER:  And I'll allow you to make the objection.

18        MR. TYRKA:  Also, just so it's not forgotten –

19        HEARING OFFICER:  Oh, so she came by.

20        MR. PRICE:  Your what?

21        MR. TYRKA:  My (inaudible).

22        MR. PRICE:  What?  I'm in a hearing.  I-I'll –

1        HEARING OFFICER:  Oh, and there was some – you know, in reading your

2    complaint after you outlined what the allegations are.  There is a little – there are some

3    distinctions in the – from the complaint from what you outlined in your opening.  You

4    said an inappropriate IEP and placements for the last three school years.  No services

5    under existing IEPs.  For the last three school years.  Simply that.  Now there are other

6    delineated issues in your complaint but if you are relying on these two as stated, those are

7    the two I can address in the HOD.

8        MR. TYRKA:  Okay.  Well the inappropriate placement is the first point.

9        HEARING OFFICER:  Uh-hum.

10       MR. TYRKA:  Obviously we're talking about that.  The evaluations – conducting

11   the evaluations, we resolved with the cause we started out with.  That DCPS was going to

12   fund those independent evaluations.

13       HEARING OFFICER:  Okay.  Okay.

14       MR. TYRKA:  That's the second point.

15       HEARING OFFICER:  Okay.  Okay.  So that's the second clause eliminated.  All

16   right.

17       MR. TYRKA:  The third is specifically about disability classifications.  That's

18   part of our –

19       HEARING OFFICER:  Inappropriate IEP?  Okay.

20       MR. TYRKA:  The fourth note about appropriate IEPs, we're talking about that

21   obviously.  The fifth, failure to provide special education and related services.

22       HEARING OFFICER:  Yes.

1      MR. TYRKA: So, that I've made. And then the sixth, failure to write ESY.

2  Well, we can look at that as a sphincter or failure to provide services, necessary services.

3  I mean, the ESY part is they didn't put it in the IEP. Therefore, it did not provide it.

4      MR. PRICE: If it's not in the IEP then it's not required.

5      MR. TYRKA: I understand, but our contention is that the IEP is inappropriate.

6  The IEP should have been for year-round services.

7      HEARING OFFICER: Yes. Now. Right. There is, at least in one of those notes

8  that I read there's a discussion with regard to the IEP and there's discussion in the notes

9  that say that he didn't meet the criteria.

10      MR. TYRKA: Correct. And we're contending that it's incorrect. And I haven't

11  heard DCPS put on a contrary case. And have the evaluations that are recommended

12  year-round.

13      MR. PRICE: Ms. Rabb?

14      MR. TYRKA: Services.

15      MR. PRICE: Ms. Rabb, Aaron Price. I'm in a hearing for D███ B███. I need

16  the –

17      HEARING OFFICER: I include that as inappropriate IEP.

18      MR. PRICE: -- get some information from you. This phone, someone

19  disconnected. Ms. Rabb, Aaron Price. Sorry about that. We were disconnected. I don't

20  know at what point we got disconnected, but I was saying I'm in a hearing and I need to

21  get some information from you with regards to D███ B███ Well, the number here is

22  5621 or do you want me to call you? Well, you call us at that number. 442-5621. Uh-

23  hum.

1    She's going to her office. She was in the main office.

2    MR. TYRKA: I think I'm with you at 3:00. Is that your case, Mr. Ruff?, Do you

3  know?

4    HEARING OFFICER: No.

5    MR. TYRKA: Right that, am I right with that?

6    HEARING OFFICER: Okay. We'll go off the record until she calls.

7    MR. TYRKA: Okay.

8                         [OFF THE RECORD]

9    MR. PRICE: She said she does.

10    HEARING OFFICER: Oh. Well you know what we can do until she does call?

11  Now with regard to remedy for the violations should I determine that they are, that they

12  existed. What's your request?

13    MR. TYRKA: We're asking for placement at Rock Creek Academy. Effective

14  immediately. Meeting to follow the evaluations that have already been agreed on.

15    HEARING OFFICER: Uh-hum.

16    MR. TYRKA: Meeting to follow to review and revise the IEP. And to – an

17  compensatory education plan for the denials we have already argued. So in other words,

18  there would be a finding. We're asking for a finding from the Hearing Officer. That the

19  IEPs were inappropriate and the placements were inappropriate, and the services were not

20  provided. And –

21    [PHONE RINGS.] MR. PRICE: Ms. Rabb? Okay. I'm going to put you on the

22  speaker phone.

23    MR. TYRKA: And then an Order to the team to

                                    42

1      MR. PRICE: Hello?

2      MR. TYRKA: To discuss the (inaudible) special education for those final issues.

3      MR. PRICE: Ms. Rabb?

4      MS. RABB: Hello?

5      MR. PRICE: Yeah. Okay.

6      HEARING OFFICER: Did you hear that, Mr. Price?

7      MR. PRICE: No I did not.

8      HEARING OFFICER: He indicated that as remedy he wanted the placement, a

9      meeting to follow the evaluations, and the comp ed plan to be determined by a team

10     based upon the findings of missed services by the hearing officer.

11     MR. PRICE: Okay. Well –

12     MR. TYRKA: Or lack thereof, I guess. I mean, presumably your order could be

13     more limited than what I'm asking for and I would still ask for and I would still ask for

14     the discussion at the meeting.

15     HEARING OFFICER: Of the missed services?

16     MR PRICE: D.C.

17     MR. TYRKA: Right. I mean for example on the statute of limitations issue you

18     may say you know, it's only two years, in which case I would ask that the team discuss

19     and determine a comp ed for that period.

20     HEARING OFFICER: Okay. Let's deal with Ms. Rabb while we have her. Ms.

21     Rabb?

22     MS. RABB: Yes.

1      HEARING OFFICER:  Okay.  I'm Mr. Ruff, the Hearing Officer.  I need you to

2   state and spell your name for us, please?

3      MS. RABB:  You're going in and out.  I'm sorry.  I didn't hear you.

4      MR. PRICE:  That phone was disconnected.

5      HEARING OFFICER:  I need you to state and spell your name.

6      MS. RABB:  I am Robin Rabb, R-A-B-B.  I'm the special educational coordinator

7   at Kimball Elementary School.

8      HEARING OFFICER:  Okay.  I need to put you under oath.  Do you swear and

9   affirm the statements you'll make today will be the truth, the whole truth and nothing but

10  the truth?

11     MS. RABB:  I do.

12     HEARING OFFICER:  Great.  Mr. Price will ask you questions.  Mr. Tyrka who

13  is the parents' attorney may have some.  I may have some.  And the only other person

14  here is the parent.

15     MS. RABB:  Okay.

16     MR. PRICE:  If you would share with us your responsibilities as the special

17  education coordinator for Kimball.

18     MS. RABB:  I didn't hear you.

19     MR. PRICE:  If you would share with us your responsibilities as a special

20  education coordinator at Kimball?

21     MS. RABB:  As a special education coordinator, I am responsible for maintaining

22  our student records, scheduling and insuring that IEP meetings are completed, insuring

23  that all students are receiving their services.  I wear a lot of hats.  I'm responsible for

44

1    monitoring and updating our on core system as well as collaborating with our students –

2    our student support team.

3        MR. PRICE:  All right.  I'm going to ask you to share with us your familiarity as

4    detailed as possible with D█████ B█████, please.

5        MS. RABB:  D████ has attended Kimball from since he was in the third grade.  I

6    believe it was the third grade.  I'm not exactly sure.  Either second or third.  I believe

7    third grade until he was in the fifth which was our last school year.

8        MR. PRICE:  And would you share with us your awareness and your involvement

9    with regards to D████ and special education.

10        MS. RABB:  I have either written or at least been a part of every IEP meeting that

11    has occurred here at Kimball since D████ has been here.

12        MR. PRICE:  Okay.  Now.  If you would to the best of your knowledge share with

13    us the scope of the first any issues, theories or meetings, and IEPs for D████

14        MS. RABB:  I'm going to try to remember off the top of my head.  I do not have

15    his records in front of me.  Initially, Ms. Sikes came to us and requested special

16    permission for D████ to attend Kimball.  She had – he was evaluated several times.  Prior

17    to coming here he was attending Benning Elementary School.  He was granted special

18    permission to attend Kimball.  Once here, we had an initial meeting where he was

19    evaluated.  There was two clinical evaluations at that initial meeting.  One done by DCPS

20    and one done by an outside psychologist.  The reports were different.  One diagnosed him

21    –

22        MR. TYRKA:  I object to that.

23        MS. RABB:  - with emotional disturbance.  And one did not –

45

1        HEARING OFFICER: Just a moment.   Just a moment.  Put her on mute, please.

2    What's your objection?

3        MR. TYRKA:  I'm going to object to a discussion of the contents of the reports as

4    hearsay and invest evidence.

5        HEARING OFFICER: Okay.  So noted.  I'll allow it.  Go ahead.

6        MR. PRICE:  You may continue, Ms. Rabb.

7        MS. RABB:  There was two clinical evaluations.  One, as I said, one diagnosed

8    the emotional disturbance, one did not.  DCPS went along with the parent's outside

9    evaluation.  He was at that point found eligible for special ed services as an emotionally

10   disturbed student.  He was given comp ed services and I believe he is still currently

11   receiving comp ed services because of he was – I guess initially he was receiving speech

12   service at Benning Elementary and for some reason his services were taken away and the

13   amount of time it took us to come back to a diagnosis, so he was given comp ed for

14   tutoring for all of that missed services that he received.  He was re-evaluated several

15   times.  But recently he was re-evaluated and his disability was changed to learning

16   disabled.  His hours were decreased.  He made tremendous progress here at Kimball.  In

17   his last meeting -

18       MR. PRICE:  Hold on, hold on, hold, on.  I'm, I just going to –

19       HEARING OFFICER:  Okay.  Just a moment, one more time.

20       MR. TYRKA:  We're probably best put that as a running objection and then

21   maybe the hearing officer can, if he wants to sustain it at various points in her testimony,

22   right?  Our main objections are to any discussion of any documents that are not in the

23   record for hearsay and best evidence.  I'm also objecting to any statement regarding any

46

1   documents on the basis of their failure to produce them in accordance with our records

2   request. I'm objecting to any statements reporting the statements of other DCPS staff for

3   the reason of hearsay, because DCPS could report – could produce those people and in

4   fact I compelled their appearance.

5        Furthermore, I'm objecting to any statements regarding D███████performance at

6   the school as a support DCPS. Because DCPS has failed to respond to our records

7   request. And has failed to produce compelled witnesses. And I just want to say on the

8   records request, as I said, it's number 26. It is exceedingly clear as to what we're asking

9   for. We also very specifically cite the various regulations and those regulations include

10  not only the basic regulation entitling the parent to records, but also the more specific

11  regulations applicable once hearing the hearing has been brought and scheduled. And

12  that – those regulations have more teeth, specifically, so that we will not be in this

13  position of the parent's case undermined, and *Schaefer* (phonetic) *v. Weist* (phonetic) you

14  know, refers to those provisions in making its decision regarding the burden of proof.

15  That's a – the parent's ability to obtain records to put on her case is fundamental to this

16  whole process. But, that's my running objection.

17      HEARING OFFICER: Okay.

18      MR. PRICE: I need –

19      HEARING OFFICER: I'll note those – that objection.

20      MR. PRICE: One moment.

21      HEARING OFFICER: The document is getting a little confused. I don't have –

22      MR. PRICE: Oh. I forgot, I'll –

23      HEARING OFFICER: Ms. –

1    MR. PRICE:  She's on mute.  Ms. Rabb, you may continue.

2    HEARING OFFICER:  I'll allow the testimony.  Go ahead.

3    MS. RABB:  Okay.  I believe where I was, I left off is the last time he was re-

4    evaluated.  It was determined that his disability had changed and he would continue to

5    receive special education services as a learning disabled student.  D▆▆▆ was here on out

6    of boundary permission for three years.  As a fifth grader he is being transitioned back to

7    his neighborhood school, which is Kelly Miller Middle School.

8    HEARING OFFICER:  As a sixth grade or fifth?

9    MS. RABB:  As a sixth grade.

10    HEARING OFFICER:  Sixth grade.  Okay.

11    MR. PRICE:  Ms. Rabb, if you will share with us –

12    MS. RABB:  Uh-hum.

13    MR. PRICE:  - to the best of your recollection, the processes that the team and the

14    team memberships, as to the best of your recollection, who were members of the team

15    during any change of classifications and what discussions were had.

16    MS. RABB:  Well, there was – we've always had a full team because there was

17    always a general ed teacher, the special education teacher, myself as the local agency

18    representative.  There was always a social worker.  I believe at some point he was getting

19    some speech services, so our speech pathologist was there.  Our whole team was there for

20    all of our MDT meetings including Ms. Sikes as well as her advocates.  She's had several

21    advocates so, I mean, as well.  Each year we had a full team meeting with Ms. Sikes'

22    advocates.

48

1    MR. PRICE:  Now, you indicated that the disability classification was originally

2    education -- emotionally -- disturbed.  Excuse me.  Would you share with us the team's

3    basis?  You were a member of the team that developed that classification, correct?

4    MS. RABB:  Right.

5    MR. PRICE:  And would you share with us the rationale the team considered in

6    making that determination?

7    MS. RABB:  Well, really, because of D██████ situation, well, what was going on

8    at home, as far as him transitioning from, you know, his biological parents to his adoptive

9    parents, and he was having, I don't know you know exactly the ramifications he went

10    through.  I'm not sure if it was abuse, or what the exact reason why he was removed from

11    the home.  So his emotionality was not of an aggressive nature.  It was more so fearful,

12    socialization withdrawal, of that matter.  Could you kind of repeat the question?

13    MR. PRICE:  Well, I was asking you, what were the considerations and the lead if

14    you will, for determining the emotional disturbance classification.

15    MS. RABB:  Because of what he was – it was determined that he was emotionally

16    disturbed because of all of the things that were going on outside and how it was

17    impacting him in school.  For example, if he was asked a question.  He may shut down or

18    begin to cry because he was called out.  It was very difficult for him to socialize and

19    come out of – come out of his shell and participate in class.   He would shut down and

20    kind of shy away and because of that and because of the two different evaluations he was

21    going to outside counseling so the input of the psychologist that he was seeing outside

22    was the major factor in determining his emotionality.  Because before, well, we received

49

1    D███ at the beginning of the school year so we had not been given the opportunity to

2    work with him before we had to be a part of this meeting.

3        MR. PRICE:  Okay.  Now, as a result of the student being emotionally disturbed,

4    would share with us the nature of services that were – the team provided or recommended

5    any IEP for?

6        MS. RABB:  He was given –

7        MR. TYRKA:  What, which IEP are we talking about?

8        MS. RABB:  - psychological counseling.  I believe –

9        HEARING OFFICER:  Hold up.

10       MS. RABB:  - it was for an hour.

11       HEARING OFFICER:  Ms. Rabb, hold – just ---

12       MR. PRICE:  Hold on a second.

13       HEARING OFFICER:  Hold just a moment.

14       MR. TYRKA:  Are we talking about he '03 IEP?

15       MR. PRICE:  Well she doesn't have an IEP before her.  And I'm not asking her to

16   read from an IEP.  I'm asking her to the best of her recollections to share with us, while

17   the student was ED, what services were prescribed for the student.  I didn't ask her to

18   quantify the actual (inaudible).

19       HEARING OFFICER:  To the best of her recollection.

20       MR. PRICE:  Right, right.

21       MR. TYRKA:  I'm just confused.  The question was "in the IEP."  I just want to

22   know what IEP.  I just want to know what IEP you're talking about.

50

1          MR. PRICE:  Well she indicated she was a member of the IEP team.  So I'm not

2    asking her.  As she indicated she does not have the IEP before her.  So she cannot state

3    with certainty the number or quantity.  I'm asking if –

4          HEARING OFFICER:  Well, what you could in your question, could focus the

5    range of the question to a time period.

6          MR. PRICE:  Ms. Rabb, if you will, I want to focus you with regard to the initial

7    IEP.

8          MS. RABB:  Uh-hum.

9          MR. PRICE:  And at that initial IEP you indicated that you – that the team

10    determined that the student would be a student with an ED classification.

11          MS. RABB:  Correct.

12          MR. PRICE:  At that particular time, would you share with us the services as you

13    recall them, and if you don't recall a specific number, that's fine.

14          MS. BABB:  Right.

15          MR. PRICE:  Share with us –

16          MS. BABB:  He was receiving specialized instructions and –

17          MR. TYRKA:  I'm, I'm sorry.  Ms. – Objection.

18          MS. BABB:  - and psychological counseling.

19          HEARING OFFICER:  Wait a minute.

20          MR. PRICE:  Hang on, Ms. Rabb.

21          MR. TYRKA:  And this will be the last time on this.  I just want to renew the best

22    evidence, but this is –

23          HEARING OFFICER:  Put it on mute, please.

51

1      MR. TYRKA:  This is partly just for time considerations.  She doesn't know

2  when the IEPs were.  We have IEPs in here.  To have the witness go by her recollection

3  of what these IEPs says,  I think we're getting, you know, best evidence in the extreme.

4  But we're also wasting a lot of time.

5      HEARING OFFICER:  Well, generally, I mean we know that he was getting

6  specialized instruction counseling and was there OT in one of them?

7      MR. TYRKA:  There was speech and language in a couple of them.  So –

8      HEARING OFFICER:  No OT in any of them?

9      MR. TYRKA:  Nobody's looking at them.

10      HEARING OFFICER:  Okay.

11      MR. PRICE:  There has been a claim that the student hadn't received services.

12      HEARING OFFICER:  Hadn't received services, right?

13      MR. PRICE:  And as the special education coordinator, she indicated that was her

14  job to make sure that the service provided to them and monitoring would improve the

15  provision services.  Therefore, my next question is going to be – did you have service

16  providers and did they indicate to you any lapse in services?  So there's a basis score for

17  providing the information with regards to her knowledge of the services that are required

18  at this time for the student.

19      HEARING OFFICER:  Okay.  Go ahead and ask her.

20      MR. PRICE:  Ms. Rabb, you can continue.

21      MS. RABB:  Okay.  He was receiving as far as his initial IEP, he's been receiving

22  specialized instruction and psychological counseling.  I'm not sure about the speech and

1    the OT. But I know he did receive those two services consistently for the time that he

2    was here.

3         MR. PRICE: Okay. Now, is your testimony that he received those services

4    consistently? Can you share with us how you are aware that he received those services

5    consistently?

6         MS. RABB: Well, first of all, because of the progress that he made in his

7    emotionality as well as in our Medicaid records there are copies of Medicaid notes that

8    the service providers must include.

9         MR. PRICE: Now. Would you share with us your responsibility in terms of

10   coordinating with those service providers.

11        MS. RABB: The service providers are to implement their IEPs. They give me a

12   schedule and they are weekly to submit medicaid forms to show the time and briefly what

13   their sessions were about.

14        MR. PRICE: Now. Would you share with us the process at Kimball where

15   there's a lapse, or inability to provide service. Who would be the focal point for the

16   special education program at Kimball in terms of being made aware of that.

17        MS. RABB: If there was a lapse in service?

18        MR. PRICE: That's correct.

19        MS. RABB: That would be me.

20        MR. PRICE: And would you share with us your knowledge of any lapse and how

21   you became aware if any lapse would have occurred with regard to services during that

22   period.

53

1       MS. RABB:  The usual, look – I'm not aware of any lapse in service.  Like I said

2   before, the comp-ed that was given to D███ was for prior to him coming to Kimball.

3   But if there is not – if we do not have a social worker on staff, or if the social worker is

4   called out of the building, I am made aware of both of those situations.  Consistently our

5   social worker – I mean their out sick or other situations that we can't prevent, but I was

6   made aware of when my service providers are coming into the building.  I monitor their

7   medicaid records to ensure that the students are being serviced, as well as central office.

8   They have a – the service provider has a supervisor that as well monitors and tracks their

9   amount of service for the children.

10      MR. PRICE:  Okay.  Now, are you aware and share with us – well share with us,

11   if you will, your knowledge or awareness that the IEP was changed for D███.

12      MS. RABB:  Was changed?  I'm sorry?

13      MR. PRICE:  Would you share with us, if you are aware that the IEP was changed

14   for D███

15      MS. RABB:  The IEPs were changed annually for D███  We annually met with

16   the parent to update and revise the IEPs.

17      MR. PRICE:  Now would you share with us if you will – and I'm not asking

18   about classification – but I'm asking about any – are you aware of any changes outside of

19   classification over the period for D███ IEPs?  There was some change in the OT and

20   speech but like I said I don't recall exactly.

21      MR. PRICE:  Okay.  Now, would you be aware if there were any change in terms

22   of the quantity of services with regard to specialized instruction?

23      MS. RABB:  Yes.

1          MR. PRICE:  Okay.

2          MS. RABB:  Now he did, now that I – he did, when his disability was changed

3     from ED to LD, there was a decrease in his specialized instruction.

4          MR. PRICE:  And would you share with us the process by which that change in

5     classification as well as change in the amount of services.  How did that come about?

6          MS. RABB:  We did a full re-evaluation.  He was given a psycho-ed.  He was

7     given a speech and I'm not sure what other assessments.  But those were reviewed by the

8     MDT team and based on the portfolio and the documentation of his teacher, all of that

9     was discussed as a team and  that's how his change of determination was made.

10          MR. PRICE:  And during the course of these MDT meetings, would you share

11     with us the level of input from the parent or the parent's advocate?

12          MS. RABB:  Ms. Sikes participated in all meetings, except for I believe our last

13     meeting she always had an advocate present with her.  She came and volunteered.  The

14     parent was very active.  She came to the conferences.  We correlated with her as far as

15     services and D███████ needs.  We worked together back and forth with the parent at home.

16          MR. PRICE:  Okay.  Now.

17          MS. RABB:  With the parent in school.  Excuse me.

18          MR. PRICE:  Would you share with us what was the basis for the team decision

19     to change the classification?

20          MS. RABB:  As I said, the emotional disturbed criteria, the criteria's to be

21     diagnosis right?  For emotional disturbance, is for them to display inappropriate periods

22     for a marked period of time.  In the time that D████ was here, he never displayed

23     aggression.  He was never suspended.  He was never – never a problem child.  He was

1    never getting in trouble.  His behavior was not impacting his class work.  He was, in fact,

2    making improvements.  So, therefore, as per his I believe it was a tri-annual re-eval.

3    That's why he was re-evaluated and his disability was changed.

4         MR. PRICE:  Now, in your awareness of D███ services and IEPs and

5    classification, would you share with us the – was there ever a warrant – or share with us

6    the warrant, if you will, for a full-time special education program based upon discussions

7    the team may have had?

8         MR. TYRKA:  Wait a minute.  I –

9         MS. RABB:  No.  There was never a discussion

10        MR. TYRKA:  Wait a minute.

11        MR. PRICE:  Hold on.

12        HEARING OFFICER:  Just a moment, just a moment.

13        MS. RABB:  - out of general ed.

14        HEARING OFFICER:  Just a moment.  Put her on mute, please.  Go ahead.

15        MR. TYRKA:  I just didn't understand the question.  The warrant as discussed –

16        MR. PRICE:  I am asking her whether or not the teams ever made a decision to

17    provide the student with a full-time placement.  Like I said, I can re-direct the question.

18        MR. TYRKA:  Okay.  That's fine.

19        HEARING OFFICER:  Re-phrase the question.

20        MR. TYRKA:  I mean, I have my usual objections, but nothing in particular.

21        MR. PRICE:  Ms. Rabb, I'm going to re-phrase the question.  My question to you

22    is did there ever come a time in any of the IEP meetings that detain, determine that a full-

23    time placement was warranted for D████

1        MS. RABB: I believe in his initial meeting, there was some discussion about a

2   full-time therapeutic placement. But, the parent had requested special permission for him

3   to attend here. And because he was making progress, it was never – the school was able

4   to implement his IEP. Let me just say that.

5        MR. PRICE: Now, if -

6        MS. RABB: I believe in his clinical, his initial clinical evaluations between the

7   psychologist – the outside psychologist, there were concerns about him being in an out of

8   general ed classroom. The parent was aware of the program that we have here. And she

9   requested special permission for him to stay here at Kimball.

10       MR. PRICE: Now if you will share with us your knowledge of Kimball's' ability

11   and the services that Kimball offers in terms of implementing and executing the IEP. The

12   IEPs, if you will, for D████

13       MS. RABB: To my knowledge, all IEPs were implemented by the special

14   education teacher as well as the service providers that were appropriate for his IEP. To

15   my knowledge there were no lapse in services. Each year, like I said, we met annually

16   with the parents. D████ made a lot of progress here.

17       MR. PRICE: Now let me ask you. Over the course that you've been for me with

18   D████, and services, has Kimball always maintained a certified special education teacher

19   for his specialized instruction?

20       MS. RABB: For D████?

21       MR. PRICE: Yes.

22       MS. RABB: Yes.

1        MR. PRICE:  And also during that same period has Kimball always been assigned

2    a social worker?

3        MS. RABB:  Yes.

4        MR. PRICE:  A psychologist?

5        MS. RABB:  Yes.

6        MR. PRICE:  And when D█████ was receiving speech language, a speech language

7    provider?

8        MS. RABB:  Yes.  An OT therapist, as well.

9        MR. PRICE:  Now would you share with us the teams of rationale and basis for

10    issuing the notice of placement to Kelly Miller?

11        MS. RABB:  That is D█████ neighborhood school.  As I stated before, he was

12    here on special permission out of boundary.  So now, as he transitions into the sixth

13    grade, he is being transitioned back to his neighborhood school.  Ms. Sikes was aware she

14    was made aware several times that she was able to, for D█████ to go to any D.C. public

15    school but she would have to do the same process in going to that school and retaining

16    out of boundary permission as she did with us here at Kimball.

17        MR. PRICE:  And were you a member of the team that issued the placement to

18    Kelly Miller?  And were – let me ask you.  Did you chair that meeting?

19        MS. RABB:  Yes, I did.

20        MR. PRICE:  And what was your knowledge and did you share with the team in

21    terms of the program capability at Kelly Miller?

22        MS. RABB:  We did the – we did discuss the placement of Kelly Miller.  I did

23    discuss, I made Ms. Sikes aware of the special ed coordinator over there as well as gave

1    her some options to some alternative schools that she may want to place D███ at.  She

2    was also being made aware that –

3              MR. TYRKA:  I'm sorry, I'm sorry, --

4              MS. RABB:  Because D███ was being –

5              HEARING OFFICER:  Wait a minute.  Just a moment.

6              MR. PRICE:  Hold up, hold up.

7              MS. RABB:  transferred to a new school he would no longer receive

8    transportation.

9              MR. PRICE:  Hold on one second, Ms. Rabb.

10             HEARING OFFICER:  Just a moment, Ms. Rabb.  Mr. Tyrka, go ahead.

11             MR. TYRKA:  Sorry.  I think my standing on it cover this, but I just want to make

12   sure.

13             HEARING OFFICER:  Yes.

14             MR. TYRKA:  But I'm also objecting to discussion of what happened at these

15   meetings.  As the notes of these meetings were not produced pursuant to our document

16   production requests.

17             HEARING OFFICER:  Uh-hum.

18             MR. TYRKA:  What happened at these meetings has – the notes of these

19   meetings were not produced pursuant to our document production request.

20             HEARING OFFICER:  Uh-hum.  Now this is the last IEP meeting you're talking

21   about.

22             MR. TYRKA:  Therefore, I'm handicapped in my ability to impeach anything she

23   says.

59

1          HEARING OFFICER:  So noted.  Go ahead.

2          MR. PRICE:  You can continue, Ms. Rabb.

3          MS. RABB:  We – I mean I have worked with Ms. Sikes for over three years,

4    now.  We discussed his placement.  We've discussed the transition.

5          MR. PRICE:  Now I want to just take you back to the last IEP that you all wrote.

6    And if you don't remember, that's fine.  Did there come a time that the parent agree and

7    sign the IEP in agreement?

8          MS. RABB:  Yes.

9          MR. PRICE:  No further questions.

10          HEARING OFFICER:  Okay.  Just a moment, Ms. Rabb.  Okay, do you have

11    some cross for her?

12          MR. TYRKA:  Yes, please.  Ms. Rabb, can you hear me okay?

13          MS. RABB:  Yes.

14          MR. TYRKA:  Hi.  This is Doug Tyrka and I'm representing Ms. Sikes in this

15    hearing.  You've never been D████ teacher, have you?

16          MS. RABB:  No.

17          MR. TYRKA:  And you haven't been his counseling provider either?

18          MS. RABB:  No.

19          MR. TYRKA:  You haven't provided his speech and language?

20          MS. RABB:  No.

21          MR. TYRKA:  Regarding the fact that Kimball is not, or was not, D████ home

22    school, you indicated that Ms. Sikes made a special request to go to Kimball, correct?

23          MS. RABB:  Correct.

1        MR. TYRKA:  And I mean I'm not sure what the formal name is, but basically an

2   out of boundary application?

3        MS. RABB:  It's an out of boundary enrollment transfer request.

4        MR. TYRKA:  And that was, she did that when she initially brought him to

5   Kimball, correct?

6        MS. RABB:  And it was renewed every year.  Yes.

7        MR. TYRKA:  Well, I want to ask you about that in a second.  So she did that

8   when she initially brought him, correct?

9        MS. RABB:  Correct.

10       MR. TYRKA:  And that was in, he was in second grade, was he not?

11       MS. RABB:  Second or third.  I don't remember exactly.

12       MR. TYRKA:  All right.  Before this evaluation and MDT process, correct?

13       MS. RABB:  I'm sorry.  I didn't hear you.

14       MR. TYRKA:  It was before the evaluation and IEP process, correct?

15       MS. RABB:  Okay.

16       MR. TYRKA:  Starting with the – once you did the first IEP, you placed

17       D███ at Kimball, correct?

18       MS. RABB:  Correct, per the parent's request.  Yes.

19       MR. TYRKA:  Per the parent's request?

20       MS. RABB:  Uh-hum.

21       MR. TYRKA:  You're saying that's why you kept on placing him at Kimball?

22       MS. RABB:  Is that why we kept placing him at Kimball?

23       MR. TYRKA:  Yes.

1     MS. RABB:  We were implementing his IEP and he was making progress.  That's

2     why he was being continually placed at Kimball.

3          MR. TYRKA:  But you did place him at Kimball in each one of these IEPs.

4          MS. RABB:  We didn't – it wasn't a placement.  He was given – his placement

5     was so that his IEP could be implemented here at Kimball.  Although this is not his

6     neighborhood school, his IEP could be implemented here.

7          MR. TYRKA:  How many IEP meetings do you think you've participated in over

8     the years?

9          MS. RABB:  With Ms. Sikes –

10         MR. TYRKA:  No.  No, no.  Total.

11         MS. RABB:  Or in total?

12         MR. TYRKA:  Total.

13         MS. RABB:  Hello?

14         MR. TYRKA:  Yes.  In total.

15         MS. RABB:  In total?  I have been with DCPS for approximately eight years.  We

16     – my first three years I taught, I had approximately 20-25 students for those three years

17     so that's about 75 IEPs.  And when I switched over to coordinator for the last five years I

18     am responsible for my total case load which is usually about 60 students.

19         MR. TYRKA:  To several hundred?

20         MS. RABB:  So that's about 60 IEPs per year.

21         MR. TYRKA:  So several hundred, total?

22         MS. RABB:  Excuse me?

23         MR. TYRKA:  Several hundred total, you'd say?

1          MS. RABB: Yes.

2          MR. TYRKA: Okay. And, at times, you have – the decision of the team has been

3    to place the child in a different school other than Kimball, correct?

4          MS. RABB: Correct.

5          MR. TYRKA: Okay. So –

6          MS. RABB: And that's if his needs warranted another placement, yes, we would

7    seek other placement for them.

8          MR. TYRKA: Okay. And in the case of D████, you placed him at Kimball,

9    correct? And I'm only asking you again because you started talking about a different

10   kind of placement. I just want to make sure we're talking about the same thing by

11   placement. The MDT assigned his school as Kimball. Correct?

12         MS. RABB: Correct.

13         MR. TYRKA: Okay. I do not have any further questions.

14         HEARING OFFICER: Anything else, Mr. Price?

15         MR. PRICE: Yes. To be clear, Ms. Rabb. Kimball, would you explain for us –

16   share with us Kimball's ability to handle the LD and the ED disabilities.

17         MS. RABB: We have three non-categorical --

18         MR. TYRKA: Objection. This is way outside of the scope of like --

19         HEARING OFFICER: Hold on. Hold on. Yeah. You're going to be on – this is

20   going to be your first – I said a re-direct. Now, a new direct.

21         MR. PRICE: Well, the question became, did we actually place him after the

22   mother initially put him there. So at the point where we place him, then it becomes what

23   did we place the student in? And that's where I'm going. Because he, opposing counsel

63

1    went to specifically did you assign, did you place?  So now the question becomes since

2    they placed him – what specific placement was he put in?

3          MR. TYRKA:  How does that relate to what services they provide.  I mean, the

4    question is, first of all, it's asked and answered.  I mean, she said, yes, we placed him

5    here.

6          MR. PRICE:  And so, the question becomes, specific placement.  What type of

7    placement?  The level of services.  It goes clearly to what services were provided.

8          HEARING OFFICER:  I'm not clear on what difference the question really

9    makes, but go ahead and ask the question.  What is it?

10         MR. PRICE:  Ms. Rabb, if you would just share with us briefly Kimball's

11   program.

12         MS. RABB:  Oh, we have – is that a non-categorical --

13         MR. TYRKA:  I'm objecting to that.

14         HEARING OFFICER:  Ms. Rabb, stop.  Yeah, that is not –

15         MS. RABB:  Hello?

16         MR. PRICE:  Let me – I will rephrase the question.

17         HEARING OFFICER:  Ask the question now (inaudible).

18         MR. PRICE:  The question I am going to ask is, the program that D▆▆▆ was

19   placed in, please describe that program.

20         HEARING OFFICER:  Okay.

21         MR. PRICE:  Ms. Rabb, my question to you is very focused.  With regards to the

22   program that D▆▆▆ was placed in for his IEPs, would you share with us the program?

64

1      MS. RABB:  D███ was placed in a non-categorical class, either intermediate or

2    primary, depending upon his grade level.  There was no more than 15 students in each

3    class with a part-time aid.

4      MR. PRICE:  And that was for his specialized instruction?

5      MS. RABB:  Excuse me?

6      MR. PRICE:  That was for his specialized instruction?

7      MS. RABB:  Yes.

8      MR. PRICE:  Okay, what about the other time.

9      MS. RABB:   The other time he was in general ed with the home room teacher.

10      HEARING OFFICER:  Anything else?

11      MR. PRICE:  Nothing further.

12      HEARING OFFICER:  Okay, Ms. Rabb.  Did you receive a request in July for

13    Mr. Tyrka for specific documents related to D███?

14      MS. RABB:  Yes, but those records were transferred as I indicated to Kelly

15    Miller.

16      HEARING OFFICER:  How did you so indicate?

17      MS. RABB:  I don't know if I indicated it to him or  to central office.  I believe it

18    was indicated to central office that those records had been transferred to Kelly Miller.

19      HEARING OFFICER:  Okay.  All right  Any other questions for her?

20      MR. PRICE:  No.

21      HEARING OFFICER:  That's it.  Thank you.

22      MS. RABB:  His general – his special education teacher –

23      HEARING OFFICER:  Ms. –

1          MS. RABB:  is in the building if she is needed.

2          HEARING OFFICER:  No.  Thank you, though.

3          MS. RABB:  Okay.

4          HEARING OFFICER:  Thank you for your testimony.

5          MR. PRICE:  Thank you.

6          HEARING OFFICER:  Bye-bye.

7          MS. RABB:  Bye-bye.

8          HEARING OFFICER:  We're at 3 o'clock.  Did you say you both had the 3

9    o'clock together?

10          MR. TYRKA:  Yes, but we should probably pop out and find the hearing officer.

11    I'm not sure who it is.

12          HEARING OFFICER:  I think it may be Mother Truesdale.

13          MR. TYRKA:  Oh, is she out hunting?

14                              [ON THE RECORD]

15          HEARING OFFICER:  Okay, so we're back on the record.  You were going to

16    call the –

17          MR. TYRKA:  Ms. Sikes.

18          HEARING OFFICER:  -- the parent?

19          MR. TYRKA:  Yes.

20          HEARING OFFICER:  Ms. Sikes, could you state your name for us, please?

21          MS. SIKES:  Evelyn Blondell (phonetic) Sikes.

1          HEARING OFFICER:  And raise your right hand, please.  Do you swear or

2   affirm the statements you make today will be the truth, the whole truth and nothing but

3   the truth?

4          MS. SIKES:  I do.

5          HEARING OFFICER:  Okay.  Great.  Go head, Mr. Tyrka.

6          MR. TYRKA:  Ms. Sikes, you are D██ B██████ mother?

7          MS. SIKES: Yes.

8          MR. TYRKA:  During his time at Kimball, has he ever been suspended?

9          MS. SIKES:  D████ has received five suspension letters.  He has been suspended

10   and I went up to the school to talk to Ms. Miller to ask her was that the best thing for him

11   to be, and she made a consolidation he could come back to school that Monday.  He was

12   out for about three days.  And he has three other suspension letters at home.  I have

13   copies.

14          HEARING OFFICER:  And when was that?

15          MS. SIKES:  I have copies of them.

16          MR. TYRKA:  When was the last one?  As best as you can remember?

17          HEARING OFFICER:  I mean, just the school years, because right now I'm all

18   over the place, you know.

19          MS. SIKES:  Oh.

20          MR. TYRKA:  Oh, yeah.  Thanks.  School year.  You can't remember the most

21   recent one.  How's this:  was there any from the last school?

22          MS. SIKES:  No.

23          MR. TYRKA:  What about the prior schools?

1          MS. SIKES:  Yes.

2          MR. TRYKA:  Do you think most of them were in the prior school year, or were

3    they spread out?

4          MS. SIKES:  Most of them were in the same year, prior school year, yes.

5          MR. TRYKA:  The two school years, yes.  Fourth grade.

6          MS. SIKES:  Yes.

7          MR. TRYKA:  Have you been by to observe D█████ classes?  His special ed

8    classes?

9          MS. SIKES:  For his upcoming school?

10         MR. TYRKA:  At Kimball.

11         MS. SIKES:  I went to Kimball Elementary School every two days – at least two

12    days a week.  Uh-hum.

13         MR. TYRKA:  And so did you see his special education class at that time?

14         MS. SIKES:  Yes.

15         MR. TYRKA:  Was there any aid in that class?

16         MS. SIKES:  No.

17         MR. TYRKA:  Has D████ always had the same counselor during his time at

18    Kimball?

19         MS. SIKES:  No, he has not.

20         MR. TYRKA:  Why not?

21         MS. SIKES:  One was dismissed because we went to the school to pull some

22    records and it was found that she had not provided the services that she needed.  I believe

23    I have to – and she was dismissed.

68

1  MR. PRICE: DCPS objects. Speculation.

2  HEARING OFFICER: What's you're objection?

3  MR. PRICE: It's speculation. The witness is not testifying for any concrete

4 (inaudible). She believes –

5  MS. SIKES: No. I have the records.

6  HEARING OFFICER: Overruled. I'll allow her testimony. Go ahead.

7  MS. SIKES: So, for what reason do you believe that she was fired because of not

8 giving counseling to D█████ What made you believe that?

9  MR. PRICE: DCPS objects.

10  HEARING OFFICER: I'll note the objection and allow the question. Go ahead.

11  MS. SIKES: For the whole year she had not given him his services. I have

12 copies. She – it was the things she was doing with him. Playing ball. Playing –

13  MR. TYRKA: I'm not sure you answered my question.

14  MS. SIKES: Okay.

15  MR. TYRKA: Did you record that fact to somebody at Kimball?

16  MS. SIKES: Yes.

17  MR. TYRKA: Okay. And what was their response – who was this person?

18  MS. SIKES: We reported it to DCPS. Ms. Bullock and I reported this to DCPS.

19 That's why she's no longer working. And that's --

20  MR. TYRKA: Hold on. Ms. Bullock is somebody at the school?

21  MS. SIKES: No. She's an advocate.

22  MR. TYRKA: Okay. And you reported this to somebody at DCPS, you mean,

23 outside of Kimball? Just somebody at DCPS?

1       MR. PRICE:  DCPS objects.

2       MS. SIKES:  Ms. Miller is the –

3       MR. TYRKA:  Wait, wait, wait, wait.

4       HEARING OFFICER:  I'll allow it, I'll allow it.  Go ahead.

5       MS. SIKES:  Ms. Miller is the –

6       MR. TYRKA:  When you say somebody at DCPS, you mean somebody at

7    Kimball or do you mean somebody outside of Kimball?

8       MS. SIKES:  Well, we have two here, before the Judge.  We brought it before the

9    Judge here.  And Mr. McBride, she would not allow, Ms. Bullock, when Mr. McBride

10   was there, she would not allow Mr. McBride to submit that information

11      MR. TYRKA:  Okay, but wait.

12      MS. SIKES: Okay.

13      MR. TYRKA:  On the other hand, listen to my question carefully.

14      MS. SIKES: Uh-huh.

15      MR. TRYKA:  You said that you reported the fact that D██████ counselor was not

16   giving him his services to somebody at DCPS.

17      MS. SIKES:  Here, in this building.

18      MR. TYRKA:  It was somebody in this building you reported that to.

19      MS. SIKES:  Yes.  Uh-huh.  In a meeting.

20      MR. TYRKA:  Okay.  And you also said that that was why this woman was fired.

21      MS. SIKES:  Yes.  Uh-huh.

22      MR. TYRKA:  How do you know that was why she was fired?

23      MS. SIKES:  She was dismissed.

1        MR. TYRKA:  Did someone tell you that?

2        MR. PRICE:  DCPS objects.

3        MS. SIKES:  I –

4        HEARING OFFICER:  I'm going to allow it, but it just—Let's try to get

5   somewhere with this, okay?

6        MR. TYRKA:  I think I'm – I'm doing my best.

7        HEARING OFFICER:  Okay.

8        MR. TYRKA:  Did someone tell you that?  That that was why she was fired?

9        MS.SIKES:  We have it in writing.  I have it in writing at home.  Mr. Bullock and

10   Mr. McBride went to Ms. Miller to try to get copies up there so we would have it at

11   home, of what she didn't provide for D███, and for the year.

12        MR. TYRKA:  Okay.  You heard some discussion about the fact that your

13   signature is on the May '06 IEP?  May 2006 IEP.

14        MS. SIKES:  It was the one when the ED was changed to LD?  Would that be

15   '06?

16        MR. TYRKA:  Well, it was the one that was just last May.

17        MS. SIKES:  The last one I was present.  Uh-hm

18        MR. TYRKA:  And you heard something about the fact that your signature is on

19   the IEP?

20        MS. SIKES:  Yes.

21        MR. TYRKA:  Why did you sign the IEP?

22        MS. SIKES:  I was told to sign the IEP because of presence.  I did not understand

23   that I was going along with everything on the IEP because of the statement.  One

1  particular statement.  She didn't give him transportation like he said and I said I don't go

2  along with the MDT meeting, not giving him transportation.  But they told me to sign

3  because – to show that I was present at the meeting.

4       MR. TYRKA:  Okay.  Now at that meeting, were you told that D██ was being

5  placed at Kelly Miller?

6       MS. SIKES:  At that meeting, yes.  I was told he would be placed at  Kelly Miller.

7       MR. TYRKA:  Who told you that?

8       MS. SIKES:  Ms. Rabb.

9       MR. TYRKA:  Did Ms. Rabb tell you anything about Kelly Miller.

10      MS. SIKES:  No she did not.

11      MR. TYRKA:  Did Ms. Rabb discuss Kelly Miller with the other members of the

12  team?

13      MS. SIKES:  No she did not.

14      MR. TYRKA:  Is Kelly Miller D█████ home school.

15      MS. SIKES:  No, Kelly Miller is not D████ home school, neighborhood school.

16      MR. TYRKA:  What is his neighborhood school?

17      MS. SIKES:  Benning Elementary.  Where I got him from in the beginning is his

18  home elementary school.

19      MR. TYRKA:  Does Benning have a sixth grade?

20      MS. SIKES:  Yes, Benning does have sixth grade.

21      MR. TYRKA:   Okay.  No further questions.

22      HEARING OFFICER:  No further questions?

23      MR. TYRKA:  Anything, Mr. Price?

72

1        MR. PRICE:  Yes.  Good afternoon, Mrs. --

2        HEARING OFFICER:  Sikes.

3        MR. PRICE:  Sikes.

4        MS. SIKES:  Good afternoon, Sir.

5        MR. PRICE:  It was your testimony that you've received five suspension letters

6   for D█████?

7        MS. SIKES:  Yes.

8        MR. PRICE:  It's correct that we have no suspension documents here, correct?

9        MS. SIKES:  No, I don't have suspension documents here.

10       MR. TYRKA:  I'll stipulate that they're not in the record.  I mean it's really a

11  question to the witness.

12       HEARING OFFICER:  Okay.

13       MR. PRICE:  You also – there is also in your testimony that you had – you have it

14  in writing.  Why the person was terminated.

15       MS. SIKES:  Yes.

16       MR. PRICE:  And it's also correct that you don't have that document here.

17       MS. SIKES:  I don't have that document, either.

18       MR. TYRKA:  Again, I'll stipulate that it's on the record.  It's not a question the

19  witness can answer.

20       MR. PRICE:  And isn't it correct that it's in your interest to contrast your own

21  testimony against Ms. Rabb?

22       MS. SIKES:  I don't understand what he's saying.

23       MR. TYRKA:  I don't think it's a proper question to the witness.

73

1          HEARING OFFICER: I don't think that's necessary. It's an impeachment

2    question, as far as I'm concerned, Mr. Price. If you have a direct question of her about

3    any facts, or anything of that nature, then ask it.

4          MR. PRICE: No further questions.

5          MR. TYRKA: Let's call Keren Plowden (phonetic) or did you want to take a

6    break?

7          HEARING OFFICER: You can call her, but I'm looking at this.

8          MR. TYRKA: Okay.

9          HEARING OFFICER: And it does cover –

10         MR. TYRKA: Okay. I'm sure we'd all like to –

11         HEARING OFFICER: And it does cover some of these claims.

12         MR. TYRKA: Not completely surprised.

13         HEARING OFFICER: I think what we can do is go ahead and get her testimony,

14    since I think it will be simpler, then, we can figure out where we are.

15         MR. TYRKA: Okay.

16         HEARING OFFICER: Okay? All right.

17         MR. TYRKA: I think it had been a few turns, including, Ms. Howard –

18         HEARING OFFICER: Okay.

19         MR. TYRKA: In a prior incarnation –

20         HEARING OFFICER: Oh, in a prior. Incarnation.

21         MR. TYRKA: We didn't have any files left, so we've had to reconstitute.

22         [SILENCE]

1        MR. TYRKA:  Hi, Karen.  It's Doug Tyrka.  Is – you're still available?  Yes.

2    We've got you on the record right now.  Okay?  Sure.

3        HEARING OFFICER:  Okay.

4        MR. TYRKA:  Sure.  She is going to be one second.

5        [LONG SILENCE]

6        MR. TYRKA:  I'm sorry.  Should we be getting the documents together?

7        HEARING OFFICER:  I'm going to see.  I'm going to go off the record and I'll

8    copy these.

9        MR. TYRKA:  That would be great.

10                      [OFF THE RECORD]

11                      [ON THE RECORD\

12        HEARING OFFICER:  Ms. Plowden?

13        MS. PLOWDEN:  Hi, I'm Mr. Ruff.  How are you?

14        HEARING OFFICER:  Great.  Could you state and spell your name for us,

15    please?

16        MS. PLOWDEN:  Yes.  My first name is spelled K-E-R-E-N. that's Keren, and

17    the last name is Plouden, P like Peter, L-O-W-D-E-N.

18        HEARING OFFICER:  And the school?  Rock Creek?

19        MR. PRICE:  Rock Creek.

20        HEARING OFFICER:  And what's your position at Rock Creek?

21        MS. PLOWDEN:  I'm the Executive Director of Student Services.

22        HEARING OFFICER:  Do you swear and affirm the statements you'll make

23    today will be the truth, the whole truth and nothing but the truth?

1          MS. PLOWDEN:  Yes, I do.

2          HEARING OFFICER:  Great.  Go ahead, Mr. Tyrka.

3          MR. TYRKA:  Ms. Plowden, is it part of your duties at Rock Creek to participate

4    in commission decisions?

5          MS. PLOWDEN:  Yes it is.

6          MR. TYRKA:  And is it part of your duties to be familiar with Rock Creek's

7    programs?

8          MS. PLOWDEN:  Yes, it is.

9          MR. TYRKA:  Are you familiar with D██████ B██████?

10         MS. PLOWDEN:  Yes, I am.

11         MR. TYRKA:  And is Rock Creek prepared to accept him if he is funded?

12         MS. PLOWDEN:  Yes we are.

13         MR. TYRKA:  Can you tell me, I'm not asking for your opinion, but can you tell

14   me what your understanding of D██████ disabilities and needs are?

15         MS. PLOWDEN:  Based on the records that I've reviewed, I –

16         MR. TYRKA:  Uh-hum.  Well, yes.  Let me ask you that, first.  Have you

17   reviewed his evaluation?

18         MS. PLOWDEN:  Yes.  I reviewed his school records, his IEPs and evaluations,

19   and subsequent documents.

20         MR. TYRKA:  And based on those, can you tell me what your understanding is of

21   the disability that has taken place?

22         MS. PLOWDEN:  Okay.  My current understanding, he has an IEP that's dated

23   from May 9, 2006 which identifies him as a student with a learning disability which

1 requires related services and psychological counseling, speech and language and

2 specialized instruction. In addition to that, there are other documents which indicate that

3 he also has been identified as having ADHD, and there are also clinical evaluations that

4 indicate that he may also qualify as student with emotional disability. There are – I did

5 also review an occupational therapy evaluation in which services were recommended,

6 which is not included in his current IEPs, so to my understanding, my question would be

7 that that may be a service he is in need of.

8   MR. TYRKA: Do you understand him to have any speech and language needs?

9   MS. PLOWDEN: Yes. According to his current IEP he is required to receive at

10 least 30 minutes of service per week.

11   MR. TYRKA: Now, based on that understanding, have you determined a class

12 for D▬ if he is placed there?

13   MS. PLOWDEN: He would be considered a sixth grade student. We currently

14 have two sixth grade classes. But there is one that is specific for him. However, they

15 would do ability grouping for reading, but he would be grouped for certain group for

16 reading and and self contained for the remainder of the day.

17   MR. TYRKA: Okay.

18   MS. PLOWDEN: And that classroom is Ms. Johnson's.

19   MS. TYRKA: Ms. Johnson?

20   MS. PLOWDEN: Uh-hum.

21   MR. TYRKA: And what are Ms. Johnson's qualifications?

22   MS. BLOWDEN: Let me get all that information for you. Would you like me to

23 give you the qualifications of both sixth grade teachers, or just Ms. Johnson?

1        MR. TYRKA:  Oh, because it's possible that you would see the other teacher for

2    a reading?

3        MS. PLOWDEN:  Yes.

4        MR. TYRKA:  Yeah, well let's start with Ms. Johnson.

5        MS. PLOWDEN:  Okay, Ms. Johnson holds a provisional license through the

6    District of Columbia in special education.  She is enrolled at George Washington

7    University in a master's program for teaching students with emotional disabilities and is

8    expected to be eligible for her standard certification this fiscal year.

9        MR. TYRKA:  And the other teacher?

10       MS. PLOWDEN:  The other teacher is Mr. William (inaudible).  He holds a

11    license in Maryland.  And he is also in the Master Degree's program at George

12    Washington University,  which will mean he will then be eligible for his standard

13    certification in special education in D.C.

14       MR. TYRKA:  Okay.  And what is the student-teacher ratio in the class?

15       MS. PLOWDEN:  In Ms. Johnson's there are currently four students in the

16    classroom.

17       MR.  TYRKA:  So D████ would be the fifth?

18       MS. PLOWDEN:  There are five students in Mr. Williams' classroom.

19       MR. TYRKA:  And what are the disabilities of the children in Ms. Johnson's

20    class?

21       MS. PLOWDEN:  They're – do you want me to go through each student?

22       MR. TYRKA:  Well, I don't mean to be specific, but do you have?

78

1      MS. PLOWDEN:  Primary students with emotional disabilities, learning

2   disabilities and other health impairments, particularly  ADHD.

3      MR. TYRKA:  And are there any ED students in the class?

4      MS. PLOWDEN: ED Yes.  And it's either for primary or secondary disability

5   classification for (inaudible).

6      MR. TYRKA:  And, are the age of the students comparable to D████?

7      MS. PLOWDEN:  Right.  They are all rising sixth grade students, born in the

8   same year. 1995.

9      MR. TYRKA:  Do you have certified counselors to provide counseling to D████?

10     MS. PLOWDEN:  He's a licensed therapist, social workers to provide counseling

11  services.

12     MR. TYRKA: And, what about OT and Speech and Language do you provide

13  those by certified providers.

14     MS. PLOWDEN: Yes, we have several full-time providers for both Speech and

15  for Occupational Therapy.

16     MR. TYRKA:  And, is Rock Creek capable for holding a MDT meeting within 30

17  days of enrollment if he is placed there?

18     MS. PLOWDEN:  Yes, we are.

19     MR. TYRKA:  Would you anticipate doing so?

20     MS. PLOWDEN:  Absolutely, just need therapy, you know questions about what

21  traditional information is needed and what exactly is disability would be.

1          MR. TYRKA:  Based on you understanding of D█████ and his records and the

2    services available that at Rock Creek, is there any reason you know of that Rock Creek

3    not provide an educational benefit.

4          MS. PLOWDEN:  No.

5          MR. TYRKA:  Alright, no further questions.

6          HEARING OFFICER: Anything Mr. Price?

7          MR. PRICE:  Yes.  Good afternoon Ms. Plowden.

8          MS. PLOWDEN:  Good Afternoon.

9          MR. PRICE:  I have a few questions for you.

10         MS. PLOWDEN:  Sure.

11         MR. PRICE:   You indicated that you reviewed the IEP of 5/06 correct.

12         MR. PLOWDEN:  Yea, I reviewed several but that's the most recent one.

13         MR. PRICE:  Okay.  The IEP of 5/06 specifically makes the student a part-time

14   Special Education student, correct?

15         MS. PLOWDEN:  Yes, correct.

16         MR. PRICE:  And, isn't it also correct that there had been no IEP that makes the

17   student full-time Special Education.

18          MS. PLOWDEN:  Not that I'm aware of.

19         MR. PRICE:  And, the program at Rock Creek is for full-time education students,

20   correct?

21         MS. PLOWDEN:  That's correct.

22         MR. PRICE:  And, isn't it also correct that you have not reviewed any evaluation

23   that warranted a full-time program.

1    MS. PLOWDEN:  There were recommendations in the existing document that

2    talked about a full-time structured setting for the students.

3    MR. PRICE: What document specifically requested or recommended a full-time

4    therapeutic setting.

5    MR. PLOWDEN:  I don't know, that I said therapeutic structured – let me see if I

6    can – there were recommendations from I believe Dr. Prayaga and other providers that

7    there was a clinical on file – let me pull that,

8    MR. PRICE:  I think we're speaking of the same evaluation, I don't want to be

9    laboring that point,

10    MS. PLOWDEN:  Okay, you know there were several on file that just talked

11    about the type of setting that he would need.

12    MR. PRICE:  With regard to the clinical evaluations, they are pretty dated, aren't

13    they.

14    MS. PLOWDEN:  There were two, one is from 2005 and then there was an earlier

15    one from, I believe that's the one from, appears to be a psychiatric from Dr. Prayaga,

16    January 03 and a clinical from January 03.  There are so many records from this child,

17    gone pretty deep, seems like my recollection is wrong – the most recent clinical however,

18    is the one from April of 2005.

19    MR. PRICE:  The April 2005 evaluation most recent?

20    MS. PLOWDEN:  That's the most recent, I did also review one January of 03.

21    MR. PRICE:  I want to direct you to the April of 05, isn't it correct that that

22    makes no –

1      MR. TYRKA:  Objection, that's evidencing, we can't let every witness read every

2  document into the record –

3      MR. PRICE:  She indicated that there were placement directions, so I'm going to

4  ask her to point out to me it there's a document, she indicated there was, where?

5      MS. PLOWDEN:  That is not the document –

6      MR. PRICE:  Which document did you review that recommended a full-time

7         Special education program.

8      MS. PLOWDEN:  I'm going through all my information now, okay it says in the

9  –I'm looking at the document dated 01-15-03 was conducted by Dr. Prayaga and again,

10  this is technicality on words, it said he would benefit from a year round structured

11  therapeutic program under the recommendation from Dr. Prayaga.

12      MR. PRICE:  Is it – now

13      MS. PLOWDEN:  And there were additional documents that supported that

14  recommendation.

15      MR. PRICE: Let me ask you this, year round and full-time are different, correct?

16      MS. PLOWDEN:  Correct.

17      MR. PRICE:  Okay, so there are no specific evaluations that has the term or

18  recommends for a full-time Special Education program, correct?

19      MS. PLOWDEN:  Not in those terms, no.

20      MR. PRICE:  No further questions.

21      HEARING OFFICER:  Any re-direct?

22      MR. TYRKA: Yes please.  Ms. Plowden, the psychiatric you were talking about

23  recommends a special therapeutic program.

1        MS. PLOWDEN:  Yes, it does.

2        MR. TYRKA:  Are you familiar with the term therapeutic school program?

3        MS. PLOWDEN:  Yes, I am.

4        MR. TYRKA:  Can you tell me what that means?

5        MS. PLOWDEN:  It can mean a program that provides intensive thought through

6   related services such as crisis intervention, counseling services, smaller classroom or

7   smaller teacher ratio, a variety of different type services that may not be available in a

8   general setting room or larger setting.

9        MR. TYRKA:   Okay, and does it generally refer to a school -- therapeutic

10   program, does that refer to a school program

11        MR. PRICE: DCPS objects – the therapeutic – was not part of my cross

12   examination.

13        HEARING OFFICER:  Over ruled, I'll let Mr. Tyrka, go ahead.

14        MR. TYRKA:  I'm sorry, did you understand the question?

15        MS. PLOWDEN:  Could you just repeat it for me?

16        MR. TYRKA:  Sure, therapeutic school program, is that generally referred to an

17   entire school?

18        MS. PLOWDEN:  It can, I mean our Rock Creek Academy is a therapeutic school

19   program.

20        MR. TYRKA:  I have no further questions.

21        HEARING OFFICER:  Mr. Price?

22        MR. PRICE:  No.

23        HEARING OFFICER:  Okay, thank you Ms. Plowden.

1       MS. PLOWDEN:  You're welcome , have a good afternoon.

2       HEARING OFFICER:  You too.

3       MS. PLOWDEN:  Okay.

4       HEARING OFFICER: Now, since I assume that you have no other witnesses,

5       MR. PRICE:  None.

6       HEARING OFFICER:  Okay, since we are over  time already, we have another

7   case pending, to follow this, what I'm going to suggest, particularly in line of this HOD is

8   that we do a summation in writing, I wanted the work already prepared to do so on the

9   statute of limitations issue but this agency makes –

10       MR. TYRKA:  I have a suggestion, if counsel is  -- I think it's pretty clear, I mean

11   the bulk of what I have to say was in my objections to --

12       HEARING OFFICER:  Okay, I think you do in light of this HOD

13       MR. TYRKA: Right, I was going to say, I don't if we need to do anything

14   comprehensive about the case overall, I know certainly – maybe we can just add if we

15   want to say anything about the HOD's –

16       HEARING OFFICER:  Okay, well what I do want – need to address, and we've

17   addressed this already, if you want to do something on statutes OK, cause otherwise I've

18   indicated what my opinion is.

19       MR. TYRKA:  Right.

20       HEARING OFFICER:  I think the statue indicates, well you go beyond two years,

21   in most circumstances you would.  With regard compensatory education issue

22   Because in some instances, you're asking that that issue be referred to a team, if I

23   determine that he's due compensatory services.

1        MR. TYRKA: Well not quite, I'm asking for a finding that he was denied faith

2   and referral to a team that determines whether is entitled services.

3        HEARING OFFICER: Yes, but even that, whether that kind of referral team is

4   something that the hearing officer is authorized to do in light of the re-decision.

5        MR. TYRKA: Okay, I do have a suggestion on that  we may be able to deal with,

6   it was my understanding from this hearing officer that this hearing officer believes that is

7   acceptable where there is an agreement.

8        HEARING OFFICER: Where there is an agreement.

9        MR. TYRKA: I'm wondering if counsel would, rather than argue at that issue, if

10  counsel would prefer to agree that the team would discuss a term comp ed, once the

11  hearing officer makes a determination on faith.

12       HEARING OFFICER: I need to think it through, I'm not seeing it at this point, I

13  can't see any agreement.

14       MR. TYRKA: That was something we had talked up before the deadline for your

15       HEARING OFFICER: Yes, exactly, and then lastly, the issues of what is change

16  of fact and the issues that are being adjudicated in light of what is already been

17  adjudicated on the issues.

18       MR. TYRKA: Okay. If I can ask –

19       HEARING OFFICER: Has this matter been continued before?

20       MR. TYRKA: No.

21       HEARING OFFICER: Okay, so I don't know how close we are 45 to 75 days.

22       MR. TYRKA: The files seems – 60 days.

23       HEARING OFFICER:  June – eight (8) eighteen (18), would be 60, right?

1            MR. TYRKA:  More accurately, sixteen (16).

2            HEARING OFFICER:  Sixteen, Oh.

3            MR. TYRKA:   We're at 8/23, which would make deadline for this 8/30, but I

4    don't know how much the hearing officer would –

5            HEARING OFFICER:  I would waive anything – well the HOD would – I would

6    say no more than ten (10) days after I got what your submission was, so you'll have an

7    HOD it's just that you might be beyond the seventy-five (75) days, so I'm asking you.

8    given in light of you giving the submission which you waived through—

9            MR. TYRKA:  Yes, I repose even for the submission and then as applicable to be

10   as possible.

11           MR. PRICE:  That is possible.

12           HEARING OFFICER:  Great.   Alright, then we are adjourned.

13   Thank you Ms. Sikes.

14           MR. SIKES:  Thank you.

15           HEARING OFFICER: You're welcome.

16                                [END OF HEARING]

17

18

19

20

21

22